IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:   ARMSTRONG WORLD INDUSTRIES, INC., et al.

---

| | | |
|---|---|---|
| SEA-PAC SALES COMPANY, | ) | |
| | ) | |
| Appellant | ) | Civil Action No. 07-4 |
| | ) | |
| v. | ) | |
| | ) | |
| ARMSTRONG WORLD | ) | Bankruptcy Case No. 00-04471 |
| INDUSTRIES, INC., | ) | Appeal No. 06-77 |
| | ) | |
| Appellee | ) | |

## APPELLANT'S APPENDIX TO OPENING BRIEF

ECKERT SEAMANS CHERIN & MELLOTT LLC
Karen Lee Turner (No. 4332)
Michael G. Busenkell (No. 3933)
300 Delaware Avenue, Suite 1360
Wilmington, Delaware 19801
(302) 425-0430

-and-

KARR TUTTLE CAMPBELL
Michael M. Feinberg
Diana K. Carey
1201 Third Avenue, Suite 2900
Seattle, Washington 98102
(206) 223-1313

-and-

ROHDE & VAN KAMPEN PLLC
Al Van Kampen
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
(206) 386-7353

ATTORNEYS FOR SEA-PAC SALES
COMPANY

Administrative Expense Claim dated November 8, 2005....................................................1

Objection To Claim(s) Of Sea-Pac Sales Company (Claim No. 4854)..............................2

Sea-Pac Sales Company's Motion (I) To Stay Objection By Armstrong World
Industries, Inc. To Sea-Pac's Proof Of Claim No. 4854 Pending Arbitration,
And (II) For Relief From The Automatic Stay Or, In The Alternative,
For Relief From The Discharge Injunction........................................................................3

Objection Of Armstrong World Industries, Inc. To Sea-Pac Sales Company's
Motion (I) To Stay Objection By Armstrong World Industries, Inc. To
Sea-Pac's Proof Of Claim No. 4854 Pending Arbitration, And (II) For Relief
From The Automatic Stay Or, In The Alternative, For Relief From The Automatic
Stay Or, In The Alternative, For Relief From The Discharge Injunction............................4

Answer To Objection Of Armstrong World Industries, Inc. To The Proof Of Claim
Of Sea-Pac Sales Company (Claim No. 4854) ..................................................................5

Memorandum In Support Of Sea-Pac Sales Company's Answer To
AWI's Objection...............................................................................................................6

Reply Memorandum In Support Of Sea-Pac Sales Company's Motion
(I) To Stay Objection By Armstrong World Industries, Inc. To Sea-Pac's
Proof Of Claim No. 4854 Pending Arbitration, And (II) For Relief From
The Automatic Stay Or, In The Alternative, For Relief From The Discharge
Injunction .........................................................................................................................7

Order Denying Sea-Pac Sales Company's Motion (I) To Stay Objection By
Armstrong World Industries, Inc. To Sea-Pac's Proof Of Claim No. 4854 Pending
Arbitration, And (II) For Relief From The Automatic Stay or, in the Alternative, For
Relief From The Discharge Injunction ..............................................................................8

Notice Of Appeal ..............................................................................................................9

Transcript Of Hearing held on October 23, 2006 before the Honorable Judith F.
Fitzgerald ........................................................................................................................10

1

FORM B10 (Official Form 10) (04/04)

| UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE | | PROOF OF CLAIM |
|---|---|---|
| Name of Debtor <br> **Armstrong World Industries, Inc.** | Case Number <br> **00-4471 (JKF)** | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property): **Sea-Pac Sales Company**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars

Name and address where notices should be sent:
c/o Michael M. Feinberg
Karr Tuttle Campbell
1201 Third Avenue, Suite 2900
Seattle, WA 98101
Telephone number: (206) 223-1313

☐ Check box if you have never received any notices from the bankruptcy court in this case.
☒ Check box if the address differs from the address on the envelope sent to you by the court

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here ☐ replaces ☐ amends   if this claim   a previously filed claim, dated: _____

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other **Breach of Contract**

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS#:
Unpaid compensation for services performed
from _____ to _____

**2.** Total debt was incurred: **2000 through Dec 2004**

**3.** If court judgment, date obtained:

**4.** Total Amount of Claim at Time Case Filed: $ **400,000.00** (unsecured) $ **4,500,000.00** (secured) (priority) $ **4,900,000.00 plus interest and** (Total) attorneys' fees
See Attached for Details
Administrative Priority is claimed with respect to the above amounts under §§ 503(b)(1) and 507(a)(1)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle
☐ Other
Value of Collateral: $
Amount of arrearage and other charges at time case filed included in secured claim if any: $

**6.** Unsecured Nonpriority Claim. $ **400,000.00**
☒ Check this box if: (a) there is no collateral or lien securing your claim, or (b) your claim exceeds the value of the property securing it, or if (c) none or only part of your claim is entitled to priority.

**7.** Unsecured Priority Claim.
☒ Check this box if you have an unsecured priority claim
Amount entitled to priority $ **4,500,000.00 plus interest and attorneys' fees**
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7)
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8)
☒ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(**1**)
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

11 / 8 /05
**RECEIVED**
NOV 08 2005
**THE TRUMBULL GROUP**
GW   4854

Date **11/4/05**

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):
Michael M. Feinberg, Attorney for Sea-Pac Sales Company

Penalty for presenting a fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years or both 18 U.S.C. §§ 152 and 3571

RLF1-2913480-1

**ORIGINAL**

In re Armstrong World Industries, Inc,
USBC District of Delaware, No. 00-4471 (JKF)

### Attachment to Proof of Claim of
### Sea-Pac Sales Company

1. Exhibits

    A.    Commercial Flooring Products Distributorship Agreement, effective February 15, 1999.

    B.    Residential Flooring Products and Distributorship Agreement and Sales/Service Center Agreement, effective February 15, 1999.

    C.    Letter Agreement dated August 25, 2004.

2. Explanation of Claim

    A.    Armstrong World Industries ("AWI") breached the parties' Commercial Flooring Products Distributorship Agreement by, including but not limited to, its appointment and provision of product to a second distributor within Sea-Pac Sales Company's ("Sea-Pac") exclusive territory. AWI's breach began in 2003 and such breach continued through the term and the extensions of said agreement and resulted in damages in an amount no less than $2 million.

    B.    AWI breached the parties' Residential Flooring Products Distributorship and Sales/Service Agreement, and was unjustly enriched, by, among other conduct, failing to reimburse Sea-Pac for RDC functions and services. AWI's illegal conduct began in 2000 and continued through the term and the extensions of said agreement and resulted in damages and/or restitution owed in an amount no less than $2.9 million.

    C.    Pursuant to the provisions of the applicable agreements, interest and attorney fees are claimed if AWI contests this claim.

3. Administrative Priority Status

    The entire amount of Sea Pac's claim for the breach of Commercial Flooring Products Distributorship Agreement is attributable to the Debtor's post petition breach of this contract which Sea-Pac was induced to perform pending the Debtor's assumption or rejection of it. $2,500,000 of the $2,900,000 of the RDC functions and services that AWI failed to reimburse Sea Pac for under the Residential Flooring Products and Distributorship Agreement were provided to AWI post-petition. Accordingly, Sea-Pac contends $4,500,000.00 of its claim is entitled to an administrative priority under 11 U.S.C. §§ 503(b)(1) and 507(a)(1).

    The terms of these agreements were extended by post-petition agreements entered into by the parties. The damages Sea-Pac suffered as a result of the post-petition agreements is also included in this claim since they arise out of a common set of facts.

#563326 v1 / 23165-001

# ARMSTRONG WORLD INDUSTRIES, INC.
## COMMERCIAL FLOORING PRODUCTS DISTRIBUTORSHIP AGREEMENT

Armstrong World Industries, Inc. ("Armstrong"), a Pennsylvania corporation, and Sea-Pac Sales Company ("Distributor"), a Washington corporation, hereby enter into this Agreement to take effect February 15, 1999. The parties agree that this Agreement will replace and cancel the existing Sales/Service Center Agreement between the parties dated on or about July 1, 1997. Armstrong and Distributor agree as follows:

1. Subject to the conditions stated herein, Armstrong appoints Distributor to be its exclusive wholesale distributor for all commercial floor covering products made available to distribution by Armstrong's Floor Products Operations ("Commercial Flooring Products") within the geographic area listed in Attachment A hereto ("Distributor Territory"). A list of those Commercial Flooring Products currently available to distribution is attached hereto as Attachment B. This list may be amended from time to time by Armstrong without prior notice and without liability to Distributor or Distributor's customers.

2. Distributor agrees to sell Commercial Flooring Products only to the commercial trade and only where the contractor or the project is located within the Distributor Territory. Will-call sales are permitted only to contractors located within the Territory. Any exceptions must have prior written approval of Armstrong. Armstrong reserves the right to sell Commercial Flooring Products and other products direct to the commercial trade as it may determine from time to time. Certain of those accounts such as Corporate Retail Accounts ("CRA Customers") and Flooring National Accounts will be sold exclusively by Armstrong on a direct basis.

3. Unless terminated as otherwise provided herein, this Agreement will continue for five (5) years until February 15, 2004 at which time it will automatically terminate. Armstrong will have the option, however, to terminate this Agreement prior to the end of its term should Distributor fail to meet the annual mill shipment requirements by product category for Commercial Flooring Products as set by Armstrong for each year of the Agreement (1999 included). In the event Distributor does not meet the annual mill shipment requirements by product category at the end of any calendar year, Armstrong will have 60 days to notify Distributor of its decision to terminate the Agreement 90 days thereafter. The Agreement will terminate at the end of that notice period unless SSC cures by obtaining shipment of the remainder of its annual mill shipment requirements within 30 days of the termination notice. Those shipments must be identified by Distributor as part of the previous year's shipment requirements and must be in addition to Distributor's normal shipment levels.

Further, at any time during a calendar year after Distributor has failed to meet the annual mill shipment requirements by product category, Armstrong, without prior notice and regardless of cure by Distributor, may appoint additional distributors of Commercial Flooring Products in the Distributor Territory, or otherwise change the Distributor Territory, as Armstrong deems necessary. Notwithstanding any other provision herein, Distributor may cancel this Agreement without cause by giving Armstrong at least 180 days written notice.

4.      The annual mill shipment requirements by product category for Commercial Flooring Products for each calendar year will be set by Armstrong based on discussions with Distributor and Armstrong's reasonable calculation of achievable market penetration within Distributor Territory (excluding sales made directly by Armstrong). Those annual mill shipment requirements by product category for 1999 are attached hereto as Attachment C and will be updated in writing no later than December 15 each year.

5.      Armstrong will sell Commercial Flooring Products to Distributor at the prices and terms and conditions of sale as set by Armstrong and in effect at the time of purchase by Distributor.

6.      Armstrong will furnish Distributor with marketing and promotional materials for use in selling Commercial Flooring Products. Armstrong will offer service, training and staff assistance to Distributor for such reasonable charges as may be specified by Armstrong.

7.      Armstrong may designate certain Commercial Flooring Products as limited distribution products. Distributor shall promote, sell and service those products only to those customers specified by Armstrong.

8.      Distributor shall maintain active customer files reflecting all information pertinent to each sale and shall transmit to Armstrong at least weekly, reports or records of all shipments of Commercial Flooring Products. Reports shall show the order date, date of shipment, the name and address of the purchaser, the destination of the shipment, the pattern numbers and the number of units shipped or such other information as may be required by Armstrong. This information must be accurate and complete and have been verified by the Distributor's internal sales records.

9.      Distributor shall maintain sufficient trained and competent personnel to promote, sell and service Commercial Flooring Products, including sales representatives and sales managers devoted exclusively to the sale of Commercial Flooring Products, with exceptions only as agreed to by Armstrong. Distributor shall employ market specialists and market specialized sales management as required by Armstrong and shall designate one manager as having overall responsibility for the total Armstrong commercial business.

10.      Each February 1, Distributor shall submit to Armstrong a written business plan that includes marketing, sales coverage, financial, personnel/succession, systems, logistics and warehousing facilities plans for all years remaining in the term of this Agreement.

11.      As stated in paragraph 2 above, Armstrong may also sell Commercial Flooring Products or other products directly to other customers in the commercial trade. Distributor will provide to those customers delivery and other services as required by Armstrong and will be paid a service fee as established by Armstrong from time to time.

12.      Armstrong is the owner of the trademark "Armstrong" and other trademarks, service marks and trade names and the goodwill attached to them (collectively, the

2

"Trademarks"). Distributor will not contest the ownership or validity of the Trademarks. Any goodwill established in the Trademarks by Distributor's use of them will accrue to Armstrong. Distributor will not use the Trademarks except in accordance with the terms of this Agreement and with Armstrong's approval.

13.     Upon expiration or termination of this Agreement, Distributor shall immediately discontinue use of the Armstrong name and Trademarks and shall remove the Armstrong name and Trademarks from its locations and its trucks.

14.     Distributor shall treat Armstrong's confidential information as though it were Distributor's own, and shall not disclose confidential information to any third party, including, but not limited to the news media or industry analysts. Armstrong's confidential information means any non-public knowledge, information and materials respecting Armstrong, including but not limited to financial projections, pricing, sales, promotions, product specification data, or the results of any mediation or private adjudication, as well as information on Armstrong's plans for distribution, marketing and product development.

15.     Distributor is not authorized to act for, incur debt for or make any representations or warranties on behalf of Armstrong. Distributor shall not represent itself to the public as an agent or representative of Armstrong. Distributor shall be solely responsible for any representations or warranties that are not authorized by Armstrong in writing or stated in Armstrong's promotional materials.

16.     Distributor shall pay all taxes of every description assessed by reason of property received from Armstrong, and Distributor shall indemnify Armstrong for such taxes, except Armstrong shall be liable for any applicable sales taxes on its sales to Flooring National Accounts and CRA customers.

17.     Distributor shall maintain adequate working capital at all times and shall conduct its financial affairs so as to meet all credit obligations, including those to Armstrong, as and when due. Distributor shall furnish Armstrong with financial information such as operating statements, balance sheets and inventory and accounts receivable status as required by Armstrong. Distributor will provide Armstrong with its annual audited financial statement or equivalent data satisfactory to Armstrong within 90 days of the end of Distributor's fiscal year.

18.     Distributor and Armstrong shall hold each other harmless and shall indemnify each other against all claims, demands, losses, costs, damages, suits, judgments, penalties, expenses and liabilities of any kind arising out of their respective negligent or intentional acts or omission or their respective breach of any duty to the other under this Agreement.

19.     Distributor shall maintain worker's compensation insurance as required by law, and commercial general liability and automobile insurance policies with limits of not less than $1,000,000 per occurrence with a $2,000,000 general aggregate insuring Distributor against any loss, claim, liability or suit for bodily injury, death, personal injury or property damage arising from or in connection with Distributor's performance under this Agreement, including its ownership, leasehold or operation of its distribution facility and its RDC. The policies shall

3.

name Armstrong as an additional insured. Before the effective date of this Agreement, Distributor shall provide Armstrong with a certificate evidencing this insurance and, upon Armstrong's request, will provide Armstrong with certified copies of its insurance policies evidencing this insurance. The insurance required herein shall not be canceled by Distributor without Armstrong's approval.

20.    In addition to the provisions of paragraph 3 above, in the event of a breach of this Agreement, Armstrong shall give written notice of the breach to Distributor. If the breach is not cured within 30 days of Distributor's receipt of notice, this Agreement, at Armstrong's sole option, may be deemed terminated for cause, either immediately upon the expiration of the 30-day cure period, or at any time thereafter.

21.    Without limitation, the following events shall constitute breaches of this Agreement:

    a.    failure of Distributor to comply promptly with any obligation, duty or undertaking to Armstrong pursuant to this Agreement, including Attachments;

    b.    filing by or against Distributor of a petition in bankruptcy or any other insolvency proceeding or the failure of Distributor to maintain a credit basis satisfactory to Armstrong or to meet its financial obligations to Armstrong as they become due;

    c.    disclosure by Distributor of confidential information;

    d.    misuse of the Trademarks;

    e.    any attempted assignment or transfer of this Agreement, as defined herein, without the written consent of Armstrong; or

    f.    the commission of an act by Distributor's management in violation of federal, state or local law that in the sole discretion of Armstrong adversely affects the goodwill and reputation of Armstrong.

22.    A waiver of any breach of this Agreement shall not be construed as a waiver of other breaches. The acceptance of any order by Armstrong after the termination of this Agreement shall not be construed as a renewal or extension of this Agreement nor as a waiver of its termination.

23.    This Agreement is not assignable or otherwise transferable by Distributor without the written consent of Armstrong. "Assignment" or "transfer" includes any change in ownership or control of Distributor which Armstrong in its sole discretion deems substantial.

24.    Armstrong and Distributor agree to attempt to resolve promptly any dispute arising out of this Agreement by negotiation between executives of Distributor and Armstrong

4

who have authority to settle the dispute.  If any dispute is not resolved by negotiation within 30 days of its arising, then, at the written request of either party within an additional 10 days, the dispute shall be submitted to mediation with a mediator chosen jointly.

25.    In the absence of a request for mediation, or if any dispute is not resolved within 90 days following a request for mediation, then, at the option of either party, such dispute shall be submitted to binding arbitration in Philadelphia, Pennsylvania, under the Commercial Arbitration Rules of the American Arbitration Association.  The arbitration shall be conducted by three attorneys chosen from the panel of the American Arbitration Association.  One arbitrator shall be chosen by each party and the third, who shall be Chairman, shall be chosen by the two party-selected arbitrators.  In the absence of agreement, the third arbitrator shall be appointed by the President of the American Arbitration Association.  The arbitrators shall strictly apply in their decisions, the substantive rules of law as provided below, and not principles of equity.  Costs of the arbitration, including reasonable attorneys' fees and witness expenses, shall be paid by the losing party.  Judgment on any award may be entered and enforced in any court capable of exercising jurisdiction.  The Federal Arbitration Act shall apply to any arbitration under this Agreement.  If arbitration is not initiated within 30 days of its becoming an option, as provided above, either party may resort to litigation pursuant to paragraph 26.

26.    DISTRIBUTOR AND ARMSTRONG AGREE THAT THE INTERPRETATION OF THIS AGREEMENT OR ANY DISPUTE ARISING OUT OF THIS AGREEMENT SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA (CONFLICT OF LAW RULES EXCLUDED).  SUBJECT TO PARAGRAPH 25, DISTRIBUTOR AND ARMSTRONG AGREE THAT THEY WILL SUBMIT THEMSELVES TO THE JURISDICTION OF THE COURTS OF THE COMMONWEALTH OF PENNSYLVANIA, COUNTY OF LANCASTER, FOR THE RESOLUTION OF ANY LAWSUIT AND THAT ANY LAWSUIT SHALL BE INITIATED AND TRIED IN THE COURTS OF THE COMMONWEALTH OF PENNSYLVANIA, COUNTY OF LANCASTER.  IF ANY DISPUTE BETWEEN DISTRIBUTOR AND ARMSTRONG INVOLVES A FEDERAL QUESTION, DISTRIBUTOR AND ARMSTRONG AGREE THAT THEY WILL INITIATE ANY ACTION IN AND BE SUBJECT TO THE JURISDICTION OF THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

27.    Should any provision of this Agreement be held unenforceable, the remaining provisions shall continue in full force and effect.

28.    This Agreement supersedes all previous or now existing arrangements or agreements between Distributor and Armstrong and contains the entire understanding between Distributor and Armstrong relating to its subject matter.  No oral statements, representations or other attempted modification or amendment of any part of this Agreement shall be binding unless in a writing that expressly amends this Agreement that is signed by both Distributor and Armstrong.

5

IN WITNESS WHEREOF, Armstrong and Distributor have caused this Agreement to be executed by their officers who have authority to bind their respective companies. The original of this Agreement is to be signed by Distributor and sent to Armstrong for execution at Lancaster, Pennsylvania.

**ARMSTRONG WORLD INDUSTRIES, INC.**          **DISTRIBUTOR:**

By: _Alan J. Bump_                           By: _Dale Griffiths_
                                             President
Title: _Sr. VP WarFPD_                       _Pra-Pac. Sabs_
                                             Company Name

Date: _8 Feb 1999_                           Date: _15 Feb 1999_

6

# ARMSTRONG WORLD INDUSTRIES, INC.
## RESIDENTIAL FLOORING PRODUCTS DISTRIBUTORSHIP
### AND SALES/SERVICE CENTER AGREEMENT

Armstrong World Industries, Inc. ("Armstrong"), a Pennsylvania corporation, and Sea-Pac Sales Company ("Sales/Service Center" "SSC"), a Washington corporation, hereby enter into this Agreement to take effect February 15, 1999. The parties agree that this Agreement will replace and cancel the existing Sales/Service Center Agreement between the parties dated on or about 1995 1998. Armstrong and SSC further agree as follows:

1.     Subject to the conditions stated herein, Armstrong appoints SSC to be its exclusive wholesale distributor for all residential floor covering products made available to distribution by Armstrong's Floor Products Operations ("Residential Flooring Products") within the geographic area described in Attachment A hereto, except as noted ("Distributor Territory"). A list of those Residential Flooring Products currently available to distribution is attached hereto as Attachment B. This list may be amended from time to time by Armstrong without prior notice and without liability to SSC or SSC's customers.

2.     SSC agrees to sell Residential Flooring Products only to the retail trade and only where the billing address or delivery is within the Distributor Territory. Will call sales are permitted only to accounts located within the Territory. Any exceptions must have the prior written approval of Armstrong. Armstrong reserves the right to sell Residential Flooring Products and other products direct to the retail trade as it may determine from time to time. Certain of those accounts, such as Corporate Retail Accounts ("CRA Customers") and Flooring National Accounts will be sold exclusively by Armstrong on a direct basis.

3.     Unless terminated as otherwise provided herein, this Agreement will continue for five (5) years, until February 15, 2004, at which time it will automatically terminate. Armstrong will have the option, however, to terminate this Agreement prior the end of its term should SSC fail to meet the annual mill shipment requirements by product category for Residential Flooring Products as set by Armstrong for each year of the Agreement (1999 included). In the event SSC does not meet the annual mill shipment requirements by product category at the end of any calendar year, Armstrong will have 60 days to notify SSC of its decision to terminate the Agreement 90 days thereafter. The Agreement will terminate at the end of that notice period unless SSC cures by obtaining shipment of the remainder of its annual mill shipment requirements within 30 days of the termination notice. Those shipments must be identified by SSC as part of the previous year's shipment requirements and must be in addition to SSC's normal shipment levels.

Further, at any time during a calendar year after SSC has failed to meet the annual mill shipment requirements by product category, Armstrong, without prior notice and regardless of cure by SSC, may appoint additional distributors of Residential Flooring Products in the Distributor Territory or otherwise change the Distributor Territory, as Armstrong deems necessary. Notwithstanding any other provision herein, SSC may cancel this Agreement in its entirety, without cause, by giving Armstrong at least 180 days written notice. Notwithstanding

any other provision herein, Armstrong may cancel SSC's appointment as an RDC only, without cause, by giving SSC at least 180 days written notice.

4.      The annual mill shipment requirements by product category for Residential Flooring Products for each calendar year will be set by Armstrong based on discussions with SSC and Armstrong's reasonable calculation of achievable market penetration within Distributor Territory (excluding sales made directly by Armstrong).    Those annual mill shipment requirements by product category for 1999 are attached hereto as Attachment C, and will be updated in writing no later than December 15 each year.

5.      Armstrong will sell Residential Flooring Products to SSC at the prices and terms and conditions of sale as set by Armstrong and in effect at the time of purchase by SSC.

6.      Armstrong will furnish SSC with marketing and promotional materials for use in selling Residential Flooring Products.  Armstrong will offer service, training and staff assistance to SSC for such reasonable charges as may be specified by Armstrong.

7.      Armstrong may designate certain Residential Flooring Products as limited distribution products.  SSC shall promote, sell and service those products only to those customers specified by Armstrong.

8.      SSC shall maintain active customer files reflecting all information pertinent to each sale and shall transmit to Armstrong at least weekly, reports or records of all shipments of Residential Flooring Products.  Reports shall show the order date, date of shipment, the name and address of the purchaser, the destination of the shipment, the pattern numbers and the number of units shipped or such other information as may be required by Armstrong.  This information must be accurate and complete and have been verified by the SSC's internal sales records.

9.      SSC shall maintain sufficient trained and competent personnel to promote, sell and service Residential Flooring Products, including sales representatives and sales managers devoted exclusively to the sale of Residential Flooring Products, with exceptions only as agreed to by Armstrong.  SSC shall employ market specialists and market specialized sales management as required by Armstrong and shall designate one manager as having overall responsibility for the total Armstrong wholesaler and RDC business.

10.    Each February 1, SSC shall submit to Armstrong annually a written business plan that includes marketing, sales coverage, financial, personnel/succession, systems, logistics and warehousing facilities plans for all years remaining in the term of this Agreement.

11.    Armstrong also appoints SSC to be a Regional Distribution Center ("RDC") at its Kent, Washington                                 location, to deliver products to designated CRA Customers located in the Territory listed on Attachment A (the "RDC Territory").  Upon 90 days notice, SSC's RDC Territory may be amended by Armstrong as it deems necessary to provide the most economical service to CRA Customers.

2

12.     Armstrong will sell certain Armstrong products (including but not limited to Residential Flooring Products) ("CRA Products") directly to Armstrong's CRA Customers, and will notify SSC of orders and delivery requirements.  Armstrong may ship CRA products directly to the CRA customer.  In connection with sales to CRA Customers, Armstrong will:

a.     perform selling activities, order processing, invoicing, customer and in-store servicing, merchandising support, collection activities and claims processing involved in its CRA business;

b.     provide detailed operational guidelines to SSC, including but not limited to the most current version of Armstrong's Regional Distribution Center Program Guidelines ("RDC Guidelines");

c.     centralize CRA order management processes at Armstrong;

d.     commit and acknowledge orders to CRA Customers;

e.     assign CRA stores to SSC for delivery of CRA Products, and change assignments and territory boundaries when necessary to achieve best cost supply;

f.     manage the replenishment process when appropriate for designated CRA Products at SSC's RDC;

g.     reimburse SSC for CRA Products and services based on the fee schedule on Attachment D.  Fees will be reviewed by Armstrong at least annually and revised at its discretion; and

h.     provide SSC with Armstrong's best estimates of RDC business forecast in its territory.

13.     SSC will provide the delivery services and other services required by Armstrong for CRA Customers, including but not limited to those services described in the most current version of the RDC Guidelines.

14.     SSC's RDC duties include but are not limited to the duties described on Attachment E, all of which shall be performed pursuant to and in accordance with the most current version of the RDC Guidelines.

15.     SSC may not sell CRA Products to anyone other than Armstrong without prior written approval of Armstrong.

16.     As stated in paragraph 2 above, in addition to sale of CRA Products to CRA Customers, Armstrong may also sell Residential Flooring Products or other products directly to other customers in the retail trade.  SSC will provide to those customers delivery and other

3

services as required by Armstrong and will be paid a service fee as established by Armstrong from time to time.

17.     Armstrong is the owner of the trademark "Armstrong" and other trademarks, service marks and trade names and the goodwill attached to them (collectively, the "Trademarks"). SSC will not contest the ownership or validity of the Trademarks. Any goodwill established in the Trademarks by SSC's use of them will accrue to Armstrong. SSC will not use the Trademarks except in accordance with the terms of this Agreement and with Armstrong's approval.

18.     Upon expiration or termination of this Agreement, SSC shall immediately discontinue use of the Armstrong name and Trademarks and shall remove the Armstrong name and Trademarks from its locations and its trucks.

19.     SSC shall treat Armstrong's confidential information as though it were SSC's own, and shall not disclose confidential information to any third party, including, but not limited to the news media or industry analysts. Armstrong's confidential information means any non-public knowledge, information and materials respecting Armstrong, including but not limited to financial projections, pricing, sales, promotions, product specification data, or the results of any mediation or private adjudication, as well as information on Armstrong's plans for distribution, marketing and product development.

20.     SSC is not authorized to act for, incur debt for or make any representations or warranties on behalf of Armstrong. SSC shall not represent itself to the public as an agent or representative of Armstrong. SSC shall be solely responsible for any representations or warranties that are not authorized by Armstrong in writing or stated in Armstrong's promotional materials.

21.     SSC shall pay all taxes of every description assessed by reason of property received from Armstrong, and SSC shall indemnify Armstrong for such taxes, except Armstrong shall be liable for any applicable sales taxes on its sales to Flooring National Accounts and CRA Customers.

22.     SSC shall maintain adequate working capital at all times and shall conduct its financial affairs so as to meet all credit obligations, including those to Armstrong, as and when due. SSC shall furnish Armstrong with financial information such as operating statements, balance sheets and inventory and accounts receivable status as required by Armstrong. SSC will provide Armstrong with its annual audited financial statement or equivalent data satisfactory to Armstrong within 90 days of the end of SSC's fiscal year.

23.     SSC and Armstrong shall hold each other harmless and shall indemnify one another against all claims, demands, losses, costs, damages, suits, judgments, penalties, expenses and liabilities of any kind arising out of their respective operation of their respective business or their respective breach of any duty to the other under this Agreement.

4

24.    SSC shall maintain worker's compensation insurance as required by law, and commercial general liability and automobile insurance policies with limits of not less than $1,000,000 per occurrence with a $2,000,000 general aggregate insuring SSC against any loss, claim, liability or suit for bodily injury, death, personal injury or property damage arising from or in connection with SSC's performance under this Agreement, including its ownership, leasehold or operation of its distribution facility and its RDC.  The policies shall name Armstrong as an additional insured.  Before the effective date of this Agreement, SSC shall provide Armstrong with a certificate evidencing this insurance and, upon Armstrong's request, will provide Armstrong with certified copies of its insurance policies evidencing this insurance.    The insurance required herein shall not be canceled by SSC without Armstrong's approval.

25.    In addition to the provisions of paragraph 3 above, in the event of a breach of this Agreement, Armstrong shall give written notice of the breach to SSC.  If the breach is not cured within 30 days of SSC's receipt of notice, this Agreement, at Armstrong's sole option, may be deemed terminated for cause, either as to SSC's duties as a wholesaler or as a Regional Distribution Center, or both, either immediately upon the expiration of the 30-day cure period, or at any time thereafter.

26.    Without limitation, the following events shall constitute breaches of this Agreement:

    a.    failure of SSC to comply promptly with any obligation, duty or undertaking to Armstrong pursuant to this Agreement, including Attachments;

    b.    consistent failure of SSC to meet the RDC operational performance measures and goals set forth on Attachment E;

    c.    filing by or against SSC of a petition in bankruptcy or any other insolvency proceeding or the failure of SSC to maintain a credit basis satisfactory to Armstrong or to meet its financial obligations to Armstrong as they become due;

    d.    disclosure by SSC of confidential information;

    e.    misuse of the Trademarks;

    f.    any attempted assignment or transfer of this Agreement, as defined herein, without the written consent of Armstrong; or

    g.    the commission of an act by SSC's management in violation of federal, state or local law that in the sole discretion of Armstrong adversely affects the goodwill and reputation of Armstrong.

27.    A waiver of any breach of this Agreement shall not be construed as a waiver of other breaches.  The acceptance of any order by Armstrong after the termination of this

5

Agreement shall not be construed as a renewal or extension of this Agreement nor as a waiver of its termination.

28.    This Agreement is not assignable or otherwise transferable by SSC without the written consent of Armstrong. "Assignment" or "transfer" includes any change in ownership or control of SSC which Armstrong in its sole discretion deems substantial.

29.    Armstrong and SSC agree to attempt to resolve promptly any dispute arising out of this Agreement by negotiation between executives of SSC and Armstrong who have authority to settle the dispute. If any dispute is not resolved by negotiation within 30 days of its arising, then, at the written request of either party within an additional 10 days, the dispute shall be submitted to mediation with a mediator chosen jointly.

30.    In the absence of a request for mediation, or if any dispute is not resolved within 90 days following a request for mediation, then, at the option of either party, such dispute shall be submitted to binding arbitration in Philadelphia, Pennsylvania, under the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall be conducted by three attorneys chosen from the panel of the American Arbitration Association. One arbitrator shall be chosen by each party and the third, who shall be Chairman, shall be chosen by the two party-selected arbitrators. In the absence of agreement, the third arbitrator shall be appointed by the President of the American Arbitration Association. The arbitrators shall strictly apply in their decisions, the substantive rules of law as provided below, and not principles of equity. Costs of the arbitration, including reasonable attorneys' fees and witness expenses, shall be paid by the losing party. Judgment on any award may be entered and enforced in any court capable of exercising jurisdiction. The Federal Arbitration Act shall apply to any arbitration under this Agreement. If arbitration is not initiated within 30 days of its becoming an option, as provided above, either party may resort to litigation pursuant to paragraph 31.

31.    SSC AND ARMSTRONG AGREE THAT THE INTERPRETATION OF THIS AGREEMENT OR ANY DISPUTE ARISING OUT OF THIS AGREEMENT SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA (CONFLICT OF LAW RULES EXCLUDED). SUBJECT TO PARAGRAPH 30, SSC AND ARMSTRONG AGREE THAT THEY WILL SUBMIT THEMSELVES TO THE JURISDICTION OF THE COURTS OF THE COMMONWEALTH OF PENNSYLVANIA, COUNTY OF LANCASTER, FOR THE RESOLUTION OF ANY LAWSUIT AND THAT ANY LAWSUIT SHALL BE INITIATED AND TRIED IN THE COURTS OF THE COMMONWEALTH OF PENNSYLVANIA, COUNTY OF LANCASTER. IF ANY DISPUTE BETWEEN SSC AND ARMSTRONG INVOLVES A FEDERAL QUESTION, SSC AND ARMSTRONG AGREE THAT THEY WILL INITIATE ANY ACTION IN AND BE SUBJECT TO THE JURISDICTION OF THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

32.    Should any provision of this Agreement be held unenforceable, the remaining provisions shall continue in full force and effect.

6

33.    This Agreement supersedes all previous or now existing arrangements or agreements between SSC and Armstrong and contains the entire understanding between SSC and Armstrong relating to its subject matter. No oral statements, representations or other attempted modification or amendment of any part of this Agreement shall be binding unless in a writing that expressly amends this Agreement that is signed by both SSC and Armstrong.

IN WITNESS WHEREOF, Armstrong and SSC have caused this Agreement to be executed by their officers who have authority to bind their respective companies. The original of this Agreement is to be signed by SSC and sent to Armstrong for execution at Lancaster, Pennsylvania.

ARMSTRONG WORLD INDUSTRIES, INC.          SALES/SERVICE CENTER:

By: _____          By: _____
                                                President

Title: _____          _____
                                                Company Name

Date: ____7/5/99____          Date: ____2-17-99____

7



Your ideas become reality.

ARMSTRONG WORLD INDUSTRIES, INC.
2500 COLUMBIA AVE., P.O. BOX 3001
LANCASTER, PA 17604
TEL 717/396-1 www.armstrong.com

ROBERT A. SILLS, VICE PRESIDENT
DISTRIBUTION STRATEGY
Tel: (717) 396-6358  —  Fax (717) 396-6334
rasills@armstrong.com

August 25, 2004

Jared Williams, Owner/President
Sea-Pac Sales Company
P.O. Box 3846
Seattle, WA 98124-3846

Dear Jared:

As you know, our Residential Flooring Products Distributorship and Sales/Service Center Agreement (including its RDC provisions) dated February 15, 1999 and our Commercial Flooring Products Distributorship Agreement dated February 15, 1999 (collectively, the "Agreements") expired on March 31, 2004.

As a follow up to Frank's letter of June 4 regarding distributor agreements we conducted a small focus group of distributors to initiate a dialogue around some of the objectives we see as important in our future agreements, i.e.:

> Performance based agreements with a disciplined approach to establishing targets and measuring results.

> Alignment of distributor compensation based upon services provided.

> Balanced agreement for both Armstrong and the distributor that takes into consideration the needs of each party.

During the upcoming months we will work to structure an agreement with each distributor individually that makes sense for each of us.

As we begin these discussions with you to implement new agreements, it is our desire to continue our distributorship relationship with you pursuant to a new interim agreement on the same terms and conditions as were in effect at the expiration of the old Agreements. The new interim agreement will commence as of the date of your signature below and will continue through December 31, 2004. If this is acceptable, please acknowledge your acceptance by signing both copies of this letter, returning one to me and keeping the other for your files. This letter supersedes my letter to you of August 6, 2004 offering to enter into an RDC-only

Jared Williams, Owner/President
August 25, 2004
Page 2


agreement.  Armstrong's entry into this new interim agreement with you does not constitute an
assumption by Armstrong in its Chapter 11 case of the expired Agreements.

We appreciate your attention to this matter.

                                        Very truly yours,


                                        Robert A. Sills

RAS/mks

Agreed and accepted:

**SEA-PAC SALES COMPANY**



By: 

Title: 

Date: 8/27/04

2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **ARMSTRONG WORLD INDUSTRIES,** | ) | |
| **INC., et al.,** | ) | |
| | ) | **Case No. 00-04471 (JKF)** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | Objection Deadline: August 21, 2006 at 4:00 p.m. |
| | ) | Hearing Date: September 25, 2006 at 9:45 a.m. |

### NOTICE OF OBJECTION AND HEARING

To:    Parties required to receive notice pursuant to Local Bankruptcy Rule 2002-1(b),
as modified by the Court's Second Revised Order Establishing Case Management
Procedures and Hearing Schedule, dated March 15, 2005

PLEASE TAKE NOTICE that the above-captioned debtors and debtors in possession (the "Debtors") have today filed the attached **Objection of Armstrong World Industries, Inc. to the Proof of Claim of Sea-Pac Sales Company (Claim No. 4854)** (the "Objection") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801 (the "Court").

PLEASE TAKE FURTHER NOTICE that any responses to the Objection must be in writing, filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801, and served upon and received by the undersigned counsel on or before **4:00 p.m. (EDT) on August 21, 2006.**

A HEARING ON THE OBJECTION WILL BE HELD ON SEPTEMBER 25, 2006 AT 9:45 A.M. BEFORE THE HONORABLE JUDITH K. FITZGERALD AT THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, WILMINGTON, DELAWARE 19801.

RLF1-3039557-1

7/20/06
9683

IF NO RESPONSES TO THE OBJECTION ARE TIMELY FILED, SERVED, AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.

Dated:  July 20, 2006
        Wilmington, Delaware

                                        /s/ Jason M. Madron
                                   Mark D. Collins (No. 2981)
                                   Jason M. Madron (No. 4431)
                                   RICHARDS, LAYTON & FINGER, P.A.
                                   One Rodney Square
                                   P.O. Box 551
                                   Wilmington, Delaware 19899
                                   (302) 651-7700


                                           -and-

                                   Stephen Karotkin
                                   Debra A. Dandeneau
                                   WEIL, GOTSHAL & MANGES LLP
                                   767 Fifth Avenue
                                   New York, NY 10153
                                   (212) 310-8000

                                   ATTORNEYS FOR DEBTORS AND
                                   DEBTORS IN POSSESSION

RLF1-3039557-1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------- x
*In re*                                        :    Chapter 11 Case No.
                                               :
ARMSTRONG WORLD INDUSTRIES,   :    00-4471 (JKF)
INC., *et al.*,                                :
                                               :    (Jointly Administered)
                    Debtors.        :
                                               :    **Objection Deadline: 8/21/06 at 4:00 p.m.**
                                               :    **Hearing Date: 9/25/06 at 9:45 a.m.**
                                               :
---------------------------------------------- x

**OBJECTION OF ARMSTRONG WORLD INDUSTRIES, INC. TO**
<u>**THE PROOF OF CLAIM OF SEA-PAC SALES COMPANY (CLAIM NO. 4854)**</u>

TO THE HONORABLE JUDITH K. FITZGERALD,
UNITED STATES BANKRUPTCY COURT JUDGE:

Armstrong World Industries, Inc. ("*AWI*") files this objection (the "*Objection*")

to the claims filed against AWI by Sea-Pac Sales Company ("*Sea-Pac*") on or about November

8, 2005, as reflected in proof of claim number 4854 (the "*Sea-Pac Claim*").[1]  This Objection is

filed pursuant to section 502 of title 11 of the United States Code (the "*Bankruptcy Code*"),

Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), and

Rule 3007-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "*Local Rules*").  In support of the Objection,

AWI respectfully represents as follows:

**I.      JURISDICTION**

1.      This Court has jurisdiction to consider this Objection pursuant to

28 U.S.C. §§ 157 and 1334.  Consideration of this Objection is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(A), (B) and (O).  Venue of this proceeding is proper in this district

---
[1] A copy of the Sea-Pac Claim is attached hereto as Exhibit "A."

NY2:\1660656\03\ZLDC03!.DOC\17168.5009
RLF1-3039538-1

pursuant to 28 U.S.C. §§ 1408 and 1409. Except as otherwise discussed herein, no previous

request for the relief sought herein has been made to this or any other court.

## II.    BACKGROUND

### A.    The Sea-Pac Agreements

2.    On or about February 15, 1999, AWI and Sea-Pac, a wholesale distributor

based in Washington State, entered into (i) a Commercial Flooring Products Distributorship

Agreement (the "*Commercial Agreement*") and (ii) a Residential Flooring Products and

Distributorship Agreement and Sales/Service Center Agreement (the "*Residential Agreement*"

and together with the Commercial Agreement, the "*Sea-Pac Agreements*").[2]  Pursuant to the

Sea-Pac Agreements, AWI appointed Sea-Pac to be a wholesale distributor of AWI's

commercial vinyl floor covering products (the "*Commercial Flooring Products*") and residential

flooring products, respectively, in the northwestern United States (with certain exceptions) (the

"*Territory*").

3.    In connection with the Residential Agreement, AWI also appointed Sea-

Pac to be a Regional Distribution Center ("*RDC*") at its Kent, Washington location to deliver

products to certain designated customers located in the Territory.

4.    The Commercial Agreement granted Sea-Pac conditional exclusivity as

AWI's only wholesale distributor of Commercial Flooring Products within the Territory.  As

explained in paragraph 3 of the Commercial Agreement, Sea-Pac's status as an exclusive

distributor was dependent upon Sea-Pac's meeting minimum purchase requirements for AWI's

Commercial Flooring Products called "annual mill shipment requirements" (as established by

AWI on a calendar-year basis).  Pursuant to Paragraph 3 of the Commercial Agreement, AWI

---

[2] Copies of the Sea-Pac Agreements are included as attachments to the Sea Pac Claim. *See* Exhibit A.

had the right to appoint an additional distributor in Sea-Pac's Territory if, at any time, Sea-Pac

failed to meet the annual mill shipment requirements.  Paragraph 3 of the Commercial

Agreement states as follows:

> Further, at any time during a calendar year after [Sea-Pac] has
> failed to meet the annual mill shipment requirements by product
> category, [AWI], without prior notice and regardless of cure by
> [Sea-Pac], may appoint additional distributors of Commercial
> Flooring Products in the Distributor Territory, or otherwise change
> the Distributor Territory, as [AWI] deems necessary.

AWI also reserved the right to sell Commercial Flooring Products directly to customers in Sea-

Pac's Territory.  (Commercial Agreement, ¶ 2).  Further, in paragraph 28 of the Agreement, the

parties agreed as follows:

> This Agreement supercedes all previous or now existing
> arrangements or agreements between [Sea-Pac] and [AWI] and
> contains the entire understanding between [Sea-Pac] and [AWI]
> relating to its subject matter.  No oral statements, representations
> or other attempted modification or amendment of any part of this
> Agreement shall be binding unless in a writing that expressly
> amends this Agreement that is signed by both [Sea-Pac] and
> [AWI].

5.    In 2001, Armstrong sent to Sea-Pac its 2002 annual mill shipment

requirements by product category for Commercial Flooring Products as provided in paragraph 4

of the Agreement.  Sea-Pac's 2002 minimum annual mill shipment requirement for commercial

vinyl tile was $5,316,630.  Sea-Pac's 2002 minimum annual mill shipment requirement for

commercial sheet floor covering was $3,795,120.  Sea-Pac's 2002 minimum annual mill

shipment requirement for commercial linoleum was $886,550.  Sea-Pac's 2002 minimum annual

mill shipment requirement for commercial wall base was $143,350.  *See* "Sea Pac Sales 2002

Sales (Traditional Channel)" attached hereto as Exhibit "B." In 2002, however, Sea-Pac's

annual mill shipments from AWI were as follows:[3]

| Product Type | Annual Mill Shipments | % of Minimum Requirement |
|---|---|---|
| Commercial Vinyl Tile | $4,724,700 | 89% |
| Commercial Sheet Floor Coverings | $3,132,830 | 83% |
| Commercial Linoleum | $492,520 | 56% |
| Commercial Wall Base | $59,040 | 41% |

Thus, Sea-Pac failed to meet any of its commercial annual mill shipment requirements in 2002,

permitting AWI to appoint in the Territory an additional Commercial Flooring Products

distributor during 2003. (Commercial Agreement, ¶ 3).

6.      Following the end of 2002, Armstrong informed Sea-Pac that it would

appoint an additional distributor of Commercial Flooring Products in Sea-Pac's Territory. *See*

Notice letter from Richard K. Born, dated February 28, 2003, attached hereto as Exhibit "C."

Consistent therewith, during 2003, a second distributor of Armstrong's Commercial Flooring

Products, Pacific Mat, began distributing to customers in the Territory. No action was taken by

Sea-Pac.

7.      Both of the Sea-Pac Agreements expired in accordance with their terms on

February 15, 2004. (Commercial Agreement, ¶ 3; Residential Agreement, ¶ 3). On or about

August 25, 2004, AWI and Sea-Pac entered into an interim letter agreement extending the Sea-

Pac Agreements until December 31, 2004 (the "*Letter Agreement*").[4] The Letter Agreement

---

[3] *See* Exhibit B under heading "NBS $." "NBS" stands for net bill sales, which are the equivalent of annual mill shipments for AWI.

[4] A copy of the Letter Agreement is attached to the Sea-Pac Claim. *See* Exhibit A.

specifically provided that AWI's entry into same did "not constitute an assumption by [AWI] in its chapter 11 case of the expired [Sea-Pac] Agreements."

### B.    The Administrative Bar Date

8.    By Order dated March 21, 2003 (the "*Administrative Expense Bar Date Order*"),[5] the Court set November 24, 2003 (the "*Administrative Expense Bar Date*") as the deadline for filing certain proofs of administrative expense claims against AWI in the chapter 11 case. Pursuant to the Administrative Expense Bar Date Order, any creditor asserting a claim for an administrative expense against AWI (of the type identified in the Administrative Expense Bar Date Order) was required to file a proof of such administrative expense on or before the Administrative Expense Bar Date. The Administrative Expense Bar Date Order identified six categories of claims explicitly subject to the Administrative Expense Bar Date, including the following:

> Any Administrative Expense for breach of an obligation — contractual, statutory or otherwise — by AWI, including any environmental liability (other than any environmental liability with respect to property that is currently owned or operated by AWI.

9.    In accordance with the Administrative Expense Bar Date Order, Trumbull Services, L.L.C. n/k/a The Trumbull Group ("*Trumbull*"), AWI's claims agent appointed pursuant to the Court's order dated December 7, 2000, mailed notices of the Administrative Expense Bar Date and proof of administrative expense forms to certain parties to contracts with AWI, including Sea-Pac.[6] Also in accordance with the Administrative Expense Bar Date Order, notice of the Administrative Expense Bar Date was published in the national editions of *The New*

---

[5] A copy of the Administrative Expense Bar Date Order is attached hereto as Exhibit "D."

[6] Notice of the Administrative Expense Bar Date was mailed to Sea-Pac on June 20, 2003. *See* Trumbull Affidavit of Service attached hereto as Exhibit "E."

*York Times*, *The Wall Street Journal*, and *USA Today*, in each case one day per week for a period of two consecutive weeks. AWI also published notice of the Administrative Expense Bar Date in approximately 21 trade publications and in 14 other regional newspapers.

10.     Sea-Pac did not file a proof of administrative expense for any claims relating to the Sea-Pac Agreements on or before the Administrative Expense Bar Date.

C.     <u>The Executory Contracts Claims Bar Date</u>

11.     By Order dated September 29, 2005 (the "*Executory Contracts Bar Date Order*"), the Court set November 8, 2005 (the "*Executory Contracts Bar Date*") as the deadline by which all parties to "Previously Scheduled Contracts" must file proofs of claim for any and all claims against AWI relating to such Previously Scheduled Contracts. Each of the Sea-Pac Agreements was identified in the Executory Contracts Bar Date Order as a "Previously Scheduled Contract," that is, as a contract that originally was listed by AWI on Schedule G to its Schedules of Assets and Liabilities filed at the outset of its chapter 11 case, but which AWI believes should no longer be considered executory. The Sea-Pac Agreements were identified as Previously Scheduled Contracts because they expired according to their terms during the pendency of AWI's chapter 11 case.

12.     In accordance with the Executory Contracts Bar Date Order, Trumbull mailed notices of the Executory Contracts Bar Date (each an "*Executory Contract Bar Date Notice*") and proof of claim forms to each party to a Previously Scheduled Contract, including Sea-Pac.

D.     <u>The Sea-Pac Claim</u>

13.     In response to the Executory Contract Bar Date Notice, on or about November 8, 2005 (the Executory Contracts Bar Date), Sea-Pac filed the Sea-Pac Claim, claim no. 4854, against AWI in the amount of $4.9 million, plus interest and attorneys' fees. Sea-Pac

contends that no less than $4.5 million of the Sea-Pac Claim is entitled to administrative expense priority.

14.    Part A of the Sea-Pac Claim alleges that AWI breached the Commercial Agreement by "its appointment and provision of product to a second distributor within [Sea-Pac's] exclusive territory," resulting in damages to Sea-Pac in an amount no less than $2 million (the "*Commercial Agreement Breach Claim*"). Sea-Pac asserts that "AWI's breach began in 2003 and such breach continued through the term and the extensions of [the Commercial Agreement]...." Sea-Pac further contends that the entire Commercial Agreement Breach Claim is entitled to administrative expense priority because it is "attributable to [AWI's] post petition breach of [the Commercial Agreement] which Sea-Pac was induced to perform pending [AWI's] assumption or rejection of it." Sea-Pac does not mention its failure to meet the 2002 annual mill shipment requirements for Commercial Flooring Products.

15.    Part B of the Sea-Pac Claim asserts that AWI breached the Residential Agreement and "was unjustly enriched, by, among other conduct, failing to reimburse Sea-Pac for RDC functions and services" (the "*Residential Agreement Breach Claim*"). Sea-Pac further alleges that "AWI's illegal conduct began in 2000 and continued through the term of and extension of [the Residential Agreement] and resulted in damages and/or restitution owed in an amount no less than $2.9 million." Sea-Pac contends that $2.5 million of the $2.9 million in RDC functions and services that AWI allegedly failed to reimburse Sea-Pac for were provided postpetition and, therefore, constitute an administrative expense claim.

16.    Finally, the Sea-Pac Claim asserts that "[p]ursuant to the provisions of the applicable agreements," Sea-Pac is entitled to attorneys' fees and interest if AWI disputes its claims.

### III.     RELIEF REQUESTED

17.     Pursuant to this Objection, and for the reasons set forth below, AWI

requests that the Court disallow the Sea-Pac Claim in its entirety.  Alternatively, to the extent

that any portion of the Sea-Pac Claim is allowed, AWI seeks a determination that the Sea-Pac

Claim is not entitled to any priority treatment, but should be treated as a general, unsecured claim

against AWI's estate.

### A.     The Sea-Pac Claim Should Be Disallowed.

(i)     *Sea-Pac's Residential Agreement Breach Claim Must Be Disallowed Because It Contains Insufficient Supporting Documentation.*

18.     With respect to the Residential Agreement Breach Claim, the Sea-Pac

Claim does not constitute a valid *prima facie* claim because it does not contain any supporting

documentation.  For a proof of claim to be legally sufficient, it must (a) "be in writing;"

(b) "make a demand upon the debtor's estate;" (c) "express the intent to hold the debtor liable for

the debt;" (d) "be properly filed;" and (e) "be based upon facts [that] would allow, as a matter of

equity, . . . the document [to be] accepted as a proof of claim."[7]  A proof of claim that is *prima*

*facie* valid "alleges facts sufficient to support a legal liability [of the debtor] to the claimant[.]"[8]

The burden of persuasion always remains with the claimant to establish a valid claim against the

debtor.  *Allegheny*, 954 F.2d at 174.

19.     The Residential Agreement Breach Claim contains insufficient factual

statements or documentation on which this Court could reasonably rely to accept the proof of

claim as evidence that Sea-Pac has a valid claim for unjust enrichment, and AWI's books and

---

[7] *In re Circle J Dairy, Inc.*, 112 B.R. 297, 299-300 (Bankr. W.D. Ark. 1990).

[8] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992); *See also In re Pinnacle Brands, Inc.*, 259 B.R. 46, 50 (Bankr. D. Del. 2001) (upholding debtor's objection to creditor's proof of claim because creditor could not establish facts necessary to support *prima facie* claim against debtor).

records do not evidence or support Sea-Pac's Residential Agreement Breach Claim. *See* Affidavit of Robert H. Miller attached hereto as Exhibit "F." Because the Residential Agreement Breach Claim is unsubstantiated, no *prima facie* validity attaches to such Claim. Therefore, AWI requests that the Residential Agreement Breach Claim be disallowed in its entirety and expunged.

      (ii)    ***AWI Has Absolute Defenses to Sea-Pac's Commercial Agreement Breach Claim.***

20.    Sea-Pac's bare-bones Commercial Agreement Breach Claim gives no explanation as to why this Court should ignore the plain, unambiguous language of the Commercial Agreement giving Armstrong the explicit right to add a second distributor of Commercial Flooring Products in Sea-Pac's Territory following Sea-Pac's failure to meet the annual mill shipment requirements for 2002. Sea-Pac's Commercial Agreement Breach Claim should be summarily dismissed as a matter of law.

21.    The Commercial Agreement, and any dispute related thereto, is to be governed by Pennsylvania law. (Commercial Agreement, ¶ 26). It is a cardinal principle of contract construction that courts are to ascertain and give effect to the parties' intentions. *Sun Co., Inc. v. Pa. Tpk. Comm'n*, 708 A.2d 875, 878 (Pa. Commw. Ct. 1998). It is well-settled that the "intent of the parties to a written contract is contained in the writing itself." *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 739 A.2d 133, 137 (Pa. 1999). The meaning of clear and unambiguous contract terms is determined solely from the contract's words. *Philadelphia Eagles Football Club, Inc. v. City of Philadelphia*, 823 A.2d 108, 125 n.25 (Pa. 2003). A contract is ambiguous only if it is reasonably susceptible to multiple constructions and capable of being understood in more than one sense. *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004). Contracts are not ambiguous simply because the parties do not agree upon the contract's proper

construction. *State Farm Fire & Cas. Co. v. MacDonald*, 850 A.2d 707, 710 (Pa. Super. Ct. 2004). Deciding whether a written contract's terms are unambiguous and, if so, determining the meaning of those terms are both questions of law. *Metzger v. Clifford Realty Corp.*, 476 A.2d 1, 5 (Pa. Super. Ct. 1984); *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 430 (Pa. 2001). Paragraph 3 of the Commercial Agreement could not be clearer regarding AWI's right in 2003 to add a second distributor to Sea-Pac's Territory.

22.     Further, any attempt by Sea-Pac to alter the clear and unambiguous language of Paragraph 3 of the Commercial Agreement with extrinsic or parol evidence should be rejected. (The basis of any such attempt at this point is unclear given the sparse nature of Sea-Pac's Proof of Claim.) Extrinsic or parol evidence may be considered to determine the parties' intent only if a contract is ambiguous. *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 437 (Pa. 2004). Courts may use parol evidence to interpret a contract only if an ambiguity exists; parol evidence cannot be used to create an ambiguity. *Delaware River Port Auth. v. Thornburgh*, 585 A.2d 1123, 1126-27 (Pa. Commw. Ct. 1991) (citing *Dahath Elec. Co. v. Suburban Elec. Dev. Co.*, 2 A.2d 765 (Pa. 1938)). Just as parol evidence cannot be used to create ambiguities, it also cannot be used to vary or alter an integrated written agreement's terms. *Pa. Dep't of Transp. v. Westmoreland Eng'g Co.*, 487 A.2d 78, 84 (Pa. Commw. Ct. 1985).

23.     When a written contract is apparently complete "without any uncertainty as to the object or the extent of the engagement, it will be *conclusively presumed* that the parties have put their whole engagement in writing and that, unless fraud, accident or mistake are averred, the contract will be so treated and parol evidence to add to or subtract from it will not be received." *First Nat'l Bank v. Payne*, 37 A.2d 568, 569 (Pa. 1944) (emphasis added). In this case, not only is the Commercial Agreement absolutely unambiguous, but the integration clause

in Paragraph 28 of the Commercial Agreement, which states that the written agreement is intended to represent the parties' "entire understanding," is "a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations and agreements made prior to its execution." *Yocca*, 854 A.2d at 436.

24.    Therefore, AWI requests that the Commercial Agreement Breach Claim be disallowed in its entirety and expunged.

(iii)    *Sea-Pac Is Not Entitled to a Claim for Attorneys' Fees or Interest.*

25.    Sea-Pac is not entitled to recover any of the attorneys' fees or interest it asserts in the Sea-Pac Claim, and, not surprisingly, Sea-Pac again provides no legal or factual support for these components of the Sea-Pac Claim. Because the Sea-Pac Agreements contain no language that entitles Sea-Pac to attorneys' fees and interest in the event AWI contests its claim, Sea-Pac cannot properly assert a contractual claim for attorneys' fees or interest.

26.    Furthermore, an unsecured creditor may not recover postpetition attorneys' fees or other collection costs, such as those asserted in the Sea-Pac Claim, particularly in a case where the debtor is insolvent.

27.    The only section of the Bankruptcy Code that expressly authorizes a creditor to be paid attorneys' fees as part of its claim is section 506(b) of the Bankruptcy Code, which expressly applies only to oversecured claims (*i.e.*, claims secured by a lien on property of the debtor's estate where the value of the collateral exceeds the amount of the claim).[9]

---

[9] Section 506(b) of the Bankruptcy Code provides as follows:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Conversely, the Bankruptcy Code does not provide such treatment to unsecured claims. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (concluding that Congress was clear in enacting the bankruptcy laws that reasonable attorney's fees, costs and other charges, such as collection costs, are only allowable to oversecured creditors and only where they are provided for in the agreement that gives rise to the claim).[10]

28.    Moreover, pursuant to section 502(b)(2) of the Bankruptcy Code, Sea-Pac may not recover postpetition interest on its unsecured claim.

**B.    The Sea-Pac Claim Should Be Treated as a General, Non-Priority Claim.**

29.    Alternatively, to the extent that the Sea-Pac Claim is allowed to any extent, the Court should determine that the Sea-Pac Claim is a general, unsecured claim that is not entitled to any priority in payment under the Bankruptcy Code, administrative or otherwise.

(i)    *Sea-Pac Is Barred From Asserting an Administrative Expense Claim.*

30.    Sea-Pac's assertion that it is entitled to an administrative expense claim for AWI's alleged breach of its contractual obligations is untimely and expressly barred for failure to comply with the Administrative Expense Bar Date Order. Sea-Pac's claims all relate to alleged breaches by AWI of its contractual obligations and, therefore, fall directly within the

---

[10] *See also In re Carter*, 220 B.R. 411 (Bankr. D.N.M. 1998) (holding that, for an unsecured creditor to recover attorneys' fees, (1) there must be a *surplus* remaining in the chapter 11 estate after interest is paid out to the unsecured creditors, (2) collection of attorneys' fees must be provided for expressly in the underlying agreement, (3) the fees requested must be reasonable, and (4) the fees must have been incurred in pursuit of establishing the validity and amount of the creditor's unsecured claim); *In re Woodmere Investors Ltd. P'ship*, 178 B.R. 346 (Bankr. S.D.N.Y. 1995) (holding that undersecured mortgagee was not entitled to postpetition interest or attorneys' fees); *In re Saunders*, 130 B.R. 208 (Bankr. W.D. Va. 1991); *In re Continental Airlines Corp.*, 110 B.R. 276 (Bankr. S.D. Tex. 1989) (holding that award of reasonable attorneys' fees could only be made where the debtor was and is solvent at all times and the creditor would have been allowed attorneys' fees under the applicable state law, but for the filing of the debtor's bankruptcy); *In re Sakowitz, Inc.*, 110 B.R. 268 (Bankr. S.D. Tex. 1989) (holding that undersecured creditor was not entitled to assert an unsecured claim for postpetition attorneys' fees against the general assets of an insolvent debtor); *In re Canaveral Seafoods, Inc.*, 79 B.R. 57, 58 (Bankr. M.D. Fla. 1987); *In re Mobley*, 47 B.R. 62, 63 (Bankr. N.D. Ga. 1985); and *In re Woerner*, 19 B.R. 708, 713 (Bankr. D. Kan. 1982).

ambit of the Administrative Expense Bar Date Order.  Sea-Pac had actual notice of the Administrative Expense Bar Date, and even though Sea-Pac had formal notice of AWI's appointment of another distributor prior to the Administrative Expense Bar Date, Sea-Pac opted not to file proof of an administrative expense.  The Sea-Pac Claim expressly states that AWI's breach with respect to the Residential Agreement "began in 2000…"  and that AWI breached the Commercial Agreement "in 2003."  By its own admission, therefore, Sea-Pac could have and should have asserted its administrative expense claims on or before the November 2003 Administrative Expense Bar Date.  Pursuant to the Administrative Expense Bar Date Order, Sea-Pac is therefore barred from asserting an administrative expense claim.

        (ii)      *The Sea-Pac Claim Is Not Entitled to Administrative Expense Priority Even if It Were Timely Filed.*

        31.      The Bankruptcy Code expressly defines what constitutes an administrative expense in section 503.  Pursuant to section 503(b)(1)(A) of the Bankruptcy Code, administrative expenses are narrowly defined to include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case."  In accordance with section 507(a)(1) of the Bankruptcy Code, only allowed administrative expense claims are entitled to receive first priority in the distribution of assets of the debtor's estate.

        32.      Courts narrowly construe what constitute priority claims such as administrative expenses because they "affect two important bankruptcy concerns: minimizing administrative costs during chapter 11 to preserve the debtor's scarce resources and thus encourage rehabilitation, … and obtaining maximum and equitable distribution of estate assets to creditors." *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001) (citations omitted).

"If a claim does not comport with the language and underlying purpose of § 503 ... the claim must fail."[11]

33.    Consequently, courts have established strict criteria for determining whether a claim is entitled to administrative expense status.[12] The seminal case of *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d. 950 (1st Cir. 1976), sets forth the test upon which courts in this circuit and elsewhere generally rely. To qualify for administrative priority, a claimant must demonstrate, by a preponderance of the evidence, that the expense (1) arose from a *postpetition transaction* with the debtor in possession *and* (2) provided an *actual benefit to the estate* that was necessary to preserve the value of the estate's assets.[13]

34.    In the instant case, it is clear that the Sea-Pac Claim is not entitled to administrative expense priority because it does not satisfy either prong of the two-part test set forth in *Mammoth Mart*.

35.    First, all of Sea-Pac's claims arise out of prepetition contracts with AWI. Claims arising from a postpetition breach of a prepetition contract are treated merely as prepetition claims — not administrative expense claims. *See, e.g., In re Trans World Airlines, Inc.*, 275 B.R. 712, 723-24 (Bankr. D. Del. 2002) (claims for breach of confidentiality and other provisions in a prepetition agreement not entitled to administrative status even though the acts

---

[11] *In re Continental Airlines, Inc.*, 148 B.R. 207, 211 (D. Del. 1992) (quoting *In re Jartran, Inc.*, 752 F.2d 584, 586 (7th Cir. 1984)); *In re Molnar Bros.*, 200 B.R. 555, 558 (Bankr. D.N.J. 1996).

[12] *See, e.g., In re Interstate Grocery Distribs. Sys., Inc.*, 267 B.R. 907, 913 (Bankr. D.N.J. 2001); *In re The Grand Union Company*, 266 B.R. 621, 625 (Bankr. D.N.J. 2001); *In re Lease-A-Fleet, Inc.*, 140 B.R. 840, 844-45 (Bankr. E.D. Pa. 1992).

[13] *Mammoth Mart*, 536 F.2d 950 (emphasis added); *See, e.g., In re O'Brien Env'l Energy Inc.*, 181 F.3d 527 (3d Cir. 1999) (*citing Mammoth Mart* test); *see also Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.)*, 66 F.3d 1091, 1094 (9th Cir. 1995); *General Am. Transp. Corp. v. Martin*, 1 F.3d 1130, 1133 (10th Cir. 1993); *In re Jartran, Inc.*, 732 F.2d at 587; *Unidigital*, 262 B.R. at 288; *Pinnacle Brands*, 259 B.R. at 51.

constituting breach occurred postpetition). As a result Sea-Pac's claims must be treated as general unsecured claims and not administrative expenses.

36.     Second, Sea-Pac has not demonstrated that any transaction giving rise to the Sea-Pac Claim provided an actual benefit to AWI's estate for which AWI has not already compensated Sea-Pac.[14] Sea-Pac's failure to meet the annual mill shipment requirements certainly did not benefit AWI's estate. Similarly, Sea-Pac has provided no support or other information which would suggest any benefit to the estate with respect to the Residential Agreement Breach Claim.

37.     In light of the foregoing, it is clear that neither the statute, its underlying policy nor judicial interpretation warrants allowance of the Sea-Pac Claim as an administrative expense. Like the thousands of other unsecured claims that are competing for the assets of AWI's estate, the Sea-Pac Claim stems from a prepetition transaction with AWI. In accordance with the fundamental goals of reorganization, treatment of the Sea-Pac Claim should be consistent with that accorded to similar unsecured claims, and the Court should determine that the Sea-Pac Claim should not be accorded any priority under the Bankruptcy Code.

## IV.    NOTICE

38.     Notice of this Objection has been provided to the United States Trustee for the District of Delaware, the agent for AWI's prepetition bank lenders, the agent for the Debtors'

---

[14] *See, e.g., In re FBI Distribution Corp.*, 330 F.3d 36, 43-44 (1ˢᵗ Cir. 2003) (absent assumption, prepetition employment agreement not enforceable against debtor in possession despite its election to receive benefits postpetition; employee entitled only to the reasonable value of postpetition services that benefited the estate); *O'Brien,* 181 F.3d 527 (affirming bankruptcy court's holding that award of break-up fees did not constitute an administrative expense because break-up fees were not actually necessary to preserve the value of the estate); *Commonwealth of Pennsylvania Dept. of Env'l Resources v. Tri-State Clinical Laboratories, Inc.*, 178 F.3d 685, 693 (3d Cir. 1999) (administrative expense status reserved for only those "actual, necessary costs and expenses" arising in the context of, or compensating for, legitimate postpetition business activity); *Pinnacle Brands,* 259 B.R. at 52 (although court concluded that the creditor's indemnification claim arose prepetition because it was based upon a prepetition contract, court also reasoned that, "even if ... there was a postpetition transaction ... there was no 'substantial benefit' conferred on the estate" by the claimant's satisfaction of its indemnification obligations.)

postpetition bank lenders, the attorneys for the Committees,[15] Sea-Pac in accordance with the address or addresses for further notice provided on the Sea-Pac Claim, counsel of record for the parties to the Sea-Pac Case, and all parties on AWI's Core Group Service List and All Notices List in these cases pursuant to the Court's Revised Order Establishing Case Management Procedures and Hearing Schedule, dated March 6, 2006. AWI submits that no other or further notice need be provided of this Objection.

---

[15] The Committees consist of: the Official Committee of Unsecured Creditors, the Official Committee of Asbestos Claimants and Dean M. Trafelet, as the legal representative for AWI's future asbestos personal injury claimants.

39.    Pursuant to Bankruptcy Rule 3007, AWI has provided Sea-Pac with at least thirty (30) days' notice of the hearing on the Objection.

WHEREFORE, AWI respectfully requests that the Court enter an order (i) disallowing and expunging the Sea-Pac Claim or alternatively, determining that any allowed amount of the Sea-Pac Claim is not entitled to priority in payment under the Bankruptcy Code, and (ii) granting AWI such other and further relief as is just.

DATED:    July 20, 2006
          Wilmington, Delaware

                              /s/ Jason M. Madron
                              Mark D. Collins (No. 2981)
                              Jason M. Madron (No. 4431)
                              RICHARDS, LAYTON & FINGER, P.A.
                              One Rodney Square
                              P.O. Box 551
                              Wilmington, Delaware 19899
                              (302) 651-7700

                                        -and-

                              Stephen Karotkin
                              Debra A. Dandeneau
                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              (212) 310-8000

                              ATTORNEYS FOR DEBTORS AND
                              DEBTORS IN POSSESSION

**<u>EXHIBIT B</u>**



**EXHIBIT A**

<br>

FORM B10 (Official Form 10) (04/04)

UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE

**PROOF OF CLAIM**

Name of Debtor: **Armstrong World Industries, Inc.**

Case Number: **00-4471 (JKF)**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property): **Sea-Pac Sales Company**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

Name and address where notices should be sent:
c/o Michael M. Feinberg
Karr Tuttle Campbell
1201 Third Avenue, Suite 2900
Seattle, WA 98101
Telephone number: (206) 223-1313

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here if this claim ☐ replaces ☐ amends a previously filed claim, dated: _____

1. Basis for Claim
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other **Breach of Contract**

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS#:
Unpaid compensation for services performed
from _____ to _____

2. Date debt was incurred: **2000 through Dec 2004**

3. If court judgment, date obtained:

4. Total Amount of Claim at Time Case Filed: $ 400,000.00 (unsecured) $ _____ (secured) $ 4,500,000.00 (priority) $ 4,900,000.00 plus interest and (Total) attorneys' fees
See Attached for Details
Administrative Priority is claimed with respect to the above amounts under §§ 503(b)(1) and 507(a)(1)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of all interest or additional charges.

5. Secured Claim.
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle
☐ Other _____
Value of Collateral: $ _____
Amount of arrearage and other charges at time case filed included in secured claim, if any: $ _____

6. Unsecured Nonpriority Claim. $ 400,000.00
☒ Check this box if: (a) there is no collateral or lien securing your claim, or (b) your claim exceeds the value of the property securing it, or if (c) none or only part of your claim is entitled to priority.

7. Unsecured Priority Claim.
☒ Check this box if you have an unsecured priority claim
Amount entitled to priority $ 4,500,000.00 plus interest and attorneys' fees
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,925,* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7)
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8)
☒ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)( **1** ).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

8. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

9. Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

10. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

11/8/05
**RECEIVED**
NOV 08 2005
**THE TRUMBULL GROUP**
GW 4854

Date: 11/4/05

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):
Michael M. Feinberg, Attorney for Sea-Pac Sales Company

Penalty for presenting a fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3571.

RLF1-2913480-1

**ORIGINAL**

In re Armstrong World Industries, Inc,
USBC District of Delaware, No. 00-4471 (JKF)

### Attachment to Proof of Claim of
### Sea-Pac Sales Company

1.    Exhibits

   A.    Commercial Flooring Products Distributorship Agreement, effective February 15, 1999.

   B.    Residential Flooring Products and Distributorship Agreement and Sales/Service Center Agreement, effective February 15, 1999.

   C.    Letter Agreement dated August 25, 2004.

2.    Explanation of Claim

   A.    Armstrong World Industries ("AWI") breached the parties' Commercial Flooring Products Distributorship Agreement by, including but not limited to, its appointment and provision of product to a second distributor within Sea-Pac Sales Company's ("Sea-Pac") exclusive territory. AWI's breach began in 2003 and such breach continued through the term and the extensions of said agreement and resulted in damages in an amount no less than $2 million.

   B.    AWI breached the parties' Residential Flooring Products Distributorship and Sales/Service Agreement, and was unjustly enriched, by, among other conduct, failing to reimburse Sea-Pac for RDC functions and services. AWI's illegal conduct began in 2000 and continued through the term and the extensions of said agreement and resulted in damages and/or restitution owed in an amount no less than $2.9 million.

   C.    Pursuant to the provisions of the applicable agreements, interest and attorney fees are claimed if AWI contests this claim.

3.    Administrative Priority Status

   The entire amount of Sea Pac's claim for the breach of Commercial Flooring Products Distributorship Agreement is attributable to the Debtor's post petition breach of this contract which Sea-Pac was induced to perform pending the Debtor's assumption or rejection of it. $2,500,000 of the $2,900,000 of the RDC functions and services that AWI failed to reimburse Sea Pac for under the Residential Flooring Products and Distributorship Agreement were provided to AWI post-petition. Accordingly, Sea-Pac contends $4,500,000.00 of its claim is entitled to an administrative priority under 11 U.S.C. §§ 503(b)(1) and 507(a)(1).

   The terms of these agreements were extended by post-petition agreements entered into by the parties. The damages Sea-Pac suffered as a result of the post-petition agreements is also included in this claim since they arise out of a common set of facts.

#563326 v1 / 23165-001

# ARMSTRONG WORLD INDUSTRIES, INC.
## COMMERCIAL FLOORING PRODUCTS DISTRIBUTORSHIP AGREEMENT

Armstrong World Industries, Inc. ("Armstrong"), a Pennsylvania corporation, and Sea-Pac Sales Company _____ ("Distributor"), a ____Washington____ corporation, hereby enter into this Agreement to take effect February 15, 1999. The parties agree that this Agreement will replace and cancel the existing Sales/Service Center Agreement between the parties dated on or about July 1, 1997. Armstrong and Distributor agree as follows:

1.     Subject to the conditions stated herein, Armstrong appoints Distributor to be its exclusive wholesale distributor for all commercial floor covering products made available to distribution by Armstrong's Floor Products Operations ("Commercial Flooring Products") within the geographic area listed in Attachment A hereto ("Distributor Territory"). A list of those Commercial Flooring Products currently available to distribution is attached hereto as Attachment B. This list may be amended from time to time by Armstrong without prior notice and without liability to Distributor or Distributor's customers.

2.     Distributor agrees to sell Commercial Flooring Products only to the commercial trade and only where the contractor or the project is located within the Distributor Territory. Will-call sales are permitted only to contractors located within the Territory. Any exceptions must have prior written approval of Armstrong. Armstrong reserves the right to sell Commercial Flooring Products and other products direct to the commercial trade as it may determine from time to time. Certain of those accounts such as Corporate Retail Accounts ("CRA Customers") and Flooring National Accounts will be sold exclusively by Armstrong on a direct basis.

3.     Unless terminated as otherwise provided herein, this Agreement will continue for five (5) years until February 15, 2004 at which time it will automatically terminate. Armstrong will have the option, however, to terminate this Agreement prior to the end of its term should Distributor fail to meet the annual mill shipment requirements by product category for Commercial Flooring Products as set by Armstrong for each year of the Agreement (1999 included). In the event Distributor does not meet the annual mill shipment requirements by product category at the end of any calendar year, Armstrong will have 60 days to notify Distributor of its decision to terminate the Agreement 90 days thereafter. The Agreement will terminate at the end of that notice period unless SSC cures by obtaining shipment of the remainder of its annual mill shipment requirements within 30 days of the termination notice. Those shipments must be identified by Distributor as part of the previous year's shipment requirements and must be in addition to Distributor's normal shipment levels.

Further, at any time during a calendar year after Distributor has failed to meet the annual mill shipment requirements by product category, Armstrong, without prior notice and regardless of cure by Distributor, may appoint additional distributors of Commercial Flooring Products in the Distributor Territory, or otherwise change the Distributor Territory, as Armstrong deems necessary. Notwithstanding any other provision herein, Distributor may cancel this Agreement without cause by giving Armstrong at least 180 days written notice.

4.    The annual mill shipment requirements by product category for Commercial Flooring Products for each calendar year will be set by Armstrong based on discussions with Distributor and Armstrong's reasonable calculation of achievable market penetration within Distributor Territory (excluding sales made directly by Armstrong). Those annual mill shipment requirements by product category for 1999 are attached hereto as Attachment C and will be updated in writing no later than December 15 each year.

5.    Armstrong will sell Commercial Flooring Products to Distributor at the prices and terms and conditions of sale as set by Armstrong and in effect at the time of purchase by Distributor.

6.    Armstrong will furnish Distributor with marketing and promotional materials for use in selling Commercial Flooring Products. Armstrong will offer service, training and staff assistance to Distributor for such reasonable charges as may be specified by Armstrong.

7.    Armstrong may designate certain Commercial Flooring Products as limited distribution products. Distributor shall promote, sell and service those products only to those customers specified by Armstrong.

8.    Distributor shall maintain active customer files reflecting all information pertinent to each sale and shall transmit to Armstrong at least weekly, reports or records of all shipments of Commercial Flooring Products. Reports shall show the order date, date of shipment, the name and address of the purchaser, the destination of the shipment, the pattern numbers and the number of units shipped or such other information as may be required by Armstrong. This information must be accurate and complete and have been verified by the Distributor's internal sales records.

9.    Distributor shall maintain sufficient trained and competent personnel to promote, sell and service Commercial Flooring Products, including sales representatives and sales managers devoted exclusively to the sale of Commercial Flooring Products, with exceptions only as agreed to by Armstrong. Distributor shall employ market specialists and market specialized sales management as required by Armstrong and shall designate one manager as having overall responsibility for the total Armstrong commercial business.

10.    Each February 1, Distributor shall submit to Armstrong a written business plan that includes marketing, sales coverage, financial, personnel/succession, systems, logistics and warehousing facilities plans for all years remaining in the term of this Agreement.

11.    As stated in paragraph 2 above, Armstrong may also sell Commercial Flooring Products or other products directly to other customers in the commercial trade. Distributor will provide to those customers delivery and other services as required by Armstrong and will be paid a service fee as established by Armstrong from time to time.

12.    Armstrong is the owner of the trademark "Armstrong" and other trademarks, service marks and trade names and the goodwill attached to them (collectively, the

2

"Trademarks"). Distributor will not contest the ownership or validity of the Trademarks. Any goodwill established in the Trademarks by Distributor's use of them will accrue to Armstrong. Distributor will not use the Trademarks except in accordance with the terms of this Agreement and with Armstrong's approval.

13.     Upon expiration or termination of this Agreement, Distributor shall immediately discontinue use of the Armstrong name and Trademarks and shall remove the Armstrong name and Trademarks from its locations and its trucks.

14.     Distributor shall treat Armstrong's confidential information as though it were Distributor's own, and shall not disclose confidential information to any third party, including, but not limited to the news media or industry analysts. Armstrong's confidential information means any non-public knowledge, information and materials respecting Armstrong, including but not limited to financial projections, pricing, sales, promotions, product specification data, or the results of any mediation or private adjudication, as well as information on Armstrong's plans for distribution, marketing and product development.

15.     Distributor is not authorized to act for, incur debt for or make any representations or warranties on behalf of Armstrong. Distributor shall not represent itself to the public as an agent or representative of Armstrong. Distributor shall be solely responsible for any representations or warranties that are not authorized by Armstrong in writing or stated in Armstrong's promotional materials.

16.     Distributor shall pay all taxes of every description assessed by reason of property received from Armstrong, and Distributor shall indemnify Armstrong for such taxes, except Armstrong shall be liable for any applicable sales taxes on its sales to Flooring National Accounts and CRA customers.

17.     Distributor shall maintain adequate working capital at all times and shall conduct its financial affairs so as to meet all credit obligations, including those to Armstrong, as and when due. Distributor shall furnish Armstrong with financial information such as operating statements, balance sheets and inventory and accounts receivable status as required by Armstrong. Distributor will provide Armstrong with its annual audited financial statement or equivalent data satisfactory to Armstrong within 90 days of the end of Distributor's fiscal year.

18.     Distributor and Armstrong shall hold each other harmless and shall indemnify each other against all claims, demands, losses, costs, damages, suits, judgments, penalties, expenses and liabilities of any kind arising out of their respective negligent or intentional acts or omission or their respective breach of any duty to the other under this Agreement.

19.     Distributor shall maintain worker's compensation insurance as required by law, and commercial general liability and automobile insurance policies with limits of not less than $1,000,000 per occurrence with a $2,000,000 general aggregate insuring Distributor against any loss, claim, liability or suit for bodily injury, death, personal injury or property damage arising from or in connection with Distributor's performance under this Agreement, including its ownership, leasehold or operation of its distribution facility and its RDC. The policies shall

3

IN WITNESS WHEREOF, Armstrong and Distributor have caused this Agreement to be executed by their officers who have authority to bind their respective companies. The original of this Agreement is to be signed by Distributor and sent to Armstrong for execution at Lancaster, Pennsylvania.

**ARMSTRONG WORLD INDUSTRIES, INC.**          **DISTRIBUTOR:**

By: _Alan T. Bemfl_                          By: _Dale Griffiths_

Title: _Sr Up WW PSO_                         President

                                             _Sea-Pac Sales_

                                             Company Name

Date: _8 Feb 1999_                           Date: _15 Feb 1999_

6

# ARMSTRONG WORLD INDUSTRIES, INC.
## RESIDENTIAL FLOORING PRODUCTS DISTRIBUTORSHIP
## AND SALES/SERVICE CENTER AGREEMENT

Armstrong World Industries, Inc. ("Armstrong"), a Pennsylvania corporation, and Sea-Pac Sales Company ("Sales/Service Center" "SSC"), a Washington corporation, hereby enter into this Agreement to take effect February 15, 1999. The parties agree that this Agreement will replace and cancel the existing Sales/Service Center Agreement between the parties dated on or about January, 1997. Armstrong and SSC further agree as follows:

1.      Subject to the conditions stated herein, Armstrong appoints SSC to be its exclusive wholesale distributor for all residential floor covering products made available to distribution by Armstrong's Floor Products Operations ("Residential Flooring Products") within the geographic area described in Attachment A hereto, except as noted ("Distributor Territory"). A list of those Residential Flooring Products currently available to distribution is attached hereto as Attachment B. This list may be amended from time to time by Armstrong without prior notice and without liability to SSC or SSC's customers.

2.      SSC agrees to sell Residential Flooring Products only to the retail trade and only where the billing address or delivery is within the Distributor Territory. Will call sales are permitted only to accounts located within the Territory. Any exceptions must have the prior written approval of Armstrong. Armstrong reserves the right to sell Residential Flooring Products and other products direct to the retail trade as it may determine from time to time. Certain of those accounts, such as Corporate Retail Accounts ("CRA Customers") and Flooring National Accounts will be sold exclusively by Armstrong on a direct basis.

3.      Unless terminated as otherwise provided herein, this Agreement will continue for five (5) years, until February 15, 2004, at which time it will automatically terminate. Armstrong will have the option, however, to terminate this Agreement prior the end of its term should SSC fail to meet the annual mill shipment requirements by product category for Residential Flooring Products as set by Armstrong for each year of the Agreement (1999 included). In the event SSC does not meet the annual mill shipment requirements by product category at the end of any calendar year, Armstrong will have 60 days to notify SSC of its decision to terminate the Agreement 90 days thereafter. The Agreement will terminate at the end of that notice period unless SSC cures by obtaining shipment of the remainder of its annual mill shipment requirements within 30 days of the termination notice. Those shipments must be identified by SSC as part of the previous year's shipment requirements and must be in addition to SSC's normal shipment levels.

Further, at any time during a calendar year after SSC has failed to meet the annual mill shipment requirements by product category, Armstrong, without prior notice and regardless of cure by SSC, may appoint additional distributors of Residential Flooring Products in the Distributor Territory or otherwise change the Distributor Territory, as Armstrong deems necessary. Notwithstanding any other provision herein, SSC may cancel this Agreement in its entirety, without cause, by giving Armstrong at least 180 days written notice. Notwithstanding

03/25/2005  15:32    2537963            SEAPACSALES                    PAGE  03/13

any other provision herein, Armstrong may cancel SSC's appointment as an RDC only, without cause, by giving SSC at least 180 days written notice.

4.     The annual mill shipment requirements by product category for Residential Flooring Products for each calendar year will be set by Armstrong based on discussions with SSC and Armstrong's reasonable calculation of achievable market penetration within Distributor Territory (excluding sales made directly by Armstrong).   Those annual mill shipment requirements by product category for 1999 are attached hereto as Attachment C, and will be updated in writing no later than December 15 each year.

5.     Armstrong will sell Residential Flooring Products to SSC at the prices and terms and conditions of sale as set by Armstrong and in effect at the time of purchase by SSC.

6.     Armstrong will furnish SSC with marketing and promotional materials for use in selling Residential Flooring Products.  Armstrong will offer service, training and staff assistance to SSC for such reasonable charges as may be specified by Armstrong.

7.     Armstrong may designate certain Residential Flooring Products as limited distribution products. SSC shall promote, sell and service those products only to those customers specified by Armstrong.

8.     SSC shall maintain active customer files reflecting all information pertinent to each sale and shall transmit to Armstrong at least weekly, reports or records of all shipments of Residential Flooring Products.  Reports shall show the order date, date of shipment, the name and address of the purchaser, the destination of the shipment, the pattern numbers and the number of units shipped or such other information as may be required by Armstrong.  This information must be accurate and complete and have been verified by the SSC's internal sales records.

9.     SSC shall maintain sufficient trained and competent personnel to promote, sell and service Residential Flooring Products, including sales representatives and sales managers devoted exclusively to the sale of Residential Flooring Products, with exceptions only as agreed to by Armstrong. SSC shall employ market specialists and market specialized sales management as required by Armstrong and shall designate one manager as having overall responsibility for the total Armstrong wholesaler and RDC business.

10.    Each February 1, SSC shall submit to Armstrong annually a written business plan that includes marketing, sales coverage, financial, personnel/succession, systems, logistics and warehousing facilities plans for all years remaining in the term of this Agreement.

11.    Armstrong also appoints SSC to be a Regional Distribution Center ("RDC") at its <u>Kent, Washington</u> _____ location, to deliver products to designated CRA Customers located in the Territory listed on Attachment A (the "RDC Territory").  Upon 90 days notice, SSC's RDC Territory may be amended by Armstrong as it deems necessary to provide the most economical service to CRA Customers.

2

03/25/2005  15:32    253796:  : 7                SEAPACSALES      · :.                    PAGE  04/13

12.    Armstrong will sell certain Armstrong products (including but not limited to Residential Flooring Products) ("CRA Products") directly to Armstrong's CRA Customers, and will notify SSC of orders and delivery requirements.  Armstrong may ship CRA products directly to the CRA customer.  In connection with sales to CRA Customers, Armstrong will:

a.    perform selling activities, order processing, invoicing, customer and in-store servicing, merchandising support, collection activities and claims processing involved in its CRA business;

b.    provide detailed operational guidelines to SSC, including but not limited to the most current version of Armstrong's Regional Distribution Center Program Guidelines ("RDC Guidelines");

c.    centralize CRA order management processes at Armstrong;

d.    commit and acknowledge orders to CRA Customers;

e.    assign CRA stores to SSC for delivery of CRA Products, and change assignments and territory boundaries when necessary to achieve best cost supply;

f.    manage the replenishment process when appropriate for designated CRA Products at SSC's RDC;

g.    reimburse SSC for CRA Products and services based on the fee schedule on Attachment D.  Fees will be reviewed by Armstrong at least annually and revised at its discretion; and

h.    provide SSC with Armstrong's best estimates of RDC business forecast in its territory.

13.    SSC will provide the delivery services and other services required by Armstrong for CRA Customers, including but not limited to those services described in the most current version of the RDC Guidelines.

14.    SSC's RDC duties include but are not limited to the duties described on Attachment E, all of which shall be performed pursuant to and in accordance with the most current version of the RDC Guidelines.

15.    SSC may not sell CRA Products to anyone other than Armstrong without prior written approval of Armstrong.

16.    As stated in paragraph 2 above, in addition to sale of CRA Products to CRA Customers, Armstrong may also sell Residential Flooring Products or other products directly to other customers in the retail trade.  SSC will provide to those customers delivery and other

3

services as required by Armstrong and will be paid a service fee as established by Armstrong from time to time.

17.     Armstrong is the owner of the trademark "Armstrong" and other trademarks, service marks and trade names and the goodwill attached to them (collectively, the "Trademarks"). SSC will not contest the ownership or validity of the Trademarks. Any goodwill established in the Trademarks by SSC's use of them will accrue to Armstrong. SSC will not use the Trademarks except in accordance with the terms of this Agreement and with Armstrong's approval.

18.     Upon expiration or termination of this Agreement, SSC shall immediately discontinue use of the Armstrong name and Trademarks and shall remove the Armstrong name and Trademarks from its locations and its trucks.

19.     SSC shall treat Armstrong's confidential information as though it were SSC's own, and shall not disclose confidential information to any third party, including, but not limited to the news media or industry analysts. Armstrong's confidential information means any non-public knowledge, information and materials respecting Armstrong, including but not limited to financial projections, pricing, sales, promotions, product specification data, or the results of any mediation or private adjudication, as well as information on Armstrong's plans for distribution, marketing and product development.

20.     SSC is not authorized to act for, incur debt for or make any representations or warranties on behalf of Armstrong. SSC shall not represent itself to the public as an agent or representative of Armstrong. SSC shall be solely responsible for any representations or warranties that are not authorized by Armstrong in writing or stated in Armstrong's promotional materials.

21.     SSC shall pay all taxes of every description assessed by reason of property received from Armstrong, and SSC shall indemnify Armstrong for such taxes, except Armstrong shall be liable for any applicable sales taxes on its sales to Flooring National Accounts and CRA Customers.

22.     SSC shall maintain adequate working capital at all times and shall conduct its financial affairs so as to meet all credit obligations, including those to Armstrong, as and when due. SSC shall furnish Armstrong with financial information such as operating statements, balance sheets and inventory and accounts receivable status as required by Armstrong. SSC will provide Armstrong with its annual audited financial statement or equivalent data satisfactory to Armstrong within 90 days of the end of SSC's fiscal year.

23.     ~~SSC and Armstrong shall hold each other harmless and shall indemnify~~ or their respective breach of any duty to the other under this Agreement.

4

03/25/2005  15:32  253796:  7          SEAPACSALES          PAGE  06/13

24. SSC shall maintain worker's compensation insurance as required by law, and commercial general liability and automobile insurance policies with limits of not less than $1,000,000 per occurrence with a $2,000,000 general aggregate insuring SSC against any loss, claim, liability or suit for bodily injury, death, personal injury or property damage arising from or in connection with SSC's performance under this Agreement, including its ownership, leasehold or operation of its distribution facility and its RDC. The policies shall name Armstrong as an additional insured. Before the effective date of this Agreement, SSC shall provide Armstrong with a certificate evidencing this insurance and, upon Armstrong's request, will provide Armstrong with certified copies of its insurance policies evidencing this insurance. The insurance required herein shall not be canceled by SSC without Armstrong's approval.

25. In addition to the provisions of paragraph 3 above, in the event of a breach of this Agreement, Armstrong shall give written notice of the breach to SSC. If the breach is not cured within 30 days of SSC's receipt of notice, this Agreement, at Armstrong's sole option, may be deemed terminated for cause, either as to SSC's duties as a wholesaler or as a Regional Distribution Center, or both, either immediately upon the expiration of the 30-day cure period, or at any time thereafter.

26. Without limitation, the following events shall constitute breaches of this Agreement:

    a.    failure of SSC to comply promptly with any obligation, duty or undertaking to Armstrong pursuant to this Agreement, including Attachments;

    b.    consistent failure of SSC to meet the RDC operational performance measures and goals set forth on Attachment E;

    c.    filing by or against SSC of a petition in bankruptcy or any other insolvency proceeding or the failure of SSC to maintain a credit basis satisfactory to Armstrong or to meet its financial obligations to Armstrong as they become due;

    d.    disclosure by SSC of confidential information;

    e.    misuse of the Trademarks;

    f.    any attempted assignment or transfer of this Agreement, as defined herein, without the written consent of Armstrong; or

    g.    the commission of an act by SSC's management in violation of federal, state or local law that in the sole discretion of Armstrong adversely affects the goodwill and reputation of Armstrong.

27. A waiver of any breach of this Agreement shall not be construed as a waiver of other breaches. The acceptance of any order by Armstrong after the termination of this

5

33.   This Agreement supersedes all previous or now existing arrangements or agreements between SSC and Armstrong and contains the entire understanding between SSC and Armstrong relating to its subject matter. No oral statements, representations or other attempted modification or amendment of any part of this Agreement shall be binding unless in a writing that expressly amends this Agreement that is signed by both SSC and Armstrong.

IN WITNESS WHEREOF, Armstrong and SSC have caused this Agreement to be executed by their officers who have authority to bind their respective companies. The original of this Agreement is to be signed by SSC and sent to Armstrong for execution at Lancaster, Pennsylvania.

ARMSTRONG WORLD INDUSTRIES, INC.      SALES/SERVICE CENTER:

By: _____          By: _____
                                               President

Title: _____          _____
                                      Company Name

Date: ____7/5/99_____                 Date: ____2-17-99____

7



**Armstrong**

*Your ideas become reality.*

ARMSTRONG WORLD INDUSTRIES, INC.
2500 COLUMBIA AVE., P.O. BOX 3001
LANCASTER, PA. 17604
717-397-0611    www.armstrong.com

ROBERT A. SILLS, VICE PRESIDENT
DISTRIBUTION STRATEGY
Tel: (717) 396-6358 — Fax (717) 396-6334
rasills@armstrong.com

August 25, 2004

Jared Williams, Owner/President
Sea-Pac Sales Company
P.O. Box 3846
Seattle, WA 98124-3846

Dear Jared:

As you know, our Residential Flooring Products Distributorship and Sales/Service Center Agreement (including its RDC provisions) dated February 15, 1999 and our Commercial Flooring Products Distributorship Agreement dated February 15, 1999 (collectively, the "Agreements") expired on March 31, 2004.

As a follow up to Frank's letter of June 4 regarding distributor agreements we conducted a small focus group of distributors to initiate a dialogue around some of the objectives we see as important in our future agreements, i.e.:

➤ Performance based agreements with a disciplined approach to establishing targets and measuring results.

➤ Alignment of distributor compensation based upon services provided.

➤ Balanced agreement for both Armstrong and the distributor that takes into consideration the needs of each party.

During the upcoming months we will work to structure an agreement with each distributor individually that makes sense for each of us.

As we begin these discussions with you to implement new agreements, it is our desire to continue our distributorship relationship with you pursuant to a new interim agreement on the same terms and conditions as were in effect at the expiration of the old Agreements. The new interim agreement will commence as of the date of your signature below and will continue through December 31, 2004. If this is acceptable, please acknowledge your acceptance by signing both copies of this letter, returning one to me and keeping the other for your files. This letter supersedes my letter to you of August 6, 2004 offering to enter into an RDC-only

Jared Williams, Owner/President
August 25, 2004
Page 2


agreement.  Armstrong's entry into this new interim agreement with you does not constitute an assumption by Armstrong in its Chapter 11 case of the expired Agreements.

We appreciate your attention to this matter.

Very truly yours,

Robert A. Sills

RAS/mks

Agreed and accepted:

**SEA-PAC SALES COMPANY**


By: _____

Title: _____

Date: _____

**<u>EXHIBIT C</u>**

Armstrong

February 28, 2003

RICHARD K. DORN
VICE PRESIDENT
DISTRIBUTOR SALES
ARMSTRONG FLOOR PRODUCTS

Mr. Jared Williams, Owner
Sea-Pac Sales Company
6307 South 228th Street
Kent, WA 98032-4835

Dear Jared:

I wanted to follow up on a previous conversation we had regarding Armstrong distribution in the Northwest part of the U.S.

There are two issues that we discussed. The first thing was overall performance at Sea-Pac Sales in 2002 as well as over the previous five years on residential and commercial products. In 2002 we, of course, had several discussions regarding how we can get the performance back on track, and while we saw some performance at the end of 2002, overall performance ranked 15th out of 15 full-line North American distributors at the end of the year.

At this time we feel it is necessary for us to augment our distribution for our commercial products in the Northwest. Our plan is to add a commercial distributor, along with Sea-Pac Sales, to improve our sales coverage. The timing of this would be approximately the beginning of the second quarter of 2003. At that time we would adjust your annual mill shipment purchase plan to reflect the addition of another distributor.

In regard to the residential distribution in the Northwest we have plans to work diligently with Sea-Pac to see how we can improve our performance. As we discussed, we'll be adding additional counties in Idaho to your territory for you to service, and you thought that this would help you in your model.

I've enclosed a copy of a map that will define your service area for residential, commercial and RDC business. What we would need is a plan from your company on how we can transition these new counties in Idaho from TRI-WEST. We would like to have a discussion on this by March 10.

Jared, as we discussed, we'd like to schedule a time to meet with your management team to discuss your 2003 plans for Armstrong commercial and residential products in the territory that you serve. I will be in touch with you to finalize a date.

Sincerely,

CMA

Enclosure

M. J. Badar
J. D. Nickel

Armstrong World Industries, Inc.     P.O. Box 3001     Lancaster     Pennsylvania 17604

**EXHIBIT D**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------- x

*In re*                                      :      Chapter 11 Case No.
                                             :
ARMSTRONG WORLD INDUSTRIES,                  :      00-4471 (RJN)
INC., *et al.*,                              :
                                             :      (Jointly Administered)
        Debtors.                             :
                                             :      Re: Docket No. 3986
                                             :      Re: MC No. RLF-62
------------------------------------------- x

## ORDER PURSUANT TO SECTION 503(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3003(c) FIXING A FINAL DATE FOR FILING REQUESTS FOR PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSES IN AWI'S CHAPTER 11 CASE, APPROVING PROPOSED CLAIM FORM, AND ESTABLISHING NOTICE PROCEDURES

Upon the motion dated February 4, 2003 (the "Motion") of Armstrong World

Industries, Inc., as debtor and debtor in possession ("AWI"), for an order pursuant to

section 503(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule

3003(c)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) fixing the

final date for filing requests for payment of certain administrative expenses in AWI's chapter 11

case, (ii) approving a proposed proof of claim form, and (iii) establishing notice procedures in

connection therewith, all as set forth more fully in the Motion; and the Court having jurisdiction

to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334; and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and it appearing that (a) fixing a final date for filing Specified

Administrative Expenses[1] is necessary for the efficient administration of AWI's chapter 11 case

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such
terms in the Motion.

NY2:\1249267\02\QRXV02!.DOC\17168.0004
RLF1-2575950-1

and to protect the interests of AWI, its creditors, and other parties in interest, (b) notification of the relief granted by this Order in the manner proposed by AWI in the Motion is fair and reasonable and will provide good, timely, and sufficient notice to the holders of Specified Administrative Expenses of their rights and obligations in connection with their claims against AWI and its estate, and (c) due and sufficient notice of the Motion having been given to the U.S. Trustee, the agent for AWI's prepetition bank lenders, the agent for the Debtors' postpetition bank lenders, the attorneys for the Committees, and all parties on the Debtors' Core Group Service List and All Notices List in these cases pursuant to the Court's Order Establishing Case Management Procedures and Hearing Schedule, dated February 11, 2002, and it appearing that no other or further notice need be given; and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted in all respects; and it is further

ORDERED that, pursuant to section 503(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), each person or entity, including, without limitation, each individual, partnership, joint venture, corporation, estate, trust and governmental unit, that asserts a Specified Administrative Expense against AWI shall file a proof of such Specified Administrative Expense that substantially conforms to the form annexed as Exhibit "B" to the Motion[2] so as to be actually received not later than 5:00 p.m. (New York City time) on the date that is five (5) business days after the date scheduled for the commencement of the hearing on confirmation of the Plan (the "Administrative Expense Bar Date"), by mailing, hand delivering, or delivering by courier service the original request to Trumbull Services LLC, Attn: Armstrong World Industries, Inc. (by mail: P.O. Box 1117, Windsor, Connecticut 06095; by hand delivery

---

[2]     Such form will be posted on the website established by AWI in connection with the Plan, www.armstrongplan.com, or may be obtained by contacting Trumbull Services LLC at 860-687-3806.

or overnight courier: 4 Griffin Road North, Windsor, Connecticut 06095); and such request will

be deemed timely filed only if it is actually received by Trumbull at the above-referenced

address on or before the Administrative Expense Bar Date; and it is further

      ORDERED that requests for payment of Specified Administrative Expenses will

*not* be deemed properly and timely filed if sent by facsimile or telecopy; and it is further

      ORDERED that only the following constitute Specified Administrative Expenses

for which a proof of Administrative Expense must be filed on or before the Administrative

Expense Bar Date:

1.     Any Administrative Expense representing personal injury, property damage, or other tort claims against AWI, *excluding* Asbestos Personal Injury Claims;

2.     Any Administrative Expense for breach of an obligation (contractual, statutory or otherwise) by AWI, including any environmental liability, but other than any environmental liability with respect to property that is currently owned or operated by AWI;

3.     Any Administrative Expense for amounts incurred by AWI after the Commencement Date in the ordinary course of AWI's business if payment of such amounts is alleged to be overdue by at least sixty (60) days as of the Confirmation Date;

4.     Any Administrative Expense incurred by AWI outside the ordinary course of its business or on other than ordinary business terms, except to the extent the incurrence of such Administrative Expense Claim was approved by the Bankruptcy Court (*e.g.*, the DIP Credit Facility Claim, the postpetition COLI loans incurred by AWI, or any claims under any hedging agreement entered into after the Commencement Date) or represents fees and expenses of professionals arising under sections 330, 331, or 503(b)(2) - (5) of the Bankruptcy Code;

5.     Any Administrative Expense that would not ordinarily be reflected as a payable on AWI's books and records or as a liability on AWI's financial statements; and

6.     Any Administrative Expense representing an employee claim against AWI, *other than* (i) a claim for wages, benefits, pension or retirement benefits or expense reimbursement by an employee who is employed by

AWI as of the Administrative Expense Bar Date or (ii) a grievance claim under any collective bargaining agreement to which AWI is a party; *provided, however,* if a claim is of a type specified in sub-paragraphs (1) – (6) above *and* the holder of such claim has asserted the claim in an action commenced against and served on AWI on or before the date of entry of this Order (and in which such holder alleges that AWI's liability is predicated upon the operation of AWI's business after the Commencement Date, or otherwise alleges that such liability should be accorded administrative expense status), then the holder of such alleged claim is not required to file a proof of Administrative Expense; and it is further

ORDERED that, to be properly filed pursuant to this Order, each Administrative Expense shall (i) be written in the English language, (ii) be denominated in lawful currency of the United States, and (iii) conform substantially to the form annexed as Exhibit "B" to the Motion (which form may be obtained on the website established by AWI in connection with the Plan, www.armstrongplan.com, or by contacting Trumbull Services LLC at 860-687-3806); and it is further

ORDERED that, pursuant to Bankruptcy Rule 3003(c), if any person or entity that is required by this Order to file proof of a Specified Administrative Expense fails to do so such that it is *actually received* by Trumbull at the address specified above prior to the Administrative Expense Bar Date, then such Specified Administrative Expense will be barred and discharged, and the holder of such Specified Administrative Expense will have no right to assert such Administrative Expense Claim against AWI, AWI's estate, or Reorganized AWI; and it is further

ORDERED that (i) notice of entry of this Order and of the Administrative Expense Bar Date substantially in the form annexed to the Motion as Exhibit "C" (the "Notice"), which Notice is hereby approved, shall be deemed good, adequate, and sufficient notice, if such Notice is served by United States Postal Service, first-class mail, in the manner provided for by

Bankruptcy Rule 3017(d), to creditors and parties in interest at their addresses last known to AWI, including: (a) all entities that supplied goods or rendered services to AWI after the Commencement Date (other than professionals retained by AWI or any of the Committees during AWI's chapter 11 case); (b) all direct customers of AWI from and after the Commencement Date; (c) all parties to contracts with AWI that either (i) were listed on Schedule G or (ii) were entered into by AWI after the Commencement Date; (d) the U.S. Trustee; (e) the members of the Committees and their attorneys; (f) the DIP Lenders and their attorneys; (g) all parties who have filed notices of appearance in AWI's chapter 11 case; and (h) all parties to actions commenced against AWI after the Commencement Date; (ii) if an entity required to receive such Notice also will be receiving a solicitation package with respect to the Plan, the Notice may be included as a separate document as part of the solicitation package; (iii) otherwise, AWI shall mail the Notice separately to such entity; and (iv) any Notice mailed pursuant to this paragraph shall be deposited in the mail at least thirty (30) days prior to the Administrative Expense Bar Date; and it is further

ORDERED that AWI will also cause to have the Notice published in the national edition of *The New York Times*, *The Wall Street Journal*, and *The USA Today* one day per week for a period of two consecutive weeks, commencing no later than ten (10) business days after entry by the Court of an order fixing the date for commencement of the hearing to consider confirmation of the Plan and in those trade publications and newspapers listed in Exhibit "D" annexed to the Motion, in accordance with the limitations set forth on the list of trade publications, once at least thirty (30) days prior to the commencement of the hearing to consider confirmation of the Plan, which publication is hereby approved in all respects and which shall be deemed good, adequate and sufficient notice of publication; and it is further

ORDERED that AWI be, and hereby is, authorized and empowered to take such steps and to perform such acts as may be necessary to implement and effectuate the terms of this Order.

Dated:   Wilmington, Delaware
         March 21 2003

THE HONORABLE RANDALL J. NEWSOME
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT E**

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Case No. 00-04471 |
| | ) | (Jointly Administered) |
| ARMSTRONG WORLD INDUSTRIES, et al., | ) | Chapter 11 |
| | ) | Judge Randall J. Newsome |
| | ) | |
| Debtors. | ) | |
| | ) | |

### AFFIDAVIT OF TRUMBULL ASSOCIATES, L.L.C. (F/K/A TRUMBULL SERVICES, L.L.C.) REGARDING SERVICE BY FIRST CLASS MAIL OF THE SOLICITATION MATERIALS RELATING TO THE DEBTORS FOURTH AMENDED PLAN OF REORGANIZATION PURSUANT TO THE ORDER APPROVING (I) DISCLOSURE STATEMENT AND (II) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE PLAN

I, Daniel McSwigan, certify as follows:

1.      I am a Consultant with Trumbull Associates, L.L.C., (f/k/a Trumbull Services, L.L.C.) ("Trumbull"), the court-appointed claims agent of the above-captioned debtors and debtors in possession (collectively the "Debtors" or "AWI"). Pursuant to the Order Authorizing the Employment and Retention of Trumbull Services Company as Official Claims Agent for the Debtors, entered on December 9, 2000, Trumbull has been retained by the Debtors to, among other things, assist with the service of solicitation packages upon AWI creditors and equity interest holders in connection with soliciting votes to accept or reject the Fourth Amended Plan of Reorganization of Armstrong World Industries, Inc. (the "Plan") pursuant to the Order (I) Approving the Disclosure Statement And (II) Establishing Notice and Objection Procedures for Confirmation of the Plan, entered on June 6, 2003 (the "Disclosure Statement Order"). I am authorized to submit this certification on behalf of Trumbull. Unless otherwise stated, I have personal knowledge of the facts hereinafter set forth.

2.      Pursuant to the Disclosure Statement Order, on June 20, 2003, I caused sufficient copies of the documents described in Paragraph 3 hereof (the "Solicitation Package") to be served by First Class United States mail on (i) each holder, as of the Voting Record Date (as such term is defined in the Disclosure Statement Order) of certain non-classified claims, and the 2002 Service list parties, as set forth on **Exhibit A** hereto, and (ii) holders, as of the Voting

Record Date, of a claim in Unimpaired Classes 1, 2, 4, 5, 9, 10, and 11 (as such Classes are defined in the Plan), as set forth on **Exhibit B** hereto.

3.    The Solicitation Package included the following documents:

   a. Notice of (I) Approval of Disclosure Statement; (II) Establishment of a Record Date for Voting Purposes; (III) Hearing to Consider Confirmation of the Plan; (IV) Procedures for Objection to Confirmation of the Plan; and (V) Procedures and Deadline for Voting on the Plan,

   b. the Disclosure Statement, dated June 2, 2003, for the Fourth Amended Plan of Reorganization of Armstrong World Industries, Inc., and

   c. the Notice of Deadline To File Certain Requests For Payment Of Administrative Expenses.

4.    I further certify that, on June 20, 2003, I caused the Solicitation Package, along with a postage prepaid reply envelope and an appropriate ballot to be served by First Class United States mail on the holders of claims in the Impaired Classes 3, 6, 7, and 12 (as such Classes are defined in the Plan), as follows:

   a. a Class 3 ballot (ballot code 3) to each holder, as of the Voting Record Date, of a Class 3 Convenience Claim, as set forth on **Exhibit C** hereto;

   b. a Class 6 ballot (ballot code 6-G(NP)) to each holder, as of the Voting Record Date, of a Class 6 General Unsecured Claim to the extent such claim relates to non-publicly traded debt, as set forth on **Exhibit D** hereto;

   c. a Class 6 ballot (ballot code 6-G) to each holder, as of the Voting Record Date, of a Class 6 General Unsecured Claim other than a claim that relates to non-publicly traded debt, as set forth on **Exhibit E** hereto;

   d. a Class 7 ballot (Ballot Code 7M) to each attorney of record, as of the Voting Record Date, for holders of a Class 7 Asbestos Personal Injury Claim, as set forth on **Exhibit F** hereto;

   e. a Class 7 ballot (ballot Code 7I) to each individual holder, as of the Voting Record Date, of a Class 7 Asbestos Personal Injury Claim, as set forth on **Exhibit G** hereto;

     f.   a Class 7 ballot (ballot code 7C) to each holder, as of the Voting Record Date, of a Class 7 Indirect PI Trust Claim (as such term is defined in the Plan), as set forth on **Exhibit H** hereto; and

     g.   a Class 12 ballot (ballot code 12) to each holder, as of the Voting Record Date, of a Class 12 Equity Interest, as set forth on **Exhibit I** hereto.

5.          I further certify that, on June 20, 2003, I caused the Notice of Deadline To File Certain Requests For Payment Of Administrative Expenses to be served by First Class United States mail to all parties as set forth on **Exhibit J** hereto.

Executed in Windsor, Connecticut this 1st day of July 2003.

Daniel McSwigan
Consultant
Trumbull Associates, L.L.C., (f/k/a Trumbull Services, L.L.C.)

STATE OF CONNECTICUT)
                   ) SS: WINDSOR
COUNTY OF HARTFORD  )

Subscribed, sworn to and acknowledged before me by Daniel McSwigan, Consultant of Trumbull Associates, L.L.C., (f/k/a Trumbull Services, L.L.C.) on the 1st day of 2003.

Notary Public
My Commission Expires:

CHRISTINE M. SIROIS
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JAN. 31, 2008

## EXHIBIT A

| | |
|---|---|
| 1899983 | ACORN GLEN QUALITY ASSISTED LIVING INC. C/O PEPPER HAMILTON LLP NANCY J. TRUESDALE, ESQ. 300 ALEXANDER PARK PRINCETON, NJ 08543-5276 |
| 1903441 | AMCHEM PRODUCTS, INC. C/O KELLEY, DRYE & WARREN, LLP WILLIAM C. HECK 101 PARK AVENUE  NEW YORK, NY 10178 |
| 1910653 | AP GREEN INDUSTRIES INC C/O RHI SERVICES INC. JACKIE MYERS, CORPORATE PARALEGAL 600 GRANT STREET USX TOWER - 51ST FLOOR PITTSBURGH, PA 15219 |
| 063601 | AT&T CORP. C/O LOWENSTEIN & SANDLER, PC. JENNIFER JACK KURYMEZAK, ESQ. 65 LIVINGSTON AVE  ROSELAND, NJ 07068 |
| 1902726 | BABCOCK & WILCOX COMPANY, INC. THE C/O HELLER, DRAPER, HAYDEN, PATRICK & HORN  C/O JAN MARIE HAYDEN 650 POYDRAS STREET, SUITE 2500  NEW ORLEANS, LA 70130 |
| 1747270 | BARNES, PATRICIA C/O LAW OFFICES OF GARY D. GINSBERG C/O GARY D. GINSBERG, ESQ. THE ATRIUM II 3000 ATRIUM WAY, SUITE 330  MOUNT LAUREL, NJ 08054 |
| 1902646 | BLAKE, RICHARD C/O JOSEPH D. JENNER, ESQ.  501 MARY ESTER CUTOFF, #6  FORT WALTON BEACH, FL 32548 |
| 1903232 | CERTAINTEED CORPORATION C/O SHEA & GARDNER ELIZABETH R. GEISE, ESQ. 1800 MASSACHUSETTS AVE, NW  WASHINGTON, DC 20036 |
| 1903438 | DANA CORPORATION C/O SHEA & GARDNER WILLIAM R. HANLON, ESQ. 1800 MASSACHUSETTS AVE, NW  WASHINGTON, DC 20036 |
| 1902726 | DIAMOND POWER INTERNATIONAL, INC. C/O HELLER, DRAPER, HAYDEN, PATRICK & HORN  C/O JAN MARIE HAYDEN 650 POYDRAS STREET, SUITE 2500  NEW ORLEANS, LA 70130 |
| 1832130 | EVANS, JUDY AND EUGENE C/O CONROY & DEMETRIO, P.C. FRANCIS PATRICK MURPHY, ESQ. 33 N DEARBORN STREET 21ST FLOOR CHICAGO, IL 60602 |
| 1478235 | FREDERICK, TODD C/O DISCHELL, BARTLE, YANOFF, & DOOLEY JONATHON B. YOUNG 2028 NORTH BROAD STREET P O  BOX 107 LANSDALE, PA 19446 |
| 1903057 | GAF CORP./RUBEROID C/O MCCARTER & ENGLISH, LLP RACHEL L. DIEHL FOUR GATEWAY CENTER 100 MULBERRY STREET PO BOX 652 NEWARK, NJ 07101-0652 |
| 1876616 | HAMILTON PROPERTIES INC C/O LAPP & PONTZ, LLP DALE E. LAPP 255 BUTLER AVENUE SUITE 101  LANCASTER, PA 17601 |
| 1478206 | HAMPTON, JUDITH C/O FALCIANI, ANGELO J.  35 SOUTH BROAD STREET  WOODBURY, NJ 08096 |
| 1832178 | HAMPTON, RANDALL C/O ANGELO J. FALCIANI, P.A.  35 SOUTH BROAD STREET PO BOX 379  WOODBURY, NJ 08096 |
| 1903209 | I & S ASSOCIATES, LLC C/O PEPPER HAMILTON, LLP MICHAEL REED, ESQ. 3000 TWO LOGAN SQUARE EIGHTEENTH AND ARCH STREETS PHILADELPHIA, PA 19103 |
| 1876176 | LEVINE, MORTON P., CHPT 11 TTEE C/O SMITH, GAMBRELL & RUSSELL, LLP BARBARA ELLIS-MONRO SUITE 3100, PROMENADE 11 1230 PEACHTREE STREET, NE  ATLANTA, GA 30309 |
| 1903002 | MARKLEY, DEAN A., ET AL C/O MALAKOFF DOYLE, & FINBERG, PC RICHARD A. FINBERG, ESQ. SUITE 200, THE FRICK BUILDING PITTSBURGH, PA 15219 |
| 1874809 | MERCER COUNTY C/O MERCER CNTY PROSECUTING ATTNY'S OFFICE AMY B. IKERD, ASST PROSECUTOR 19 NORTH WALNUT STREET CELINA, OH 45822 |
| 1903464 | NATIONAL SERVICES INDUSTRIES, INC. C/O KING & SPALDING MARK M. MALONEY, ESQ. 191 PEACHTREE STREET  ATLANTA, GA 30303 |
| 1902222 | OWENS-ILLINOIS, INC. C/O WOOLF MCCLANE BRIGHT ALLEN & CARPENTER HUGH B. BRIGHT, JR., ESQ. PO BOX 900 900 GAY STREET, SUITE 900  KNOXVILLE, TN 37901-0900 |
| 1903473 | PFIZER, INC. C/O KAYE SCHOLER LLP LESTER M. KIRSHENBAUM, ESQ. 425 PARK AVENUE  NEW YORK, NY 10022 |
| 1890103 | PRODUCTS SYSTEMS INTERNATIONAL, INC. C/O HARTMAN UNDERHILL & BRUBAKER LLP JOSHUA D. COHEN, ESQUIRE 221 EAST CHESTNUT STREET  LANCASTER, PA 17602 |
| 1903466 | PROXICOM INC C/O ZUCKERMAN SPAEDER LLP THOMAS G. MACAULEY ONE COMMERCE CENTER 120 ORANGE STREET, SUITE 650 PO BOX 1028 WILMINGTON, DE  19899-1028 |
| 1903473 | SOUTHWEST RECREATIONAL INDUSTRIES, INC. C/O KAYE SCHOLER LLP LESTER M. KIRSHENBAUM, ESQ. 425 PARK AVENUE  NEW YORK, NY 10022 |
| 1903461 | TRAVELERS CASUALTY & SURETY CO. C/O PHILLIPS NIZER BENJAMIN KRIM & BALLON LL JACQUELINE L. GIORGIO 600 OLD COUNTRY ROAD  GARDEN CITY, NY 11530-2011 |
| 1903441 | UNION CARBIDE CORPORATION C/O KELLEY, DRYE & WARREN, LLP WILLIAM C. HECK 101 PARK AVENUE  NEW YORK, NY 10178 |
| 1902964 | ZEBERT, DONALD C/O STEVENS & WARD, P.A. LANCE STEVENS, ESQ. 1855 LAKELAND DRIVE  SUITE Q-230  JACKSON, MS 39216 |
| 1430457 | ARMSTRONG WORLD INDUSTRIES M. HOWALDT, W. GANGL, K. JACOBS LEGAL DEPARTMENT 2500 COLUMBIA AVENUE BUILDING 701 LANCASTER, PA 17603 |
| 1432717 | CACI INC-FEDERAL MARJORIE CROSSMAN 1100 N GLEBE ROAD  ARLINGTON, VA 22201 |
| 1433326 | CENTER FOR CLAIMS RESOLUTION JOSEPH J. JORDEN C/O 993 LENOX DR STE 207  TRENTON, NJ 08648-2316 |
| 1433447 | CERTAINTEED 1220 OAK HILL ROAD  MOUNTAINTOP, PA 18707 |
| 1433780 | CIGNA DENTAL HEALTH INC DRAWER CS 198382  ATLANTA, GA 30384 |
| 1433783 | CIGNA HEALTHCARE SO CALIFORNIA FILE # 31625  LOS ANGELES, CA 90074 |
| 1433784 | CIGNA HLTHCARE OF OHIO-COLUMBUS P O BOX 371166  PITTSBURGH, PA 15251 |
| 1435474 | DANA CORPORATION P O BOX 67000 DEPT 21201  DETROIT, MI 48267 |
| 1443664 | LIBERTY MUTUAL  P O BOX 650714  DALLAS, TX 75265-0714 |
| 1443666 | LIBERTY MUTUAL INSURANCE  P O BOX 931684  ATLANTA, GA 31193-1684 |
| 1443669 | LIBERTY MUTUAL INSURANCE GROUP  P O BOX 13770  PHILADELPHIA, PA 19101 |
| 1445630 | MONSANTO ENVIRO-CHEM  P O BOX 945526  ATLANTA, GA 30394 |
| 1445631 | MONSANTO ENVIRO-CHEM SYSTEMS  PO BOX 14547  ST LOUIS, MO 63178 |
| 1447302 | OWENS CORNING FIBERGLAS CORP  P O BOX 102035 68 ANNEX  ATLANTA, GA 30368 |
| 1447303 | OWENS CORNING FIBERGLAS CORP  P 0 BOX 360029M  PITTSBURGH, PA 15251-6029 |
| 1447310 | OWENS ILLINOIS LABELS INC.  1051 BLOOMFIELD RD  BARDSTOWN, KY 40004 |
| 1447311 | OWENS ILLINOIS PLASTIC PRODUCTS INC  BOX 10565  NEWARK, NJ 07101 |
| 1448924 | PRUDENTIAL  P O BOX 905579  CHARLOTTE, NC 28290 |
| 1448930 | PRUDENTIAL INSURANCE CO OF AMERICA  P O BOX 101000  ATLANTA, GA 30392 |
| 1454576 | UNITED STATES GYPSUM CO STANLEY L. FERGUSON 125 S FRANKLIN ST  CHICAGO, IL 60606 |

**EXHIBIT F**

**3**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| ARMSTRONG WORLD INDUSTRIES, | ) |
| INC. et al., | ) |
| | ) Case No. 00-04471 (JKF) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) Objection Deadline: October 6, 2006 |
| | ) Hearing Date: October 23, 2006 at 9:45 a.m. |

### NOTICE OF SEA-PAC SALES COMPANY'S MOTION (I) TO STAY OBJECTION BY ARMSTRONG WORLD INDUSTRIES, INC. TO SEA-PAC'S PROOF OF CLAIM NO. 4854 PENDING ARBITRATION, AND (II) FOR RELIEF FROM THE AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE DISCHARGE INJUNCTION

TO:    All Persons on the Attached Service List

Attached hereto is Sea-Pac Sales Company's Motion (I) To Stay Objection By Armstrong World Industries, Inc. To Sea-Pac's Proof Of Claim No. 4854 Pending Arbitration, And (Ii) For Relief From The Automatic Stay Or, In The Alternative, For Relief From The Discharge Injunction (the "Motion").

Any party wishing to oppose the entry of an order approving the Motion must file an objection ("Objection") with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Wilmington, Delaware 19801 on or before **October 6, 2006** (the "Objection Deadline"). At the same time, you must serve such Objection on the following so as to be received by the Objection Deadline.

Eckert Seamans Cherin & Mellott, LLC
Michael G. Busenkell, Esq.
300 Delaware Avenue, Suite 1360
Wilmington, DE 19801

A HEARING ON THE MOTION, IF NECESSARY, WILL BE HELD ON **OCTOBER 23, 2006 AT 9:45 A.M.** BEFORE THE HONORABLE JUDITH K. FITZGERALD, UNITED STATES BANKRUPTCY JUDGE, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 5TH FLOOR, WILMINGTON, DELAWARE 19801.



9/15/06
9830

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

ECKERT SEAMANS CHERIN & MELLOTT, LLC

Karen Lee Turner (Bar No. 4332)
Michael G. Busenkell (Bar No. 3933)
300 Delaware Avenue, Suite 1360
Wilmington, Delaware 19801
(302) 425-0430

Michael M. Feinberg
Diana K. Carey
KARR TUTTLE CAMPBELL
1201 Third Avenue, Suite 2900
Seattle, Washington 98102
(206) 223-1313

Al Van Kampen
ROHDE & VAN KAMPEN, PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
(206) 386-7353

*Attorneys for Creditor Sea-Pac Sales Company*

Dated: September 15, 2006

*U0003286*

2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| ARMSTRONG WORLD INDUSTRIES, | ) |
| INC. et al., | ) |
| | ) Case No. 00-04471 (JKF) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) Objection Deadline: October 6, 2006 |
| | ) Hearing Date: October 23, 2006 at 9:45 a.m. |

## SEA-PAC SALES COMPANY'S MOTION (I) TO STAY OBJECTION BY ARMSTRONG WORLD INDUSTRIES, INC. TO SEA-PAC'S PROOF OF CLAIM NO. 4854 PENDING ARBITRATION, AND (II) FOR RELIEF FROM THE AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE DISCHARGE INJUNCTION

Sea-Pac Sales Company ("Sea-Pac"), by and through its undersigned counsel, respectfully submits this Motion (i) to Stay Objection by Armstrong World Industries, Inc. ("AWI") to Sea-Pac's Proof of Claim No. 4854 Pending Arbitration, and (ii) for Relief from the Automatic Stay or, in the Alternative, for Relief from the Discharge Injunction. In support of this Motion, Sea-Pac respectfully states as follows:

### BACKGROUND

1.    The factual and procedural background is set forth in Sea-Pac Company's Memorandum in Support of Answer to the Objection by Armstrong World Industries, Inc. to Sea-Pac's proof of claim no. 4854 filed concurrently herewith and incorporated herein by reference.

### I.    Plan and Confirmation Order

2.    On or about August 18, 2006, the Court entered the Findings of Facts, Conclusions of Law and Order Pursuant to 11 U.S.C. § 1129 and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming the Fourth Amended Plan of

Reorganization of AWI (the "Confirmation Order") confirming the Fourth Amended Plan of Reorganization of Armstrong World Industries, Inc., as modified (the "Plan"). The Confirmation Order contains a permanent injunction which provides:

> All Entities shall be precluded and forever barred from asserting against AWI, Reorganized AWI, its successors or assigns, or its assets, properties, or interests in property any other or further Claims based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

*See* Confirmation Order ¶12. The Plan contains a similar provision. *See* Plan § 11.2.

## II.    Arbitration Provisions of Residential Agreement and Commercial Agreement

3.    Sea-Pac and AWI agreed to resolve disputes arising under the Commercial Agreement and the Arbitration Agreement through arbitration.[1]

4.    The Commercial Agreement and the Residential Agreement each provide, in pertinent part:

> Armstrong and [Sea-Pac] agree to attempt to resolve promptly any dispute arising out of this Agreement by negotiation between executives of [Sea-Pac] and Armstrong who have authority to settle the dispute. If any dispute is not resolved by negotiation within 30 days of its arising, then, at the written request of either party within an additional 10 days, the dispute shall be submitted to mediation with a mediator chosen jointly.

*See* Commercial Agreement § 24; Residential Agreement § 29.

5.    The Commercial Agreement and the Residential Agreement each further provide, in pertinent part:

---

[1]    Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Response Memorandum. The Commercial Agreement and the Residential Agreement are attached to Sea-Pac's proof of claim no. 4854, which is attached to the Objection of Armstrong World Industries, Inc. To The Proof Of Claim Of Sea-Pac Sales Company (Claim No. 4854) (the "Claims Objection") as Exhibit A.

2

> In the absence of a request for mediation, or if any dispute is not resolved within 90 days following a request for mediation, then, at the option of either party, such dispute shall be submitted to binding arbitration in Philadelphia, Pennsylvania, under the Commercial Arbitration Rules of the American Arbitration Association.

See Commercial Agreement § 25; Residential Agreement § 30. The parties have attempted to resolve the disputes underlying Sea-Pac's claims. Accordingly, arbitration of Sea-Pac's claims is required pursuant to the Commercial Agreement and the Residential Agreement.

## JURISDICTION AND VENUE

6.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and pursuant to Article IX of the Plan and paragraph 24 of the Confirmation Order. Venue is proper pursuant to 28 U.S.C. §§ 1448 and 1409. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(G).

## RELIEF REQUESTED

7.  Sea-Pac respectfully requests that the Court enter an order staying the Claims Objection pending arbitration. In addition, Sea-Pac requests that the Court enter an order granting relief from the automatic stay, or, in the alternative, relief from the discharge injunction, so as to permit Sea-Pac to proceed with arbitration of its claims.

## LEGAL ARGUMENT

### I.    Stay Pending Arbitration

8.  The agreements forming the basis of Sea-Pac's claims, the Commercial Agreement and the Residential Agreement, both contain mandatory arbitration provisions as cited above. There is no question that Sea-Pac's claims are subject to these mandatory arbitration provisions.

3

9.     The Federal Arbitration Act ("FAA") provides that arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2.  Federal courts have recognized that "there is a strong presumption in favor of arbitration and a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Carter v. Countrywide Credit Industries, Inc.*, 362 F.3d 294, 297 (5th Cir. 2004) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)).  In addition, a court has the power to stay a proceeding if the court determines that the arbitration clause applies to the dispute.[2]

10.     Due to the strong federal policy in favor of arbitration as reflected in the above FAA provisions, a court has the discretion to refuse to enforce a valid arbitration provision only if "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *See In re Mintze*, 434 F.3d 222, 229 (3d Cir. 2006) (citing *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220 (1987)).  In other words, the court lacks discretion to deny enforcement of a valid arbitration clause unless the <u>party opposing arbitration</u> can establish congressional intent "to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* (citing *Hays & Co. v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156-57 (3d Cir. 1989)).  Furthermore, the court may determine congressional intent through an analysis of the statutory text, its legislative history or "an inherent conflict between arbitration and the statute's underlying purposes." <u>Id.</u>

---

[2] *See* 9 U.S.C. § 3. The scope of the arbitration provision is a matter of contract interpretation that is subject to determination by the arbitrator. *See Green Tree Financial Corp., nka Conseco Finance Corp. v. Bazzle*, 539 U.S. 444 (2003).

4

11.    Although *Hays* involved a non-core proceeding, the Third Circuit held in *Mintze* that the *Hays* standard as set forth above applies with equal force to core proceedings. *Id.* at 230. In applying the *Hays* standard, the *Mintze* court did not find any evidence of the requisite congressional intent in the text or legislative history of the Bankruptcy Code; therefore, the court had to determine whether there was an inherent conflict between the Bankruptcy Code and arbitration. *Id.* at 231. As there were no claims created by the Bankruptcy Code at issue in *Mintze*, the court found no inherent conflict between the statute and arbitration. *Id.; see also In re Erie Power Technologies, Inc.*, 315 B.R. 41, 45 (Bankr. E.D. Pa. 2004) (the underlying causes of action arose from the parties' contract, and, therefore, the court concluded that there was no conflict between enforcement of the arbitration provision and the purposes of the Bankruptcy Code).

12.    While core claims that arise under the Bankruptcy Code – such as fraudulent transfer claims or preference claims – may not be sent to arbitration, *see OHC Liquidation Trust*, 2005 WL 670310 at *4 (Bankr. D. Del. March 18, 2005)[3], the enforcement of arbitration agreements with respect to other core claims is discretionary. *See Hays*, 885 F.2d at 1155; *Hylland v. Northwestern Corp. (In re Northwestern Corp.)*, 319 B.R. 68, 75 (D. Del. 2005); *CGE Ford Heights, LLLC v. Browning-Ferris Indus. Of Illinois, Inc.*, 208 B.R. 825, 827 (Bankr. D. Del. 1997).

13.    With respect to core claims, the Court may decline to compel arbitration only if it finds that enforcement of the arbitration clause would conflict with the policies of the Bankruptcy Code, or where the dispute underlying the arbitration is based on rights created by the Bankruptcy Code. *See Shubert v. Wellspring Media, Inc. (In re Winstar*

---

[3]    A copy of this opinion is attached hereto as Exhibit A.

5

*Communs., Inc.),* 335 B.R. 556 (Bankr. D. Del. 2005). The burden is on the party opposing arbitration to demonstrate why the court should not enforce an arbitration clause. *See id.* In *Winstar,* the court noted that:

> The Debtors, however, in agreeing to the arbitration clause, determined that arbitration, and not this Court, would be the avenue through which this issue should be addressed. Absent evidence that arbitration would jeopardize the objectives of the Bankruptcy Code, the Court gives deference to the procedures agreed upon by the parties for resolving this dispute. *See Hays,* 885 F.2d at 1162 n.23 (*citing Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519, 94 S. Ct. 2449, 41 L. Ed. 2d 270 (1974)) ("An agreement to arbitrate before a specific tribunal is, in effect, a specialized kind of forum selection clause. Moreover, based on the recent Supreme Court arbitration cases we have previously reviewed, the national policy favoring enforcement of agreements to arbitrate is at least as strong or stronger than that favoring enforcement of forum selection agreements.").

As noted by the Third Circuit in *Mintze,* absent a demonstration by the party opposing arbitration of an intent by Congress to preclude waiver of judicial rights, the Court lacks discretion in enforcing an arbitration provision. *See Mintze, 434 F.3d at 231*

14.     In this proceeding, as in *Mintze,* the underlying claims did not arise from the Bankruptcy Code; rather, the claims arose from the contracts between the parties. Moreover, enforcement of the arbitration provisions would not conflict with the Bankruptcy Code. Therefore, as no conflict exists between the Bankruptcy Code and enforcement of the arbitration provisions, this Court must enforce the arbitration provisions.

15.     Assuming arguendo that the Court has discretion in determining whether to enforce the arbitration provisions, in exercising its discretion to enforce the arbitration provisions of the Commercial Agreement and the Residential Agreement the Court must consider: (i) whether a claim is debtor-derivative, *i.e.,* whether the trustee stands in the shoes of the debtor for the purposes of a contract containing an arbitration clause; or (ii)

6

whether referring the core matter to arbitration would conflict with the text, legislative history, or purpose of the Bankruptcy Code. In determining whether arbitration of a claim would conflict with the Bankruptcy Code, courts will consider (i) whether requiring the debtor to pursue arbitration would expend already limited resources in litigating an action in geographically diverse forum, *see Pardo v. Pacificare of Texas, Inc. (In re APF Co.)*, 264 B.R. 344, 361-64 (Bankr. D. Del. 2001); (ii) whether arbitration is the most effective and efficient forum to resolve issues related to a bankruptcy case, as the efficient resolution of claims an conservation of the estate's assets benefits creditors, id. (iii) whether resolution of the claim would determine the priorities of claims, *see In re Glen Eagle Square, Inc.*, Bankr. No. 91-10796, 1991 WL 71782, at *1 (Bankr. E.D. Pa. May 1, 1991)[4]; and (iv) whether referring claims to arbitrators who have little experience in bankruptcy matters would lead to inconsistent results. *See OHC*, 2005 WL 670310, at *5.

16.    Requiring the debtor to pursue arbitration in Philadelphia, Pennsylvania, twenty miles away from this Court, in accordance with the underlying agreements will not expend the Debtors' resources through litigation in a geographically diverse forum. *See, e.g., Winstar*, 335 B.R. at 567 (finding that costs of arbitration of dispute in New York versus proceeding in Delaware bankruptcy court not significantly greater). With respect to the second factor, arbitration, as the parties' chosen dispute resolution mechanism, is an efficient and economical forum to resolve Sea-Pac's claims.[5] Notably, the Commercial Agreement and the Residential Agreement are the Debtors' form agreements and, consequently, the Debtors cannot now complain about the enforcement

---

[4]    A copy of this opinion is attached hereto as Exhibit B.

[5]    As noted by the Court in *Winstar*, the Court should give "deference to the procedures agreed upon by the parties for resolving this dispute. *Winstar*, 335 B.R. at 567 (citing *Haus*, 885 F.2d at 1162 n.23.

of arbitration provisions that they insisted upon. With respect to the third factor, arbitration of Sea-Pac's claims will not determine the priority of the claims – merely the amount. Finally, arbitration will not lead to any inconsistent result with the bankruptcy proceedings. Accordingly, the Court should stay the Claims Objection pending arbitration.

## II.    Relief from Automatic Stay

17.    Section 362(d) of the Bankruptcy Code provides in pertinent part:

> (d)    On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
> (1)  for cause. . .

*See* 11 U.S.C. § 362(d). The Bankruptcy Code does not offer a definition for the term "cause;" therefore, the court must determine whether cause exists on a case by case basis. *See In re Rexene Products Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

18.    The factors that the court must consider in a determination of whether there is cause to grant relief from the automatic stay are the following: (a) whether prejudice to the debtor will result from relief from the stay; (b) whether the hardship to the movant by maintaining the stay outweighs the hardship to the debtor by granting relief from the stay; and, (c) whether the movant has a probability of success on the merits. *See id.; see also In re Integrated Health Services, Inc.*, 2000 Bankr. LEXIS 1319, Case No. 00-389 (MFW) (Bankr. D. Del. 2000) (citing *Rexene*)[6]; *In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993).

---

[6]    A copy of this opinion is attached hereto as Exhibit C.

8

19.     To the extent the Debtors oppose relief from stay to proceed with a arbitration, they has the burden under 362(g) of demonstrating why arbitration should not be granted. *See Slipped Disc, Inc. v. CD Warehouse, Inc. (In re Slipped Disc, Inc.)*, 245 B.R. 342, 346 (Bankr. D. Iowa 2000).

20.     The application of the above three factors demonstrates that cause exists to grant Sea-Pac's request for relief from the automatic stay. First, AWI will not suffer any prejudice from the court granting relief from the stay because, as a result of the Claims Objection, Sea-Pac's claims must be adjudicated. Moreover, there is no prejudice in adjudicating the claim in arbitration as it is the parties' negotiated choice of forum.

21.     With respect to the second *Rexene* factor, the hardship to Sea-Pac if the Court maintains the stay outweighs the hardship to AWI if the court grants relief from the stay. Denying relief from the stay would prevent Sea-Pac from pursuing its claims for breach of the Residential Agreement and Commercial Agreement in arbitration – the parties' bargained-for choice of forum.

22.     Finally, with respect to a probability of the movant's success, the showing need only be "very slight." *See Rexene* at 578. Sea-Pac satisfies this showing of probability of success by setting forth a prima facie case for breach of the above agreements, and, therefore, has a reasonable probability of success on the merits.

### III.     Relief from Discharge Injunction

23.     In the alternative, Sea-Pac seeks relief from the discharge injunction set forth in the Plan and Confirmation Order.

24.     The standard for a determination of whether the court should grant relief from the discharge injunction is also a "cause" standard. *See In re Fucilo*, 2002 Bankr.

LEXIS 475, Case No. 00-36261 (CGM) at 26; *see also In re Jenkins*, 330 B.R. 625, 629 (Bankr. E.D. Tenn. 2005).  The factors to be considered in determining whether cause exists are the following: (1) whether relief would result in partial or complete resolution of the issues; (2) the lack of any connection to or interference with the bankruptcy case; (3) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (4) whether the litigation would prejudice the interests of other creditors; (5) the interests of judicial economy and expeditious and economical resolution of the litigation; (6) whether the parties are ready for trial in the other proceeding; and (7) the impact of the stay on the parties and balance of harms.  *See Fucilo* at 27 (citing *Sonnax Industries, Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990)).

25.    The above listed factors that are relevant to this proceeding are those same factors that constitute cause under *Rexene* for relief from the automatic stay.  In addition to those factors discussed under the automatic stay analysis, granting relief from the discharge injunction would not affect the rights of any other creditors, would not interfere with the bankruptcy case and would be in the interest of judicial economy as a resolution of the claims at arbitration would save this court's valuable judicial resources.

10

## CONCLUSION

Sea-Pac respectfully requests that the Court (a) enter an order staying the Claims Objection pending arbitration; (b) grant relief from the automatic stay, or, in the alternative, grant relief from the discharge injunction, to permit Sea-Pac to pursue its claims in arbitration; and (c) grant such other relief as is just and proper.

ECKERT SEAMANS CHERIN &
MELLOTT, LLC

Karen Lee Turner (Bar No. 4332)
Michael G. Busenkell (Bar No. 3933)
300 Delaware Avenue, Suite 1360
Wilmington, Delaware 19801
(302) 425-0430

Michael M. Feinberg
Diana K. Carey
KARR TUTTLE CAMPBELL
1201 Third Avenue, Suite 2900
Seattle, Washington 98102
(206) 223-1313

Al Van Kampen
ROHDE & VAN KAMPEN, PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
(206) 386-7353

*Attorneys for Creditor Sea-Pac Sales
Company*

Dated: September 15, 2006

*U0003263*

11

# EXHIBIT A

Westlaw.

Not Reported in B.R.                                                                        Page 1

Not Reported in B.R., 2005 WL 670310 (Bkrtcy.D.Del.), 53 Collier Bankr.Cas.2d 1664, 44 Bankr.Ct.Dec. 127
**(Cite as: Not Reported in B.R.)**

**H**

United States Bankruptcy Court,D. Delaware.
In re: OAKWOOD HOMES CORPORATION, et
al., Debtors.
OHC Liquidation Trust, by and through Alvarez &
Marshal, LLC, the OHC Liquidation Trustee,
Plaintiff,
v.
AMERICAN BANKERS INSURANCE CO.,
Defendant.
No. 02-13396PJW, ADV.No. 04-56928PBL.

March 18, 2005.

Michael G. Busenkell, Wilmington, DE, for Debtor.

*MEMORANDUM OPINION*

LINDSEY, Bankruptcy J.
*1 Before the Court is the Motion of American
Bankers Insurance Company (hereafter referred to
as "Defendant") for Dismissal in Favor of
Arbitration. For the reasons stated herein, the
Motion will be denied.

*I. BACKGROUND*

The Debtors, Oakwood Homes Corporation, and
certain of its affiliates (hereafter referred to as "
Debtors"), filed voluntary petitions for relief under
Chapter 11 of the Bankruptcy Code on November
15, 2002. Debtors' Second Amended Joint
Consolidated Plan of Reorganization was confirmed
on March 31, 2004. The Plan provided for the
creation of a liquidating trust and vested the trust
with the right to pursue and prosecute any and all
avoidance actions on behalf of the beneficial
interests in the trust.

The OHC Liquidation Trust (hereafter referred to as
"Plaintiff"), commenced this adversary proceeding

by filing a complaint on November 12, 2004 against
Defendant. Plaintiff seeks to avoid and recover
certain allegedly preferential transfers pursuant to §
547(b), or alternatively, to avoid and recovery any
fraudulent transfers pursuant to §§ 548 and 544(b);
to preserve any avoidable transfers for the benefit of
Debtors' estates pursuant to § 551; and to disallow
any claims of Defendant until the amount of the
avoidable transfers are repaid to the OHC
Liquidation Trust pursuant to § 502(d).[FN1] The
complaint prayed for recovery of an amount not less
than $9,760,004.62. Defendant responded to the
complaint with this Motion to Dismiss which was
filed on December 20, 2004. Briefing has been
completed and on February 15, 2005, Defendant
appropriately filed a Notice of Completion of
Briefing. The Motion is therefore, ripe for
disposition at this time.

FN1. Hereinafter, references to statutory
provisions by section number only will be
to provisions of the Bankruptcy Code
unless the contrary is clearly stated.

*II. JURISDICTION AND VENUE*

This Court has jurisdiction over this adversary
proceeding and the parties thereto, pursuant to 28
U.S.C. §§ 1334 and 157(b)(1), and this is a core
proceeding pursuant to 28 U.S.C. § 157(b)(2), (A),
(B), (F), (H) and (O). Venue is proper in this
jurisdiction pursuant to 28 U.S.C. § 1409.

*III. DISCUSSION*

Defendant American Bankers Insurance Company
has filed its Motion to Dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6), made applicable
to this adversary proceeding by Federal Rule of
Bankruptcy Procedure 7012(b), seeking an order
dismissing this action in favor of arbitration.
Defendant asserts that it and Oakwood Mobile

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                    Page 2

Not Reported in B.R., 2005 WL 670310 (Bkrtcy.D.Del.), 53 Collier Bankr.Cas.2d 1664, 44 Bankr.Ct.Dec. 127
(Cite as: Not Reported in B.R.)

Homes, Inc., one of the debtors in this bankruptcy case, are parties to a certain Insurance Services Agreement (hereafter, the "Agreement"). Section V of the Agreement provides, in material part, that " [i]f any dispute shall arise between the [Debtor] and [Defendant] with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, the dispute shall be settled by arbitration in accordance with the rules of the American Arbitration Association." (Exhibit A to American Banker Insurance Co.'s Opening Brief in Support of the Motion to Dismiss in Favor of Arbitration, at 6)

*2 Defendant argues that all of the claims made by Plaintiff are covered by § V of the Agreement, and therefore, the complaint fails to state a claim upon which relief can be granted "because all of the claims purportedly asserted in the Complaint are subject to mandatory arbitration and must be referred to arbitration pursuant to 9 U.S.C. §§ 2 and 3." (Defendant's Brief in Support of the Motion to Dismiss, at 2)

Alternatively, Defendant asserts that it is well established in this district, that this Court is permitted to exercise its discretion to dismiss an adversary proceeding in favor of arbitration, notwithstanding the fact that this is a core proceeding.[FN2] (Id. at 5) Defendant has urged this Court therefore, to use that discretion and dismiss in favor of arbitration because it will be more cost effective, more expeditious than litigation, and the panel of arbitrators will presumably be more familiar with the insurance industry and the relationships involved in this dispute.

> FN2. See, SFC New Holdings, Inc. v. Earthgrains Co. (In re GWI, Inc.), 269 B.R. 114, 117 (Bankr.D.Del.2001) (holding that "where a matter is a core proceeding, it is left to the bankruptcy court's discretion to decide whether to refer the matter to arbitration.")

Conversely, Plaintiff opposes the Motion to Dismiss arguing that a trustee cannot be compelled to arbitrate fraudulent conveyance claims under §§ 544(b) and 548, as well as, any other type of claim that the trustee brings on behalf of the creditors of the bankruptcy estate, including preference claims. (Plaintiff's Answering Brief in Opposition to Defendant's Motion for Dismissal in Favor of Arbitration, at 2) Plaintiff asserts that a trustee, who stands in the shoes of the creditors, cannot be required to arbitrate disputes pursuant to an agreement that neither the creditors nor the trustee entered into. Plaintiff also contends that " [b]ankruptcy courts enjoy significant discretion to deny arbitration of core bankruptcy-created claims." (Id, at 4) Plaintiff then discusses certain factors that courts have typically looked to when determining whether to exercise their discretion in favor of dismissal. Those factors include: the importance of a centralized resolution of purely bankruptcy issues, the degree to which specialized bankruptcy knowledge is required to resolve the dispute, the need to protect creditors from piecemeal litigation, whether the parties have commenced arbitration outside of bankruptcy, and whether arbitration would cause undue delay in the administration of the case. (Plaintiff's Answering Brief, at 4) (citations omitted)

The leading Third Circuit precedent on the issue of mandatory arbitration in the bankruptcy context is *Hays and Company v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149 (3rd Cir.1989). In that case, the Chapter 11 trustee brought an action against a securities broker-dealer, asserting various claims under federal and state securities laws, as well as common law claims for breach of contract and fiduciary duties, gross negligence and conversion, claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), and equitable claims pursuant to § 544(b) of the Bankruptcy Code under the Uniform Fraudulent Conveyances Act as adopted by New York, New Jersey and Pennsylvania. The broker-dealer/defendant filed a motion to compel arbitration under its pre-petition agreement with the debtor. The District Court denied the motion, holding that it had discretion to nullify a mandatory arbitration clause, and stating that since neither the trustee nor the creditors represented by him signed the arbitration clause, they should not be bound by its terms. *Hays,* 885 F.2d at 1151.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 2005 WL 670310 (Bkrtcy.D.Del.), 53 Collier Bankr.Cas.2d 1664, 44 Bankr.Ct.Dec. 127
(Cite as: Not Reported in B.R.)

*3 On appeal, the Third Circuit Court of Appeals held that the District Court was correct denying the motion with respect to the § 544(b) claims, because those claims were not derivative of the debtor and therefore not subject to arbitration. Initially, *Hays* noted that the United States Supreme Court held that an arbitration agreement binds the parties who execute it and it is the parties' intentions that must then be carried out. *Id.*, at 1155 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)). The *Hays* Court therefore held that " there is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative from one who was a party to it." *Id.*, at 1155. The Court noted that its conclusion in this regard was supported by *Allegaert v. Perot*, 548 F.2d 432 (2nd Cir.), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977), where the trustee's complaint also contained several causes of action unique to the trustee under the Bankruptcy Act and not derivative of the bankrupt. In its discussion of *Allegaert*, the Court stated:
(With respect to those of the trustee's claims, such as fraudulent and preferential transfers, that arose under the Bankruptcy Act, the court stated that " [t]hese are statutory causes of action belonging to the trustee, not to the bankrupt, and the trustee asserts them for the benefit of the bankrupt's creditors, whose rights the trustee enforces."). It follows that the trustee cannot be required to arbitrate its section 544(b) claims and that the district court was not obliged to stay them pending arbitration.

*Hays*, 885 F.2d at 1155 (quoting *Allegaert*, 548 F.2d at 436).

With regard to the remaining issues, i.e., the non-core securities law, common law and RICO claims, *Hays* refers to a number of decisions in which debtors in bankruptcy had been held bound by mandatory arbitration agreements entered into by them pre-petition, and held "that the trustee is bound to arbitrate all of its claims that are derived from the rights of the debtor under section 541." *Id.*, at 1154.

*Hays* next examined the provisions of the Bankruptcy Code and determined that the Code does not conflict with the Arbitration Act or with the enforcement of a valid arbitration clause in a non-core adversary proceeding. *Id.*, at 1156. Therefore, *Hays* found that the District Court lacked discretion to deny enforcement in such a case.

While it is clear that bankruptcy courts do not possess discretion with respect to enforcement of an arbitration clause in a non-core adversary proceeding, it does appear manifest that such discretion exists with respect to core adversary proceedings. *In the Matter of National Gypsum Company*, 118 F.3d 1056 (5th Cir.1997) (core declaratory judgment action by debtor against liability insurer to collect pre-confirmation debts); *In re Mintze*, 288 B.R. 95 (Bankr.E.D.Pa.2003) (core proceeding to determine validity, priority and extent of lien); *In re APF Co.*, 264 B.R. 344 (Bankr.D.Del.2001) (core proceeding to recover capitation payments withheld by HMO); *American Freight Sys. v. Consumer Prods. Assocs. (In re American Freight Sys.)*, 164 B.R. 341, 347 (D.Kan., 1994) (core proceeding to collect freight undercharges); *Sacred Heart Hosp. v. Independence Blue Cross (In re Sacred Heart Hosp.)*, 181 B.R. 195, 202 (Bankr.D.Pa., 1995) (core proceeding).

*4 Although the issues before the *Hays* Court, except for the § 544(b) claims, were clearly non-core, and therefore arbitrable, the Court also made reference to circumstances in which discretion could be exercised on the issue of enforcement of an arbitration agreement. After discussing the Bankruptcy Reform Act of 1978, *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.W. 50, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (generally ruling the jurisdictional provision of the 1978 Act unconstitutional), the 1984 amendments to the 1984 Act, and various Supreme Court cases interpreting the Arbitration Act, the *Hays* Court stated:
[W]e can no longer subscribe to a hierarchy of congressional concerns that places the bankruptcy law in a position of superiority over [the Arbitration] Act. The message we get from these recent cases is that we must carefully determine

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                    Page 4

Not Reported in B.R., 2005 WL 670310 (Bkrtcy.D.Del.), 53 Collier Bankr.Cas.2d 1664, 44 Bankr.Ct.Dec. 127
(Cite as: Not Reported in B.R.)

whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an arbitration clause and that we should enforce such a clause unless that effect would seriously jeopardize the objectives of the Code.

*Hays,* 885 F.2d at 1161.

In this adversary proceeding, Plaintiff urges this Court to hold that the § 547 and § 548 claims asserted by it in its complaint are entitled to precisely the same treatment as the § 544(b) claims, on the grounds that they are purely core statutory claims not derivative of the Debtor. Plaintiff contends that the § 547 and § 548 claims are those that belong solely to the trustee, and are asserted for the benefit of the creditors of the debtor. As a result, they are not arbitrable.

In *In re EXDS, Inc.,* 316 B.R. 817, (Bankr.D.Del.2004), Judge Peter J. Walsh of this Court held without discussion that a § 548 fraudulent conveyance claim, like a § 544(b) claim, was created by the Bankruptcy Code, and that therefore, under *Hays,* he could not require such claims to be submitted to arbitration. Although the *Hays* Court referred to the trustee's statutory causes of action in *Allegaert,* collectively as claims "such as fraudulent and preferential transfers," Plaintiff does not cite, and this Court has not found, any decisions holding that § 547 preference actions may be equated with § 544(b) and § 548 actions for purposes of disposition under *Hays.* Nevertheless, this Court agrees with Plaintiff that such equation is entirely appropriate.

A preference action under § 547 is clearly a core proceeding under 28 U.S.C. § 157(b)(2)(F), as are fraudulent conveyance actions under §§ 544(b) and 548, pursuant to 28 U.S.C. § 157(b)(2)(H). Neither of these may be brought by a debtor, and under no interpretation could any such action be described or construed as having been derived from the debtor. They are creatures of statute, available in bankruptcy solely for the benefit of creditors of the debtor, whose rights the trustee enforces. The arbitration agreement was entered into by Debtor, pre-petition, and as the courts have made clear, it is the parties to such an agreement who are bound by

it and whose intentions must be carried out. Thus, it is the view of this Court that, under *Hays,* as extended by *EXDS,* this Court may not require fraudulent conveyance actions, under either §§ 544(b) or 548, or preference actions under § 547, to be submitted to arbitration.

*5 Moreover, even if the § 547 and § 548 claims set forth in Plaintiff's complaint herein were determined to be derived from Debtor, the interests, policies and objectives of the Bankruptcy Code would be seriously jeopardized by requiring arbitration of such claims. Many, if not most substantial bankruptcy cases involve numerous preference and fraudulent conveyance claims. The law, and the lore surrounding the adjudication of such claims is extensive, and has been developed over significant periods of time. The result is, that certain fact situations may be expected to bring about fairly consistent results, wherever they are tried. To subject these matters to arbitration, before individuals or tribunals with little or no experience in bankruptcy law or practice, and with little or no concern for the rights and interests of the body of creditors, of which the particular defendant is only one, would introduce variables into the equation which could potentially bring about totally inconsistent results. Such a result would be contrary to the primary policy of the Bankruptcy Code, which is that all classes of creditors of a debtor are entitled to be treated as equitably as possible, and that the remaining assets of a liquidating debtor are to be distributed on a pro rata basis to all creditors of a given class. Thus, even if §§ 547 and 548 were found to be claims derivative of the Debtor, this Court would exercise its discretion in favor of declining to enforce the arbitration agreement as contrary to the objectives of the Bankruptcy Code, and would therefore deny the motion to dismiss filed herein by Defendant.

### IV. CONCLUSION

For the foregoing reasons, the Motion of American Bankers Insurance Company for Dismissal in Favor of Arbitration is DENIED. An appropriate order follows.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                        Page 5

Not Reported in B.R., 2005 WL 670310 (Bkrtcy.D.Del.), 53 Collier Bankr.Cas.2d 1664, 44 Bankr.Ct.Dec. 127
**(Cite as: Not Reported in B.R.)**


Bkrtcy.D.Del.,2005.
In re Oakwood Homes Corp.
Not Reported in B.R., 2005 WL 670310
(Bkrtcy.D.Del.), 53 Collier Bankr.Cas.2d 1664, 44
Bankr.Ct.Dec. 127

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Not Reported in B.R.                                                    Page 1

Not Reported in B.R., 1991 WL 71782 (Bkrtcy.E.D.Pa.)
(Cite as: Not Reported in B.R.)

**H**
Only the Westlaw citation is currently available.
United States Bankruptcy Court, E.D. Pennsylvania.
In re GLEN EAGLE SQUARE, INC., Debtor.
Bankruptcy No. 91-10796S.

May 1, 1991.

Kevin J. Carey, Hepburn Wilcox Hamilton &
Putnam, Philadelphia, Pa., for debtor.
Richard L. Berkman, Dechert Price & Rhoads,
Philadelphia, Pa., for 1st Union.
Stephen M. Dodd, Hoyle, Morris & Kerr,
Philadelphia, Pa., for Madison Concrete.
Anthony Carrozza, III, Media, Pa., for Graveley
Roofing, Inc.
James J. O'Connell, Ass't. U.S. Trustee,
Philadelphia, Pa.
Sam L. Warshawer, Jr., Venzie, Phillips &
Warshawer, Philadelphia, Pa., for
Meehan-Weinmann, Inc.
Mary Walrath, Clark Ladner Fortenbaugh &
Young, Philadelphia, Pa., for American Ceilings,
Inc.
John K. Fiorillo, Klehr, Harrison, Harvey,
Branzburg & Ellers, Philadelphia, Pa., for Liberty
Bank.
Jonathan S. Ziss, Philadelphia, Pa., for Precision
Piping Co.

*MEMORANDUM*
DAVID A. SCHOLL, Bankruptcy Judge.
*1 We recognize the strong federal policy in
support of enforcement of contractual arguments to
arbitrate disputes between the parties. *See, e.g.,
Hays & Co. v. Merrill Lynch, etc.,* 885 F.2d 1149,
1155-56 (3d Cir.1989). However, even in light of
this policy, deferral to arbitration is within the
court's discretion, even as to non-core proceedings,
*id.,* at 1156. As to core proceedings, deferral
should not be the norm, *id.,* at 1155, and relief to
allow arbitration to go forward should be granted
only if the balance of hardships tips in favor of the

party seeking arbitration. *See In re FRG, Inc.,* 115
B.R. 72, 74 (E.D.Pa.1990).

The instant matter would be classified as core by
the *FRG* court, simply because it involves a matter
for relief from the automatic stay. *Id.* at 74 n. 2.
In addition, the dispute is, at least in substance, a
claim of MW against the Debtor and for that reason
classifiable as core. *See In re Meyertech Corp.,*
831 F.2d 410, 414-18 (3d Cir.1987). Resolving
claims is the most fundamental of bankruptcy court
processes, and therefore is rarely relegated to
arbitration. *See Zimmerman v. Continental
Airlines, Inc.,* 712 F.2d 55, 59 (3d Cir.1983), *cert.
denied,* 464 U.S. 1038 (1984); *In re F & T
Contractors, Inc.,* 649 F.2d 1229, 1232-33 (6th
Cir.1981); *In re J.T. Moran Financial Corp.,* 118
B.R., 233, 235-36 (Bankr.S.D.N.Y.1990); *In re
Guild Music Corp.,* 100 B.R. 624, 627-28
(Bankr.D.R.I.1989); *In re T.D.M.A., Inc.,* 66 B.R.
992, 996-97 (Bankr.E.D.Pa.1986); *In re Double
TRL, Inc.,* 65 B.R. 993, 998-99
(Bankr.E.D.N.Y.1986); and *In re Brookhaven
Textiles, Inc.,* 21 B.R. 204, 207-07
(Bankr.S.D.N.Y.1982).

MW has not demonstrated that the "balance of
hardships" tips in favor of granting its motion.
There is a considerable question as to whether MW
and the subcontractors have waived their right to
invoke arbitration. Pending before us is an
adversary proceeding (Adv. No. 91-0300S) to
determine MW's secured status, which involves
many of the same issues as the dispute which MW
wishes to relegate to arbitration. It seems foolish to
defer to an alternative forum which may decide that
its invocation has been waived and would be
obliged to return the matter to us in any event. We
have little doubt that the proceeding is core and we
have jurisdiction to hear it.

Other, more typical considerations weigh against
our deferral of this matter to arbitration. The issues
involved are crucial to the Debtor's reorganization,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in B.R.

Page 2

Not Reported in B.R., 1991 WL 71782 (Bkrtcy.E.D.Pa.)
(Cite as: Not Reported in B.R.)

as they impact upon the Debtor's relationship with its entire body of creditors, including a major secured creditor, First Union National Bank of North Carolina ("1st Union"), as well as with MW and the numerous subcontractor creditors. Resolution of the priorities in the claims of these parties is crucial to the Debtor's reorganization. *See In re Chas. P. Young Co.,* 111 B.R. 410, 417-18 (Bankr.S.D.N.Y.1990); and *In re Flechtner Packing Co.,* 63 B.R. 585, 587 (Bankr.N.D.Ohio 1986).

*2 Other considerations in favor of denying MW's motion are present. The issues presented are contract disputes which are not unusually complex. *See In re Wm. S. Newman Brewing Co.,* 87 B.R. 236, 241 (Bankr.N.D.N.Y.1988); and *T.D.M.A., supra,* 66 B.R. at 995-97. *Compare In re Bicoastal Corp.,* 111 B.R. 999, 1002 (Bankr.M.D.Fla.1990) (complex stock dispute); *In re Edgerton,* 98 B.R. 392, 395 (Bankr.N.D.Ill.1989) (same); and *In re R.M. Cordova Int'l, Inc.,* 77 B.R. 441, 449-51 (Bankr.D.N.J.1987) (matter of international commerce). We have little doubt that this court would be more expeditious than the arbitration system, since requests to arbitrate the instant dispute and attached disputes are still pending in various state courts. *See T.D.M.A., supra,* 66 B.R. at 997. We offered MW an opportunity to have the proceeding tried as soon as it was prepared to do so. The bankruptcy process will allow all interested parties, including 1st Union as well as the subcontractors, to participate in trials relevant to the disputes in issue. *Cf. In re Zeits,* 79 B.R. 222, 224, 226 (Bankr.E.D.Pa.1987), *aff'd,* C.A. No. 87-7756 (E.D.Pa. Feb. 29, 1988).

No such panoply of contrary considerations were present in *In re Chorus Data Systems, Inc.,* 122 B.R. 845, 850-54 (Bankr.D.N.H.1990), relied upon heavily by MW, in which the court granted relief to the party seeking arbitration only after a careful weighing process. That process yields a different result here.

For all of these reasons, MW's Motion must be denied.

### ORDER

AND NOW, this 1st day of May, 1991, after an extensive hearing of April 24, 1991, on the Motion of Meehan-Weinmann, Inc. for Relief from Stay and for Order Compelling Arbitration of Claims (" the MW Motion"), and careful consideration of the submission by the interested parties pursuant thereto and additional argument on May 1, 1991, it is hereby

ORDERED AND DECREED that the MW Motion is DENIED.

Bkrtcy.E.D.Pa.,1991.
In re Glen Eagle Square, Inc.
Not Reported in B.R., 1991 WL 71782 (Bkrtcy.E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



LEXSEE 2000 BANKR. LEXIS 1319

IN RE: INTEGRATED HEALTH SERVICES, INC., et al., Debtors. ALLIANCE ASSOCIATES, Movant, v. INTEGRATED HEALTH SERVICES, INC., et al., Respondents.

Chapter 11, Case No. 00-389 (MFW) through 00-825 (MFW) (Jointly Administered Under Case No. 00-389 (MFW)), Reference No. 1196

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

*2000 Bankr. LEXIS 1319*

**August 11, 2000, Decided**

**DISPOSITION:** [*1] Motion for relief from the stay filed by Alliance granted.

**COUNSEL:** James A. Patton, Esquire, Robert S. Brady, Esquire, Joel A. Waite, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE, for Integrated Health Services, Inc., et al.

Michael J. Crames, Esquire, Arthur Steinberg, Esquire, Marc D. Rosenberg, Esquire, KAYE SCHOLER FIERMAN HAYS & HANDLER, LLP, New York, NY, for Integrated Health Services, Inc., et al.

Francis A. Monaco, Esquire, Rachel B. Mersky, Esquire, WALSH, MONZACK & MONACO, P.A., Wilmington, DE, for Alliance Associates.

Howard L. Adelman, Esquire, Mark A. Carter, Esquire, ADELMAN, GETTLEMAN, MERENS, BERISH & CARTER, LTD., Chicago, IL, for Alliance Associates.

Joanne B. Wills, Esquire, Steven K. Kortanek, Ewsquire, Maria Aprile Sawczuk, Esquire, KLEHR HARRISON HARVEY BRANZBURG & ELLERS LLP, Wilmington, DE, for Official Committee of Unsecured Creditors.

Glenn Rice, Esquire, William Silverman, Esquire, OTTERBOURG STEINDLER HOUSTON & ROSEN, PC, New York, NY, for Official Committee of Unsecured Creditors.

Daniel K. Astin, Esquire, Maria Giannarakis, Esquire, OFFICE OF THE UNITED STATES TRUSTEE, Philadelphia, PA.

**JUDGES:** Mary F. Walrath, United [*2] States Bankruptcy Judge.

**OPINION BY:** Mary F. Walrath

**OPINION:**

**MEMORANDUM OPINION** n1

> n1 This Opinion Constitutes the findings of fact and conclusions of law of the Court pursuant to *Federal Rule of Bankruptcy Procedure 7052*, which is made applicable to contested matters by *Federal Rule of Bankruptcy Procedure 9014*.

I. INTRODUCTION

This matter is before the Court on the Motion of Alliance Associates ("Alliance") for Relief from the Automatic Stay. After consideration of the Debtors' Objection and argument of counsel at the hearing held on July 7, 2000, we grant the Motion for the reasons set forth below.

II. FACTUAL BACKGROUND

On February 2, 2000, Integrated Health Services, Inc., and certain of its direct and indirect subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

Prior to the petition date, on or about February 14, 1990, Alliance Associates Limited Partnership and Horizon Healthcare Corporation entered into a Lease of premises located at 1785 S. Freshly [*3] Avenue, Alliance, Ohio, consisting of a 100 bed nursing home ("the



Premises"). The term of the Lease was ten years, expiring on February 29, 2000; subject to two five year renewal options. The renewal option required that the tenant give notice of the exercise of the renewal 90 days prior to the expiration of the Lease. Through a series of assignments the parties to the Lease are now Alliance and one or more of the Debtors. n2

> n2 While the Debtors initially asserted that Alliance was not a party to the Lease, Alliance presented an affidavit confirming its standing. The Debtors did not contest that point at the hearing and, apparently, now concede that Alliance is the landlord under the Lease.

The Debtors failed to exercise the renewal option within the time required by the Lease. When they discovered their mistake, prior to the expiration of the Lease term, they did attempt to exercise the option.

Subsequently, on March 24, 2000, the Debtors filed a Motion to extend the time within which they may assume or reject [*4] all their leases. n3 On April 14, 2000, Alliance filed an objection to the Motion, on the basis that the Lease had expired by its own terms because the Debtors had failed to exercise the renewal option on time. We granted the Debtors Motion at the hearing held on April 17, 2000, concluding that we were extending the deadline only as to any leases which were still extant. Alliance filed a Motion for relief from the stay on May 15, 2000, seeking a determination that its Lease had terminated. The Debtors objected and a hearing on the Motion was held on July 7, 2000.

> n3 The Debtors have in excess of 1,500 leases to which they are parties.

## III. JURISDICTION

This Court has jurisdiction over this matter, which is a core proceeding, pursuant to *28 U.S.C. § § 1334* and *157(b)(2)(G)*.

## IV. DISCUSSION

Section 362(d)(1) permits the Court to grant relief from the stay "for cause." The term "cause" as used in section 362(d) has no obvious definition and is determined on a case-by-case [*5] basis. A three-factor test has been adopted for determining whether "cause" exists, applying the following criteria:

> (a) [Whether] any great prejudice to either the bankrupt estate or the debtor will result from the continuation of the civil suit;
>
> (b) [Whether] the hardship to the [non-bankrupt party] by maintenance of the stay considerably outweighs the hardship of the debtor; and
>
> (c) [Whether] the creditor has a probability of prevailing on the merits.

See, e.g., *In re Rexene Products Co., 141 B.R. 574, 576 (Bankr. D. Del. 1992)* (citations omitted).

Alliance asserts that it is clear that it will prevail on the merits since, under its express terms, the Lease expired on February 29, 2000. The Debtors concede that their exercise of the renewal option was not timely but assert that, under Ohio law, n4 equitable grounds support a finding that their late action was sufficient to retain their rights in the Lease. See, e.g., *Ward v. Washington Dist., Inc., 67 Ohio App. 2d 49, 425 N.E.2d 420 (Ohio Ct. App. 1980)*. In the Ward case, the Court concluded that "Equity will relieve a lessee from the consequences of a failure to give notice [*6] at the time, or in the form and manner, required as a condition precedent to the renewal of a lease, where such failure results from accident, fraud, surprise or honest mistake, and has not prejudiced the lessor. . . ." *Id. at 53*. The Debtors assert that their delay in exercising the option arose from an honest mistake and did not prejudice Alliance since it was exercised before the end of the Lease term and Alliance had not found another tenant by then or otherwise changed its position in reliance on the Debtors' failure to act.

> n4 The parties concede that Ohio law governs interpretation of the Lease.

Alliance asserts that equitable relief from the express terms of the Lease is not available to the Debtors under Ohio law because, in order to obtain relief from the effect of its mistake, the Debtors must actually affirm their intent to comply with the terms of the Lease as extended. See, e.g., *Paterakis v. Estate of Tuma, 66 Ohio App. 3d 373, 584 N.E.2d 61 (Ohio Ct. App.)*, [*7] appeal den. *52 Ohio St. 3d 706*, rehrg den. *53 Ohio St. 3d 711 (Ohio 1990)* (equitable defense not available because tenants never actually exercised their renewal option). To avail itself of such an equitable defense under Ohio law,



Alliance asserts that the Debtors must actually exercise the option and demonstrate that they are ready, willing and able to perform under the Lease. *Paterakis, 66 Ohio App. 3d at 376.* Alliance asserts the Debtors have not affirmed their intention to be bound by the terms of the Lease sufficient to warrant the extraordinary relief from their mistake that they seek because they have not assumed the Lease.

The Debtors argue that Alliance's argument is really in opposition to their request for an extension of time to decide whether to assume or reject the Lease. They assert that it is the Bankruptcy Code (and our Order dated April 17, 2000) which have already given them the extension of time. The Debtors assert that the Lease may be a valuable asset of their estate and argue that their interest in the Lease should be preserved until they have decided whether to assume or reject the Lease.

Alliance further argues [*8] that there is prejudice to it by granting the Debtors relief from their mistake because it has found a new tenant for both the Lease and another lease which Alliance had with another debtor in this Court, Mariner Health Group, Inc. ("the Rosegate Lease"). Alliance has obtained the rejection of the Rosegate Lease but the tenant insists on obtaining both leases. Thus, Alliance asserts it is severely prejudiced, not just by the loss of this Lease but by its loss of ability to lease the Rosegate property. Any delay prejudices its rights.

The Debtors argue that the only prejudice that we should consider is whether the landlord changed its position between the time that the renewal was required to be exercised and the time it was actually exercised. See, e.g., *Fletcher v. Frisbee, 119 N.H. 555, 404 A.2d 1106 (N.H. 1979).* The Debtors argue that Alliance did not find a new tenant within that time, and in fact was only in a position to lease the two facilities to the new tenant on July 7, 2000, when it obtained the rejection of the Rosegate Lease in the Mariner case.

We disagree with the Debtors' argument that we may consider only the prejudice which Alliance may have suffered [*9] in the time before the option was actually exercised. While this may be true under the equities applied by the state courts in circumstances where a tenant is in danger of a lease forfeiture, we note that the Bankruptcy Court is a court of equity and that we are required to consider all the equities of this case. In particular, relief from the stay is an equitable remedy and we are required to balance the harms to the debtor and the movant in considering whether such relief should be granted. See *Rexene Products, 141 B.R. at 576.*

In this case, we conclude that the equities favor Alliance. While it is true that equity abhors a forfeiture and that forfeitures of lease rights in bankruptcy cases are not favored, n5 one who seeks equity must do equity. n6 In particular, one who seeks equitable relief may not sleep on his rights. n7 That is what the Debtors have done in this case. The Debtors, cognizant of the argument of Alliance that the Lease has terminated, have taken no action to seek relief from that alleged forfeiture, either in this court or in the state court. See, e.g., *Fletcher, 404 A.2d at 1107* (tenant brought declaratory judgment action). [*10] Instead, they sought to extend their time to determine what they wanted to do with that Lease (along with all their other leases). At the hearing on their extension request (April 17, 2000), the Debtors were put on notice of Alliance's position. Yet they still took no action. In fact, they have not even determined whether the Lease is a valuable asset of this estate and should be assumed. Clearly, the Debtors have sat on their rights.

n5 See, e.g., *Finn v. Meighan, 325 U.S. 300, 301, 89 L. Ed. 1624, 65 S. Ct. 1147 (1945).*

n6 See, e.g., *Insurance Co. of N.A. v. Travelers Ins. Co., 118 Ohio App. 3d 302, 328, 692 N.E.2d 1028 (Ohio Ct. App. 1997)*(equitable maxims must be applied flexibly so that no equitable rule is applied that will operate inequitably).

n7 See, e.g., *Williams v. Erie Ins. Group, 86 Ohio App. 3d 660, 665, 621 N.E.2d 770 (Ohio Ct. App. 1993)*(equitable relief denied to one who failed to act to protect its rights).

In the interim, Alliance [*11] has found another tenant which requires the Lease in order to consummate the Rosegate lease. Alliance is prejudiced by the Debtors' delay.

Balancing the equities, we conclude that the Debtors are not entitled to relief from their mistake in failing to exercise the Lease renewal option timely and that Alliance is entitled to relief from the stay to obtain the Premises.

## V. CONCLUSION

For the reasons set forth above, we grant the Motion for relief from the stay filed by Alliance. An appropriate order is attached.

BY THE COURT:

Dated: August 11, 2000

/s/

Mary F. Walrath



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) **Chapter 11** |
| ARMSTRONG WORLD INDUSTRIES, | ) |
| INC. et al., | ) |
| | ) **Case No. 00-04471 (JKF)** |
| Debtors. | ) |
| | ) **Jointly Administered** |

**[PROPOSED] ORDER GRANTING SEA-PAC SALES COMPANY'S MOTION (I) TO STAY OBJECTION BY ARMSTRONG WORLD INDUSTRIES, INC. TO SEA-PAC'S PROOF OF CLAIM NO. 4854 PENDING ARBITRATION, AND (II) FOR RELIEF FROM THE AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE DISCHARGE INJUNCTION**

UPON CONSIDERATION of the motion of Sea-Pac Sales Company (i) to stay objection by Armstrong World Industries, Inc. to Sea-Pac's proof of claim no. 4854, and (ii) for relief from the automatic stay or, in the alternative, for relief from the discharge injunction (the "Motion"), the objections thereto, the arguments of counsel, and the entire record herein, it is hereby ORDERED that

1.    The Motion is GRANTED;

2.    Sea-Pac's request for a stay of the Objection Of Armstrong World Industries, Inc. To The Proof Of Claim Of Sea-Pac Sales Company (Claim No. 4854) (D.I. 9683) (the "Claims Objection") pending arbitration is hereby granted and any and all further proceedings regarding the Claims Objection shall be and hereby are stayed pending the outcome of arbitration; and.

3.    The automatic stay provisions of section 362 of the Bankruptcy Code

and/or the discharge injunction are hereby modified to allow Sea-Pac to proceed with

arbitration of its claims.

Dated: Wilmington, Delaware
_____, 2006

_____
JUDITH K. FITZGERALD
United States Bankruptcy Judge

*U0003282*

2

## CERTIFICATE OF SERVICE

I, Michael G. Busenkell, certify that on September 15, 2006 I caused copies of the foregoing Sea-Pac Sales Company's Motion (I) To Stay Objection By Armstrong World Industries, Inc. To Sea-Pac's Proof Of Claim No. 4854 Pending Arbitration, And (II) For Relief From The Automatic Stay Or, In The Alternative, For Relief From The Discharge Injunction to be served in the manner indicated on the parties on the attached service list.

_____
Michael G. Busenkell (No. 3933)

*U0003203*

# SERVICE LIST

### By First Class Mail Unless Indicated

Robert T. Aulgur, Jr.
P. O. Box 617
313 North DuPont Highway
Suite 120
Odessa, DE 19730

Ian Connor Bifferato, Esq.
Bifferato, Gentilotti & Biden
P. O. Box 2165
1308 Delaware Avenue
Buckner Building
Wilmington, DE 19899-2165

Stuart M. Brown
Edwards and Angell, LLP
P. O. Box 2367
824 Market Street
Wilmington, DE 19899-2367

Noel C. Burnham
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Avenue
Suite 750
Wilmington, DE 19801

Linda M. Carmichael, Esq.
White & Williams LLP
P. O. Box 709
824 Market Street
Suite 902
Wilmington, DE 19899-0709

Brian L. Colborn, Esq.
Blank Rome LLP
1201 Market Street
Suite 800
Wilmington, DE 19801

Mark D. Collins, Esq.
Rebecca L. Booth
Richards, Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE 19899
*By Hand Delivery*

Scott D. Cousins, Esq.
William E. Chipman, Jr., Esq.
Greenberg Traurig, LLP
The Brandywine Building
1000 West Street
Suite 1540
Wilmington, DE 19801

Michael Crimi
Parcels/DDR
200 W. North Street
Lower Level
Wilmington, DE 19801

Terry Currier, Esq.
Eric L. Schnabel, Esq.
Klett Rooney Lieber & Schorling, PC
The Brandywine Building
1000 West Street
Suite 1410
Wilmington, DE 19801

Charlene D. Davis, Esq.
Michael L. Vild, Esq.
The Bayard Firm
222 Delaware Avenue
Suite 900
Wilmington, DE 19801

John D. Demmy
Stevens & Lee, P.C.
1105 North Market Street
7th Floor
Wilmington, DE 19801

Mark E. Felger, Esq.
David W. Carickhoff, Jr.
Cozen & O'Conner, PC
Chase Manhattan Centre
1201 North Market Street
Suite 1400
Wilmington, DE 19801

Kevin Gross, Esq.
Rosenthal, Monhait, Gross & Goddess, P.A.
Mellon Bank Center
Suite 1401
P. O. Box 1070
Wilmington, DE  19899-0170

Henry A. Heiman, Esq.
Heman, Gouge & Kaufman LLP
800 King Street
Suite 303
P. O. Box 1674
Wilmington, DE  19899-1674

Susan F. Herr, Esq.
DuPont Legal, D-7156
1007 Market Street
Wilmington, DE  19898

R. Karl Hill
Seitz, Van Ogtrop & Green, P.A.
P. O. Box 68
222 Delaware Avenue
Suite 1500
Wilmington, DE  19899

Daniel K. Hogan
The Hogan Firm
1311 Delaware Avenue
Wilmington, DE  19806

Robert Jacobs, Esq.
Jacobs & Crumplar, P.A.
2 East 7th Street
P. O. Box 1271
Wilmington, DE  19899

Henry Jaffee
Pepper Hamilton LLP
Hercules Plaza
1313 Market Street
Suite 5100
Wilmington, DE  19899-1709

J. Michael Johnson, Esq.
Maron & Marvel, PA
1300 North Broom Street
Wilmington, DE  19806

Joseph T. Kremer
Lipsiptz, Green, Fahringer, Roll, Salisbury
& Cambria, LLP
42 Delaware Avenue
Suite 300
Buffalo, NY  14202

Michael R. Lastowski, Esq.
Duane, Morris & Heckscher LLP
1100 North Market Street
Suite 1200
Wilmington, DE  19801-0124

Neal J. Levitsky, Esq.
Foxrothchilds LLP
P. O. Box 2323
919 North Market Street
Ste 1300 Citizens Bank Ctr
Wilmington, DE  19899-2323

Aileen Maguire
Marla R. Eskin
Campbell & Levine, LLC
800 King Street
Suite 300
Wilmington, DE  19801

Kathleen M. Miller
Smith, Katzenstein & Furlow
800 Delaware Avenue
7th Floor
Wilmington, DE  19899

Mark Minuti, Esq.
Saul Ewing LLP
222 Delaware Avenue
Suite 1200
P. O. Box 1266
Wilmington, DE  19899

James L. Patton, Jr., Esq.
Sharon M. Zeig, Esq.
Curtis J. Crowther, Esq.
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street
7th Floor
Wilmington, DE  19801

Frederick B. Rosner, Esq.
Walsh, Monzack & Monaco, PA
1201 N. Orange Street
Suite 400
Wilmington, DE  19801

Richard Schepacarter
Office of the United States Trustee
844 King Street
Room 2207
Lockbox 35
Wilmington, DE  19801

Laurie Selbert Silverstein, Esq.
Potter, Anderson & Corroon LLP
1313 North Market Street
6th Floor
Wilmington, DE  19899-0951

Ellen W. Slights, Esq.
U.S. Attorney's Office
1007 Orange Street
Suite 700
Box 2046
Wilmington, DE  19899

Stephen W. Spence, Esq.
Phillips, Goldman & Spence, P.A.
1200 North Broom Street
Wilmington, DE  19806

William D. Sullivan
Elzufon Austin Reardon Tarlvo & Mondell, P.A.
P. O. Box 1650
300 Delaware Avenue
Suite 1700
Wilmington, DE  19899

William F. Taylor, Jr., Esq.
McCarter & English LLP
Mellon Bank Center
919 Market Street
Suite 1800
Wilmington, DE  19899

Joanna B. Wills
Richard M. Beck, Jr.
Klehr, Harrison, Harvey, Branzburg & Ellers LLP
919 Market Street
Suite 1000
Wilmington, DE  19801

Secretary of Treasury
P.O. Box 7040
Dover, DE  19903

Secretary of State
Division of Corporations
Franchise Tax
P.O. Box 7040
Dover, DE  19903

Mr. Joseph Alban
Airgas, Inc.
259 Radnor-Chester Road
Suite 100
P. O. Box 100
Radnor, PA  19087-8675

Bill Angelowitz
Daily Insights
JAF Box 3127
New York, NY  10116

Gary L. Barnhart
MO Dept. of Revenue
P. O. Box 475
301 W. High Street
Room 670
Jefferson City, MO  65105-0475

David E. Cherry
Campbell, Cherry, Harrison, Davis & Dove PC
P. O. Box 21387
5 Ritchie Road
Waco, TX  76702-1387

Rebecca B. Connelly
36 Church Ave
Suite 400
P.O. Box 1001
Roanoke, VA  24011

Janet Cradeur
Dept. of Revenue & Taxation
P.O. Box 66658
Baton Rouge, LA  70896

Nancy Davis
Joseph F. Rice
Ness, Motely, Loadholt, Richardson & Poole
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC  29465

Rosa Dominy
Bankruptcy Administration
1738 Bass Road
P.O. Box 13708
Macon, GA  31208-3708

Richard E. Fehling, Esq.
111 N. Sixth Street
P.O. Box 679
Reading, PA  19603-0670

Phyllis A. Hayes
c/o D&B/RMS Bankruptcy Services
P. O. Box 5126
Timonium, MD  21094

Paul Mainardi
Stephanie N. Deviney
Brown & Conneery, LLP
360 Haddon Ave
P.O. Box 539
Westmont, NJ  08108

Stephehen G. Murphy
Department of Revenue, Litigation Bureau
P. O. Box 9565
100 Cambridge Street
7th Floor
Boston, MA  02114

Mark S. Palmer
P.O. Box 2045
Pittsburgh, PA  15230-2045

Joan E. Pilver
Office of the Attorney General
55 Elm St, 5th Floor
P.O. Box 120
Hartford, CT  06141-0120

Glenn M. Reisman
Two Corporate Drive
P.O. Box 861
Shelton, CT  06484-0861

Richard L. Rodgers
42 Church Street
P.O. Box 330
Canajoharie, NY  13317

William Steven Steele
Davis & Davis
3000 Briarcrest Dr.
Suite 602
P.O. Box 3610
Bryan, TX  77805-3610

John Mark Stern
Assistant Attorney General
Bankruptcy & Collections Div.
P.O. Box 12548
Austin, TX  78711-2548

Charles M. Tatelbaum
Stephen C. Hunt
Cummings & Lockwood
P.O. Box 413032
Naples, FL  34101

Lisa A. Thompson
Kozloff Stoudt
2640 Westview Drive
P.O. Box 6286
Wyomissing, PA  19610

Dean M. Trafelet
P. O. Box 518
9130 Wild Lane
Baileys Harbor, WI  54202

David B. Wheeler, Esq.
Moore & Van Allen PLLC
40 Calhoun St, Ste 300
P.O. Box 22828
Charleston, SC  29413-2828

General Counsel 4HC7.325
Enron Energy Services, Inc.
4 Houston Center
1221 Lamar Street
Suite 1600
Houston, TX  77010

Jonathan H. Alden, Esq.
Assistant General Counsel
Dept. of Environmental Protect.
3900 Commonwealth Blvd.
Tallahassee, FL  32399-3000

Kristina L. Anderson
Suntrust Bank
Director, CRM, Special Assets Grp
303 Peachtree Street
4th Floor
Atlanta, GA  30308

Philip D. Anker
Wilmer, Cutler & Pickering
2445 M Street, NW
Washington, DC  20037-1420

Julie A. Ardoin
Stephen B. Murray
The Murray Law Firm
909 Poydras Street
Suite 2550
New Orleans, LA  70112-4000

Scott Baldwin Jr.
Baldwin & Baldwin, LLP
400 West Houston Street
Marshall, TX  75670

Paul C. Bametzreider
Reilly, Wolfson, Sheffey, Schrum & Lundberg
1601 Cornwall Road
Lebanon, PA  17042

Craig A. Barbarosh
Pillsbury Winthrop LLP
650 Town Center Dr.
7th Floor
Costa Mesa, CA  92626-7122

Steven T. Baron
Silber Pearlman, LLP
2711 N. Haskell Ave
Fifth Floor, LB 32
Dallas, TX  75204

Leslie Beth Baskin, Esq.
Robert H. Kwait, Esq.
Spector Gadon & Rosen, P.C.
1635 Market Street
7th Floor
Philadelphia, PA  19103-3913

Kenneth N. Bass, Esq.
Kirkland & Ellis
655 Fifteenth Street, NW
Suite 1200
Washington, DC  20005

Bret J. Berlin, Esq.
Jones, Day, Reavis & Pogue
3500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA  30308-3242

Mark N. Berman, Esq.
Robert P. Sherman, Esq.
Nixon Peabody LLP
101 Federal Street
Boston, MA  02110

Richard Blackstone Webber II
Richard Blackstone Webber II, PA
320 Maitland Avenue
Altamonte Spring, FL  32701

Scott E. Blakeley
Blakeley & Blakeley LLP
2030 Main Street
Suite 540
Irvine, CA  92614

Thomas F. Blakemore
David A. Agay
Winston & Strawn
35 W. Wacker Dr.
Chicago, IL  60601

Jean Marie Breen
Pension Benefit Guaranty Corporation
Office of the General Counsel
1200 K Street, NW
Washington, DC  20005-4026

Herbert C. Broadfoot II, Esq.
Ragsdale, Beals, Hooper & Seigler, LLP
2400 International Tower
229 Peachtree Street, NE
Atlanta, GA  30303-1629

Mark D. Brodsky
Elliott Associates, LP
712 Fifth Ave
36th Floor
New York, NY  10019

Stuart M. Brown
Buchanan Ingersoll, PC
Eleven Penn Center
1835 Market Street
14th Floor
Philadelphia, PA  19103-2985

Kathleen Maxwell
The Dow Chemical Company
Legal Department
2030 Dow Center
Office 732
Midland, MI  48674

Jane Castle
Lehman High Yield Research
745 7th Avenue
3rd Floor
New York, NY  10022

Peter A. Chapman
572 Fenwood Lane
Fairless Hill, PA  19030

Conrad K. Chiu
Pitney, Hardin, Kipp & Szuch LLP
P.O. Box 1945
Morristown, NJ  07962-1945

Art C. Cody
Wilkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY  10019-6099

Bernice Conn
Robins, Kaplan, Miller & Ciresi LLP
2049 Century Park East
Suite 3700
Los Angeles, CA  90067

Michael J. Crames
Lester M. Kirshenbaum
Kaye Scholer LLP
425 Park Avenue
New York, NY  10022

Nicholas Cremona
Andrew A. Kress
Kaye Scholer LLP
425 Park Avenue
New York, NY  10022

Gregory A. Cross
Venable, Baetjer & Howard, LLP
Two Hopkins Plaza
Ste 1800
Baltimore, MD  21201

Debra A. Dandeneau
Stephen Karotkin
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
Suite 2100
New York, NY  10153

Patrick Darby
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL  35203

Stephen B. Darr
KPMG, LLP
99 High Street
Boston, MA  02110-2371

Anthony J. Diana
Leslie Chebli
Mayer, Brown, Rowe & Maw
1675 Broadway
New York, NY  10019

James M. Donohue, Esq.
McCord, Bubsey, Ketchum & Donohue, LLP
210 South Monroe Street
Tallahassee, FL  32301

Lynn Drysdale
126 West Adams Street
Suite 502
Jacksonville, FL  32232

Michael R. Enright
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT  06103

General Counsel Enron
Energy Services
1400 Smith Street EB 0889
Houston, TX  77002

Paul Falick
Attorney for Prior Energy Corporation
c/o Prior Chemical Corporation
460 Park Avenue
New York, NY  10022

Oscar B. Fears, III
Assistant Attorney General
40 Capital Square, SW
Atlanta, GA  30334

Traci Fette
Debt Acquisition Company of America V, LLC
1565 Hotel Circle South
#310
San Diego, CA  92108

Arlene Fickler
The Hoyle Law Firm
One South Broad Street
Suite 1500
Philadelphia, PA  19107

John V. Fiorella
Archer & Greiner
One Centennial Square
Haddonfield, NJ  08033-0968

Mary Beth Forshaw
Elisa Alcabes
Bryce Friedman
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY  10017-3954

Ryan A. Foster
The Foster Law Firm PLLC
440 Louisiana, Suite 2100
Houston, TX  77002

Don P. Foster, Esquire
Klehr, Harrison, Harvey, Branzburg & Ellers LLP
260 South Broad Street
Philadelphia, PA 19102

Thomas M. Fuller
Angelo, Gordon & Co.
245 Park Ave
26th Floor
New York, NY 10167

Walter T. Gangl
Kenneth Jacobs
Mary Huwalt
Armstrong World Industries, Inc.
2500 Columbia Avenue
Building 701
Lancaster, PA 17603

Chad H. Gettleman
Brad A. Berish
Adelman, Gettleman, Merens, Berish & Carter, LTD
53 W. Jackson Blvd.
Suite 1050
Chicago, IL 60604

Gregory A. Goldberger
Steven E. Ostrow
White & Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395

Douglas R. Gooding
A. Hugh Scott
John A. Nadas
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, MA 02109-2819

Jay L. Gottlieb
Brown Raysman Millstein Felder & Steiner LLP
900 Third Avenue
23rd Floor
New York, NY 10022

Deborah E. Greenspan
The Feinberg Group, LLP
1455 Pennsylvania Avenue, N.W.
Suite 390
Washington, DC 20004-1008

Frank H. Griffin, III
Amy Donohue-Babiak
Gollatz, Griffin & Ewing, PC
Four Penn Center, Suite 200
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103-2808

Jon M. Gruber
Russell, Krafft & Gruber, LLP
930 Red Rose Ct.
Suite 300
Lancaster, PA 17601

Sean Haas
Citadel Investment Group, LLC
131 South Dearborn Street
36th Floor
Chicago, IL 60603

William L. Hallam, Esq.
Gebhardt & Smith, LLP
9th Floor
The World Trade Center
Baltimore, MD 21202-3064

Jan M. Hayden
William H. Patrick
Heller, Draper, Hayden, Patrick, & Horn, LLC
650 Poydras Street
Suite 2500
New Orleans, LA 70130-6103

Thomas S. Hemmendinger
Brennan, Recupero, Cascione, Scungio & McAllister, LLP
362 Broadway
Providence, RI 02909

Andrew Herenstein
Quadrangle Group LLC
375 Park Avenue
14th Floor
New York, NY  10152

Anthony Herrling
Burson-Marsteller
230 Park Ave South
New York, NY  10003

James Hintzen
IBM Credit Corp.
Restr. Group - MD NC317
North Castle Drive
Armonk, NY  10504

Peggy A. Housner
Dept. of Attonrey General, Revenue Division
First Floor Treasury Blng
Lansing, MI  48922

John D. Huige
Unisys Corporation
Assistant General Counsel
695 Blairmoor Court
Grosse Pointe, MI  48202-3099

Allan H. Ickowitz
Nossman, Guthner, Knox & Elliott, LLP
445 S. Figueroa Street
31st Floor
Los Angeles, CA  90071

Elihu Inselbuch
Rita C. Tobin
Caplin & Drysdale, Chartered
399 Park Avenue
27th Floor
New York, NY  10022-4614

David R. Jury
Legal Department
5 Gateway Center
Suite 807
Pittsburgh, PA  15222

Harold L. Kaplan
Emily S. Gottlieb
Gardner, Carton & Douglas
191 North Wacker Drive
Suite 3700
Chicago, IL  60606-1698

Marc E. Kasowitz, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY  10019

William S. Katchen
Duane, Morris & Heckscher LLP
1 Riverfront Plaza
2nd Floor
Newark, NJ  07102

Jeffrey Kaufman
Gerald F. Ellersdorfer
Kaufman & Logan LLP
100 Spear Street
12th Floor
San Francisco, CA  94105

Steven Kazan
James L. Oberman
171 Twelfth Street
Suite 300
Oakland, CA  94607

William E. Kelleher
Tina L. Campo
Cohen & Grigsby, PC
11 Stanwix Street
15th Floor
Pittsburgh, PA  15222

Alan B. Kellman
Maritime Asbestosis Legal Clinic
Div of The Jaques Adm. Law Firm
1570 Penobscot Building
Detroit, MI  48226

Paul Kizel
Lowenstein Sandler, PC
65 Livingston Ave
Roseland, NJ 07068

Alfred C. Knight
Westvaco Corporation
1 High Ridge Park
Stamford, CT 06905

Caryn Lasky
Pillsbury Winthrop LLP
1540 Broadway
New York, NY 10036

Andrew P. Lederman
Sonnenschein Nath & Rosenthal
1221 Avenue of the Americas
New York, NY 10020-1089

Rita Lofton
Euler Hermes ACI
800 Red Brook Blvd.
Owings Mills, MD 21117

Janice Mac Avoy, Esq.
Adam M. Adler, Esq.
Fried, Frank, Harris, Shriver & Jacobson
One New York Plaza
New York, NY 10004

Leslie E. Maldonado
Sheri Levine
Amroc Investments, Inc.
535 Madison Ave
15th Floor
New York, NY 10022

Alan E. Marder
Scarcella Rosen & Slome LLP
333 Earle Ovington Blvd.
Ninth Floor
Uniondale, NY 11533-3622

Paul M. Matheny
Law Offices of Peter G. Angelos, PC
505 Harford Road
Baltimore, MD 21214

Jacob A. Maurer
Robert D. Wildstein
Bodker, Ramsey, Andrews, Winograd, et al.
3490 Piedmont Road
One Securities Centre
Suite 1400
Atlanta, GA 30305-4808

Michael J. McGinnis
1001 Louisana Suite N1823A
Houston, TX 77002

Maureen A. McGreevey
Corporate Counsel
680 E. Swedesford Road
Wayne, PA 19087

Michael G. Menkowitz
Fox, Rothschild, O'Brien & Frankel, LLP
2000 Market Street
10th Floor
Philadelphia, PA 19103-3291

John M. Merritt
Troutman Sanders LLP
600 Peachtree Street, N.E.
Suite 5200
Atlanta, GA 30308-2216

Robert B. Millner, Esquire
Sonnenschein Nath & Rosenthal
Sears Tower
Suite 8000
233 South Wacker Drive
Chicago, IL 60606

Carol E. Momjian
Office of Attorney General
21 S. 12th Street
3rd Floor
Philadelphia, PA 19107-2128



Karen L. Morris
Office of the General Counsel
1200 K Street, NW
Suite 340
Washington, DC 20005

Alison K. North
Barbara LaWall
Pima County Attorney Civil Division
32 North Stone
Suite 2100
Tucson, AZ 85701-1412

Joseph Ollock
Queen Anne's County Board of Education
202 Chesterfield Ave
Centerville, MD 21617

Lloyd A. Palans
Bryan Cave LLP
One Metropolitan Square
211 N. Broadway, Ste 3600
St. Louis, MO 63102-2750

Anthony F. Parise
Cornell University
Office of the University Counsel
300 CCC Building Garden Ave
Ithaca, NY 14853-2601

Dale J. Park
Law Offices of Dale J. Park
3345 Wilshire Boulevard
Suite 810
Los Angeles, CA 90010

John A. Peca
Climaco, Lefkowitz, Peca, Wilcox, & Garofoli
Co., LPA
1228 Euclid Avenue
The Halle Building
9th Floor
Cleveland, OH 44115-1891

Jason D. Perry
Vanderburgh County Treasurer
1 NW Martin Luther King Jr. Blvd.
Room 210, Civic Center Complex
Evansville, IN 47708-1882

Albert N. Peterlin
Gates & Associates, PC
1013 Mumma Rd.
Suite 100
Lemoyne, PA 17043

William A. Piatak
Unempl. Comp., Tax Office Mgr.
Bureau of Empl. Tax Operations
1171 S. Cameron Street
Room 312
Harrisburg, PA 17104-2513

Robert W. Pontz, Esq.
Lapp & Pontz, LLP
221 East Chestnut Street
Lancaster, PA 17602-2705

Antonio D. Pyle
Antonio D. Pyle, PC
227 Commercial Ave
2nd Floor
Pittsburgh, PA 15215

Thomas J. Quinn
Mendes & Mount, LLP
750 Seventh Avenue
New York, NY 10019-6829

Natalie D. Ramsey
Jennifer Taylor
Natalie Grill Einsig
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109



Andrew Rebak
Credit Suisee First Boston
11 Madison Ave
5th Floor
New York, NY 10010

Michael H. Reed
Bonnie MacDougal Kistler
Pepper Hamilton LLP
3000 Two Logan Square
8th & Arch Streets
Philadelphia, PA 19103-2799

Dennis Reich Reich
Bedorah Hayes
Reich & Binstick
4265 San Felipe
Suite 1000
Houston, TX 77027

Alan B. Rich
Baron & Budd, PC
3102 Oak Lawn Ave
Suite 1100
Dallas, TX 75219

Michael P. Richman
Jean Marie L. Atamian
Mayer, Brown, Rowe & Maw
1675 Broadway
New York, NY 10019

J. Michael Riley, Esq.
Jones, Martin, Parris & Tessener
410 Glenwood Ave
Suite 200
Raleigh, NC 27603

Robert H. Rosenbaum
M. Evan Meyers
Meyers, Rodbell & Rosenbaum, PA
Berkshire Blng, Ste 400
6801 Kenilworth Ave
Riverdale, MD 20737-1385

Andrew N. Rosenberg, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064

Paul M. Rosenblatt
Kilpatrick Stockton, LLP
1100 Peachtree Street, NE
Suite 2800
Atlanta, GA 30309-4530

Lewis Rosenblum
McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096

Thomas Roy
24731 Bay Bean Court
Bonita Springs, FL 34134

James P. Ruggeri
Hogan & Hartson LLP
555 Thirteenth St, NW
Washington, DC 20004

Peter D. Russin
Meland Russin Hellinger & Budwick, P.A.
3000 Wachovia Financial Center
200 S. Biscayne Boulevard
Miami, FL 33131

Stanley J. Samorajczyk
Mark D. Taylor
Akin, Gump, Strauss, Hauer & Feld, LLP
1333 New Hampshire Ave., N.W.
Washington, DC 20036

Frank A. Savage
Lazard Freres & Co.
30 Rockefeller Plaza
New York, NY 10020

Robert Scheibe
Richard Toder
Scott Talmadge
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060

Small Business Self-Employed Div. Counsel
Dept. of the Treasury - IRS
Office of Chief Counsel
701 Market Street, Ste 2200
Mellon Independence Center
Philadelphia, PA 19106

Maurie Shalmone
Longacre Master Fund, Ltd.
810 Seventh Avenue
22nd Floor
New York, NY 10019

Byran A. Shapiro
Bear, Stearns & Co. Inc.
383 Madison Avenue
New York, NY 10179

Andrea Sheehan
Law Offices of Robert E. Luna, PC
4411 North Central Expressway
Dallas, TX 75205

Patricia F. Shenfelt, Esq.
Exxon Mobil Chemical Co.
13501 Katy Freeway
Houston, TX 77079-1398

Susan R. Sherrill
Securities & Exchange Commission
Atlanta Regional Office, Branch
3475 Lenox Road, NE
Suite 100
Atlanta, GA 30326-1232

Andrew E. Shirley
Avenue Capital Management, LLC
535 Madison Ave
New York, NY 10022

William P. Skinner
Covington & Burling
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401

Warren H. Smith
Warren H. Smith & Associates
325 North St. Paul Street
Suite 1275
Dallas, TX 75201

Michael W. Sozansky
Archer & Greiner, PC
1 State Route 12
Suite 201
Flemington, NJ 08822-7702

James E. Spiotto
Ann E. Archer
Chapman & Cutler
111 W. Monroe Street
Chicago, IL 60603

Robert J. Stark
David H. Botter
Akin, Gump, Strauss, Hauder & Feld, LLP
590 Madison Avenue
New York, NY 10022

William D. Sullivan
Mark N. Poovey
Womble, Carlyle, Sandridge & Rice, PLLC
200 West Second Street
Drawer 84
Winston-Salem, NC 27102

Mark V. Swirsky
U.S. Department of Labor
170 South Independence Mall West
Suite 630E
The Curtis Center
Philadelphia, PA 19106-3306



Laura S. Taylor
Sheppard, Mullin, Richter & Hampston LLP
501 West Broadway
19th Floor
San Diego, CA  92101

Thomas Tew
Jeffrey Tew
Tew Cardenas Rebank Kellogg Lehman
DeMaria Tague Raymond & Levine, LLP
201 South Biscayne Blvd.
Suite 2600, 26th Floor
Miami, FL  33131-4336

Peter Van N. Lockwood
Caplin & Drysdale, Chartered
One Thomas Circle
Suite 1100
Washington, DC  20005

Raymond L. Vandenberg
Vandenberg, Feliu & Peters, LLP
110 East 42nd Street
New York, NY  10017

Eric G. Waxman, III
Phillips, Nizer, Benjamin, Krim & Ballon LLP
600 Old Country Road
Garden City, NY  11530

Scott W. Wert, Esq.
Foster & Sear, LLP
524 East Lamar Boulevard
Suite 200
Arlington, TX  76011

Stephanie Wickouski
Gardner, Carton & Douglas LLC
1301 K Street, NW
East Tower 900
Washington, DC  20005

Denise Wildes
Lewis Kruger
Stroock, Stroock & Lavin LLP
180 Maiden Lane
New York, NY  10038-4982

Jim Wimberley
McPherson, Monk, Hughes, Bradley & Wimberley
3120 Central Mall Drive
Port Arthur, TX  77642

Jan Wray
Old Dominion Frieght Line, Inc.
500 Old Dominion Way
Thomasville, NC  27360

Chun Won Yi
Quadrangle Group LLC
375 Park Avenue
14th Floor
New York, NY  10152

Internal Revenue Service
Insolvency Section
31 Hopkins Plaza
Room 1150
Baltimore, MD  21201

Securities & Exchange Commission
15th & Pennsylvania Ave, NW
Washington, DC  20020

UBS Warburg
677 Washington Blvd.
Stamford, CT  06901

Internal CM/ECF Live Database                                                    Page 1 of 14

## File a Motion:

00-04471-JKF Armstrong World Industries, Inc.
Type: bk                        Chapter: 11 v                    Office: 1 (Delaware)
Judge: JKF                      Assets: y
Case Flag: LEAD, MEGA, APPEAL, MTRUNADV, CLMSAGNT, CONFIRMED

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Busenkell, Michael G. entered on 9/15/2006 at 5:07 PM EDT and filed on 9/15/2006
**Case Name:**        Armstrong World Industries, Inc.
**Case Number:**      00-04471-JKF
**Document Number:** 9830

**Docket Text:**
Motion for Relief from Stay *Sea-Pac Sales Company's Motion To Stay Objection By Armstrong World Industries, Inc. To Sea-Pac's Proof Of Claim No. 4854 Pending Arbitration, And (II) For Relief From The Automatic Stay Or, In The Alternative, For Relief From The Discharge Injunction.* Fee Amount $150. Filed by Sea-Pac Sales Company Hearing scheduled for 10/23/2006 at 09:45 AM at US Bankruptcy Court, 824 Market St., Wilmington, DE. Objections due by 10/6/2006.. (Attachments: # (1) Notice # (2) Exhibit A# (3) Exhibit B# (4) Exhibit C# (5) Proposed Form of Order # (6) Certificate of Service # (7) Service List) (Busenkell, Michael)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**u:\wdox\docs\clients\295774\00001\u0003287.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=9/15/2006] [FileNumber=5191599-0]
[743f5db341a232366c48a4c56dc68a166ae9c7b75c5ca3b5b190e682bfca1efdd364
d9d34daf61557956c45bddec9dd6ed0f4e25761fa59509d6dd65c2d9993d]]
**Document description:**Notice
**Original filename:**u:\wdox\docs\clients\295774\00001\u0003288.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=9/15/2006] [FileNumber=5191599-1]
[50ec90e4b7ad082acaedadb00acad191309f7f5ee73a80543249d6fb8e3bc238516a
62dc298c116ef661c2795293f37f34ae75976c34681313b120022a20faee]]
**Document description:**Exhibit A
**Original filename:**u:\wdox\docs\clients\295774\00001\u0003289.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=9/15/2006] [FileNumber=5191599-2]
[8e6764ff46355647d2db0fe67ab5a3510e615a55878dda9d3bd9196507cbb346de90
1030e63ae6de56930d871eae2103ebbb3866cac6a7b4862e129e6f0c6889]]
**Document description:**Exhibit B
**Original filename:**u:\wdox\docs\clients\295774\00001\u0003290.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=9/15/2006] [FileNumber=5191599-3]
[78ac2297ea035dc74d935a460186bb21ed65f716de39c40605a4f9a7b50df2c42f08
971b28bfbac8cbc67db572733c59a6a088a55f7449ca089006933e77d90f]]
**Document description:**Exhibit C
**Original filename:**u:\wdox\docs\clients\295774\00001\u0003291.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=9/15/2006] [FileNumber=5191599-4]
[70b853d61a8c737c4b6c55d1f4b603e069890e22682247e086c82d27ffd4aede199a
6c022f87166c1614a79d236010988f01a849524080c7a8ddc13f5e63325b]]

**4**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------x
```
| | | |
|---|---|---|
| *In re* | : | **Chapter 11** |
| | : | |
| **ARMSTRONG WORLD INDUSTRIES,** | : | **Case No. 00-4471 (JKF)** |
| **INC.,** *et al.*, | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |
| | : | Re: Docket No. 9830 |
```
--------------------------------------------------------x
```

**OBJECTION OF ARMSTRONG WORLD INDUSTRIES, INC. TO SEA-PAC
SALES COMPANY'S MOTION (I) TO STAY OBJECTION BY ARMSTRONG
WORLD INDUSTRIES, INC. TO SEA-PAC'S PROOF OF CLAIM NO. 4854
PENDING ARBITRATION, AND (II) FOR RELIEF FROM THE AUTOMATIC STAY
OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE DISCHARGE INJUNCTION**

TO THE HONORABLE JUDITH K. FITZGERALD,
UNITED STATES BANKRUPTCY COURT JUDGE:

Armstrong World Industries, Inc. ("*AWI*"), as reorganized debtor, hereby objects

(the "*Objection*") to the Motion, dated September 15, 2006 [Docket No. 9830] (the "*Arbitration*

*Motion*"), of Sea-Pac Sales Company ("*Sea-Pac*") seeking (i) to stay the objection, dated July

20, 2006 [Docket No. 9683] (the "*Claim Objection*"), filed by AWI with respect to Sea-Pac's

proof of claim no. 4854 (the "*Sea-Pac Claim*") pending arbitration and (ii) relief from the

automatic stay or, in the alternative, for relief from the discharge injunction.  In support of the

Objection, AWI respectfully represents as follows:

## I.    OVERVIEW OF OBJECTION

1.      By the Arbitration Motion, Sea-Pac seeks to compel arbitration of its

claims against AWI rather than have the Claim Objection resolved by this Court.  The

Arbitration Motion must be denied.  Sea-Pac has no right to submit its claims to arbitration under

RLF1-3068065-1

9914
10/6/06

the explicit terms of the expired Sea-Pac Agreements[1] because it failed to exercise its option to elect arbitration, and the expired Sea-Pac Agreements unambiguously authorize litigation of disputes in such circumstances. Moreover, as Sea-Pac itself concedes,[2] the Claim Objection raises the following disputed bankruptcy issues that this Court, and not an arbitration panel, should decide:

    i.    Whether any portion of Sea-Pac's claims are entitled to administrative expense priority;

    ii.    if so, whether Sea-Pac is barred from asserting administrative expenses by virtue of Sea-Pac's failure to comply with the administrative expense bar date established in AWI's chapter 11 case;

    iii.    if Sea-Pac may assert an administrative expense, how any such administrative expense would be valued; and

    iv.    whether Sea-Pac is entitled to attorneys' fees.

    2.    Included in the Sea-Pac Claim is a claimed administrative expense arising from AWI's alleged breach of an exclusivity provision in the expired Sea-Pac Agreements during the pendency of AWI's chapter 11 case. Thus, determining Sea-Pac's right to administrative expense priority is inextricably intertwined with the underlying factual issues of whether the alleged breach occurred, when Sea-Pac had notice of the alleged breach, how (if at all) Sea-Pac was damaged by its continued performance under the Sea-Pac Agreements despite full knowledge of the events giving rise to the alleged breach, how AWI's estate benefited (if at all) from the alleged breach, and the effect of Sea-Pac remaining silent for years and never seeking relief from this Court, or even an arbitration panel, with respect to the alleged breach.

---

    [1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Claim Objection.

    [2] In the Arbitration Motion, Sea-Pac states that "arbitration of Sea-Pac's claims will not determine the priority of claims — merely the amount." Arbitration Motion, ¶ 16.

Accordingly, even if the arbitration provision conferred upon Sea-Pac the right to seek

arbitration — which it does not — the overwhelming weight of the bankruptcy policies

implicated in this matter compel the Court to exercise its discretion to deny the Arbitration

Motion.

## II.    JURISDICTION

3.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this

proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. Except as

otherwise discussed herein, no previous request for the relief sought herein has been made to this

or any other court.

## III.    FACTUAL BACKGROUND

4.    Except to the extent supplemented by certain relevant facts set forth

herein, the material facts, including the relationship between the parties and the terms of the

expired Sea-Pac Agreements, are set forth in the Claim Objection.

### A.    *The Sea-Pac Claim*

5.    On or about November 8, 2005, Sea-Pac filed the Sea-Pac Claim, claim

no. 4854, against AWI in the amount of $4.9 million, plus interest and attorneys' fees. Sea-Pac

contends that no less than $4.5 million of the Sea-Pac Claim is entitled to administrative expense

priority.

6.    The Sea-Pac Claim arises from alleged breaches by AWI of the expired

Sea-Pac Agreements and is comprised of the following components:

i.    The Commercial Agreement Breach Claim:  Sea-Pac alleges that AWI breached
the Commercial Agreement by "its appointment and provision of product to a
second distributor within [Sea-Pac's] exclusive territory," resulting in damages to
Sea-Pac in an amount no less than $2 million. Sea-Pac asserts that "*AWI's*

3

*breach began in 2003* and such breach continued through the term and the extensions of [the Commercial Agreement]...." Sea-Pac further contends that the entire Commercial Agreement Breach Claim is entitled to administrative expense priority because it is "attributable to [AWI's] post petition breach of [the Commercial Agreement] which Sea-Pac was induced to perform pending [AWI's] assumption or rejection of it."

ii.  <u>The Residential Agreement Breach Claim</u>: Sea-Pac asserts that AWI breached the Residential Agreement and "was unjustly enriched, by, among other conduct, failing to reimburse Sea-Pac for RDC functions and services." Sea-Pac further alleges that "*AWI's illegal conduct began in 2000* and continued through the term of and extension of [the Residential Agreement] and resulted in damages and/or restitution owed in an amount no less than $2.9 million." Sea-Pac contends that $2.5 million of the $2.9 million in RDC functions and services for which AWI allegedly failed to reimburse Sea-Pac were provided postpetition and, therefore, constitute an administrative expense claim.

iii.  <u>Attorneys' Fees</u>: Finally, the Sea-Pac Claim asserts that "[p]ursuant to the provisions of the applicable agreements," Sea-Pac is entitled to attorneys' fees and interest if AWI disputes its claims.

**B.  *The Claim Objection and the Arbitration Motion***

7.  On July 20, 2006, AWI filed the Claim Objection. AWI objects to the Sea-Pac Claim on a number of grounds, including that (i) AWI has an absolute defense to the Commercial Agreement Breach Claim because Sea-Pac failed to meet the annual mill shipment requirements required to maintain its exclusivity as AWI's distributor within the relevant territory, (ii) Sea-Pac is barred from asserting entitlement to any administrative expense arising prior to November 24, 2003 because Sea-Pac failed to assert such administrative expenses, as required by the Administrative Expense Bar Date established in AWI's chapter 11 case,[3] and

---

[3] In the *Declaration of Jared Williams in Support of Sea-Pac's Answer to Armstrong's Objection*, dated September 14, 2006 [Docket No. 9834] (the "*Declaration*"), Sea-Pac's President, Jared Williams, asserts that Sea-Pac did not receive notice of the Administrative Expense Bar Date. Declaration, ¶ 14. As indicated in the Trumbull Affidavit of Service annexed as Exhibit "E" to the Claim Objection, AWI's claims agent mailed notice of the Administrative Expense Bar Date to each of the following addresses for Sea-Pac: Sea Pac Sales, P.O. Box 3846, Seattle, WA 98124; Sea Pac Sales, P.O. Box 24994, Seattle, WA 98124-0994; and Sea Pac Sales Company, 6307 South 228th Street, Kent, WA 98032. *See* Trumbull Affidavit of Service, p. 269. These addresses include (i) the notice address

4

(iii) Sea-Pac's Commercial Agreement Breach Claim is not entitled to administrative expense

priority in any event because, among other things, such claim arises from an alleged breach of a

prepetition contract for which the proper remedy would have been to seek to compel AWI to

assume or reject the Commercial Agreement — instead, Sea-Pac continued performing for years

after receiving formal notice of the facts giving rise to the alleged breach — and Sea-Pac has

conferred no benefit on AWI's estate.

8.    In response to the Claim Objection, Sea-Pac filed its Answer to the Claim

Objection, together with the Declaration and a supporting memorandum of law. Simultaneously

therewith, Sea-Pac filed the Arbitration Motion, which represents the first indication of Sea-

Pac's interest in arbitrating the parties' disputes.

9.    In substance, the Arbitration Motion asserts that the expired Sea-Pac

Agreements require arbitration of all disputes arising thereunder, and, therefore, the Court should

stay proceedings on the Claim Objection pending arbitration.[4] Alternatively, Sea-Pac requests

---

provided by Sea-Pac in the original proof of claim, claim number 3528, filed by Sea-Pac against AWI's
estate (a copy of such claim, which was subsequently withdrawn, is attached hereto as Exhibit "A"), and
(ii) the address AWI used to mail correspondence to Sea-Pac, including the letters extending the terms of
the Sea-Pac Agreements and noting appointment of a second distributor. *See* Exhibits "A" and "C"
annexed to the Claim Objection.

[4] On the date hereof, AWI has also filed a supplement to the Claim Objection, which sets forth
objections of AWI to any additional administrative expenses asserted by Sea-Pac in any amendment or
deemed amendment to the Sea-Pac Claim, as well as certain counterclaims of AWI, in each case with
respect to recent activities occurring during the pendency of AWI's chapter 11 case. Because the alleged
claims and counterclaims described in such pleading are independent of the expired Sea-Pac Agreements,
they are not subject to the Arbitration Motion

5

RLF1-3068065-1

that the Court modify the automatic stay or grant relief from the discharge injunction[5] to allow

Sea-Pac to proceed with arbitration with respect to the claims asserted in the Sea-Pac Claim.

**C. Alternative Dispute Resolution**
   **Provisions of the Expired Sea-Pac Agreements**

     10.    With respect to alternative dispute resolutions under the expired Sea-Pac

Agreements, the parties agreed as follows:

> [AWI] and [Sea-Pac] agree to attempt to resolve promptly any dispute arising out of this Agreement by negotiation between executives of [Sea-Pac] and [AWI] who have authority to settle the dispute. If any dispute is not resolved by negotiation within 30 days of its arising, then, at the written request of either party within an additional 10 days, the dispute shall be submitted to mediation with a mediator chosen jointly.

Commercial Agreement, ¶ 24; Residential Agreement, ¶ 29. The expired Sea-Pac Agreements

further provide as follows:

> *In the absence of a request for mediation,* or if any dispute is not resolved within 90 days following a request for mediation, *then, at the option of either party, such dispute shall be submitted to binding arbitration* in Philadelphia, Pennsylvania, under the Commercial Arbitration Rules of the American Arbitration Association. [...].

Commercial Agreement, ¶ 25; Residential Agreement, ¶ 30 (emphasis added). Notably, this

paragraph in each of the expired Sea-Pac Agreements concludes with the following statement:

> *If arbitration is not initiated within 30 days of its becoming an option, as provided above, either party may resort to litigation pursuant to paragraph [--].*

*Id.* (emphasis added). Unfortunately, in the Arbitration Motion, Sea-Pac completely omits any

reference to this last sentence of the relevant provisions of the expired Sea-Pac Agreements,

---

[5] On October 2, 2006, the "Effective Date" under AWI's Fourth Amended Plan of Reorganization, As Modified, dated February 21, 2006 (the "*Plan*"), occurred, and AWI emerged from chapter 11.

6

RLF1-3068065-1

thereby incorrectly implying that the requested arbitration is mandated by the expired Sea-Pac

Agreements. *See* Arbitration Motion, ¶ 5.

## IV.    OBJECTION

11.     Sea-Pac has failed to establish any basis for the relief requested in the

Arbitration Motion. Under the principles enunciated by the Third Circuit in the *Mintze* decision,

the Court must consider the following three issues to determine whether or not to compel this

matter to be resolved by arbitration: (i) whether the dispute is governed by an enforceable

arbitration clause, (ii) whether the court has discretion to deny enforcement of the arbitration

clause (*i.e,* whether the Bankruptcy Code conflicts with the Federal Arbitration Act (the "*FAA*")

in such a way as to bestow discretion on the Court to decline to enforce an otherwise applicable

arbitration provision), and (iii) if the Court has such discretion, whether the Court should

exercise its discretion to deny arbitration. *In re Mintze*, 434 F.3d 222 (3d Cir. 2006).

Application of the *Mintze* analysis to the instant case makes clear that Sea-Pac's Arbitration

Motion must be denied.

### A.  *Sea-Pac Has No Right to Arbitration*
### *Under the Terms of the Expired Sea-Pac Agreements*

12.     As set forth above, it is clear from the face of the expired Sea-Pac

Agreements that they do not mandate arbitration as Sea-Pac suggests. To the contrary, the

expired Sea-Pac Agreements expressly permit the parties to litigate their disputes if no party

timely elects arbitration.

13.     The undisputed facts clearly demonstrate that neither Sea-Pac nor AWI

elected to proceed with arbitration within the deadlines provided in the expired Sea-Pac

Agreements. Specifically, the expired Sea-Pac Agreements provide that "*[i]f any dispute is not*

*resolved by negotiation within 30 days of its arising, then, at the written request of either party within an additional 10 days, the dispute shall be submitted to mediation with a mediator chosen jointly.*" Accordingly, Sea-Pac had 40 days from the date the dispute arose to send AWI a written request to submit to mediation. Although Sea-Pac admits in the Sea-Pac Claim that the alleged breaches forming the basis of its claims occurred as early as 2000 and 2003, taking the latest possible date on which the dispute could have technically arisen — November 4, 2005, the date on which Sea-Pac filed the Sea-Pac Claim — either Sea-Pac or AWI had until December 14, 2005 to request mediation. No such request was made by either party.

14.    In accordance with the expired Sea-Pac Agreements, "*[i]n the absence of a request for mediation ... then, at the option of either party, such dispute shall be submitted to binding arbitration....*" As of December 14, 2005 no request for mediation had been made, and, until the recent filing of the Arbitration Motion, Sea-Pac took no action in furtherance of its option to submit the alleged disputes to arbitration.

15.    The expired Sea-Pac Agreements, though, provide a deadline by which a party must elect arbitration: "*If arbitration is not initiated within 30 days of its becoming an option, as provided above, either party may resort to litigation pursuant to paragraph [--].*" Because neither Sea-Pac nor AWI requested mediation, arbitration became an option no later than December 14, 2005. Under the express terms of the expired Sea-Pac Agreements, Sea-Pac then had an additional 30 days to initiate arbitration and, therefore, could have done so at any time on or before January 13, 2006 at the latest. Sea-Pac failed to do so and made no request for arbitration until after AWI — six months after the expiration of the latest possible deadline for requesting arbitration — filed the Claim Objection. Sea-Pac's request to arbitrate the parties' disputes, made solely in response to the Claim Objection, is simply too little too late.

8

16.    The clear intention of the parties, as evidenced by the plain language of the expired Sea-Pac Agreements, was to create the ability to submit disputes to arbitration *if and only if* arbitration was sought within the appropriate time frame, after which either party had the express right to initiate litigation. Having failed to invoke either mediation or arbitration within the deadlines established under the explicit terms of the expired Sea-Pac Agreements, Sea-Pac now is bound by AWI's election to litigate the parties' disputes. Because Sea-Pac has no enforceable right to arbitration, the Court need not even consider whether it can or should defer resolution of the Claim Objection to arbitration.

***B. Arbitration is Not an Appropriate Forum***
   ***for Resolution of the Sea-Pac Claim***

17.    Even assuming, *arguendo*, the arbitration provisions in the expired Sea-Pac Agreements were enforceable under the terms of the expired Sea-Pac Agreements, the Court is not required to enforce such arbitration provisions and, indeed, in this case, strong policy reasons support having a single forum — this Court — resolve the disputes between Sea-Pac and AWI. *Schubert v. Wellspring Media, Inc. (In re Winstar Communications, Inc.)*, 335 B.R. 556, 566 (Bankr. D. Del. 2005) ("a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purposes of the Code, including the centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.") (*quoting In re Startec Global Comm. Corp.*, 300 B.R. 244, 250 (D. Md. 2003)).

**i.    The Court Has Discretion to Deny**
     **Enforcement of Arbitration Provisions**

18.    In *Mintze*, the Third Circuit reiterated the standard first articulated in *Hays & Co. v. Merrill Lynch, Inc. (In re Monge Oil Corp.)* ("*Hays*"), 885 F.2d 1149 (3d Cir. 1989),

9

for when a bankruptcy court may exercise its discretion to deny a request for arbitration. *Mintze,*

434 F.3d 222; *Hays,* 885 F.2d 1149 (applying to bankruptcy proceedings the analysis set forth in

the Supreme Court's decision in *Shearson/Am. Exp. v. McMahon,* 482 U.S. 200 (1987)).[6] Under

*Mintze,* whether the court has discretion to deny enforcement of an otherwise applicable

arbitration clause depends on whether the party opposing arbitration has established

congressional intent to preclude judicial remedies for the statutory rights at issue by showing that

the text, legislative history, or purpose of the Bankruptcy Code conflicts with the enforcement of

an arbitration provision. *Mintze* at 229. The fundamental issue for the Court is whether the

dispute could arise outside of bankruptcy or whether the "statutory rights" at issue derive

exclusively from the provisions of the Bankruptcy Code. *Mintze* at 231; *see also Insurance Co.*

*of N. Am. V. NGC Settlement Trust (In re National Gypsum Co.),* 118 F.3d 1056, 1067 (5th Cir.

1997).

   19. In *Mintze,* because the claimant did not raise any statutory claims created

by the Bankruptcy Code, the court found no inherent conflict between arbitration and the

consumer protection issues involved. Here, however, Sea-Pac has asserted entitlement to an

administrative expense — a creature of the Bankruptcy Code — which is afforded priority

treatment ahead of other creditors.[7] "Where the issues to be arbitrated involve exclusively

---

  [6] In *McMahon,* the Supreme Court interpreted the FAA as establishing a federal policy favoring arbitration and requiring enforcement of arbitration provisions. The Court noted, however, that the FAA's mandate to allow arbitration may be overridden by a contrary congressional intent to prohibit waiver of a judicial forum for a particular claim, which intent is deducible from the statute's text, legislative history, or underlying objectives. *McMahon,* 482 U.S. at 226-7.

  [7] Allowance or disallowance of Sea-Pac's claim for an administrative expense is a core bankruptcy issue that should be decided by the Court. "Resolving claims is the most fundamental of bankruptcy court processes, and therefore, is rarely relegated to arbitration." *In re Glen Eagle Square, Inc.,* WL 71782, *1 (Bankr. E.D. Pa. 1991) (*citing Zimmerman v. Cont'l Airlines, Inc.* 712 F.2d 55, 59 (3d Cir, 1983), *cert. denied,* 464 U.S. 1038 (1984)); *see also Hays,* 885 F.2d at 1156, n.9 (specifically

bankruptcy matters, *such as the determination of claim priority*, such issues *should not be submitted* to arbitration because they are core bankruptcy matters." *In re Slipped Disk*, 245 B.R. 342, 345 (Bankr. N.D. Iowa 2000) (emphasis added).

20.    Accordingly, under the Third Circuit's analysis, with respect to core bankruptcy issues, "bankruptcy courts continue to enjoy discretion to refuse enforcement of an otherwise applicable arbitration provision provided the standard in *McMahon* has been met." *In re APF Co.*, 264 B.R. 344, 362 (Bankr. D. Del. 2001) (Walsh, J.) (exercising discretion to deny arbitration of core proceedings derived from the Bankruptcy Code where arbitration would conflict with fundamental tenets of centralized resolution of purely bankruptcy issues and equality of distribution among creditors). In other words, the Court may exercise its discretion to deny enforcement of an otherwise applicable arbitration provision if arbitration would jeopardize the fundamental objectives of the Bankruptcy Code. Accordingly, even if there were an enforceable arbitration provision at issue here, which there is not, the Court has discretion to refuse to refer the matter to arbitration because, here, arbitration of the Claim Objection (which raises bankruptcy-specific issues) conflicts with the objectives of the Bankruptcy Code.

ii.    **The Court Should Exercise Its Discretion
to Deny the Arbitration Motion Because
the Facts Here Mitigate Against Arbitration**

21.    In determining whether to exercise discretion to deny enforcement of an arbitration provision, courts have considered a number of factors, including the following: (i) the importance of a centralized resolution of purely bankruptcy issues, (ii) whether the issue can be resolved more expeditiously by the bankruptcy judge as opposed to through the arbitration

---

distinguishing the non-core issues at hand from typical core issues including "the allowance of claims against the estate.").

process, (iii) the degree to which special bankruptcy expertise is necessary in deciding the issue, (iv) the impact on creditors of the debtor who were never parties to the agreement containing the arbitration clause, and (v) whether the parties have commenced arbitration outside of bankruptcy.[8] *See, e.g., Winstar*, 335 B.R. at 365-366; *Slipped Disk*, 245 B.R. at 346.

22.    Of course, where the proceeding at issue derives from provisions of the Bankruptcy Code or relates to matters as to which the Bankruptcy Court was granted specific jurisdiction to resolve, it invokes more of the concerns reflected in the above-referenced factors, making arbitration inappropriate. *See, e.g., Glen Eagle Square Inc.*, 1991 WL 71782 at *1 ("As to core proceedings, deferral [to arbitration] should not be the norm, and relief to allow arbitration to go forward should be granted only if the balance of hardships tips in favor of the party seeking arbitration.") (internal citations to *Hays* omitted). In this case, resolution of the Claim Objection requires determinations with respect to a number of bankruptcy-specific issues which, collectively, demonstrate that the bankruptcy policies reflected in the foregoing factors weigh heavily in favor of the Court retaining jurisdiction to resolve the Claim Objection.

> ➤ *Priority of Sea-Pac's Claims Relative to Other Creditors*

23.    Liquidating the Sea-Pac Claim also requires determining whether any portion of the Sea-Pac Claims is entitled to administrative expense priority. Determining the priority of claims is within the exclusive jurisdiction of the Bankruptcy Court, given the strong policy of the Bankruptcy Code to have a centralized forum for resolving the entire body of claims against a debtor's estate. *See, e.g.,* APF, 264 B.R. 344, 364 ("The efficient resolution of claims and the conservation of the bankruptcy estate's assets is an integral purpose of bankruptcy

---

[8] *See APF*, 264 B.R. at 363 ("...particularly in a case such as this, where the parties have not commenced or requested arbitration outside of bankruptcy, this court *is* the most efficient and effective forum in which to resolve these fundamental Bankruptcy Code issues.")

and inures to the benefit of the [d]ebtor's creditors.") (*citing Nat'l Gypsum*, 118 F.3d at 1069,

n.21). Because administrative expense claims are afforded priority status under the Bankruptcy

Code, the party seeking administrative expense priority has a heavy burden to demonstrate

entitlement to such priority, and the Bankruptcy Court is in a unique position to evaluate whether

that burden — as a legal, as well as a factual, matter — has been met. In this case, resolving the

Sea-Pac Claim includes determining whether Sea-Pac's alleged breach of contract claims should

be elevated above the claims of other similarly situated creditors of AWI's estate — an estate

this Court has been administering for nearly six years.

       24.    Moreover, proving entitlement to an administrative expense priority claim

requires satisfaction of bankruptcy-specific standards. Indeed, to prove that any damages

suffered by Sea-Pac qualify as administrative expenses, Sea-Pac must, as a matter of bankruptcy

law, show that its continued performance was induced by AWI notwithstanding that Sea-Pac

knew of the alleged breaches that form the basis of its claims beginning in 2000 and 2003

(before the Sea-Pac Agreements expired). Sea-Pac continued to perform in spite of the alleged

breaches, and Sea-Pac took no action in AWI's chapter 11 case to protect its rights for any

alleged breach of the Sea-Pac Agreements until November of 2005 — after the Sea-Pac

Agreements expired. It is AWI's position that, if Sea-Pac was really harmed by AWI's actions,

its remedy was to move to compel AWI to assume or reject the Sea-Pac Agreements, which it

did not do. By continuing to perform (and, with respect to the Commercial Agreement Breach

Claim, not even asserting that the appointment of the second distributor was a default), Sea-Pac

deprived AWI of the ability to reject the Sea-Pac Agreements. An arbitration panel lacking

experience in the bankruptcy concepts associated with postpetition performance under executory

13

contracts (and rejection of such contracts) would be unable to assess the merits of AWI's Claim Objection.

> *Applicability of the Administrative Expense Bar Date*

       25.      The Claim Objection requires the Court to decide whether Sea-Pac is barred from asserting any administrative expenses arising prior to November 24, 2003 by virtue of Sea-Pac's failure to comply with the Administrative Expense Bar Date established in AWI's chapter 11 case. AWI submits that Sea-Pac is absolutely barred from asserting its administrative expense claims after failing to comply with this Court's order establishing a bar date for such claims. The Administrative Expense Bar Date Order explicitly required Sea-Pac — as a counterparty to a then unexpired executory contract with actual knowledge of the alleged breaches by AWI that form the basis of its claims — to assert such claims (as claims for "breach of an obligation – contractual, statutory, or otherwise – by AWI...")[9] on or before the Administrative Expense Bar Date. Sea-Pac has asserted that the Administrative Expense Bar Date did not apply to its claims and suggests that the Executory Contracts Bar Date entered two years later relieved Sea-Pac of any obligation to comply with the Administrative Expense Bar Date. In short, Sea-Pac's response to this portion of the Claim Objection raises questions about the interpretation of two previous orders entered by this Court. It is indisputable that Bankruptcy Courts have the absolute right to enforce and interpret their own orders. *In re Continental Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999) ("It is axiomatic that a court possesses the inherent authority to enforce its own orders."), *aff'd*, 279 F.3d 226 (3d Cir. 2002). Accordingly, this Court — and not a panel of arbitrators unfamiliar with the orders in question

---

[9] *See* Administrative Expense Bar Date Order, attached as Exhibit "D" to the Claim Objection.

RLF1-3068065-1

— is in the best position to determine the applicability of the Administrative Expense Bar Date to Sea-Pac's claims.

> *Valuing Administrative Expense Claims*

26.     Resolving the Sea-Pac Claim also requires the Court to value any administrative expense claims to which Sea-Pac may be entitled.  Contrary to Sea-Pac's simplified suggestion, liquidating the Sea-Pac Claim involves more than a simple breach of contract dispute to determine the amount, if any, of damages suffered by Sea-Pac on account of the alleged breaches by AWI.  As a matter of bankruptcy law, if any of Sea-Pac's claims are entitled to administrative expense priority, what that claim might be is not necessarily based upon the damages that an arbitration panel might otherwise assess, but upon the reasonable value of the services (or benefits) provided by Sea-Pac to AWI's estate.  *See In re FBI Distribution Corp.*, 330 F.3d 36, 48 (1st Cir. 2003) (holding that a creditor is entitled to only the reasonable value of the beneficial services rendered during the reorganization); *In re Adelphia Business Solutions, Inc.*, 296 B.R. 656, 664, n.9 (Bankr. S.D.N.Y. 2003) (recognizing that courts should be guided by "the equitable principle of unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him"); *In re Cardinal Indus., Inc.*, 142 B.R. 801, 805 (Bankr. S.D. Ohio 1992) (holding that the measure of expense entitled to an administrative priority is the benefit to the estate, not the damage to the claimant).  Again, the remedy, if the other party finds it is being harmed, is for that party to seek to compel assumption or rejection of the contract at issue.[10]  Because the analysis involved in valuing administrative expense claims

---

[10]  Prior to the amendment of the Bankruptcy Code to require ongoing postpetition payment for equipment leases (and, before then, real estate leases), a number of cases addressed this issue, which are often referred to as the "use and occupancy" cases.  *See, e.g., Philadelphia Co. v. Dipple*, 312 U.S. 168, 61 S.Ct. 538, 85 L. Ed. 651 (1941); *aff'g* 111 F.2d 932 (3d Cir. 1940) (prior to assumption of an executory lease, the trustee or debtor in possession is required to pay as an administrative expense only the value of

15

derives from the development of a unique area of bankruptcy law, it requires the expertise of the

Bankruptcy Court, and application of breach of contract principles by an arbitration panel may

well conflict with the standard imposed by the Bankruptcy Code. In that regard, this Court's

statement in *In re Oakwood Homes Corp.*, applies with equal force to the issue of valuing

administrative priority claims:

> The law and the lore surrounding adjudication of such claims is extensive,
> and has been developed over significant periods of time. The result is,
> that certain fact situations may be expected to bring about fairly consistent
> results, wherever they are tried. To subject these matters to arbitration,
> before individuals or tribunals with little or no experience in bankruptcy
> law or practice, and with little or no concern for the rights and interests of
> the body of creditors, of which the particular defendant is only one, would
> introduce variables into the equation which could potentially bring about
> totally inconsistent results. Such a result would be contrary to the primary
> policy of the Bankruptcy Code, which is that all classes of creditors of a
> debtor are entitled to be treated as equitably as possible...

2005 LEXIS 429, *14-15 (Bankr. D. Del. 2005) (holding that statutory fraudulent

conveyance and preference actions may not be submitted to arbitration and finding that,

even if such actions were debtor-derivative, the court would exercise discretion to decline

enforcement of arbitration provision as contrary to the objectives of the Bankruptcy

Code).

> ➢ *Sea-Pac's Entitlement to Attorneys' Fees*

27.    As set forth more fully in the Claim Objection, AWI disputes Sea-Pac's

entitlement to attorneys' fees not only because the expired Sea-Pac Agreements fail to contain

any language that would entitle Sea-Pac to such fees, but also because, as a matter of bankruptcy

---

the use or occupancy); *Palmer v. Palmer*, 104 F.2d 161, 163 (2d Cir.), *cert. denied*, 308 U.S. 590, 60 S.
Ct. 120, 84 L. Ed. 494 (1939) ("the trustee need not pay the rent during the probationary period, and the
court will hold off the lessor and force him to be content with the value of the use and occupancy
meanwhile..."); *Crook v. Zorn*, 100 F.2d 792 (5th Cir.), *cert. denied*, 307 U.S. 630, 59 S. Ct. 833, 83 L.
Ed. 1573 (1939) (same).

RLF1-3068065-1

law, an unsecured creditor may not recover postpetition attorneys' fees or other collection costs from an insolvent debtor. Accordingly, whether Sea-Pac is entitled to a claim for attorneys' fees is a question this Court will ultimately have to resolve as a bankruptcy matter and is not something that can be easily assessed by a panel of arbitrators.

        28.     For all of the reasons set forth above, liquidating the Sea-Pac Claim is inherently intertwined with distinctive bankruptcy concepts that require specific expertise — and this Court will ultimately have to determine the priority of Sea-Pac's claims in any event. Of course, to the extent the issues could be segregated so as to allow arbitration to determine Sea-Pac's damages and a subsequent determination of priority by the Bankruptcy Court, it would require this Court to revisit many of the facts reviewed by the arbitrators and would impose additional costs and expenses on AWI, which is directly contrary to the bankruptcy objectives favoring resolution of bankruptcy claims in one forum and encouraging expeditious administration of the estate for the benefit of all creditors. Conversely, resolution of certain of the bankruptcy issues by the Bankruptcy Court, including whether Sea-Pac's claims are entitled to administrative expense priority and, if so, whether any such administrative expenses are barred by Sea-Pac's failure to comply with the Administrative Expense Bar Date, could substantially narrow the issues to be resolved. Efficiency concerns, therefore, mitigate against arbitration and in favor of this Court retaining jurisdiction over the Claim Objection.

RLF1-3068065-1

## V.     CONCLUSION

29.     Because resolution of the Sea-Pac Claim implicates so many bankruptcy objectives and because the facts so strongly mitigate against arbitration, the Court should exercise its discretion to deny the Arbitration Motion.  Ultimately, the Court is required to balance the policies underlying the FAA and the Bankruptcy Code to determine whether an inherent conflict exists.  When such balancing is applied to this case, the scale tips heavily against arbitration.  As an initial matter, the FAA does not apply because Sea-Pac cannot satisfy the threshold showing of a valid and enforceable arbitration provision.[11]  On the other hand, the nature of the Claim Objection and Sea-Pac's asserted entitlement to priority treatment in the Sea-Pac Claim implicate strong bankruptcy concerns that directly conflict with the proposed arbitration.  In *APF*, this Court noted the following:

> The efficient resolution of claims and the conservation of the bankruptcy estate's assets is an integral purpose of bankruptcy and inures to the benefit of the debtor's creditors.  This policy concerns more than the mere private rights of individuals to an arbitration agreement, which was the preeminent concern of Congress in passing the FAA.  In this regard, it seems to me that efficiency concerns in the bankruptcy context, at least as they pertain to fundamental bankruptcy rights such as the ones here, may present a genuine conflict between the FAA and the Bankruptcy Code.

---

[11]  Section 3 of the FAA provides that a court has the power to stay a proceeding *if* the court determines that the arbitration clause applies to the dispute.  *See* 9 U.S.C. § 3; Arbitration Motion, ¶ 9.  In fact, section 3 of the FAA provides that, upon being satisfied that an issue is referable to arbitration, the court "shall on application of one of the parties stay the action until such arbitration has been had in accordance with the terms of the agreement, *providing the applicant for the stay is not in default in proceeding with such arbitration.*"  9 U.S.C. § 3.  Where, as here, the applicant is in default in proceeding with such arbitration, the FAA mandate does not apply.

18

264 B.R. at 364. The statement applies with equal force to the instant matter and, therefore, the

Court should deny the Arbitration Motion.

Dated:      October 6, 2006                 Respectfully submitted,
            Wilmington, Delaware

                                            _Mark D. Collins (No. 2981)_____
                                            Mark D. Collins (No. 2981)
                                            Jason M. Madron (No. 4431)
                                            RICHARDS, LAYTON & FINGER, P.A.
                                            One Rodney Square, P.O. Box 551
                                            Wilmington, Delaware 19899
                                            (302) 651-7700

                                                    -and-

                                            Stephen Karotkin
                                            Debra A. Dandeneau
                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, New York 10153
                                            (212) 310-8000

                                            ATTORNEYS FOR DEBTORS AND
                                            DEBTORS IN POSSESSION

**Exhibit A**

DO NOT USE THIS FORM IF YOU HAVE AN ASBESTOS PERSONAL INJURY CLAIM

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

**Name of Debtor: check one (See Reverse Side for Complete List of Debtors and Case Nos.)**
- ☐ Armstrong World Industries, Inc. (Case No. 00-4471)
- ☐ Nitram Liquidators, Inc. (Case No 00-4469)
- ☐ Desseaux Corporation of North America (Case No. 00-4470)

**Name of Creditor (The person or other entity to whom the debtor owes money or property):**

**Name and Address where notices should be sent:**

Sea Pac Sales
Dale Griffiths, Pres
6307 South 228th Street
Kent, WA 98032
Telephone # 253-796-3500

Account or other number by which creditor identifies debtor:

- ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars
- ☐ Check box if you have never received any notices from the bankruptcy court in this case.
- ☐ Check box if the address differs from the address on the envelope sent to you by the court.

This Space is for Court Use Only

Check box if ☐replaces
this claim    ☐amends    a previously filed claim, dated _____

**1. Basis for Claim**
- ☐ Acquisition/Divestitures
- ☐ Asbestos Property Damage
- ☐ Bank Service Charges
- ☐ Contribution, Indemnity or Guaranty
- ☐ Customer Deposits
- ☐ Environmental
- ☐ Equipment Financing
- ☐ ESOP Repurchase Obligation
- ☐ Executory Contracts
- ☐ Expenses
- ☐ Freight
- ☒ Goods Sold
- ☐ Industrial Revenue Bonds
- ☐ Letters of Credit or Surety Bonds
- ☐ Litigation
- ☐ Long Term Disability
- ☐ Mechanic's Liens
- ☐ Money Loaned
- ☐ Mortgages
- ☐ Non-Asbestos Personal Injury
- ☐ Non-Asbestos Property Damage
- ☐ Officer Indemnity
- ☐ Other
- ☐ Other Financing
- ☐ Pension Insurance
- ☐ Professional Fees
- ☐ Property Leases
- ☐ Reclamation Notices
- ☐ Retiree Benefits as defined in 11 U.S.C §1114(a)
- ☐ Senior Debt
- ☐ Subordinated Debt
- ☐ Taxes
- ☐ Tooling
- ☐ Trade Payables
- ☐ Unknown
- ☐ Wages, Salaries and Compensation (fill out below)
  Your SS #: _____
  Unpaid compensation for services performed from _____ (date)
  to _____ (date)
- ☐ Workers' Compensation

**2. Date debt was incurred:**

**3. If court Judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ See Attached
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle
☐ Other_____
Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,300), earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C § 507(a)(4)
☐ Up to $1,950 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8)
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary

**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

This Space is for Court Use Only

RECEIVED
TRUMBULL SERVICES COMPANY

2001 AUG 30 PH 2: 16

BANKRUPTCY
8/30/01 #3528 AP

Date
8/29/01

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):

Dale Griffiths    Dale GRIFFITHS, President
SEA-PAC SALES

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Prepared by Trumbull Services on Time: 12:15 pm Date: 6-September-01

Exhibit A

**PROOF OF CLAIM**
(Sea Pac Sales Company)

Sea Pac Sales Company ("SPSC") is an Armstrong distributor under a series of Sales Service Agreements ("Contracts") with Armstrong World Industries, Inc.

SPSC has a liquidated, noncontingent claim for $11,448 for STPA and SCPR for sales of products pursuant to the Contracts made prior to December 6, 2000.

SPSC additionally asserts an unliquidated, contingent, unmatured claim for STPA and SCPR based on materials shipped prior to December 6, 2000, in the amount of $100,000  This amount is estimated and subject to amendment, revision or supplementation.  SPSC contends that its right to these payments are post-petition contractual obligations of the debtor entitled to administrative priority   SPSC files this claim on a precautionary basis to the extent this claim is determined to be a prepetition claim

SPSC is also a third party beneficiary of that certain Inventory Purchase Agreement dated April 23, 2001, between Armstrong World Industries, Inc , and U.S. Bank  SPSC as third party beneficiary asserts an unliquidated, contingent, unmatured claim in the amount of $7,000,000.  This amount is estimated and subject to amendment, revision or supplementation.  SPSC contends that its right to these payments are post-petition contractual obligations of the debtor entitled to administrative priority.  It files this claim on a precautionary basis to the extent this claim is determined to be a prepetition claim.

SPSC has not received any notice from the court and any notice of the bar date other than that contained in the letter dated August 24, 2001, from Stephen E. Stockwell, Senior V P. Strategic Relations   SPSC expressly reserves the right to amend and supplement this proof of claim for any other damages arising out of its pre-petition contractual relationships with Armstrong World Industries, Inc., including, but not limited to, any damages or breaches the untimely notice of the bar date precluded Sea Pac from discovering and for any claims which may arise form the subsequent rejection of the Contracts

Proof of Claim - Exhibit A
Sea Pac sale Company, page 1 of 1

## CERTIFICATE OF SERVICE

I, Jason M. Madron, hereby certify that on the 6th day of October, 2006, I caused

copies of the foregoing **Objection of Armstrong World Industries, Inc. to Sea-Pac Sales**

**Company's Motion (I) To Stay Objection by Armstrong World Industries, Inc. to Sea-Pac's**

**Proof of Claim No. 4854 Pending Arbitration, and (II) For Relief from the Automatic Stay**

**or, in the Alternative, for Relief from the Discharge Injunction** to be served upon the parties

on the attached list and in the manner indicated thereon.



Jason M. Madron (No. 4431)

RLF1-3068066-1

**ARMSTRONG WORLD INDUSTRIES, INC.**
**CASE NO. 00-4471**
**<u>SERVICE LIST</u>**

**<u>Via Hand Delivery</u>**

Karen Lee Turner
Michael G. Busenkell
Eckert Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1360
Wilmington, DE 19801

**<u>Via First Class Mail</u>**

Michael M. Feinberg
Diana K. Carey
Karr Tuttle Campbell
1201 Third Avenue, Suite 2900
Seattle, WA 98102

Al Van Kampen
Rohde & Van Kampen, PLLC
1001 Fourth Avenue, Suite 4050
Seattle, WA 98154

Sea-Pac Sales Company
6307 South 228th Street
Kent, WA 98032

RLF1-3068066-1

**5**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) |
| | ) **Chapter 11** |
| ARMSTRONG WORLD INDUSTRIES, | ) |
| INC. *et al.*, | ) **Case No.  00-04471 (JKF)** |
| | ) |
| Debtors. | ) **Jointly Administered** |
| | ) **Objection Deadline: September 15, 2006 (rev.)** |
| | ) **Hearing Date: October 23, 2006 9:45 a.m.** |
| | ) **Re: DI 9683** |

**ANSWER TO OBJECTION OF ARMSTRONG
WORLD INDUSTRIES, INC. TO THE PROOF OF CLAIM
OF SEA-PAC SALES COMPANY (CLAIM NO. 4854)**

To:    Parties required to receive notice pursuant to Local Bankruptcy Rule 2002-1(b), as modified by the Court's Second Revised Order Establishing Case Management Procedures and Hearing Schedule, dated March 15, 2005.

In answer to the Objection filed by Armstrong World Industries, Inc. ("AWI"), Sea-Pac Sales Company ("Sea-Pac") alleges as follows:

## I. JURISDICTION

1.    Sea-Pac denies that this Court has jurisdiction to consider AWI's Objection as a core proceeding, or that venue in this District is proper, but states that but for the arbitration provisions contained in the Commercial and Residential Agreements, this Court would have jurisdiction to consider AWI's objection as a core proceeding and that venue would be proper.  Sea-Pac lacks information sufficient to deny or admit the other allegations contained in paragraph 1, and therefore denies same.

## II. BACKGROUND

### A.    The Sea-Pac Agreements

2.    Sea-Pac admits the allegations of paragraph 2, except to deny that the entire Commercial and Residential Agreements are attached to the Sea-Pac proof of claim or Exhibit A to AWI's Objection.

3.    Sea-Pac admits that AWI appointed Sea-Pac to be a Regional Distribution Center ("RDC") to AWI's direct customers located within Sea-Pac's sales territory.

4.    Sea-Pac admits that the Commercial Agreement granted it exclusive distribution rights within its sales territory; that the agreement provided that AWI could appoint additional distributors within that sales territory if Sea-Pac failed to meet "annual mill shipment requirements" that had been set as required by the Commercial Agreement; that AWI reserved the right to sell certain Commercial Flooring Products to certain customers defined in paragraph 2 of that Agreement; and that paragraph 28 of that Agreement contains a provision that is quoted in paragraph 4 of AWI's Objection. Sea-Pac further states that the Agreement itself is the best source of its provisions, and denies all other and further allegations contained in paragraph 4.

5.    Sea-Pac denies all allegations contained in paragraph 5 of AWI's Objection.

6.    Sea-Pac admits that it received a copy of the letter which is attached to AWI's Objection as Exhibit C, and that Pacific Mat was appointed as a second distributor of AWI's Commercial Flooring Products within Sea-Pac's exclusive territory. Sea-Pac further alleges that it objected on numerous occasions to the appointment of a second distributor, and denies all other allegations contained in paragraph 6.

7.    Sea-Pac admits that the Commercial and Residential Agreements were to expire by their terms on February 15, 2004; that on about August 25, 2004, AWI and

2

Sea-Pac entered into interim letter agreements extending the Sea-Pac agreements until December 31, 2004, and that the August 25, 2004 agreement contains language that is recited in paragraph 7; and denies all other allegations contained therein. Sea-Pac affirmatively alleges that through two letters dated January 29, 2004 and February 9, 2004 from AWI, which were accepted by Sea-Pac, the Residential and Commercial Agreements were extended until March 31, 2004.

### B.    The Administrative Bar Date

8.     Sea-Pac admits that an Administrative Expense Bar Date was set on the terms as described in paragraph 8 of AWI's Objection, but denies that such bar date is the relevant one for purposes of determining Sea-Pac's Claims.

9.     Sea-Pac denies receiving a copy of the Administrative Expense Bar Date notice. Sea-Pac lacks sufficient information to admit or deny the other allegations in this paragraph, and therefore denies same.

10.     Sea-Pac admits that it did not file a proof of administrative expense for Sea-Pac's claims relating to the Sea-Pac Agreements or on before the Administrative Bar Date, but denies that such failure bars Sea-Pac's Claims.

### C.    The Executory Contracts Claims Bar Date

11.     Sea-Pac admits that an Executory Contracts Bar Date was set on the terms as described in paragraph 11, and that the Sea-Pac Agreements were identified as "Previously Scheduled Contracts" because they expired according to their terms during the pendency of AWI's chapter 11 case, but denies the other allegations in this paragraph.

12.     Sea-Pac admits receipt of the Executory Contract Bar Date Notice and proof of claim form, but lacks sufficient information to admit or deny the other allegations in this paragraph, and therefore denies same.

3

**D.   The Sea-Pac Claim**

13.   Sea-Pac admits that it filed claim no. 4854 on or about November 8, 2005, against AWI in the amount of $4.9 million, plus interest and attorney fees, and that it alleges that a portion of its claim is entitled to administrative expense priority.

14.   Sea-Pac admits that AWI has accurately summarized Sea-Pac's Commercial Agreement Breach Claim but states that such claim itself is a better reference for the allegations therein. Sea-Pac specifically denies that it failed to meet any operative mill shipment requirement, and denies all other allegations in this paragraph.

15.   Sea-Pac admits that AWI has accurately summarized Sea-Pac's Residential Agreement Breach Claim but states that such claim itself is a more accurate reference for the allegations therein.

16.   Sea-Pac admits that it alleges it is entitled to attorney fees and interest if AWI disputes its claims.

### III.  RELIEF REQUESTED

17.   Sea-Pac denies the allegations in paragraph 17 of AWI's Objection.

### A.    The Sea-Pac Claim Should Be Disallowed.

**(i)   *Sea-Pac's Residential Agreement Breach Claim Must Be Disallowed Because It Contains Insufficient Supporting Documentation.***

18.   Sea-Pac denies the allegations in paragraph 18 of AWI's Objection.

19.   Sea-Pac denies the allegations in paragraph 19 of AWI's Objection.

**(ii)  *AWI Has Absolute Defenses to Sea-Pac's Commercial Agreement Breach Claim.***

20.   Sea-Pac denies the allegations in paragraph 20 of AWI's Objection.

21.   Sea-Pac admits that the Commercial Agreement is governed by Pennsylvania law. The remaining portion of paragraph 21 of AWI's Objection calls for

4

legal conclusions to which no answer is required. Sea-Pac denies all other allegations contained in paragraph 21.

22.    These allegations assert legal conclusions to which no response is required by Sea-Pac.

23.    These allegations assert legal conclusions to which no response is required by Sea-Pac.

24.    Sea-Pac denies the allegations in paragraph 24 of AWI's Objection.

   (iii)    *Sea-Pac Is Not Entitled to a Claim for Attorneys' Fees or Interest.*

25.    Sea-Pac denies the allegations in paragraph 25 of AWI's Objection.

26.    Sea-Pac admits that an unsecured creditor may not recover postpetition attorneys' fees or other collection costs where the debtor is insolvent but denies that Sea-Pac is an unsecured creditor and denies the remaining allegations in paragraph 26 of AWI's Objection.

27.    Sea-Pac admits that Bankruptcy Code section 506(b) authorizes a creditor to be paid attorney fees as part of its oversecured claim, but denies that this section governs attorney fees in Sea-Pac's Claims.

28.    Sea-Pac denies the allegations in paragraph 28 of AWI's Objection.

**B.    The Sea-Pac Claim Should Be Treated as a General Non-Priority Claim**

29.    Sea-Pac denies the allegations in paragraph 29 of AWI's Objection.

   (i)    *Sea-Pac Is Barred From Asserting an Administrative Expense Claim.*

30.    Sea-Pac denies the allegations in paragraph 30 of AWI's Objection.

   (ii)    *The Sea-Pac Claim Is Not Entitled to Administrative Expense Priority Even if It Were Timely Filed.*

31.    These allegations assert legal conclusions to which no response is required.

5

32.    These allegations assert legal conclusions to which no response is required.

33.    These allegations assert legal conclusions to which no response is required.

34.    Sea-Pac denies the allegations in paragraph 34 of AWI's Objection.

35.    Sea-Pac denies that all of Sea-Pac's claims arise out of prepetition contracts and that its claims must be treated as general unsecured claims and not administrative expenses. The remaining portion of paragraph 35 of AWI's Objection calls for legal conclusions to which no answer is required.

36.    Sea-Pac denies the allegations in paragraph 36 of AWI's Objection.

37.    Sea-Pac denies the allegations in paragraph 37 of AWI's Objection.

## IV. NOTICE

38.    Sea-Pac lacks sufficient information to deny or admit the allegations contained in paragraph 38 regarding notice to various referenced parties and therefore denies same.

39. Sea-Pac admits that AWI has provided Sea-Pac with at least thirty (30) days' notice of the hearing on the Objection.

## V. NEW MATTER

40.    Unless specifically admitted herein, all allegations in AWI's Objection are hereby denied.

WHEREFORE, Sea-Pac requests that the Court grant an order (a) granting relief from stay and referring the Sea-Pac Claims to mediation and/or arbitration; (b) allowing the Sea-Pac Claims in their entirety; (c) determining that the Sea-Pac claims are entitled

6

to administrative priority, either in whole or part; and (d) granting Sea-Pac such other and further relief as is just.

DATED: September 15, 2006.

ECKERT SEAMANS CHERIN & MELLOTT LLC

/s/ _____

Karen Lee Turner (No. 4332)
Michael G. Busenkell (No. 3933)
300 Delaware Avenue, Suite 1360
Wilmington, Delaware 19801
(302) 425-0430

Michael M. Feinberg
Diana K. Carey
KARR TUTTLE CAMPBELL
1201 Third Avenue, Suite 2900
Seattle, Washington 98102
(206) 223-1313

Al Van Kampen
ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
(206) 386-7353

ATTORNEYS FOR CREDITOR SEA-PAC
SALES COMPANY

CERTIFICATE OF SERVICE

I, Paula M. Shapiro, certify that on September 15, 2006 I caused copies of

the foregoing **Sea-Pac Sales Company's ANSWER TO OBJECTION TO**

**ARMSTRONG WORLD INDUSTRIES, INC. TO THE PROOF OF CLAIM OF**

**SEA-PAC (Claim No. 4854), MEMORANDUM IN SUPPORT, and**

**DECLARATION OF JARED WILLIAMS w/exhibits 1-9,** to be served via Electronic

Case Filing per the Mailing Matrix as of this day, and to:

| Via First Class Mail: | Via First Class Mail: |
|---|---|
| Mark D. Collins, Esquire<br>Jason Madron, Esquire<br>Richards, Layton & Finger<br>One Rodney Square<br>Wilmington, DE 19801 | Stephen Karotkin, Esquire<br>Debra A. Dandeneau, Esquire<br>Weil, Gotshall & Manges<br>767 Fifth Avenue<br>New York, NY 10153 |

/s/
Paula M. Shapiro

*u00032671.doc*

**6**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** ) | |
| ) | **Chapter 11** |
| **ARMSTRONG WORLD INDUSTRIES,** ) | |
| **INC.** *et al.,* ) | **Case No. 00-04471 (JKF)** |
| ) | |
| **Debtors.** ) | **Jointly Administered** |
| ) | **Objection Deadline: September 15, 2006 (rev.)** |
| ) | **Hearing Date: October 23, 2006 9:45 a.m.** |
| ) | **Re: DI 9683** |

## MEMORANDUM IN SUPPORT OF SEA-PAC SALES COMPANY'S ANSWER TO AWI'S OBJECTION

To:    Parties required to receive notice pursuant to Local Bankruptcy Rule 2002-1(b), as modified by the Court's Second Revised Order Establishing Case Management Procedures and Hearing Schedule, dated March 15, 2005.

Sea-Pac Sales Company ("Sea-Pac") files this memorandum in support of its

Answer to the Objection by Armstrong World Industries, Inc. ("AWI") to Sea-Pac's

proof of claim No. 4854 (the "Sea-Pac Claims"). Concurrent with the filing of the

answer and this memorandum, Sea-Pac also has filed a motion requesting relief from

stay in order to pursue its claims in mediation and/or arbitration as the parties' contracts

require. Pursuant to well-settled case law, all issues concerning Sea-Pac's Claims

should be resolved in arbitration, with Sea-Pac's Claims being allowed as administrative

claims, in whole or part.

## I. BACKGROUND

Sea-Pac has been a Pacific Northwest distributor of Armstrong products for

almost 50 years. Declaration of Jared Williams (hereinafter "Williams Decl.") at ¶ 12.

9/15/06
9833

It seeks damages for AWI's violations of the parties' Residential Flooring Products Distributorship and Sales/Service Center Agreement (the "Residential Agreement") and Commercial Flooring Products Distributorship Agreement (the "Commercial Agreement"), portions of which were attached to Sea-Pac's Proof of Claim and also as Exhibit A to AWI's Objection. The Residential and Commercial Agreements provide that they terminate on February 15, 2004. By letter agreements entered into between the parties, the agreements were extended until March 31, 2004, and then December 31, 2004. Williams Decl. at ¶ 3 and Exhibit 1; AWI Objection Exhibit A.

## A. The Residential Agreement

As part of the Residential Agreement, AWI required Sea-Pac to be a Regional Distribution Center ("RDC") to warehouse, merchandise, service and ship to AWI's Corporate Retail Accounts, such as The Home Depot and Lowe's, to which AWI sold product directly. AWI was required to reimburse Sea-Pac for its RDC services so that Sea-Pac received a "fair return on investment" for the services it provided to AWI. Williams Decl. at ¶ 4, Exhibit 2 at 2, 5, Exhibit 3 at 2, 3. In line with this, AWI disseminated a RDC fee schedule which was to "be reviewed by Armstrong at least annually and revised at its discretion." Residential Agreement ¶ 12.g. Sea-Pac was required to, and did provide, to AWI its "financial performance of RDC activity," which was to be used in AWI's "annual Operation Study" to revise the fee schedule so that it fully-reimbursed Sea-Pac for its RDC services to AWI. *See* Residential Agreement Attachment E at ¶ 16, attached as Exhibit 4 to the Williams Decl.; Williams Decl. ¶ 5.

The annual operation statement studies prepared by AWI showed that AWI was not reimbursing Sea-Pac for its RDC services. For example, in 2002 , AWI failed to reimburse Sea-Pac a total of $260,577, and in 2003, the under-reimbursement was $509,794, according to AWI's own records. *See* Williams Decl. ¶ 6 & Exhibit 5. In effect, as a result of AWI's failure to reimburse Sea-Pac for RDC services, Sea-Pac was subsidizing AWI's profits for its direct sales to The Home Depot and Lowe's by these annual sums. Moreover, these sums were far from trivial, amounting to more than 50 percent of the profit generated by Sea-Pac's other operations in 2002, and more than 60 percent of Sea-Pac's profits in 2003. *Id.*

Sea-Pac consistently complained the AWI's RDC fees did not reimburse it for its services. *Id.* at ¶ 8 & Exhibits 6-7. Sea-Pac's complaints were borne out by AWI's own analyses, which among other things, found AWI's RDC reimbursements to be based on outdated formulas ("5 year old compensation structure") that did not recognize the realities of Sea-Pac's sales territory, which includes vast stretches of rural, sparsely-populated lands (*i.e.*, servicing Montana is unlike servicing Manhattan). *Id.* at ¶ 8 & Exhibits 2-3, 7.

After July 2004, AWI finally began paying Sea-Pac greater RDC fees so that the reimbursement more closely covered the actual RDC costs incurred by Sea-Pac. Since then, Sea-Pac has charged AWI almost $1.5 million over and above the AWI RDC fee schedule. Williams Decl. ¶ 9 & Exhibit 8.

3

## B. The Commercial Agreement

Pursuant to the Commercial Agreement, AWI appointed Sea-Pac

> to be its exclusive wholesale distributor for all commercial floor covering products made available to distribution by Armstrong's Floor Products Operations ("Commercial Flooring Products") within the geographic area listed in Attachment A hereto ("Distributor Territory").

Commercial Agreement ¶ 1. This geographic area was the Northwest United States, including Washington, Oregon, Idaho, Montana and Northern Wyoming, plus Alaska. Williams Decl. ¶ 8.

Under the Commercial Agreement, AWI was required to consult with Sea-Pac before setting reasonably achievable mill shipment requirements for the next year by December 15 of the prior year:

> The annual mill shipment requirements by product category for Commercial Flooring Products for each calendar year will be set by Armstrong *based on discussions with Distributor* and Armstrong's *reasonable* calculation of *achievable* market penetration within Distributor Territory (excluding sales made directly by Armstrong). Those annual mill shipment requirements by product category for 1999 are attached hereto as Attachment C and *will be updated in writing no later than December 15 each year.*

Commercial Agreement ¶ 4 (emphasis added).

However, AWI never discussed with Sea-Pac the reasonably achievable mill shipment requirements, and to the extent it even communicated mill shipment requirements to Sea-Pac, the mill shipments requirements set by AWI were unreasonable and unachievable. Williams Decl. ¶ 10.

4

In its Objection, AWI claims that it *"sent* to Sea-Pac its 2002 annual mill shipment requirements." AWI Objection at 3, ¶ 5 (emphasis added). It is noteworthy that AWI provides no evidence supporting this allegation, and never even alleges that it did so by December 15, 2001. More importantly, AWI also never alleges that it ever discussed these requirements with Sea-Pac in advance, but rather that it only "sent" the requirements, which Sea-Pac denies. Williams Decl. ¶ 11. Indeed, in 2002, AWI did not utilize mill shipments (or AWI's "net bill sales") to measure Sea-Pac's performance, but instead used wholesale sales (*i.e.*, sales by Sea-Pac to its customers). *See* Williams Decl. ¶ 11 & Exhibit 9. There were no operative "mill shipment requirements" in 2002, and Sea-Pac did not fail to meet any operative requirements. *Id.* With no operative mill shipment requirements for 2002, AWI was prohibited by the terms of the Commercial Agreement from appointing a second distributor within Sea-Pac's exclusive territory. Commercial Agreement ¶ 3.

There is no requirement in either the Commercial Agreement or Residential Agreement that Sea-Pac sell solely AWI products. By 2002, many of AWI's products had become unprofitable, and Sea-Pac had begun selling a line of wood laminate floor covering, Quick-Step, manufactured by Unilin, which competed with AWI's inferior wood laminate product. Williams Decl. at ¶ 12. AWI representatives advised Sea-Pac that it did not want Sea-Pac to sell the Quick-Step product, and when Sea-Pac continued to do so, decided "to punish" Sea-Pac by appointing a second distributor in Sea-Pac's territory in breach of the Commercial Agreement. Williams Decl. ¶¶ 12-13.

Sea-Pac complained vehemently to AWI's officers about the appointment of a second distributor, identifying it correctly as a breach of contract by AWI. *Id.* at ¶ 13. In these discussions, AWI never defended its decision under the mill shipment provisions of the Commercial Agreement that it now relies upon in its Objection. *Id.* Indeed, Frank Ready, the current president and CEO for AWI North America Floor Products, specifically admitted in a telephone conference on March 22, 2004, and at other times, that AWI appointed a second distributor in Sea-Pac's territory because Sea-Pac was selling the Quick-Step flooring product, and not because of any failure to meet a mill shipment requirement. *Id.* Other officers of AWI confirmed this at various times. *Id.* at ¶¶ 12-13.

## II. THE SEA-PAC CLAIMS SHOULD BE ALLOWED

Sea-Pac has a valid claim under the Residential Agreement as a result of AWI's failure to reimburse Sea-Pac for RDC services. AWI's sole defense to Sea-Pac's Commercial Agreement claims – that it had the legal right to appoint a second commercial products distributor within Sea-Pac's territory – lacks any factual foundation, and therefore AWI also is liable to Sea-Pac under that contract. AWI's objections should be overruled, both claims should be referred to mediation and/or arbitration as required by the parties' agreements, and the claims should be allowed as filed, with all or a portion of these claims allowed as an administrative claim entitled to priority treatment.

### A. AWI Breached The Residential Agreement By
### Failing To Reimburse Sea-Pac For RDC Services

By failing to reimburse Sea-Pac for its RDC services, AWI violated paragraph 12.g. of the Residential Agreement. It is well-settled under Pennsylvania law that "[t]o 'reimburse is to 'pay back.'" *Philadelphia Trust, Safe Deposit & Ins. Co. v. Audenreid,* 83 Pa. 257, 264 (1877).

> Reimbursement...means to reimburse in the classic sense which, by definition, is "to pay back, to make restoration, to repay that expended; to indemnify, to make whole." Black's Law Dictionary, (5th ed.).

*Commonwealth v. Figueroa,* 456 Pa. Super. 620, 625, 691 A.2d 487, 490 (1997).

> The term reimbursement means "the action of reimbursing." Webster's Third Int'l Dictionary 1914 (1993). The term "reimburse" is defined as "to pay back (an equivalent for something taken, lost or expended) to someone." Id. As it is used in its common parlance, reimbursement means the delivery of money to a person to pay back that person for money that the person expended for some matter.

*United States v. Serafini,* 7 F. Supp.2d 529, 544 (M.D. Pa. 1998), *aff'd,* 233 F.2d 758, 767 (3d Cir. 2000). *Accord Clark v. Teeven Holding Co.,* 625 A.2d 869, 879 (Del. Ch. 1992)("'Reimburse' means 'to pay back, to repay that expended'"); *Strawberry Electric Service v. Spanish Fork City,* 918 P.2d 870, 879-80 (Utah 1996)(reimburse means "to make whole"); *State v. Anderson,* 863 P.2d 1370, 1376 (Wash. App. 1993)(reimburse defined as repaying "an amount equal to the fees that he or she has paid in the past").

The provision that AWI's reimbursement was to be made through a fee schedule in no way diminished AWI's overall obligation to "reimburse" Sea-Pac for its RDC services. Under the Residential Agreement, RDC "[f]ees will be reviewed by

7

Armstrong at least annually," Residential Agreement ¶ 12.g., using the annual operation study on RDC financial performance, Williams Decl. Exhibit 4 at ¶ 16. Yet AWI's own operation studies demonstrated that it was under-reimbursing Sea-Pac. *Id.* at Exhibit 5. Although AWI occasionally tried to adjust its RDC fees so that they actually reimbursed its RDC distributors, AWI's own studies showed that this did not occur and that "[m]ost [RDC distributors] believe they lose money on the RDC component of their business," *id.* at Exhibit 2 at 3, instead of the "fair return on investment" that RDC fees were suppose to provide, *id.* at Exhibit 2 at 2, 5; Exhibit 3 at 3. Perhaps the most obvious acknowledgement that its RDC fees were set too low was AWI's more recent agreement to pay Sea-Pac almost $1.5 million over and above the RDC fee schedule since July 2004. *Id.* at ¶ 9 & Exhibit 8.

But during the period prior to July 2004, AWI also was required by Pennsylvania law to exercise its discretion in "good faith" to revise the RDC fees so they reimbursed Sea-Pac for its RDC services. "Every contract in Pennsylvania imposes a duty of good faith and fair dealing in its performance and its enforcement." *Donahue v. Federal Express Corp.*, 2000 Pa. Super 146, 753 A.2d 238, 242 (Pa. Super. 2000). *Accord* RESTATEMENT (2D) OF CONTRACTS § 205. Indeed, because AWI's agreements with Sea-Pac primarily concern the sale of goods, Pennsylvania's Uniform Commercial Code applies, including 13 Pa.C.S. § 1203 and § 1201, which, respectively, impose a duty of good faith and define it to be "[h]onesty in fact in the conduct or transaction concerned." *See Loos & Dilworth v. Quaker State Oil Refining Corp.*, 347. Pa. Super.

8

477, 486-87, 500 A.2d 1155, 1160-61 (1985)(applying U.C.C. definition of "good faith"

in context of distribution contract). In Pennsylvania, bad faith includes:

> evasion of the spirit of the bargain, lack of diligence and slacking
> off, willful rendering of imperfect performance, abuse of a power to
> specify terms, and interference with or failure to cooperate in the
> other party's performance.

*Somers v. Somers*, 418 Pa. Super. 131, 136, 613 A.2d 1211, 1213 (1992)(following

RESTATEMENT § 205). Whether a particular act is bad faith is normally a question for

the fact finder, which in this circumstance is the arbitrators. *See Lichtenstein v. Kidder,*

*Peabody & Co.*, 777 F. Supp. 423, 427 (W.D. Pa. 1991).

   The fact that the Residential Agreement provided that AWI had discretion to

revise the RDC reimbursement schedule does not excuse it from its obligation to revise

the reimbursement schedule so that it actually reimbursed Sea-Pac. *See Travellers*

*International, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994)

("Even when a contract confers decision-making power on a single party, the resulting

discretion must be exercised in good faith."); *Textile Biocides v. Avecia Inc.*, 52 Pa. D.

& C.4th 244, 283, 2001 WL 1855059 at *15 (2001)(if "'one party is given discretion in

determining whether [a] condition in fact has occurred[,] that party must use good faith

in making that determination'"); *Philadelphia Plaza-Phase II v. Bank of American*

*National Trust & Savings Ass'n*, 2002 WL 1472337 at *6-7 (Pa. Com. Pl. June 21,

2002)(discretion cannot be exercised unreasonably); *Juran v. Bron*, 2000 WL 1521478

at *19-20 (Del. Ch. Oct. 6, 2000) (contract providing for "sole discretion" did not

permit "unfettered discretion" because of the obligation to act in good faith); *Warner v.*

9

*Konover*, 210 Conn. 150, 155-56, 553 A.2d 1138, 1141 (1989)(discretion not unfettered, but must be exercised in good faith). Indeed, Pennsylvania law

> impl[ies] an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Somers*, 418 Pa. Super. at 137-38, 613 A.2d at 1214.

AWI plainly violated this obligation when its own studies demonstrated that AWI was under-reimbursing Sea-Pac. Williams Decl. at Exhibit 5. AWI's documents show that this was the result of RDC fees being based on a "5 year old compensation structure" that lacked any "documented information on rate development," *id.* at Exhibit 2 at 5, AWI's delays in implementing new RDC compensation, *id.* at ¶ 7 and Exhibit 6, AWI's use of a freight reimbursement structure that was inconsistent with Sea-Pac's vast, sparsely-populated sales territory and discounts unavailable to Sea-Pac, *id.* at ¶ 8 and Exhibit 7.

Of course, any delay in correcting the RDC fees due to Sea-Pac directly benefited AWI by reducing the latter's expenses. But the failure to utilize a fee schedule that reimbursed Sea-Pac was a plain violation of AWI's duty to use good faith in revising Sea-Pac's RDC fees "at least annually." *See* Residential Agreement ¶ 12.g. As a result, an arbitration panel will find that AWI owes Sea-Pac substantial damages for under-reimbursing Sea-Pac for RDC services.

10

**B.** <u>Sea-Pac's Residential Agreement Claim Is Adequately Supported</u>

AWI argues that Sea-Pac's claim pursuant to the Residential Agreement does not constitute a *prima facie* claim because it does not contain sufficient supporting documentation and its books and records do not evidence or support this claim. AWI Objection at 8-9, ¶ 19. This argument is flawed because Sea-Pac's Residential Agreement claim was sufficiently supported in its proof of claim, is fully supported by AWI's own records, and has now been thoroughly supplemented by Sea-Pac's instant filings. Under these circumstances, there is no basis to disallow this claim and the claim should proceed to be adjudicated under the contract's alternative dispute resolution provisions.

### 1. Sea-Pac Has Stated A *Prima Facie* Claim

A proof of claim is *prima facie* valid if it alleges facts sufficient to support the legal liability of the claimant to the debtor. *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). AWI's argument on inadequate documentation appears to focus on lack of documentation regarding the alleged damages. This argument apparently is based on Paragraph 9 of the Proof of Claim form:

> **Supporting Documents.** *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien.

AWI Objection at Exhibit A. Sea-Pac notes that this provision does not require a claimant to attach *all* documents which might be relevant to the issue, only the operative

legal documents. Sea-Pac's Residential Agreement Claim on its face alleges sufficient facts to support AWI's legal liability to Sea-Pac: it alleges the existence of a contract, attaches a copy of the applicable contract documents, alleges a breach of the contract and that it was damaged by the breach.

"[F]ull conformance with [the proof of claim form] has never been required for allowance of claim." [1] Indeed, it has been held that "[a] proof of claim for an unsecured creditor requires little more than a listing of name, address, amount of claim . . . and a signature. It should take less than five minutes to fill out." *LTV Corp. v. Gulf States Steel, Inc.*, 969 F.2d. 1050, 1058 (D.C. Cir. 1992), *quoting In re Great W. Cities, Inc.*, 88 B.R. 109, 114 (Bankr. N.D. Tex. 1988). *Allegheny*, the case on which AWI relies, provides no support for AWI's position because the issue in that case was not the inadequacy of the proof of claim, but instead the failure of the claimant to establish his claim following an evidentiary hearing. 954 F.2d at 170.

## 2. Sea-Pac Has Corrected Any Deficiencies In Documentation

The overwhelming majority of cases hold that the failure to attach sufficient documentation is *not* a basis for disallowance of a claim.[2] In any event, where there is insufficient information attached to the proof of claim, the creditor may supplement the

---

[1] *In re Burkett,* 329 B.R. 820, 828 (S.D. Ohio 2005).

[2] *E.g., In re Heath,* 331 B.R. 424, 433, 436-37 (9th Cir. BAP 2005) ("Debtors' proposed standard would require creditors to provide volumes of documentation attached to every proof of claim."); *In re Dove-Nation,* 318 B.R. 147, 151-52 (8th Cir. BAP 2004) ("claims complied with the spirit of the applicable rules and as such constituted prima facie evidence of the validity and amount of the claims"); *In re Guidry,* 321 B.R. 712, 714 (Bankr. N.D. Ill. 2005) (objection based on the lack of attached

12

information in response to an objection or file an amended proof of claim, supplying the alleged missing documentation.[3]  Sea-Pac's Answer, this memorandum and the Williams Declaration provide additional detail and documentation concerning Sea-Pac's Residential Agreement claim.  Any possible procedural deficiencies in this claim plainly have been remedied and are not a legally recognized basis for disallowance.

### 3. AWI's Books And Records Support The Claim

Moreover, AWI misleads the Court by asserting that "AWI's books and records do not evidence or support Sea-Pac's Residential Agreement Breach Claim" [4] because its own records are replete with evidence supporting Sea-Pac's claim that AWI breached its obligations under the Residential Agreement to reimburse Sea-Pac for RDC services. Not only do AWI's records show repeated complaints from Sea-Pac that AWI was under-reimbursing Sea-Pac for RDC services, *see* Williams Decl. Exhibits 6-7, but its own calculations also demonstrate significant RDC under-reimbursement, including $260,577 in 2002, and $509,794 in 2003, *id.* at Exhibit 2, 3 & 5.  Consistent with the under-reimbursement for earlier periods covered by the Residential Agreement claim, AWI paid Sea-Pac an additional $1,448,818 over its RDC fee schedule in more recent

---

documents provides no basis for disallowance of a claim); *Burkett,* 329 B.R. at 828 & n.2, 832 (failure to provide documents "does not form the basis for objecting to, or disallowing, a claim").

[3]   *In re Stoecker*, 5 F.3d 1022, 1027-28 (7th Cir. 1993)(creditor always allowed to amend incomplete proof of claim); *In re Holm*, 931 F.2d 620, 622 (9th Cir 1991) (amendments to proofs of claim should be liberally allowed); *In re Sandifer*, 318 B.R. 609, 611 (Bankr. M.D. Fla. 2004)(amended claims filed in response to debtor's objection provided adequate documentation for determination of the validity of each claim).

[4]   AWI Objection at 8-9, ¶ 19.

months. *Id.* at Exhibit 8. Therefore, it is at best misleading for AWI to contend that it does not understand Sea-Pac's Residential Agreement claim.[5]

In sum, Sea-Pac has a valid claim under the parties' Residential Agreement which should not be disallowed, but instead referred to mediation, and then arbitration if the mediation is unsuccessful. AWI knowingly violated the Residential Agreement when its own studies demonstrated that it was under-reimbursing Sea-Pac for RDC services.

### C. AWI Breached The Commercial Agreement

According to AWI's own argument, it is liable to Sea-Pac for breach of contract if it appointed a second distributor for Sea-Pac's territory without a legal basis to do so under the Commercial Agreement. AWI's sole defense is that it had the right to do so because it complied with paragraph 4 of the Commercial Agreement in setting and distributing Sea-Pac's mill shipment requirements and then appointed a second distributor as a result of Sea-Pac's failure to meet such standards. AWI Objection at 9, ¶ 20.

However, neither assertion is true. Not only did AWI itself fail to comply with the mill shipment provision upon which it relies, but it also did not appoint a second distributor in Sea-Pac's exclusive territory for its stated reason – Sea-Pac's alleged

---

[5] Indeed, the affiant upon which AWI relies, Robert H. Miller, is fully aware that Sea-Pac has long contended that it has been under-reimbursed for RDC services, *see, e.g.,* Williams Decl. Exhibit 6, which is the reason his affidavit was so artfully drafted so that he "assume[d]" – contrary to his personal knowledge – that Sea-Pac was "claiming that AWI failed to properly pay Sea-Pac for RDC services based on the fee schedule established by AWI." *See* Miller Affid. ¶ 2, attached as AWI Objection Exhibit F.

14

breach – but rather did so in order "to punish" Sea-Pac for selling competing products as was Sea-Pac's right under the contract. For both reasons, arbitrators will conclude that AWI's defense is invalid and it is liable to Sea-Pac for breaching the parties' Commercial Agreement.

While AWI has described Sea-Pac's exclusive distribution rights under the Commercial Agreement as "conditional," AWI Objection at 2, ¶ 4, the contract itself provides otherwise. Instead, it was AWI's option to terminate Sea-Pac's exclusivity by appointing additional distributors within the sales territory that was made conditional by the contract. And the conditions necessary to make that option effective, in fact, never came to pass.

Under the terms of the Commercial Agreement, Sea-Pac's exclusivity did not automatically terminate upon Sea-Pac's failure to meet annual mill shipment requirements. Instead, paragraphs 3 and 4 of the Commercial Agreement, when read together, make plain that the contract set forth five conditions, all of which had to be fulfilled, before AWI's option to terminate Sea-Pac's exclusivity became effective.

Specifically, AWI's option to terminate Sea-Pac's exclusivity was conditioned on the following five events occurring in chronological order: (1) AWI discussing with Sea-Pac the annual mill shipment requirements; (2) AWI basing the annual mill shipment requirements on its discussions with Sea-Pac; (3) AWI formulating annual mill shipment requirements that were a reasonable calculation of achievable market share within Sea-Pac's exclusive sales territory; (4) AWI providing updated annual mill

15

shipment requirement to Sea-Pac for each year in writing by December 15 of the previous year; and (5) Sea-Pac failing to meet annual mill shipment requirements that in turn met the other four conditions listed above. In fact, none these five conditions occurred; nor were any of AWI's obligations excused. Therefore, AWI's option to terminate Sea-Pac's exclusivity never was effective, and AWI's appointment of a second distributor was a breach of the Commercial Agreement.

The effects of AWI's failure to perform the initial four conditions were two-fold. First, AWI's performance of these duties was a condition of the contract, the non-occurrence of which rendered inoperative the provision permitting AWI to revoke Sea-Pac's exclusivity. Second, AWI's failure to perform these conditions operated as a waiver of the mill shipment requirement and barred AWI from appointing a second distributor.

No particular language is required to create a condition precedent, with the purpose of a condition to be determined according to general principles of contract law. *Joseph Paolino & Sons Inc., v. City of Philadelphia*, 429 Pa. Super. 191, 196, 631 A.2d 1353, 1356 (1993). AWI's consultation with Sea-Pac, calculation of reasonable annual mill shipment requirements based on those discussions, and timely distribution of those requirements to Sea-Pac, were necessarily conditions precedent to Sea-Pac's obligation to meet the requirements and, by extension, conditions precedent to the effectiveness of AWI's option to terminate Sea-Pac's exclusivity. AWI's failure to comply with paragraph 4 of the Commercial Agreement, therefore, excused any requirement for Sea-

16

Pac to meet any mill shipment targets, and prevented the operation of AWI's election to appoint a second distributor. *See, e.g., Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Board,* 559 Pa. 56, 68-69, 739 A.2d 133, 139-40 (1999)(where condition unfulfilled, other party has no duty to perform); *Paolino,* 429 Pa. Super. at 196 (duty to pay excused by failure of other party to fully perform, which court found was an implied condition precedent); RESTATEMENT (2D) OF CONTRACTS § 225(1) ("[p]erformance of a duty subject to a condition cannot become due unless the condition occurs").

In addition to constituting the non-occurrence of a condition precedent to the effectiveness of AWI's option to terminate Sea-Pac's exclusivity, AWI's failure to meet the requirements of paragraph 4 of the Commercial Agreement also acted as a waiver of AWI's right to appoint a second distributor. By failing to discuss annual mill shipment *requirements* with Sea-Pac, by failing to formulate reasonable mill shipment requirements based on those discussions, and by failing to provide Sea-Pac with the 2002 mill shipment requirements by December 15, 2001, AWI waived such requirements.

> "It is a well settled rule of law that a party to a contract cannot escape liability under his obligation on the ground that the other party has failed to perform a condition precedent to the establishment of such liability or to the maintenance of an action upon the contract, where he himself has caused that failure."

*Commonwealth v. Transamerica Ins. Co.,* 462 Pa. 268, 274, 341 A.2d 74, 77 (1975) (finding waiver). *Accord Den-Tal-Ez v. Siemens Capital Corp.,* 389 Pa. Super. 219,

17

238, 566 A.2d 1214, 1223 (1989)(waiver found as a result of conduct that made performance only more difficult, but not impossible). Indeed, this principle is long-established:

> "It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance of and obligation due him or of a condition upon which his own liability depends, he cannot take advantage of that failure."

*Arlotte v. National Liberty Ins. Co.*, 312 Pa. 442, 445, 167 A. 295, 296 (1933), citing WILLISTON ON CONTRACTS § 667 [now 13 R. Lord, WILLISTON ON CONTRACTS § 39:6 (4TH ed. 2000)]. Indeed, as a result of AWI's conduct, there were *no* annual mill shipment requirements for Sea-Pac to meet, and AWI had no legal basis for terminating Sea-Pac's exclusivity.

Moreover, at the time AWI appointed a second distributor, it did not rely upon any alleged mill shipment requirements but, instead, made plain that it was punishing Sea-Pac for doing business with AWI's competitors. In so doing, AWI committed a further breach of the contract. As discussed *supra,* a covenant of good faith and fair dealing is an implied term of every Pennsylvania contract, with "good faith" defined as honesty in fact with respect to the conduct or transaction concerned. By terminating Sea-Pac's exclusivity out of spite and then advancing a pretextual rationale for its actions, AWI's conduct grossly deviated from the requirements of good faith. *See, e.g.,* RESTATEMENT (2D) CONTRACTS § 205, comment d ("Subterfuges and evasions violate the obligation of good faith in performance").

18

### III. SEA-PAC HAS A VALID ADMINISTRATIVE CLAIM

Sea-Pac and AWI agree that Sea-Pac (a) did not file a claim by the Administrative Expense Bar Date; and (b) Sea-Pac did file a timely claim under the Executory Contracts Bar Date. AWI argues that to the extent the Sea-Pac Claim is allowed, it should only be a general, unsecured claim, alleging that Sea-Pac's claim for administrative expense was "untimely and expressly barred for failure to comply with the Administrative Expense Bar Date Order." AWI Objection at 12, ¶ 30. The Court should reject AWI's arguments. Sea-Pac's claim was both timely filed and subject, in whole or part, to administrative priority.

#### A. Sea-Pac's Claim Was Timely Filed

AWI argues that the alleged breaches Sea Pac alleges in its proof of claim pre-dated the Administrative Bar Date and therefore should have been filed by the Administrative Bar Date. Sea-Pac counters, however, that by requiring persons identified in the Executory Bar Date Order to file claims, AWI reopened the claims period with respect to any claim arising under the Previously Scheduled Contracts. The language of the Notice of Deadline to File Claims Related to Certain Contracts and Leases supports this interpretation; it specifically indicates that a claim related to the Previously Scheduled Contract must be filed if of a status other than a pre-petition general unsecured claim (i.e., presumably including administrative claims as "other").

> You **MUST** file a proof of claim on or before the
> **Previously Scheduled Contract Bar Date** if (i) you believe
> that you have a Claim against AWI on account of a
> Previously Scheduled Contract, and (ii) it is in an amount

19

other than what is already reflected on the Proof of Claim Form enclosed herewith, or of a status other than a prepetition general unsecured claim.

**YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU AGREE WITH THE AMOUNT OF THE CLAIM SET FORTH ON THE ENCLOSED PROOF OF CLAIM AND AGREE THAT THE CLAIM IS A PREPETITION, GENERAL UNSECURED CLAIM.**

Notice of Deadline to File Claims Related to Certain Contracts and Leases

(*emphasis in original*).

The quoted language makes no sense if the intent was to preclude persons who were parties to Previously Scheduled Contracts from filing administrative claims if they had not filed claims by the Administrative Bar Date. If the language in the notice relating to the status of claims was intended only to cover claims on Previously Scheduled Contracts that arose subsequent to the Administrative Bar Date, that interpretation is not deducible from the face of the notice.

AWI's own motion to fix the executory contracts bar date (Court Dkt. No. 8537, the "Executory Contracts Bar Date Motion") supports Sea-Pac's interpretation. The motion notes:

10. Because, under the Bar Date Order, parties to executory contracts and unexpired leases were not required to file a claim for rejection damages until rejection of such contracts and leases, the expiration. . . *creates uncertainty about the deadline by which the non-debtor counterparties are required to file claims relating to the Previously Scheduled Contracts.*

20

*Id.* at 5 (emphasis added). Indeed, in direct contradiction to its position now, AWI conceded that "the non-debtor counter-parties to the Previously Scheduled Contracts *have not yet been required to fix the amount of any claims relating to such contracts.*" *Id.* at 6, ¶ 11 (emphasis added).

Further, when explaining why fixing of a bar date for executory contracts was justified at that time, AWI again recognized that claims relating to these contracts still needed to be filed:

> Because of the delay in confirming a plan of reorganization, many contracts and leases have expired or been terminated in accordance with their terms and are no longer subject to assumption or rejection. Accordingly, any claims relating thereto, as well as with respect to contracts that were not executory as of the Commencement Date, *should now be fixed and determined*.

Executory Contracts Bar Date Motion at 7, ¶ 13 (emphasis added).

In construing the effects of the two bar dates, this Court should find that Sea-Pac's timely filing of a claim by the bar date in the Executory Bar Date Order was sufficient to establish a valid claim.[6]

---

[6] The confusion is further compounded by the Order Confirming the Fourth Amended Plan of Armstrong World Industries as Modified, dated August 28, 2006 (the "Confirmation Order"), which again reopens the filing period with respect to any claims arising under the Previously Scheduled Contracts.

> Claims created by . . . the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date . . . must be filed with the Bankruptcy Court and served on AWI no later than thirty (30) days after . . . in the case of a lease or executory contract that expired by its terms prior to the Confirmation Date.

Confirmation Order ¶ 22. The above-quoted language appears to permit any person who has a claim based on a prepetition contract that expired prior to the Confirmation Date, such as Sea-Pac, to file a claim, including one claiming an Administrative Expense, through September 27, 2006.

21

### B. Sea-Pac's Claim Is Entitled To Administrative Priority

Sea-Pac agrees that *In re Mammoth Mart*, 536 F.2d 950 (1st Cir. 1976), sets forth the criteria for determining whether an expense is an administrative expense: (1) claim must arise from a transaction between the claimant and the debtor-in-possession and (2) the consideration supplied by the claimant must benefit the debtor-in-possession. *Id.* at 954. However, by using "transaction" and "contract" as equivalent terms, AWI misstates the *Mammoth Mart* criteria to make it appear that the breach of a pre-petition contract can never give rise to an administrative claim. This is not the law in this circuit or elsewhere. Instead, whether a *transaction* is considered post-petition for purposes of the *Mammoth Mart* test depends not on the execution date of the contract, but, instead, whether the claimant was "induced" to perform the contract by the debtor-in-possession, not the pre-petition debtor. *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) (finding that inducement is key factor in awarding administrative priority), *citing Mammoth Mart*, 536 F.2d at 954. *See also In re Continental Airlines, Inc.*, 146 B.R. 520, 526 (Bankr. D. Del. 1992) (aircraft lessor whose prepetition lease was rejected by debtor was entitled to administrative claim for rent based on debtor's post-petition use of leased aircraft.). If the *Mammoth Mart* test were applied in the manner AWI suggests, a landlord with a pre-petition lease would never be entitled to an administrative claim, which, of course, is not the law.

Sea-Pac's claims are clearly post-petition claims under the *Mammoth Mart* criteria. First, a significant portion of Sea-Pac's claims arise under the January,

22

February and August 2004 letter agreements — which extend the terms of both the
Residential and Commercial Agreements — are by their express terms post-petition
agreements. AWI Objection Ex. A ("The new interim agreement will commence as the
date of your signature below and will continue through December 31, 2004."); Williams
Decl. Ex. 1. These agreements were entered in the ordinary course of the debtor's post-
petition business, the breach of which would give rise to an administrative claim under
11 U.S.C. § 364(d).

Second, with respect to the claims arising under the prepetition agreements that
expired by their own terms during the pendency of the bankruptcy, AWI induced Sea-
Pac to continue performance of the contracts by providing valuable services to AWI
post-petition pending AWI's decision to assume or reject the agreements. Under the
Residential Agreement, AWI benefited not only by Sea-Pac's purchases from AWI, but
also because Sea-Pac provided valuable RDC services post-petition by delivering
product to AWI's direct customers such as Lowe's and The Home Depot, services for
which AWI was obligated to reimburse Sea-Pac, but did not. Under the Commercial
Agreement, Sea-Pac was obligated to maintain, and did maintain, a sales force and
inventory for the benefit of AWI, provided AWI marketing information on Sea-Pac's
customer orders and shipments, *see* AWI Objection Ex. A (Commercial Agmt. ¶¶ 8, 9,
10), and purchased millions of dollars of product. Thus, with respect to both the
Residential Agreement and the Commercial Agreement, AWI benefited by obtaining
sales and revenues that otherwise would have been lost. Accordingly, these transactions

23

satisfied both prongs of the *Mammoth Mart* test and entitle Sea-Pac to administrative priority status for its claims.

AWI also relies on *In re Trans World Airlines, Inc.,* 275 B.R. 712, 723-24 (Bankr. Del. 2002) ("*TWA*") to support its argument that Sea-Pac's claims should not be afforded priority status. However, the facts of *TWA* are clearly distinguishable from those presented here. In *TWA*, the court found both that there was no post-petition transaction or relationship between debtor TWA and creditor MBNA supporting the claim and that MBNA had not conferred any benefit to TWA by using the airline's trademarks and logos. *Id.* at 724. Here, both the existence of a post-petition transaction and the benefit conveyed to AWI are irrefutable facts.

AWI's discussion of the policies underlying the priority of administrative expense claims also conveniently ignores the principle that "[t]he concern for the estate's survival is tempered by the equitable principle of unjust enrichment." *Continental Airlines,* 146 B.R. at 526. In this case we have the unusual situation of pre-petition executory contracts that were neither assumed nor rejected, but rather expired by their own terms during the course of the bankruptcy and prior to the confirmation of a plan of reorganization, and provided great benefit to AWI. The *Continental Airlines* opinion makes plain that in such circumstances the creditor is entitled to administrative priority.

> "If a debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services."

24

*Id., quoting NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984).

There is no question that Sea-Pac's claims are entitled to administrative priority based on the written contracts it entered into with the debtor-in-possession post-petition under Section 364(d). Similarly, with respect to the claims that Sea-Pac makes based on the pre-petition contracts under which it continued to provide valuable post-petition services at the request of, and to the benefit of, AWI, Sea-Pac's claims are likewise entitled to administrative priority.

### C. Sea-Pac's Administrative Claim Is Entitled To Attorney Fees And Interest

AWI erroneously states that the Sea-Pac Agreements "contain no language that entitles Sea-Pac to attorneys' fees and interest." AWI Objection at 11, ¶ 25. Both agreements, however, contain alternative dispute resolution provisions which provide that the costs of arbitration, including "reasonable attorneys' fees" shall be paid by the losing party.[7]  In addition, both agreements also provide that AWI will hold Sea-Pac harmless, and indemnify Sea-Pac, from any "claims, demands, losses, costs, damages, suits, judgments, penalties, expenses and liabilities of any kind arising out of ... breach of any duty to the other under this Agreement." [8]  Both provisions would permit the arbitrators to award Sea-Pac fees and expenses as a result of AWI's breaches.

Sea-Pac seeks to have its claim resolved by mediation and/or arbitration pursuant to these agreements. It is for the arbitrators to determine the award, if any, of attorney

---

[7] Residential Agreement ¶ 30; Commercial Agreement ¶ 25.

[8] Residential Agreement ¶ 23; Commercial Agreement ¶ 18.

25

fees and interest.

## **CONCLUSION**

Sea-Pac Sales Company respectfully requests that the Court enter an order

staying the claims objection to permit them to be resolved in mediation and/or

arbitration; or, alternatively, allowing the Sea-Pac Claims in their entirety; determining

that the claims are entitled to administrative priority, either in whole or in part; and

granting Sea-Pac such other and further relief as is just.

DATED: September 15, 2006.

ECKERT SEAMANS CHERIN & MELLOTT LLC

/s/ _____
Karen Lee Turner (No. 4332)
Michael G. Busenkell (No. 3933)
300 Delaware Avenue, Suite 1360
Wilmington, Delaware 19801
(302) 425-0430

Michael M. Feinberg
Diana K. Carey
KARR TUTTLE CAMPBELL
1201 Third Avenue, Suite 2900
Seattle, Washington 98102
(206) 223-1313

Al  Van Kampen
ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
(206) 386-7353

ATTORNEYS FOR CREDITOR SEA-PAC
SALES COMPANY

26

**Westlaw.**

Not Reported in A.2d                                                    Page 1

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Jan G. JURAN, individually and as Trustee of the
Jan G. Juran Trust and Juran Investments, Inc., a
Delaware corporation, Plaintiffs,
v.
Guillermo BRON, Bron Corporation, a Delaware
corporation, Bastion Capital Fund, L.P., a Delaware
limited partnership, Bastion Partners, L.P., a
Delaware partnership, Bastion Capital Corporation,
a Delaware corporation, BCC Soccer, Inc., a
Delaware corporation, Daniel D. Villanueva and
Villanueva Investments, Inc., a Delaware
corporation, Defendants.
No. Civ.A. 16464.

Submitted June 20, 2000.
Decided Oct. 6, 2000.

Elizabeth M. McGeever, Paul M. Lukoff, and
Elizabeth A. Wilburn, of Prickett, Jones & Elliott,
Wilmington, Delaware, for Plaintiffs.
Edward P. Welch, Robert S. Saunders, and Laura S.
Clare, of Skadden, ARPS, Slate, Meagher & Flom,
LLP, Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*
CHANDLER, Chancellor.
*1 This lawsuit arises from a dispute between
plaintiff Jan G. Juran ("Juran") and defendants
William Bron ("Bron") and Daniel Villanueva ("
Villanueva") over their management of, and
participation in, a private equity fund. Plaintiffs [FN1]
Juran and Juran Investments, Inc. ("Juraco") filed
this suit on June 22, 1998 alleging fraud, breach of
fiduciary duty, and breach of contract. A trial took
place on October 18-22, 1999.

> FN1. For simplicity, where I refer to "

plaintiffs," I mean either, or both, Juran
and Juraco. Where specificity is necessary,
the specific party is named.

In a sentence, a personality conflict between Juran
and Bron caused this conflict. The inability of the
parties to resolve the rift between the two partners
resulted in this litigation. With this background in
mind, this is the Court's post-trial opinion.

**I. FINDINGS OF FACT**

In the early 1990s, defendants Bron and Villanueva
joined together to raise a private equity fund called
Bastion. Bron and Villanueva created three
Delaware business entities: Bastion Capital Fund,
L.P. (the "Fund"), Bastion Partners, L.P. ("BPLP"
or the "Partnership"), and Bastion Capital
Corporation Management ("BCC" or the "
Management Company").[FN2] The relationship
among the three entities is complex. In the simplest
terms possible, the defendants operated these
entities as follows: Bron wholly owns a corporation
called Bron Corporation ("Bronco"). Villanueva
wholly owns a corporation called Villanueva
Investments, Inc. ("Villaco"). Villaco and Bronco
served as the joint general partner of BPLP. BPLP,
in turn, served as the general partner of the Fund.
BPLP, in addition to serving as the general partner
of the Fund, was also a 3% limited partner in the
Fund. The Partnership joined a number of other
entities as limited partner investors in the Fund. The
Fund, in turn, invested in a number of portfolio
companies. The Management Company, BCC,
pursuant to a management services agreement, ran
the Fund. Bron and Villanueva each individually
owned one-half of the Management Corporation.

> FN2. For simplicity, where I refer to "
defendants," I mean all named defendants
collectively. Where specificity is
necessary, the specific party is named.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

After canvassing the market for four years, the defendants raised approximately $72.5 million in commitments from three institutional investors. In July 1994, the Fund completed its first closing. Shortly thereafter, the Fund invested in a Spanish language television network, Telemundo Group, Inc. ("Telemundo"). This particular investment plays a significant role in this litigation.

The private equity industry considers any fund under $100 million small. The defendants, therefore, deemed it necessary to bring in a more seasoned professional with more extensive experience in the private equity industry. Such an addition, the defendants hoped, would enable Bastion to grow its fund beyond the $100 million threshold.

In the spring of 1994, Bron and Villanueva solicited plaintiff Jan Juran, a private equity principal at Butler Capital Corporation ("Butler"), to join them as a third partner. The defendants assert that they brought Juran in as a "junior partner" and as an "employee," but the trial has made clear that Bron and Villanueva solicited Juran as an equal partner. They did so with the hope that Juran's track record in the private equity industry would instill confidence in the investors who had previously hesitated to invest due to the defendants' relative inexperience in the industry. Bron and Villanueva hoped Juran's addition would help grow Bastion beyond $100 million.

*2 In August 1994, Bron and Villanueva presented Juran with a term sheet containing all material terms of Juran's agreement (the "1994 Term Sheet"). Juran accepted the defendants' offer and informed Butler that he was resigning. The parties negotiated for two items: (1) a partnership agreement whereby Juraco, a company controlled by Juran, would become a general partner in the Partnership, and (2) an employment contract where Juran himself would join the Management Company.

The 1994 Term Sheet indicates that the defendants wanted a creative ownership structure under which Juraco would not technically be a general partner. The defendants desired such a structure to prevent jeopardizing Bastion's investment in the PCS

industry.[FN3] The flexible ownership structure, however, does not alter the fact that both Bron and Villanueva intended to bring Juran in as their equal.

> FN3. Federal regulations regarding minority preferences in this industry were being structured. Villanueva warned Bron that in order to qualify for these preferences, Bastion might have to be 100% minority-owned. Bron explained this to Juran, and because Juran was not a minority, Bron included in the 1994 Term Sheet a provision regarding PCS.

In addition to discussing the partnership agreement, Bron and Juran discussed the employment agreement. The 1994 Term Sheet reflected that, after one year, the defendants could terminate Juran's employment with the Management Company "at-will." The parties discussed compensation and agreed that Juran would receive the same compensation as Bron and Villanueva, provided that Juran would reimburse Bron and Villanueva approximately $500,000 for organizational expenses advanced prior to Juran's involvement and pay them a $1.5 million placement fee.

Shortly after joining Bastion, Juran became concerned because Bron and Villanueva had not presented him with the written partnership agreement reducing the 1994 Term Sheet to a final agreement. Juran asked Bron for a written agreement reflecting his promised 20% equity participation in Bastion. In December, following a number of requests, Bron finally gave Juran a draft agreement. Juran insists that the December draft did not reflect the terms to which the parties agreed in the 1994 Term Sheet. For example, instead of making Juran a general partner, it gave Juran the title of "special general partner." Although Bastion's involvement in the PCS industry motivated this choice of title, it left Juran uneasy because he wanted assurance that Bron and Villanueva were bringing him in as their equal, as they had previously discussed. Juran also rejected the draft because he said it eliminated his vesting rights. The draft specifically stated, however, that the partnership could redeem his interest if Juraco

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

failed to meet its capital calls, a subject not covered in the 1994 Term Sheet. Finally, Juran objected to provisions in the draft that provided Bron and Villanueva with the power to distribute investment points to employees. Juran feared this power could be used to dilute his 20% equity interest. Juran rejected the December draft.

In June 1995, Juran still had not received a finalized partnership agreement. At that time, he told Bron and Villanueva that he would have to resign if he did not have a partnership agreement by June 30, 1995. Juran wanted to finalize the partnership agreement because he, Bron, and Villanueva had represented to Bastion's investors that Juran was a "managing partner." Moreover, Juran, quite reasonably, wanted an explicit agreement in order to protect his investment in Bastion. Juran did not receive a partnership agreement from the defendants by June 30, 1995. He resigned on July 3, 1995.

*3 The resignation surprised Bron and Villanueva. They moved quickly to try to resolve this issue because they did not want to delay closing the Fund's second round of financing. Bron presented Juran with a partnership agreement reflecting the August 1994 Term Sheet. Juran was a co-general partner with Bron and Villanueva and a 20% limited partner in the Partnership. On July 13, 1995, Bron, Villanueva, and Juran executed a Second Amended and Restated Partnership Agreement for the Partnership ("Partnership Agreement"). This effectively brought Juran "back into the fold."

On July 13, 1995, Bron and Villanueva also executed an employment contract ("Employment Agreement") with Juran. The Employment Agreement reflected the previous discussions that Juran's employment would be "at-will." Simultaneously, Juran purchased 50 shares of BCC stock, the equivalent of 20% of the corporation.

Both the Partnership Agreement and the Employment Agreement contain intertwining provisions germane to this litigation. Those provisions will be discussed in detail as they relate to discussions in the analysis section.

Shortly after both the Partnership and Employment

Agreements were signed, Bastion completed its second closing on July 15, 1995. The fund received an additional $47 million in commitments. The second closing should have been a cause for celebration. The three partners did not celebrate, however, as the personality conflict between Bron and Juran grew more acute.

As noted above, personality differences between Bron and Juran have driven, and continue to drive, this litigation. Their feud began during their tense and difficult negotiations regarding the Employment Agreement and Partnership Agreement. Following the second closing, an irreparable rift had developed between the two. It is apparent from record evidence and the testimony at trial, Juran's rigid, meticulous style simply clashed with Bron's more "fast and loose" approach.

The record contains a number of examples of Juran's painstaking methods. For example, while describing his career before joining Bastion, Juran stated that his boss at Butler Capital, where Juran gained much of his experience in the private equity industry, had been extraordinarily meticulous and demanding. Juran adopted a similar style that he brought with him to Bastion. Indicative of his demeanor was his practice of sending memos to his partners, rather than walking over to their offices. Indeed, after it was clear to Juran that this litigation would ensue, he took copious notes in his daily planner of every single phone conversation that he had with his partners. Although Juran's diligence is clear, his unrelenting approach may have been abrasive to some in the industry. For instance, in 1996, Bron received a complaint about Juran from a partner at the Wasserstein Perella firm.

Bron took the opposite approach to his work. Bron's original attempt to call Juran a "Special Partner" to avoid running afoul of the Federal regulations regarding minority preferences in the PCS wireless communications industry reflect his approach. Moreover, Bron and Villanueva had worked together for a number of years before Juran joined Bastion; therefore, they trusted each other. They preferred to talk to each other about the business face-to-face without writing memos or other formality. Villanueva told Juran on a number of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

occasions that Bastion was not a formal operation.

*4 By August 1995, however, it was clear that Bron and Juran were not getting along. Despite the fact that Bron and Villaneuva typically avoided formality, on August 7, 1995, Bron asked Villanueva if he would enter into a stockholders' voting agreement. They agreed that at any time after October 15, 1995, they would both vote their shares of BCC stock in favor of Juran's termination as a BCC employee if one of them desired such a vote. To this end, Bron and Villanueva executed a written agreement giving each of them a mutual proxy to vote the other's shares with respect to Juran's termination.

In April 1996, the tensions between Bron and Juran boiled over into a heated argument. Villanueva, like a middle child caught between two fighting siblings, tried desperately to hold the "family" together. The tensions and arguments between Bron and Juran, however, were adversely affecting the office environment. Villanueva concluded that the relationship was irretrievably broken and that Juran's termination was necessary to preserve Bastion as he and Bron had built it. Villanueva testified that he reached this conclusion on his own and was the first to broach the subject with Bron. They both decided to terminate Juran's employment. On May 9, 1996, Bron and Villanueva signed a letter terminating Juran's employment. Juran was notified orally and given the letter indicating that he would no longer be associated with Bastion. At this point, Juran was automatically converted from a general partner in BPLP to a "special limited partner " and required to sell back his stock in BCC. He was also provided with a severance check representing two week's salary. The parties attempted to negotiate a separation agreement, but were unsuccessful. It is Juran's termination that gave rise to this litigation

## II. ANALYSIS

### A. Plaintiffs' Fraud Claim

Juran   contends   that   Bron   and   Villanueva

fraudulently induced him to enter an employment and partnership relationship with them. Specifically, Juran argues that the defendants committed fraud by not disclosing an agreement between Bron and Villanueva that if either of them wished to oust Juran, the other would respect the wishes of the first and also vote for Juran's termination. Moreover, as the argument goes, by concealing this agreement, Juran was fraudulently induced to join initially, and ultimately remain associated with, Bron and Villanueva because he relied on the provisions of the Employment Agreement and the Partnership Agreement requiring the unanimous agreement of Bron and Villanueva in any decision to terminate his association. Ultimately, Juran contends that, because Villanueva agreed to terminate him based on Bron's request, and in compliance with the arrangement between Villanueva and Bron, his termination was not based on the unanimous vote of both. Thus, Juran insists his termination was procedurally flawed because it was in derogation of the Employment and Partnership Agreements.

*5 The defendants center their counter-arguments on two primary theories. First, they argue that Juran's claim that he was fraudulently induced to join Bron and Villanueva in 1994 is barred by Delaware's three-year statute of limitations.[FN4] Second, they contend that the plaintiff has not proven all the elements necessary for a cause of action based on fraud. Specifically, the defendants urge that any loose agreement that they may have had to respect the other's wish with regards to the ouster of a third partner was never formalized until August 7, 1995-after both alleged acts of fraudulent inducement.[FN5]

FN4. The evidence indicates that Juran first became aware of the alleged fraudulent conduct around the time he was terminated. This would put that time in May 1996. The action was brought in June 1998-just over *two* years from when Juran learned of the alleged fraud. This issue is, however, moot in light of my ultimate decision on the claim.

FN5. Juran   alleges   two   counts   of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 5

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

fraudulent inducement. First, when he negotiated for his employment in August 1995 and, second, when he was persuaded not to resign in July 1995. In both cases, Juran claims that his association with Bron and Villanueva was predicated on the understanding that one could not unilaterally terminate his employment. Rather, any such ouster would require the unanimous consent of both.

Under California law,[FN6] an action for fraud may arise under either the common law or by statute. The elements of common law fraud are: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."[FN7]

> FN6. The parties have stipulated that California law will govern the resolution of Juran's fraud claim.

> FN7. *Lazar v. Rykoff-Sexton, Inc.*, Ca.Supr., 49 Cal.Rptr.2d 377, 380 (1996).

Fraudulent acts are also proscribed by statute. For instance, the California Civil Code describes actual fraud between contracting parties as:
Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:
1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;
3. The suppression of that which is true, by one having knowledge or belief of the fact;
4. A promise made without any intention of performing it; or,
5. Any other act fitted to deceive.[FN8]

> FN8. Cal. Civil Code § 1572.

With this body of law as a backdrop, the California Supreme Court, in a trilogy of cases, examined how tort actions for fraud interrelate with more traditional breach of contract actions and govern the relationship between an employer and an employee.[FN9] In *Lazar*, the Court extensively analyzed, and further clarified, its earlier decisions in *Hunter* and *Foley*.

> FN9. See *Lazar, supra*; *Hunter v. Up-Right, Inc.*, Ca.Supr., 6 Cal.4th 1174, 26 Cal.Rptr.2d 8, 864 P.2d 88 (1994); *Foley v. Interactive Data Corp.*, Ca.Supr., 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988).

The California Supreme Court, in *Lazar*, was faced with a factual situation somewhat analogous to that currently before this Court. Lazar was contentedly employed as president of a family-owned restaurant equipment company in New York. The Defendant, Rycoff-Sexton, Inc., approached Lazar and successfully persuaded him to relocate his family to California to work for Rycoff-Sexton, Inc. In doing so, Lazar was assured that his job would be secure and that he would receive frequent increases in his salary. Lazar did not, however, receive a written employment contract. These assurances were "hollow" and Lazar was eventually given the choice of resignation or termination. He resigned and brought an action for promissory fraud for inducing him to leave a secure job in New York and move to California. After making its way to the California Supreme Court, the Court limited its review to "whether, or under what circumstances, a plaintiff may state a cause of action for fraudulent inducement of employment contract."[FN10]

> FN10. *Lazar*, 49 Cal.Rptr.2d at 380, 909 P.2d 981.

*6 The Court ultimately found that Lazar's termination was proper because he was an "at-will" employee. He was, however, allowed to pursue his claim for fraudulent inducement because his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

allegations, if true, would satisfy all the elements of promissory fraud.[FN11] Because Lazar's termination itself was not the problem, the Supreme Court's discussion of *Hunter* and *Foley* is most germane to the present action.

FN11. *Id.* at 381.

In *Hunter,* the California Supreme Court " concluded wrongful termination of employment ordinarily does not give rise to a cause of action for fraud or deceit, even if a misrepresentation is utilized to effect the termination."[FN12] In so ruling, the Court intended "to preclude fraud recovery ... where 'the result of [the employer]'s misrepresentation is indistinguishable from an ordinary constructive wrongful termination.'"[FN13]

FN12. *Id.* at 382.

FN13. *Id.* at 384.

This clarification of its decision in *Hunter* evinces the California Supreme Court's intention to look at the true nature of the action to define the corresponding cause of action.[FN14] Moreover, the Court notes its "consistent refusal to validate tort remedies for breach of contract...."[FN15] Finally, the California Supreme Court indicated that a cause of action for fraud will not lie where the wrongful conduct is really a breach of the employment contract, and "so long as the alleged injury would not have occurred but for the employment termination, ... the employee is generally limited to a contractual remedy."[FN16]

FN14. *Lazar,* 49 Cal.Rptr.2d at 386, 909 P.2d 981 ("Here [in *Lazar* ] we are not dealing with allegations of breach of a contract provision, but with allegations of fraud. *Foley* was a contract case in which we declined to expand the availability of tort remedies for breach of contract; this is a tort case in which we are being asked by defendant to constrict traditional tort remedies.").

FN15. *Id.* at 387.

FN16. *Id.* at 387-88 (quoting *Hine v. Dittrich,* Ca. Ct.App., 228 Cal.App.3d 59, 278 Cal.Rptr. 330(1991)).

Considering the foregoing California decisions, I am convinced that Juran's fraud claim must fail. First, as discussed more fully below, I find that the fraud claim is really a claim for damages from a perceived breach of his employment agreement. As such, the fraud claim would run afoul of *Lazar* and its predecessors and fail. Second, and also discussed more fully below, even if the fraud claim did not fail under *Lazar,* Juran cannot satisfy the elements for a prima facie case of fraud.

Juran claims he was defrauded by the voting agreement between Bron and Villanueva because he did not get the benefit of the unanimous voting requirements of both the Employment Agreement and the Partnership Agreement. Because that contractual term, unanimity, was important to him, he argues that he was fraudulently induced to join, and remain with, Bron and Villanueva at Bastion and its related entities.

On September 1, 1994, Juran, Bron, and Villanueva executed an Employment Agreement that set forth the terms of Juran's employment. One provision of this agreement provides in pertinent part that:
At the present time, Management and Bastion have delegated to Bron the primary responsibility for managing the day to day administrative affairs of Management and Bastion, *provided all investment, hiring, and compensation decisions shall be subject to the general governance provision of Section 3.01(a) of the Bastion partnership agreement.*[FN17]

FN17. Employment Agreement § 1.5, Sept. 1, 1994 (Pls.' Ex. 19) (emphasis added).

*7 Section 3.01(a) of the partnership agreement, in turn, provides that Bron and Villanueva would manage the affairs of the partnership by "unanimous agreement."[FN18]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN18. Second Amended and Restated Agreement of Limited Partnership of Bastion Partners, L.P., Art. III, § 3.01(a), July 13, 1995 (Pls.' Ex. 14).

On August 7, 1995, Bron and Villanueva executed a letter stating in its entirety:
As controlling shareholders of the Corporation we hereby agree that after October 15, 1995 at the request of one or the other, we will each vote our shares of the Corporation so as to cause the Corporation to terminate Jan Juran's employment with the corporation, provided that at least fifteen (15) days prior to the intended date of such termination, either you or me, as the case may be, delivers to the other written notice of his intent to terminate Jan Juran. If Jan Juran's employment is terminated pursuant hereto, we hereby agree to take all actions necessary to terminate Juran Investments, Inc. as a general partner of Bastion Partners, L.P. This is the entire agreement of the parties with respect to the subject matter hereof.[FN19]

FN19. Letter, Aug. 7, 1995 (Pls.' Ex. 23).

Juran argues that the agreement memorialized by the August 7 th letter vitiates the unanimity provisions of the employment and partnership agreements. Moreover, Juran contends that his termination, effected pursuant to the August 7 th letter, is in derogation of the contractual provisions set forth above because it is not a "unanimous" decision.

Despite Juran's assertions that he was fraudulently induced to join Bron and Villanueva, I can see no way to view this claim as anything but a claim for breach of contract that led to his wrongful termination. The promises he relies on are the express written provisions of two contracts. These are not akin to the pre-employment oral promises made to Lazar. As such, the purported fraud claim runs afoul of Lazar and fails.

Even as a breach of contract claim, I do not understand how the agreement between Bron and Villanueva robbed Juran of the unanimity

provisions of the contracts. Juran consistently urged that the parties intended these provisions to require " separate unanimous consent," apparently meaning some sort of exercise of independent free-will on the part of both Bron and Villanueva at the precise moment they voted for his termination. I do not read the plain meaning of these contract provisions as being so restrictive. On their face, these contract provisions require that both Bron and Villanueva vote for his termination and that one, without the other, cannot unilaterally oust Juran. They require two votes; Juran received two votes. The letter of August 7 th does not change this, despite Juran's personalized concept of "separate unanimous consent." [FN20]

FN20. Even if I accepted Juran's "separate, unanimous consent" concept, it would not change the result. The evidence at trial persuades me that Bron and Villanueva did voluntarily, and independently, come to the conclusion that Juran had to be fired. The August 7, 1995, letter did not influence the deliberative process by which Bron and Villanueva reached their joint conclusion.

Even without the *Lazar* problem, Juran's fraud claims independently fail because he cannot satisfy the requirements for either common law or statutory fraud. The first element of common law fraud is that there must be a "misrepresentation." [FN21] That misrepresentation can consist of either a false representation, concealment, or nondisclosure.[FN22] Plaintiffs have not established that at the time Juran initially joined Bron and Villanueva, or when he was later persuaded to stay, that they misrepresented a material fact either affirmatively or by omission.

FN21. *Lazar,* 49 Cal.Rptr.2d at 380, 909 P.2d 981.

FN22. *Id.*

*8 The plaintiffs claim that Bron and Villanueva failed to disclose their mutual proxy agreement both

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 8

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

in 1994, when the defendants were negotiating the Term Sheet with Juran, and then again in 1995, when the defendants asked Juran to withdraw his resignation. Moreover, the plaintiffs argue that the failure to disclose this information constitutes a material omission. Juran's basic argument is that if he would have known about the agreement between Bron and Villanueva, he would have taken different actions, whether it would have been negotiating a different agreement, or electing not to join Bastion altogether.

Juran's argument faces several obstacles, not the least of which is my finding above, that even with the secret voting agreement, he nonetheless received exactly what he wanted–a unanimous vote by Bron and Villanueva in matters relating to his employment. Thus, there was no material misrepresentation inherent in the existence of the agreement.

Moreover, I find that the plaintiffs have not established that an enforceable secret voting agreement, even if it had been a material misrepresentation, existed in either written or oral form at the time Juran claims he was defrauded. The written agreement was signed on August 7, 1995. This date follows both August 1994, when Juran first joined Bastion, and July 1995 when he was persuaded to stay.

Perhaps the closer question is whether some form of enforceable oral agreement existed between Bron and Villanueva before that time. While it is true that Bron and Villanueva had an understanding regarding management decisions for Bastion, it is less clear that the two had a specific, binding oral agreement which would have bound both men to always vote in unison. It is quite natural that two men that have a long working relationship and a business history would want to be "on the same page" in running their business. It is also quite understandable that two partners who had worked to build a private equity fund from scratch wanted to protect the business in case a new partner they brought in did not work out. A "gentlemen's agreement" between two friends who work together to refuse to allow a new partner to affect their relationship, or threaten the business they have

worked hard to construct, is very different from a binding oral contract, the terms of which demand that one partner vote with the other partner if that other partner invokes the provisions of the oral contract.

While Bron and Villanueva likely had some kind of general understanding akin to a high level of mutual respect, it is not evident that any agreement legally bound both men. Indeed, Bron likely felt it was necessary to create a written agreement on August 7th because he recognized the "gentlemen's agreement" or mutual respect that existed between Bron and Villanueva would not be legally binding. Moreover, while Villanueva was trying to hold Bastion together with all three parties involved, he likely signed the agreement because he remained loyal to his original partner, Bron, and had already himself anticipated a continuing problem between Bron and Juran. Ultimately, in August 1995, Villanueva likely foresaw that Juran might have to be terminated to restore peace and order to the business. In April 1996, Villanueva approached Bron about the issue of termination. Based on these facts, I cannot find that the mutual understanding of two partners, prior to adding a third, rises to the level of an enforceable oral agreement. Moreover, I find as a factual matter that the voting agreement did not play any significant role in Juran's termination since Villanueva first approached Bron about the subject and not the other way around.

*9 Plaintiffs' fraud claims ultimately fail. First, the trilogy of cases ending with *Lazar* provides no support for these fraud claims. No evidence was presented at trial to indicate that Juran's claims related to his termination, allegedly through the use of the voting agreement, are anything but a claim for the wrongful breach of his employment contract. Under *Lazar*, where the alleged wrongful conduct is really in the nature of a breach of contract, no tort action for fraud will lie. That is the case here. Even without *Lazar*, the plaintiffs' fraud claims fail because they cannot show a fraudulent misrepresentation or omission that satisfies the elements for either common law fraud or statutory fraud. Because the claims fail on the first element, I need not address the remaining elements.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 9

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

### B. Plaintiffs' Breach of Fiduciary Duty Claims

Plaintiffs contend that defendants, as partners and majority shareholders, owe them fiduciary duties and that their actions have breached those duties. First, as partners, Juran argues that Bron and Villanueva breached their fiduciary duties by entering into the voting agreement on August 7th and by not providing him access to certain financial records of the partnership. Second, he urges that as controlling shareholders of BCC, the management company and holder of the LA Soccer investment, Bron and Villanueva owed him fiduciary duties that were breached by the voting agreement of August 7th and by diluting his interest in the LA Soccer investment. The defendants, in turn, argue that the Delaware Supreme Court's decision in *Riblet Products Corp. v. Nagy* [FN23] prevents a claim for breach of fiduciary duty where the acts allegedly in breach of the duty are related to an employment contract and the person's role as an employee, rather than as a shareholder or partner.

FN23. 683 A.2d 37 (1996).

Under Delaware law, "[a] majority shareholder of a corporation clearly owes fiduciary duties to the minority shareholders." [FN24] Similarly, one partner owes the other partners fiduciary duties.[FN25] These concepts are relatively straightforward until an employment relationship among the parties is thrown into the mix. Where a partner or minority shareholder, who is also an employee, is injured by the acts of his partners or the majority shareholders, they may, or may not, have breached their fiduciary duties. If the minority shareholder/partner/employee is injured in his capacity as a shareholder or partner, the acts against him may be a breach of fiduciary duty. Where, however, the person is injured as an employee, such as in a breach of an employment contract situation, his remedy would be under the contract. [FN26]

FN24. *Zirn v. VLI Corp.*, Del. Ch., C.A. No. 9488, Hartnett, V.C. (Feb. 15, 1991), mem. op. at 8 (citing *Ivanhoe Partners v. Nemont Mining Corp.*, Del.Supr., 535

A.2d 1334 (1987)).

FN25. *See Boxer v. Husky Oil Co.*, Del. Ch., 429 A.2d 995, 997 (1981).

FN26. *Riblet Products Corp.*, 683 A.2d 37 (1996).

Plaintiffs' claims that Bron and Villanueva breached their fiduciary duties towards him by entering into the voting agreement fail for two reasons. First, as discussed above, I do not find that the voting agreement between Bron and Villanueva involves any form of culpable conduct. Thus, it cannot form the basis for a breach of fiduciary duty claim. Second, also discussed more fully above, Juran's perceived injury from the voting agreement is his interpretation of how it affects his employment agreement. This is an issue of contract interpretation and, under *Riblet Products Corp.*, will not give rise to a breach of fiduciary duty action.

*10 The next claim, that defendants will not provide plaintiffs with financial information relating to the various entities and transactions, may be a breach of fiduciary duty. These issues will, however, resolve themselves in the discussion below concerning the breach of contract claims. Likewise, the issue of the dilution of Juran's interest in the LA Soccer investment will be discussed more fully below.

### C. Claims for Additional Sums Due under the Contracts

Plaintiffs contend they are due additional sums under various contracts governing the relationships between the plaintiffs and defendants. Specifically, they claim:

1. They should receive a $314,815 "placement fee" as provided for by the Employment Agreement;
2. They should receive an award of $530,000 representing the "consulting fees" that Bron and Villanueva paid to themselves. Plaintiffs contend these fees are merely disguised bonuses and that he should receive an equal amount as provided by the Employment Agreement;
3. The defendants improperly reduced Juran's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 10

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

ownership interest in BCC's investment in LA Soccer; and
4. The defendants miscalculated the plaintiffs' share of the profits from the partnership's investment in Telemundo.

The defendants, in turn, defend their actions on various grounds. With respect to the "placement fee," they argue that the plaintiff is not entitled to this money because he was terminated prior to his rights to the fee vesting. Moreover, conditions precedent to the payment of the fee are not satisfied in that Bron and Villanueva have not recouped certain organizational expenses or an "initial placement fee" as provided for in the contracts. Defendants also claim that this is a claim for wages and is barred by the one-year statute of limitations, 10 *Del. C.* § 8111

Similarly, defendants argue that Juran is not entitled to his share of the "consulting fees" because: (1) the defendants have not recouped the organizational expenses and the initial placement fee, and (2) that this is a claim for wages and is barred by the same one-year statute of limitations.

Defendants also defend the reduction of Juran's interest in the LA Soccer investment by arguing that it was entirely proper because Juran did not participate in subsequent capital calls. As a result, they say, Juran's proportional contribution was diluted. Finally, defendants contend that their calculation of the profits to be distributed from the Telemundo investment is correct under the contracts.

I believe it is most appropriate to begin by addressing the defendants' arguments that the plaintiffs' claims are barred by the one-year statute of limitations of 10 *Del. C.* § 8111. Before the Court can address this issue, it must be satisfied that the Delaware statute would apply to this action that arises from conduct in California and that adopting the one-year limitations period would be appropriate for an action in equity.

Where the law of two different states may apply to an action, Delaware courts apply the Restatement

(Second) Conflicts of Laws to determine which state law applies.[FN27] With respect to questions of which state's statute of limitations to apply, the courts are instructed by the Restatement to apply the statute of limitations of the forum.[FN28] Thus, in this case, the Court would look to the statute of limitations laws of Delaware.

> FN27. *Asten, Inc. v. Wangner Systems Corp.*, Del. Ch., C.A. No. 15617, Steele, V.C. (Sept. 23, 1999), mem. op. at 5.

> FN28. *Restatement (Second) Conflict of Laws* § 142. *See also Lumb v. Cooper*, Del.Super., 266 A.2d 196, 198 (1970) ("[L]imitations questions are generally settled by the law of the forum.").

*11 The General Assembly, however, has modified this general rule by statute. Delaware has adopted a "borrowing statute" that provides, in pertinent part: Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action.[FN29]

> FN29. 10 *Del. C.* § 8121.

There are three limitations periods that may apply to this action. First, as noted above, I have determined that this action is in the nature of a suit for breach of contract. Under Delaware law, a breach of contract action is subject to a three-year statute of limitations.[FN30] California, however, has established a four-year statute of limitations for breach of contract. Finally, the defendants urge that these claims are for wages or salary and are, thus, subject to Delaware's one-year limitations period for wage or salary claims.[FN31] The complexity of this issue, in this particular case, is compounded by the fact that the parties, in the Employment Agreement, have adopted a choice of law provision stating that the "Agreement shall be governed by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

and construed in accordance with the laws of the State of California without regard to conflict of law rules thereof." [FN32]

FN30. 10 *Del. C.* § 8106.

FN31. 10 *Del. C.* § 8111.

FN32. Employment Agreement § 6.2 (Sept. 1, 1994) (Pls.' Ex. 19).

I do not find that the choice of law provision is dispositive on this issue. First, there is some authority, which I find persuasive, that while generally choice of law provisions will be given effect, those provisions will only include the statute of limitations of the chosen jurisdiction if their inclusion is specifically noted. [FN33] Second, and more importantly, I find that this case presents one of those "unusual" or "special" circumstances where the Court, as a Court of Equity, should not look to the applicable statute of limitations at law for guidance.

FN33. *See American Energy Tech. v. Colley & McCoy Co.,* D. Del., Civ. A. 98-398 MMS, 1999 WL 301648, Schwartz, J. (April 15, 1999).

Generally, a statute of limitations for an action at law that is analogous to the action in equity will guide an Equity Court in applying the equitable doctrine of laches. [FN34] Moreover, "[a] statute of limitations is not binding upon a court of equity" and will not be applied where there are "unusual" or special circumstances. [FN35] The case presently before this Court presents those special or unusual circumstances where it would be inequitable to apply the statute of limitations at law. [FN36]

FN34. *See The Scott Fetzer Company v. Douglas Components Corp.,* Del. Ch., C.A. No. 11327, Hartnett, V.C. (April 12, 1994), mem. op. at 8.

FN35. *Id.*

FN36. By finding as I do on this issue, it is not necessary to this action to decide which limitations period would apply to this action. This Court did, however, examine the question closely. Had the special circumstances not been present, or had this been an action at law, this Court believes that, despite the choice of law provision in the contract, Delaware limitations periods would apply. This includes Delaware's borrowing statute. Either way, the Court is presented with a three-year limitations period for a contract action or a one-year period for a wage claim action. Based on past judicial interpretation of the wage claim statute, 10 *Del. C.* § 8111, I would also be inclined to view the plaintiffs' claims for the placement fee and consulting fees as falling within the purview of this statute.

This is a California case. The parties were California residents at all relevant times to this action. The Employment Agreement was executed in California and the performance of the contract was to be in California. The contract specifies that it is subject to California law. Finally, the alleged breach of this agreement occurred in California. The cause of action accrued in, and has the most significant ties to, California. The parties are in the Delaware Court of Chancery because the organizational parties were established under Delaware law and presumably to take advantage of this Court's experience in handling disputes of this nature. For these reasons, it would be inequitable to rigidly apply a Delaware statute of limitations to this action.

*12 I also find that my ruling on this issue falls squarely within the policy behind Delaware's borrowing statute. The borrowing statute, 10 *Del. C.* § 8121, was designed to protect Delaware's courts from having to adjudicate stale out-of-state claims. The typical problem this statute addresses is where a plaintiff's action is barred in its "home state" because the limitations period has run, but the Delaware courts may have jurisdiction over the parties and the action would not yet be barred under Delaware law. By forcing the Delaware courts to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 12

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

apply the shorter of the two periods, the General Assembly sought to prevent forum shopping to take advantage of a longer limitations period.

Here, we do not have that situation. The plaintiffs have come to a jurisdiction with a *shorter*, rather than a longer, limitations period. Thus, there is no danger of forum shopping here.

For this action, the possible limitations periods at law that may have applied ranged from a low of one-year to a high of four-years. With this range in mind, I find that the plaintiffs' claims are not barred by laches. They did not sit on their rights. Juran was terminated in May 1996 and the action was brought in June 1998. This two-year period falls in the middle of the range noted above, is shorter than both the California and the Delaware limitations periods for contract actions, and is only one-year longer than the statute of limitations for wage claims. Moreover, the defendants have not shown they have been prejudiced by any unnecessary delay in bringing the action. For these reasons, I find that the plaintiffs' claims are not time-barred.

I now turn to the merits of the plaintiffs' claims that he is entitled to a "placement fee" and certain "consulting fees" under the Employment Agreement.

#### (i) *The Placement Fee*

Juran argues that he is entitled, under the terms of his employment agreement, to receive a "placement fee" of $314,815.00. The defendants, however, contend that the fee is not due because other terms of the Employment Agreement absolve them from paying the fee.

Section 5.6 of the Employment Agreement provides that:
The parties hereto agree that, for their efforts in forming the Fund and raising its initial capitalization, Bron and Villanueva shall each receive a placement fee of $750,000.00, which fee shall be paid as soon as practicable from fees earned by Management from the Fund. Following payment of the $750,000.00 fee to each of Bron and Villanueva, Bron Villanueva, and Juran shall each

be entitled to receive a placement fee of $314,815.00 for their efforts in raising subsequent capital for the Fund. In all circumstances, such amounts of $314,815.00 shall be paid (x) only after the amounts payable under Sections 5.5 and 5.6 have been paid, (y) at the same time and on a pro rata basis to each of Bron, Villanueva and Juran, and (z) as soon as practicable from the fees earned by the Management from the Fund.[FN37]

> FN37. Employment Agreement § 5.6 (Sept. 1, 1994) (Pls.' Ex. 19).

*13 The defendants argue that § 3.4(c) trumps § 5.6. Section 3.4(c) provides that:
Should Juran's employment by Management continue beyond the Term of this Agreement, such employment shall be terminable at the will of either party, at any time, with or without cause or reason, *and Management shall have no liability or obligation to Juran other than* for any unpaid salary which shall have accrued as of the date of such termination or upaid benefits to which Juran is entitled, if any, under the terms and conditions of any applicable employee benefit plans.[FN38]

> FN38. Employment Agreement § 3.4(c) (emphasis added).

I do not read these two sections of the Employment Agreement as being mutually exclusive. First, the plaintiffs argue persuasively that when read in context, § 3.4(c) relieves the defendants from paying Juran any severance payments following termination after one year of employment. Sections 3.4(a) and (b) provide for termination only "for cause" and varying severance payments if Juran is terminated during either the first or second six months of employment. Section 3.4(c) continues that thought but changes Juran's employment to "at will" and eliminates any severance payment provisions. Second, § 3.4(d), which requires Juran to sell back his stock in BCC upon termination, expressly includes the placement fee to be paid under § 5.6 in the calculation of the sum Juran is to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

be paid for his shares. Finally, and most importantly, the defendants acknowledged at the time of termination that Juran was entitled to the " placement fee." [FN39]

> FN39. Letter from Villanueva to Juran, June 13, 1996 (Pls.' Ex. 37) ("Although Bastion is not obligated to pay your salary beyond your termination date, we are providing you herewith a severance check in the amount of two week's salary (less deductions and withholding). You will separately receive information about continuance of health coverage at your own expense. *Finally, of course, the placement fee will be handled in accordance with paragraph 5.6 of your Employment Agreement.*" ) (emphasis added).

Section 5.6 falls under a heading of "Additional Agreements." While headings are not dispositive, I find that it is, indeed, an "additional agreement" and is segregated from the provisions of § 3.4(c) and that the defendants acknowledged the same shortly after Juran's termination. Their arguments now, to the contrary, are disingenuous. Thus, the language of § 3.4(c) in no way affects the requirement to pay the "placement fee."

There are, however, conditions precedent to Juran's entitlement to the placement fee. First, all sums owed to Bron and Villanueva under §§ 5.5 and 5.6 must have been paid. Second, they must all be paid at the same time. Third, the fee must be paid as soon as practicable.

It is difficult for this Court to determine whether, and to what extent, Bron and Villanueva have received either the refund of organizational expenses under § 5.5 or the $750,000 placement fee of § 5.6. This difficulty is directly related to the failure on the part of the defendants to keep adequate records. I do, however, find credible evidence that both Bron and Villanueva received significant monetary distributions from BCC from time to time.[FN40] Some of these distributions were characterized as "loans," but there is inadequate

documentation to support this classification. Because there is no documentation to support a finding of whether, and to what extent, this precondition has been satisfied, I find it inequitable at this point to force the plaintiff to wait for the defendants to pay themselves these sums and adequately document the payments. Moreover, considering the contentious nature of their relationship with Juran, I find it unlikely that defendants would *ever* officially pay themselves the fees. At this point, I think it is more likely that defendants would forego the payment (if it has not already been made in a disguised form) so as to deny Juran what he is rightfully owed. For these reasons, this pre-condition is met.

> FN40. The plaintiffs argue that defendants used BCC as their personal "piggy bank." After reviewing the evidence presented at trial, I do not think that characterization is entirely unfair.

*14 Next, they must all be paid the $314,815.00 at the same time. While the fee may not have been paid to date, there is nothing to prevent Bron and Villanueva from paying themselves at the same time they pay Juran.

Finally, the fee must be paid as soon as practicable from fees earned by BCC. The greatest obstacle to this precondition is if BCC did not have the financial resources to pay the fee. Evidence introduced at trial indicates that BCC earned over $11 million in management fees from 1995 to the time of trial. Because BCC appears to be thriving, I believe it is fair to treat the "practicability" requirement as satisfied.[FN41]

> FN41. If the defendants want to continue to argue that BCC does not have the wherewithal to make the payment to Juran, the plaintiffs may seek an order from this Court directing an independent accounting firm to conduct an audit of BBC's financial records.

Because the conditions precedent to paying the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

placement fee are either excused or are met, I find that it is practicable for BCC to pay Juran the placement fee owed him under § 5.6 of the Employment Agreement. Thus, the defendants are ordered to pay Juran the $314,815.00 placement fee as required by the Employment Agreement.[FN42]

> FN42. Subject to the defendants' right to demonstrate that BBC does not have the ability, presently or in the near future, to make the required payment. In the event, as noted above, plaintiffs may apply for relief from the Court in the form of an independent accounting.

### (ii) The Consulting Fees

Juran argues that Bron and Villanueva received over $530,000 in "consulting fees" that are really disguised bonuses or compensation.[FN43] As the argument goes, because he is entitled to the "same total compensation (including base salary and such benefits and bonuses, if any)" as Bron and Villanueva, he is entitled to receive similar "bonuses."[FN44]

> FN43. This figure is lifted from a Profit and Loss Statement for BCC for 1995. This statement shows that the "consulting fees" were a significant (25%) delineated deduction from the management fees received as income ($2,023,865). (Pls.' Ex. 28).

> FN44. Employment Agreement § 2.1.

The defendants do not quarrel with this amount but rather with the classification. At trial, the defendants never could identify why these amounts were labeled "consulting fees." There was no evidence that they were paid for consulting services. Bron and Villanueva argue instead that no matter what the nomenclature, they were really just advances on the amounts owed them under §§ 5.5 and 5.6 of the Employment Agreement.

This argument fails for many of the same reasons as

noted above. There is scant evidence of the amount of organizational expenses actually incurred by Bron and Villanueva and there is little or no documentation of how much of this amount has been repaid under § 5.5. Likewise, as noted above, there is little evidence of whether, and to what extent, Bron and Villanueva have been paid the $750,000 placement fees of § 5.6.

They could have classified the $530,000 as a return of either of these amounts. They, however, did not do so. Rather, they chose for reasons known only to defendants to label these cash distributions as "consulting fees." But I am not required to accept "labels" when the evidence adduced at trial points logically in a different direction. I find these payments are indistinguishable from compensation and that Juran is entitled to an equal amount under § 2 .1 of the Employment Agreement. Defendants shall pay to Juran a like amount of compensation that they have already paid to themselves, which appears in this case to be $265,000.[FN45]

> FN45. Juran pulled the $530,000 figure from the financial statement. That amount represents the *total* for both Bron and Villanueva. Thus, Juran would receive an amount equal to one-half of that figure, or $265,000.

### (iii) The LA Soccer Investment Proceeds

*15 In 1996, Bron, Villanueva, and Juran agreed to invest in a professional soccer team through the Los Angeles Soccer Limited Partnership. The minimum investment was $100,000 and the three agreed to go together to invest that amount. Bron and Villanueva would each contribute 40% and Juran 20%. Thus, for the first installment of $60,000, Juran paid $12,000 and Bron and Villanueva each paid $24,000. To avoid the necessity of forming another entity to make this investment, the parties submitted their money to BCC which then made the investment in LA Soccer. Later, this investment interest was transferred to a new company formed for this purpose, BCC Soccer, Inc. ("BCC Soccer"). LA Soccer made three capital calls between 1997 and 1998 amounting to the remaining $40,000 owed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

on the original $100,000 investment plus an additional $25,000. This resulted in a total investment by BCC Soccer of $125,000.

Juran refused to honor the capital calls and remit his 20% for each. Bron and Villanueva made up the deficiencies. In late 1998, LA Soccer was sold and BCC Soccer received proceeds in the neighborhood of $215,000.[FN46] Shortly before trial, Juran received a check for $20,734 representing 9.6% of the $215,977 reportedly received from LA Soccer. Juran's interest was reduced from 20% to 9.6% because he contributed only $12,000 of the total $125,000 invested in LA Soccer (12,000/125,000 = 9.6%).

> FN46. Plaintiffs contest the exact amount received by BCC Soccer, Inc., but it is not material to my opinion.

Juran argues he was not required to honor the capital calls and that his initial 20% interest could not be abated for that reason. For this argument, Juran points to a letter from Bron and Villanueva of March 20, 1996. The letter provides in whole: Notwithstanding Section 3.4 of your Employment Agreement dated as of September 1, 1994, in the event that you become no longer a shareholder in Bastion Capital Corporation ("Bastion") prior to the ultimate sale or disposition of Bastion's investment in Los Angeles Soccer Partner, L.P. (or its successors and assigns), you will receive the same economic consideration (including tax treatment, etc.) from Bastion in respect of such investment as if you had continued to be a 20% shareholder in Bastion.[FN47]

> FN47. Letter, March 20, 1996 (Pls.' Ex. 29).

This letter, however, does not require Bron and Villanueva to provide Juran with a windfall where he has not made a 20% contribution to the entire investment. It merely states that in the event Juran's employment is terminated, and his interest in BCC extinguished, his interest in the LA Soccer

investment would not be erased by means of his termination. His interest would not be affected by reason of his termination or, in other words, if he had *not* "continued to be a 20% shareholder in Bastion."

Juran did not honor the capital calls. I can find no contractual provision absolving him of that responsibility. That being the case, Juran is not entitled to a windfall. Thus, the reduction of his interest from 20% to 9.6% was proper. Because there appears to be some question whether the final proceeds from LA Soccer totaled $215,977, I will direct the defendants to provide plaintiffs with adequate documentation to verify the appropriate final figure.

#### (iv) *Telemundo*

*16 Beginning in July 1994, the Fund made three separate investments in Telemundo Group, Inc. (" Telemundo"). The three investments were known among the parties as Tranches 1, 2, and 3. Tranches 1 and 2 were a part of the Fund's portfolio made before Juran's termination. The investment in Tranche 3, however, was made after Juran's separation from Bastion. Thus, there are two categories of investments in the fund as related to Juran. First are those investments made before his termination and in which he participates in the profits and losses. Second are those investments made after his separation and in which he does *not* participate.[FN48]

> FN48. This "pooling" scheme is discussed in detail below.

The parties do not dispute that Juran would, and should, participate in any gains from Tranches 1 and 2, as well as an investment in Nextwave. Juran would not, however, participate in the gains and losses from Tranche 3 and an investment in Renaissance Cosmetics, Inc. ("RCI").

In August 1996, the Fund's entire investment in Telemundo (Tranches 1, 2, and 3) was sold for $81.5 million. Of these sale proceeds, $77 million

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

can be attributed to the Fund's investment in Tranches 1 and 2. Moreover, since Tranches 1 and 2 originally cost $22 million, the gain on these two investments was $55 million. The gain on Tranche 3 was approximately $4.4 million. Thus, the total gain realized by the Fund on this investment was nearly $60 million.

This gain was distributed to BPLP and the other partners in the Fund pursuant to the distribution scheme in the Fund's partnership agreement. The parties agree that BPLP, for its 1% general partner and 3% limited partner interests in the fund, received a distribution of those profits from the Fund in the amount of $5.354 million dollars. It is the subsequent "carving" of this "goose" that will determine the serving each of the partners of BPLP will receive and is the subject of the current dispute.

Juran ultimately received a check for $366,933, purportedly representing his share of the distribution from the Fund for the sale of Telemundo. Juran argues that §§ 5.10 and 7.02 of BPLP's Partnership Agreement govern the further distribution of the $5.354 million between Bron, Villanueva, and Juran. Specifically, Juran contends that these sections demand a distribution scheme where the total distribution from the Fund is divided into two pools. One pool reflects the gains on the sale of Telemundo Tranches 1 and 2 and a "write down" reflecting losses from the investment in Nextwave. The other pool reflects the gains from the sale of Telemundo Tranche 3 and another "write down" to account for significant losses from the investment in RCI. Juran argues that, by following this "pooling" requirement of § 7.02 and then applying the distribution scheme of § 5.10(b), he should have received approximately $1.8 million.

Defendants respond that in calculating the distribution, certain sections of the Fund's partnership agreement also come into play. The ultimate result of the defendants' distribution scheme is that the significant losses from the RCI investment are offset by the Telemundo Tranches 1 and 2 profits. Under this distribution scheme, the defendants calculate Juran's share at just over $800,000. This amount was then reduced to $366,933 to account for reserves that the defendants

deemed necessary to cover any future exercise of "claw-back" provisions in both the Fund's and BPLP's partnership agreements.

*17 The parties agree that the distribution from the Fund to BPLP of $5.354 million was a correct distribution under the Fund's partnership agreement. Thus, this Court's focus will be on how the BPLP partnership agreement orchestrates the distribution among its partners, Bron, Villanueva, and Juran.

I note at the outset that both parties appear to agree that § 7.02 and § 5.10(b) of the Partnership Agreement are the applicable sections. As in any partnership, the relationship of the parties to one another within that partnership often also determines their financial relationship. Here, § 7.02 defines the relationship between the parties upon the occurrence of a "disabling event." In this case, the disabling event was Juran's termination. Section 7.02 provides in substantial part that:

Section 7.02 *General Partner to become Special Limited Partner upon Disabling Event.* In the event that either Villanueva, Bron or Juran shall have (a) ceased to be an active principal of either the Management Company or the General Partner Company of which he is an Affiliate, ... ( ... hereinafter referred to as a "Disabling Event"), Bronco (in the case of a Disabling Event of Bron or Bronco), or Villaco (in the case of a Disabling Event of Villanueva or Villaco), or Juraco (in the case of a disabling event of Juran or Juraco) shall no longer be a General Partner, but rather shall automatically become a Special Limited Partner and shall receive all cash distributions and Net Income and Net Loss allocations that Bronco, Villaco or Juraco, as the case may be, would have otherwise been entitled to receive absent such Disabling Event with respect to investments made by the Fund prior to such Disabling Event; *provided* that upon the Disabling Event of Bron or Bronco, or Villanueva or Villaco, or Juran or Juraco, Bronco (in the case of a Disabling Event of Bron or Bronco) or Villaco (in the case of a Diabling Event of Villa or Villaco) or Juraco (in the case of a disabling event of Juran or Juraco) shall no longer be obligated to make any further Capital Contributions.... *The new Special Limited Partner shall only be entitled to Investment Points* [FN49] *with respect to the Partnership's share*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*of investments made by the Fund prior to the Disabling Event of Bron or Bronco, Villanueva or Villaco, or Juran or Juraco, as applicable. All future Investment Points and obligations to make Capital Contributions shall be assigned to the remaining General Partners, if they remain. The allocations of Net Income and Net Loss and distributions shall be adjusted to provide for two separate pools of Investment Accounts:* [FN50] *(a) one pool for all investments in Portfolio Companies made by the Fund with respect to which the Special Limited Partner has an interest and (b) another pool for all future transactions for which the Special Limited Partner will not invest. The allocations of Net Income and net loss and distributions shall be separately maintained for each pool. A Special Limited Partner shall not be relieved of any liabilities attributable to the period that it was a General Partner.* [FN51]

FN49. Defined as: *"Investment Points -initially mean with respect to (i) Bronco, 40, (ii) Villaco, 40 and (iii) Juraco, 20."* See Partnership Agreement § 1.01.

FN50. *"Investment Account*-has the meaning set forth in Section 5.01(c). *See* Partnership Agreement § 1.01. Section 5.01(c) defines Investment Account as: A separate investment account ... shall be established for each Partner for the investments by the Partnership in the Fund's investment in each separate Portfolio Company. The Investment Account shall be created with a Partner's Capital Contribution with respect to the investments in the relevant Portfolio Company and the income or gain from the disposition of such investments and it shall be debited with the distributions and losses attributable to the disposition of any such investments."

FN51. Partnership Agreement § 7.02 (emphasis added).

**18** This section provides the initial framework for

dividing distributions among the partners where one has become a Special Limited Partner. In the present case, Juran had become a Special Limited Partner at the time the distribution was made. Thus, the distribution from the Fund is subject to the " pooling" scheme of § 7.02.

Under this scheme, Juran *"shall only be entitled to Investment Points with respect to the Partnership's share of investments made by the Fund prior to the Disabling Event of ... Juraco. All future Investment points and obligations to make Capital Contributions shall be assigned to the remaining General Partners...."* [FN52] In this case, Juran had an interest in Telemundo Tranches 1 and 2 and Nextwave. Juran did not, however, have an interest in Telemundo Tranche 3 and RCI. Under this system, Juran enjoys both the "upside" and the " downside" of the former, but not the latter. This system makes sense and is clear from the plain language of the partnership agreement.

FN52. *Id.*

Once the "pools" have been identified, and the distributions assigned to the proper pool, § 5.10(b) prescribes the appropriate division of the money in the pools between the partners. Depending on the source of the distribution, the division will be based on either the partner's "Capital Contributions with respect to the fund's investment in a particular Portfolio Company producing such distribution" or their respective "Investment Points with respect to the fund's investment in a particular Portfolio Company producing such distribution...." [FN53]

FN53. *See* Partnership Agreement §§ 5.10(b)(i)-(v).

I find that the initial calculations of Bastion's in-house analyst and those of the plaintiffs' expert accurately reflect my interpretation of these provisions of the Partnership Agreement. Bastion's in-house analyst, Scott Kim, was asked to calculate the partners' distributive share of the $5.354 million. Using the above provisions of the partnership agreement as his guide, he concluded

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

that Juran was entitled to $1.815 million.[FN54] The plaintiff's expert, Roger Bennett, independently came to a similar conclusion. Bennett reached this figure by creating the two "pools" and filling pool 1 with the profits from the sale of Telemundo Tranches 1 and 2, and then "siphoning off" the Nextwave write-down. The second pool was filled with the much more meager profits from the sale of Telemundo Tranche 3 and then drained in whole by the significant write-down for the investment in RCI. After offsetting the profits by the write-downs in each pool, pool one, in which Juran had an interest, had a net profit of $9.1 million. Pool two, however, was dry. Then, after applying the 40-40-20 distribution of § 5.10(b) to this profit (20% x $9.1 million), Bennett and Kim determined that Juran was entitled to receive approximately $1.8 million.[FN55] Villanueva was entitled to $2.367 million, and Bron was entitled to $1.75 million.[FN56]

FN54. *See* Kim's calculations on Bates No. 5291 (Pls.' Ex. 73).

FN55. Kim and Bennett differ slightly on this amount. Kim found Juran was entitled to $1.815 million and Bennett found he should receive $1.825 million.

FN56. The analysts calculated these numbers using Bates No. 5291 (Pls.' Ex. 73).

I think it significant to note at this point that, at trial, evidence developed showing that Kim's calculations were presented to Bron, and it was only after Bron saw these calculations that he told Kim to go back to the drawing board. Bron's rationale for doing so was dubious, at best. Suffice it to say that defendants' strained interpretation of the BPLP partnership agreement had the ultimate effect of using the significant profits from Tranches 1 and 2 of Telemundo to offset Bron and Villanueva's losses on RCI and provide them with an 8% [FN57] return on the losing RCI investment. This reduced Juran's share from $1.8 million to $849,000 and increased Bron and Villanueva's share by approximately $500,000 each.

FN57. The Fund's partnership agreement provides that investors are to realize at least an 8% return on even losing investments through the "claw-back" provisions discussed below.

*19 Defendants make much of a provision in the 1994 Term Sheet that states that Juran's interest is subject to the claw-back provisions and that " he will suffer to the detriment of the deals he has not invested in." [FN58] This language is in a document separate from the Partnership Agreement. The Partnership Agreement contains a "merger" clause. The defendants have provided no argument or evidence that would convince this Court to look beyond the parties' fully integrated writing, the Partnership Agreement.

FN58. 1994 Term Sheet, ¶ 6.

Defendants' result does not comport with either the language, or the spirit, of the pooling concept of § 7.02. I find the calculations of Kim and Bennett accurately reflect the distribution scheme established by the BPLP Partnership Agreement. Juran participated in Telemundo Tranches 1 and 2 and Nextwave. Thus, he is entitled to experience both the highs and lows of these investments. He is not, however, to be saddled with losses from investments made by Bron and Villanueva after the Disabling Event, his termination. Considering the foregoing, I find that Juran is entitled to $1.815 million as his share of the profits from the Fund's sale of the Telemundo investments. This is the share Bastion's analyst found based on his "common sense " understanding of the various contracts. He has no stake in this litigation and I find his results credible. This amount, however, may be subject to reduction by amounts he has already received and "reserves" being held to protect against future exercise of the " claw-back" provisions. This is discussed below.

(v) *The "Claw-Back" Reserves*

Even under the defendants' calculations, Juran was entitled to nearly $850,000, yet he received a check for $366,933. The defendants argue that the nearly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

$500,000 difference reflects an amount being withheld from Juran's distribution as a reserve to cover any potential, future exercise of "claw-back" provisions in both the Fund's Partnership Agreement and BPLP's Partnership Agreement.[FN59] These claw-back provisions establish a system where, if the Fund's required rate of return will not be realized in the future, the Fund may look to its investors, the partners, for a return of excess profits they received in the past.[FN60] Thus, the Fund could seek a return of past profits from BPLP. To address this situation, BPLP's partnership Agreement contains a similar provision so that if BPLP has to refund a portion of past distributions to the Fund, BPLP may, in turn, seek to recover the same from its partners.[FN61]

FN59. Bron and Villanueva have elected to retain a total of $2.5 million as a reserve from the Telemundo distribution.

FN60. See Second Amended and Restated Agreement of Limited Partnership of Bastion Capital Fund, L.P., a Delaware Limited Partnership § 9.3 (July 11, 1994) (Pls.' Ex. 2).

FN61. "Partnership Give Back. To the extent that the Partnership is responsible for contributing money to the Fund pursuant to Section 9.3 of the Fund Agreement, such contribution shall be made by the Partners who received distributions in respect of their Investment Points in proportion to their Investment Points that gave rise to the original distribution from the Partnership." BPLP Partnership Agreement § 8.03 (Pls.' Ex. 14)

The defendants argue that their actions in retaining these funds as a reserve are entirely proper because § 5.10(a) of the Partnership Agreement allows them to retain these reserves in their "sole discretion." " Sole discretion" is not always unfettered discretion.[FN62]

FN62. See Schnell v. Chris-Craft Indus.,

Inc., Del.Supr., 285 A.2d 437, 439 (1971) ( "[I]nequitable action does not become permissible simply because it is legally possible.").

I find that the defendants' sole discretion, in this case, has been exercised in bad faith. First, it is obvious that the relationship between the parties, at the time of the distribution, was irretrievably broken. As such, the danger for a "bad faith" exercise of this power is that much greater.

*20 Defendants contend that this is precisely why there is a need to maintain this reserve-so that they will not have problems collecting should the claw-back provisions ever come into play. I find this argument unpersuasive. Juran, like the other non-BPLP partners of the Fund, is contractually bound to refund these sums should the claw-back provisions ever have to be exercised. The effort necessary to collect from Juran is no greater than that of other partners.

I also find it telling that no real thought or analysis went into calculating the amount sufficient for a " reasonable" reserve. Here, it appears that we have the reverse-an entirely excessive reserve under the circumstances. For instance, in calculating the reserve amount, Bron completed "back of the envelope" calculations that assumed all of the Fund's investments would be 100% losses. Certain Fund investments, however, have built-in guarantees of profit and, thus, cannot cause the losses Bron fears.

Where one partners' share is disproportionately affected by this exercise of "sole discretion," it is further evidence of bad faith. Using defendants' calculations it appears that Villanueva received 63% of his full distribution while Juran received only 38%.[FN63] Such disparity of treatment among partners bespeaks bad faith and inequitable conduct.

FN63. Plaintiffs extract these numbers from Bates 5241 (Pls.' Ex. 72).

Finally, I am troubled by the fact that even if the reserve in this case were proper, there does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)
(Cite as: Not Reported in A.2d)

appear to be a mechanism for Juran to recover this money should the "doomsday predictions" never come to fruition. That money could conceivably be held well beyond Juran's lifetime "just in case."

While it is true that Bron and Villanueva have the power to maintain certain reserves, this power must be exercised in good faith. I do not find that to be the case here. There was no effort to determine whether the circumstances required such a reserve and what amount would be appropriate under the circumstances. Despite their differences, I also do not believe that the defendants have shown that collecting this money from Juran, if and when the claw-back provisions are exercised, will be any more difficult than collecting from other partners. Finally, Juran is disproportionately affected by this exercise of power. A greater percentage of his return was withheld and there is no mechanism in place for him to get this money back. Considering the foregoing, the defendants' exercise of their power to hold certain reserves was improper in this case and, thus, a breach of their fiduciary duties owed to a partner. Juran is entitled to his entire share of the distribution from the. Telemundo investment subject to the risk (however small) that he may have to refund a portion of these profits in the future if the claw-back provisions ever are exercised.

### D. Defendants' Failure to Provide Financial Information

The plaintiffs argue that Article 9 of BPLP's Partnership Agreement requires the Partnership to prepare audited financial statements at the end of each fiscal year. The Partnership has not provided the plaintiffs with financial statements audited by a national accounting firm as required by the agreement. [FN64] Plaintiffs also contend that they have been harmed by the defendants' failure to provide unaudited financial statements [FN65] and timely Schedule K-1's.[FN66]

FN64. Partnership Agreement § 9.01.

FN65. *Id.* at § 9.02.

FN66. *Id.* at § 9.03.

*21 Defendants counter that all necessary financial information concerning BPLP was included in the Fund's financial statements and tax returns. The Fund's financial statements are audited by a national accounting firm and form the basis for BPLP's tax returns. At the Partnership level, there are very few " transactions" that would form the basis for financial statements. For instance, when the Fund makes an investment, BPLP receives one check from each partner and then remits one check to the Fund. When the Fund's position in an investment is liquidated, the opposite occurs.

Article 9 of the Partnership Agreement provides for certain reports that must be provided to partners. The evidence presented in this action does not show that these provisions of the partnership have been precisely followed in all cases. The evidence does show, however, that plaintiffs received most of the necessary financial information from various other sources, albeit somewhat late in many circumstances. While I cannot condone the defendants' actions in ignoring these provisions they contractually agreed to, I do not find, on these facts, that a wholesale accounting of the partnerships' affairs is necessary to protect the plaintiffs. To this end, I order the defendants to provide the necessary information to the plaintiffs to carry out the provisions of this decision. For instance, I have found that Juran is entitled to 9.6% of the proceeds from the sale of LA Soccer. There appears, however, to be a slight discrepancy on the exact amount realized by BCC Soccer. The defendants are ordered to provide sufficient documentation of this transaction for the parties to calculate the correct figure. The parties should work together to " flesh out" the framework provided by this decision. Should they not be able to, the Court is prepared to revisit this issue.

### III. CONCLUSION

Neither party is a true "winner" in this action. An arguably successful professional relationship was torn apart by personality conflicts. The breaking-up process resulted in this litigation. Considering the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence presented at trial and the arguments advanced both at trial and in post-trial briefing, I find the following:

1. The plaintiffs' fraud claims fail. The voting agreement between Bron and Villanueva did not constitute fraud. Juran's complaints were really in the nature of a breach of an employment agreement. As such, under *Lazar*, the fraud claims must fall. I also find that the voting agreement did not breach the Employment Agreement. First, it is not clear that the agreement was ever followed. To the contrary, the evidence showed that Villanueva first approached Bron about Juran's termination. Second, the Employment Agreement provides for unanimous consent, and that is precisely what Juran received. Both Bron and Villanueva voted to terminate Juran.

2. Juran's breach of fiduciary duty claims fail for similar reasons. First, I do not find that the existence of a voting agreement, that did not appear to come into play, by itself, constitutes a breach of fiduciary duty. Moreover, I have found this to be an action for the breach of an employment contract. Thus, under *Riblet*, the breach of fiduciary duty claims fail.

*22 3. Finally, there are the plaintiffs' claims for additional sums under the contracts and additional financial disclosures. I find that the conditions are met and that plaintiffs are entitled to the "Placement Fee" of $314,815.00. I also find that the plaintiffs are entitled to an equal share of "consulting fees" in the amount of $265,000.00. The plaintiffs' claim for additional sums from the sale of the LA Soccer investment, however, fail. Because he refused to honor capital calls, Juran's interest was reduced to 9.6%. To the extent there is some discrepancy in the amount realized from that sale, the defendants are directed to provide the necessary financial data to ascertain the true figure. Finally, there are the profits from the Telemundo investment. I find that Juran is entitled to the $1.815 million as calculated by Kim, less the amount he has already received.

4. I do not, however, order that pre-judgment or post-judgment interest be paid on these amounts at this time. This issue was not adequately addressed

in the briefs. Counsel should confer and if no agreement on this can be reached, counsel shall submit letter memoranda setting forth their respective positions.

5. Finally, pursuant to Court of Chancery Rule 54(d), I conclude that the parties should share the costs of this litigation equally.

Counsel shall confer in order to submit an appropriate implementing Order.

Del.Ch.,2000.
Juran v. Bron
Not Reported in A.2d, 2000 WL 1521478 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

Pennsylvania Court of Common Pleas.
TEXTILE BIOCIDES, INC. and Saniclean, Inc.
v.
AVECIA, INC.
No. 1519 JAN.TERM 2000.

July 26, 2001.

ORDER

West Headnotes

**Fraud 27**
184k27 Most Cited Cases
Defendant was not entitled to summary judgment on plaintiffs' fraud claims where there was evidence that plaintiffs entered into agreements to buy and sell defendant's product on the basis of misrepresentations that defendant had certain EPA registrations.
HERRON, J.

*1 AND NOW, this 26th day of July 2001, upon consideration of the plaintiffs' motion for summary judgment on the defendant's counterclaims, and the defendant's response, and in accordance with the court's contemporaneously-filed opinion, IT IS HEREBY ORDERED that the motion is GRANTED IN PART as follows:

(1) Summary judgment on the defendant's contract counterclaims (Counterclaims, Counts I and II) is GRANTED to the extent that those counterclaims are based on the plaintiffs' promises not to create obligations on Avecia's behalf or bind Avecia, and that aspect of the contract counterclaims is DISMISSED.

(2) Summary judgment on all other aspects of the defendant's contract counterclaims (Counterclaims, Counts I and II) is DENIED.

(3) Summary judgment on the defendant's fraud claim (Counterclaims, Count III) is GRANTED to the extent that that counterclaim is based on Saniclean's statement in the exclusive supply agreement that it had requirements for Reputex, and that aspect of the fraud counterclaim is DISMISSED.

(4) Summary judgment on all other aspects of the defendant's fraud counterclaim is DENIED.

OPINION
Plaintiffs Textile Biocides and Saniclean signed agreements to buy and sell the defendant Avecia's antimicrobial product, Reputex. [FN1] The deal went poorly for both sides. The plaintiffs sued Avecia for fraud, breach of contract, tortious interference and negligent misrepresentation. Avecia filed counterclaims for fraud and breach of contract. Each side moved for summary judgment on the other's claims. The court grants in part both sides' motions.

FN1. The agreements were between the plaintiffs and Avecia's predecessor, Zeneca. Avecia succeeded to Zeneca's interests in those agreements in July 1999. Complaint ¶ 3 and Answer ¶ 3. Though the plaintiffs alleged in the complaint that the succession provided the motive for Avecia's conduct, the plaintiffs did not pursue that theory in their motion papers. As the distinction between Zeneca and Avecia does not seem to be relevant to these motions, this opinion refers to Zeneca and Avecia as "Avecia."

FACTS
I. AVECIA, REPUTEX AND THE EPA

Avecia is the manufacturer of Polyhexamethylene Biguanide Hydrochloride Solution ("PHMB"), an antimicrobial product that Avecia markets as, among other brand names, Vantocil IB and Reputex 20 ("Vantocil" and "Reputex"). The EPA classifies PHMB as a pesticide. The EPA requires the registration of a pesticide--including each brand name and each use--before it can be sold in the United States. 40 C.F.R. § § 152.15, 152.113. The scope of the registered uses determines the breadth of the advertising and labeling claims that a seller of a pesticide may make. By April 1997, PHMB was registered with the EPA under the primary brand name Vantocil "as an agent to control the growth and action of microorganisms, and control generation of odors, on textiles such as cotton, cotton blends ... and cellulosic material such as non-wovens, tissues, paper and pulps." Vantocil's EPA registration number is 10182-128. In September 1997, the EPA accepted Avecia's application to add the brand name Reputex to the PHMB registration.

The EPA calls the textiles and cellulosic materials to which a pesticide may be applied "treated articles." 40 C.F.R. § 152.25. Under the "treated article

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 2
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

exemption," an article treated with a registered pesticide need not be separately registered with the EPA as long as the pesticide is registered for use on that article and the manufacturer does not claim that the pesticide has an effect on anything other than the treated article itself. 40 C.F.R. § 152.25(a); (Ex. Da-6, Pesticide Registration Notice 2000-1, 3/6/00). [FN2] For example, Avecia may claim that Reputex controls microorganisms on a cloth treated with Reputex. Avecia may not claim that Reputex controls microorganisms on a kitchen counter wiped with the treated cloth.

> FN2. This opinion refers to the exhibits attached to Avecia's motion for summary judgment as "Ex. Da-1", "Ex. Da-2," etc.; the exhibits attached to Avecia's reply brief as "Ex. Db-1," "Ex. Db-2," etc.; and the exhibits attached to Avecia's response to plaintiff's motion for summary judgment as "Ex. Dc-1," "Ex. Dc-2," etc.

*2 The EPA has further limited the treated article exemption to prohibit making public health claims. A public health claim is a claim for the control of specific microorganisms. For example, Avecia may not claim that Reputex controls the growth of E. coli. To expand the Reputex registration to include such a public health claim, Avecia would have to submit data to the EPA showing that Reputex does indeed control the growth of E. coli. (Ex. Da-6, Pesticide Registration Notice 2000-1, 3/6/00; Ex. Da-14, Wright memo to Schapiro, 7/18/97.) Avecia admits that Reputex is not and never has been registered for public health claims.

EPA Registration No. 10182-128 permits Avecia to sell Reputex in the United States. To sell Reputex in a foreign country, Avecia must fulfill any registration requirement of that country. Avecia admits that Reputex is not and never has been registered for sale or use in Mexico or Canada. (Ex. P-8, Burt dep, 6/19/00, at 199-200.)

II. ACCORDING TO THE PLAINTIFFS, AVECIA MISREPRESENTED FACTS ABOUT THE STATUS OF THE REPUTEX REGISTRATION TO INDUCE THE PLAINTIFFS TO SIGN THE AGREEMENTS.

In 1996, Saul Schapiro learned that Avecia sells PHMB. Schapiro began discussions with Avecia about using PHMB for the treatment of wipes and towels. Avecia informed Schapiro that PHMB was not yet registered with the EPA. (Ex. P-1, Complaint,

ex. 1, Lee letter to Schapiro, 7/30/96.)

Schapiro contemplated a deal between Avecia and his companies Global Nonwoven Technologies and Daniel Schapiro & Co. In correspondence with Avecia he estimated that he could sell wipes and towels containing 39,000 pounds of Reputex in one year. He later raised that estimate to 118,000 pounds per year. (Ex. Dc-6, Schapiro letter to Kudner, 11/26/96; Ex. Dc-6, Commercial Development Visit Report, 1/15/97.)

Schapiro's main contact at Avecia at that time seems to have been Donald Kudner. Until the fall of 1997, Kudner was Avecia's Commercial Development Manager for Reputex. By April 1997, Avecia had registered PHMB with the EPA as Vantocil for the control of microorganisms on textiles and non-wovens. By May 5, 1997, Schapiro knew of this registration. (Da-10, Schapiro memo to Kudner, 5/5/97.) Though Schapiro claims not to have known that Vantocil and Reputex were names for the same product, Avecia informed him so on June 9, 1997. (Ex. Da-12, Burt Fax to Schapiro, 6/9/97) (enclosing draft labels for Vantocil and explaining that PHMB would "be marketed under the alternate brand name of Reputex").

Avecia told Schapiro that the registration did not permit public health claims. (Ex. Da-10, Schapiro Fax to Kudner, 5/5/97; Ex. Da-12, Burt Fax to Schapiro, 6/9/97.) Schapiro understood this, (Ex. Dc-5, Schapiro dep., 7/7/00, at 123-24), and he then got a quotation from a laboratory to determine how much it would cost to develop data to support a PHMB public health claim registration. (Ex. Dc-17, Gibraltar Laboratories Quotation, 7/15/97.)

*3 At Avecia's recommendation, Schapiro hired attorney James Wright to assist him in designing EPA-acceptable packaging for PHMB-treated cloths. Schapiro sent sample packaging to Wright. Wright reviewed the packaging and, on July 18, 1997, faxed and mailed Schapiro a legal opinion on the permitted scope of the claims on the Saniclean labels. As Wright was giving his opinion on the Vantocil registration, he referred to PHMB as Vantocil, not Reputex. He also specifically explained that, at that time, public health claims would not be permitted for cloths treated with PHMB. (Ex. Da-14, Wright Memo to Schapiro, 7/18/97.)

A few days later, Schapiro sent a fax to the firm handling the artwork for the Reputex packaging. The fax read, in part:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00004-ER     Document 8-7     Filed 02/05/2007     Page 51 of 76

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl))

Finally got a fax from the attorney concerning what we are now allowed to say until we register products further with the EPA. Until we submit testing and get approval, we cannot say certain things about specific bacteria so need to be more general. Here are the suggested changes....

(Ex. Da-15, Schapiro fax to Baker, 7/21/97.) The changes were substantively the same as those that Wright suggested.

On June 9, 1997, Zeneca informed Schapiro that PHMB was not registered in Mexico, and that "expert legal counsel should be sought" on using PHMB in Mexico. (Ex. Da-12, Burt fax to Schapiro, 6/9/97.)

Therefore, as late as July 21, 1997, Schapiro knew that the American registration of PHMB did not permit public health claims, and as late as June 9, 1997, he knew that PHMB was not registered in Mexico. Furthermore, he knew or should have known that Reputex and Vantocil were alternate brand names for PHMB.

In their affidavits, however, Schapiro and Krupnick aver that, during summer 1997, Kudner assured them that Zeneca would expand the PHMB registration to permit public health claims and to permit sale and use of PHMB in Mexico and Canada. (Krupnick aff. ¶ ¶ 13, 17; Schapiro aff. ¶ ¶ 25, 29.) Anticipating an agreement with Avecia, Schapiro and Steven Krupnick formed Textile Biocides to sell Reputex and formed Saniclean to manufacture and sell Reputex-treated products. (Krupnick aff. ¶ 14; Schapiro aff. ¶ 26.) According to the plaintiffs, the expansion of the registrations was the only thing holding up the execution of the agreements. (Ex. P-6, Krupnick dep., 7/14/00, at 83-87.) In their affidavits, Schapiro and Krupnick aver that "[o]n or around August 20, 1997" Kudner told them that Zeneca had obtained the public health claim registration in the United States and the Mexico and Canada registrations and that the agreements were ready to be signed. (Krupnick aff. ¶ ¶ 17, 18; Schapiro aff. ¶ ¶ 29, 30.) [FN3] On August 20, 1997, Avecia signed a sales representative agreement with Textile Biocides and an exclusive supply agreement with Saniclean. (Ex. Da-1, Sales Representative Agreement; Ex. Da-2, Exclusive Supply Agreement; Krupnick aff. ¶ 18; Schapiro aff. ¶ 30.) Though the agreements referred to an attached EPA Registration No. 10182-128, the plaintiffs allege that registration was not attached to either agreement. (Krupnick aff. ¶ 18; Schapiro aff. ¶ 20.) Krupnick and Schapiro claim never to have seen the registrations.

FN3. As the survival of plaintiffs' fraud claims depends almost entirely on these affidavits, the relevant paragraphs of the affidavits are worth reproducing:

17. Throughout the remainder of July 1997 and through mid-August 1997, Mr. Schapiro and I continued our negotiations with Zeneca and continued to be assured and promised by Mr. Kudner that Zeneca was obtaining the necessary and proper registration for Reputex 20, including public health claims, in order for Reputex 20 to be promoted and sold for the antimicrobial treatment of textiles, including, among other things, durable and disposable antimicrobial wipes and towels for industrial use in hotels, restaurants, hospitals and other similar commercial establishments within the United States, Canada and Mexico.

18. On or around August 20, 1997, Mr. Schapiro and I received a Sales Representative Agreement and Exclusive Supply Agreement from Zeneca which finally included an EPA registration number for Reputex 20. Around this same time, Mr. Kudner represented to Mr. Schapiro and me that Zeneca now had the necessary and proper registration and that the agreements were ready to be signed.

(Krupnick aff. ¶ ¶ 17, 18; Schapiro aff. ¶ ¶ 29, 30.) One could interpret these vague averments as alleging that Kudner made no misrepresentations and/or that he made them after August 20. Krupnick and Schapiro's deposition testimony supports this interpretation. But the court must view the evidence in the light most favorable to the non-moving party. For the sake of Avecia's motion, the court reads the averments as alleging that, before the plaintiffs signed the agreements, Kudner specifically told them that Avecia had registered Reputex in the United States for public health claims and in Mexico and Canada.

*4 Under the Sales Representative Agreement, Avecia appointed Textile Biocides as a nonexclusive sales representative for Reputex in the United States, Canada and Mexico. (Ex. Da-1, Sales Representative Agreement ¶ 1.) Textile Biocides would solicit orders for Reputex and forward the orders to Avecia for acceptance. (Ex. Da-1, Sales Representative Agreement ¶ 5.) Avecia would accept or reject the order--"generally ... within ten (10) days" and pay Textile Biocides a commission of 7 1/2% on Textile

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 4
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

Biocides' net sales of Reputex. Avecia retained the right to refuse any order "in its sole discretion" and "at any time and for any reason." (Ex. Da-1, Sales Representative Agreement ¶ ¶ 5, 6.) Avecia retained the right to contact any customers in Textile Biocides' territory directly. (Ex. Da-1, Sales Representative Agreement ¶ 6.) The initial term of the agreement was three years. (Ex. Da-1, Sales Representative Agreement ¶ 13(a).) It was terminable by either party on 30 days written notice and renewable by mutual agreement for one year periods. (Ex. Da-1, Sales Representative Agreement ¶ 13(a) and (b).)

Under the Exclusive Supply Agreement, Saniclean agreed to buy and Avecia agreed to sell 100% of Saniclean's requirements of Reputex, at $10.00 per pound, in the United States, Mexico and Canada, which the agreement called the marketing area. (Ex. Da-2, Exclusive Supply Agreement ¶ ¶ 1.1, 5.1 and ex. C.) Avecia would sell Reputex to Saniclean on an exclusive basis for "use on durable and disposable antimicrobial wipes and towels (but specifically excluding the use of the Products to preserve liquids) for industrial use in hotels, restaurants, hospitals, other similar commercial establishments and consumer uses ...," which the agreement called the field of use. (Ex. Da-2, Exclusive Supply Agreement ¶ 1.2.) The exclusivity provision, however, was contingent on Saniclean's purchasing 50,000 pounds of Reputex in the first contract year, [FN4] 100,000 pounds in the second contract year and 125,000 pounds in the third contract year. (Ex. Da-2, Exclusive Supply Agreement ¶ 4.1 and ex. B.) If Saniclean failed to meet a minimum purchase requirement, Avecia had the option, within 30 days of the end of the contract year, to change the exclusive relationship with Saniclean to a non-exclusive relationship. (Ex. Da-2, Exclusive Supply Agreement ¶ 4.1.) The initial term of the agreement ended December 31, 2000, and it was renewable for additional periods of one year each by mutual agreement of the parties. (Ex. Da-2, Exclusive Supply Agreement ¶ 3.1.)

> FN4. The first contract year was August 20, 1997 to December 31, 1998. The second and third contract years coincided, respectively, with the 1999 and 2000 calendar years.

Both agreements contained integration clauses. (Ex. Da-1, Sales Representative Agreement ¶ 16; Ex. Da-2, Exclusive Supply Agreement ¶ 6.12.)

By August 22, 1997, Textile Biocides had begun contacting potential customers. (Ex. P-17, Textile Biocides' notices to Avecia of customer contacts.)

In an August 25, 1997 letter, Kudner informed Krupnick that Avecia was "still in the process of adding Reputex to our sales range and sorting out the EPA claims our customers can make." (Ex. P-14, Kudner letter to Krupnick 8/25/97.) Krupnick and Schapiro claim that this letter alerted them to problems with the Reputex registration. (Krupnick aff. ¶ 22; Schapiro aff. ¶ 34.) They called Kudner, who they claim was embarrassed about Avecia's failure to obtain the proper registrations and who assured them that Avecia would obtain the registrations as soon as possible. (Krupnick aff. ¶ ¶ 22, 23; Schapiro aff. ¶ ¶ 34, 35.) Based on Kudner's assurances, Krupnick and Schapiro agreed to continue their relationship with Avecia, and the plaintiffs continued to contact potential customers. (Ex. P-17, Textile Biocides' notices to Avecia of customer contacts; Krupnick aff. ¶ ¶ 24, 25; Schapiro aff. ¶ ¶ 36, 37; Ex. P-18, Kenline E-mail to Rajan et al, 2/5/98.) Krupnick and Schapiro claim that, until the end of 1999, Kudner continued to assure them that Avecia would obtain the Reputex public health claim registration. (Krupnick aff. ¶ 27; Schapiro aff. ¶ 39.)

*5 On August 28, 1997, Avecia applied to the EPA to use Reputex as an alternate brand name for Vantocil under Registration No. 10182-128. (Ex. P-15, Burt letter to EPA, 8/28/97.) On September 24, 1997, the EPA approved this application. (Ex. P-16, EPA letter to Burt, 9/24/97.) [FN5]

> FN5. The plaintiffs allege that Avecia misrepresented that it had already registered PHMB under the name Reputex when they signed the agreements on August 20, 1997. Any fraud claim based on this alleged misrepresentation must fail, because there is no evidence that Avecia affirmatively misrepresented that it had registered the Reputex name or that it made such a misrepresentation intending to mislead the plaintiffs. See Lord v. Souder, 748 A.2d 393, 402 (Del.2000) (stating that the elements of fraud under Delaware law include "a false representation" and "an intent to induce the plaintiff to act or refrain from acting"). Furthermore, Avecia cured the defect by registering the Reputex name, and the plaintiffs have not alleged any harm arising from the one-month delay in obtaining this registration. See Restatement (Second) of Contracts § 165 (Cure By Change of

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

Circumstances).

On February 26, 1998, the parties signed a sublicensing agreement. The sublicensing agreement allowed Saniclean to "permit other parties in the Marketing Area to use [Reputex] within Saniclean's exclusive Field of Use." (Ex. Da-23, Sublicensing Agreement, ¶ 2). A sublicensee would "be treated as a customer of TEXTILE BIOCIDES under the Sales Representative Agreement, and all sales of [Reputex would] be governed by the terms of the Sales Representative Agreement." (Ex. Da-23, Sublicensing Agreement ¶ 4.)

Sometime in late 1997 or early 1998, Mark Kenline replaced Kudner as the plaintiffs' contact at Avecia. (Krupnick aff. ¶ 28; Schapiro aff. ¶ 40.) The plaintiffs claim that Kenline was hostile to them and unwilling to assist them in their marketing efforts. In the following years, the parties' relationship broke down. The plaintiffs claim that Avecia tried to cut the plaintiffs out of deals by contacting their customers directly.

III. ACCORDING TO AVECIA, THE PLAINTIFFS SIMPLY FAILED TO MAKE A REASONABLE EFFORT TO SELL AND BUY REPUTEX UNDER THE AGREEMENTS.

Avecia denies having promised to obtain public health claim registrations for Reputex or to register Reputex in Mexico and Canada. It denies having said that it had such registrations. According to Avecia, Reputex was marketable in the United States without the public health claim registrations, but the plaintiffs failed to make an effort to market it. To prove this, Avecia points to the evidence of the plaintiffs' marketing activities. Textile Biocides expenses in 1998, the first year of the sales representative agreement, were only $1226. (Dc-30, Textile Biocides 1998 Federal Income Tax Return.) Saniclean seems to have had no expenses that year. (Ex. Dc-50, Saniclean 1998 Federal Income Tax Return.) Saniclean never had a bank account. (Ex. Dc-5, Schapiro dep ., 6/8/00, at 285.) Krupnick and Shapiro were the plaintiffs' only employees; and over the parties' three year relationship, they visited only seven customers, though they seem to have contacted many more by phone. (Ex. Dc-5, Schapiro dep., 6/8/00, at 308, *and* 8/16/00, at 229; Ex. Dc-29, Krupnick dep., 8/18/00, at 28- 29 .) Textile Biocides' sales of Reputex totaled only $30,000 over the entire term of the sales representative agreement. (Ex. Dc-21, summary of Reputex sales.) Saniclean never met its minimum purchase requirements and never

granted a sublicense to a third party. (Ex. Dc-5, Schapiro dep., 6/8/00, at 297-98.)  [FN6] Avecia alleges that the plaintiffs deceived it into entering the agreement by misrepresenting their financial status and their ability to carry out their end of the deal. Avecia also alleges that the plaintiffs made untrue promotional claims about Reputex and the plaintiffs' relationship with Avecia.

> FN6. Avecia alleges in its brief that Saniclean never bought any Reputex, but Avecia does not cite any evidence to support the allegation.

*SUMMARY OF THE PARTIES' CLAIMS AND THE COURT'S HOLDINGS*
*6 Both plaintiffs claim fraud and negligent misrepresentation based on Avecia's misrepresentation of the status of the Reputex registrations. The court denies Avecia's motion for summary judgment on these claims.

Textile Biocides claims fraud based on Avecia's promise to pay commissions. The court grants Avecia's motion for summary judgment on this claim.

Both plaintiffs claim breach of contract and breach of the implied duty of good faith and fair dealing based on Avecia's failure to obtain the Reputex registrations. The court denies Avecia's motion for summary judgment on this claim.

Both plaintiffs claim tortious interference and breach of the implied duty of good faith and fair dealing based on Avecia's contacting potential Reputex customers. The court grants Avecia's motion for summary judgment on these claims.

Avecia claims breach of contract based on the plaintiffs' promotional activities for Reputex and their failure to buy or sell Reputex. Avecia claims fraud based on the plaintiffs' statements about their requirements for Reputex, their financial status and their marketing abilities. The court grants in part the plaintiffs' motion for summary judgment on these claims.

*DISCUSSION*
I. CHOICE OF LAW

A. Delaware Substantive Law Governs Both Sides' Contract Claims.

The Sales Representative Agreement states that Delaware law governs the "validity, interpretation,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 6
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

construction and performance of this Agreement."
(Ex. Da-1, Sales Representative Agreement ¶ 17.)
The Exclusive Supply Agreement states that "[t]he
Agreement and performance hereunder shall be
governed and construed and interpreted according to"
Delaware law. (Ex. Da-2, Exclusive Supply
Agreement ¶ 6.11.) A choice-of-law provision in a
contract is valid if the transaction bears a reasonable
relation to the jurisdiction whose law is chosen.
*Churchill Corp. v. Third Century, Inc.*, 396 Pa.Super.
314, 578 A.2d 532, 537 (1990); *Restatement
(Second) of Conflict of Laws § 187, cited in
Schifano v. Schifano,* 324 Pa.Super. 281, 471 A.2d
839, 843 & n. 5 (1984).* The transactions at issue in
this suit bear a reasonable relation to Delaware.
Avecia is a Delaware corporation and its principal
place of business is in Delaware. Saniclean is a
Delaware corporation. The parties executed the
contracts in Delaware and Avecia's performance
under the contract took place though its Delaware
offices. Therefore, Delaware law applies to the
plaintiffs' contract claims and Avecia's contract
counterclaims.

  B. The Parties Have Agreed in their Briefs that
Delaware Law Governs the Plaintiffs' Fraud,
Negligent   Misrepresentation   and   Tortious
Interference Claims.

  There seems to be no published decision by a
Pennsylvania state appellate court addressing whether
a contractual choice of law provision extends to
misrepresentation and tortious interference claims
arising from the contracting parties' relationship. One
Pennsylvania federal court applying Pennsylvania
choice of law rules has held that a choice of law
provision does not govern tort claims "unless the fair
import of the provision embraces all aspects of the
legal relationship." *Jiffy Lube Int'l. Inc. v. Jiffy Lube
of Pa., Inc.*, 848 F.Supp. 569, 576 (E.D.Pa.1994). *See
also Stone St. Servs., Inc. v. Daniels,* 2000 WL
1909373, at *4 n. 7 (E.D.Pa.); *Coram Healthcare
Corp. v. Aetna U.S. Healthcare Inc.*, 94 F.Supp.2d
589, 593 (E.D.Pa.1999). [FN7]* Under the
Restatement, however, there seems to be a
presumption that a contractual choice of law extends
to misrepresentation claims or other claims affecting
the validity of the contract. *Restatement (Second) of
Conflict of Laws § § 200, 201. See also Mazzioni
Farms, Inc. v. E.I. Du Pont de Nemours & Co.,* 761
So.2d 306, 307 n. 2, 313 (Fla.2000). [FN8]* The
Restatement does not directly address whether a
contractual choice of law applies to a tortious
interference claim.

FN7. In *Stone Street Services*, the court
concluded that a contractual choice of
Pennsylvania law encompassed the
plaintiff's consumer fraud claims where the
agreement stated that the " 'obligations of
the parties ... shall be governed, interpreted,
construed, and enforced' in accordance with
Pennsylvania law." *Stone St. Servs.*, 2000
WL 1909373, at *4 n. 7 (refusing however
to apply Pennsylvania law because doing so
would violate the strong public policy of
Kansas). In *Coram Healthcare,* the court
concluded that a contractual choice of
Delaware law did not encompass the
plaintiff's common law fraud claims where
the agreement stated that the " 'agreement
shall be governed by the laws of the State of
Delaware" ' and "did not refer to the matter
of contract validity." *Coram Healthcare
Corp.,* 94 F.Supp.2d at 593. Under *Stone
Street Services* and *Coram Healthcare,*
Delaware law would apply to a Textile
Biocides' fraud claims because the choice of
law provision in the sales representative
agreement mentions contract validity.
Pennsylvania law would apply to Saniclean's
fraud claims because the choice of law
provision in the exclusive supply agreement
does not mention contract validity.

FN8. In a decision contrary to *Coram
Healthcare,* the court in *Mazzioni Farms*
applied a contractual choice of law to a
fraudulent inducement claim even though
the provision, if read strictly, seemed to
encompass only contract claims. *Mazzioni
Farms,* 761 So.2d at 306 n. 2, 313 (applying
Delaware law to a fraudulent inducement
claim where the contract stated that the
contract "shall be governed and construed in
accordance with the laws of the State of
Delaware"). Under the Restatement and
*Mazzioni Farms,* Delaware law would apply
to Textile Biocides' and Saniclean's fraud
claims.

  *7 The court need not resolve this issue, however,
because the parties already have agreed in their briefs
that Delaware law applies to all of the plaintiffs'
claims. [FN9] The court deems this agreement by
both sides as a stipulation that Delaware law applies
to the plaintiffs' tort claims or an admission that the
parties intended that the choice of law provisions
extend to tort claims. *Tyler v. King,* 344 Pa.Super. 78,
496 A.2d 16, 21 (1985) ( "[P]arties may bind

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

themselves, even by a statement made in court, on matters relating to individual rights and obligations, so long as their stipulations do not affect the court's jurisdiction or due order of business."). [FN10]

FN9. In an apparent attempt to hedge their bets in case they do not like the outcome of this motion under Delaware law, the plaintiffs agreed that Delaware law applies "[f]or purposes of this response to Avecia's motion" only. But the plaintiffs cited no Pennsylvania cases on any issue of substantive law case in their responses to Avecia's motion, and they did not show how the outcome of any issue would differ under Pennsylvania law.

FN10. There seems to be no published decision by a Pennsylvania state appellate court addressing whether a party may stipulate to choice of law. Courts in other jurisdictions have enforced parties' explicit and implicit choice of law stipulations. *See e.g., Tehran-Berkeley Civil & Envil. Eng'rs v. Tippetts-AbbettMcCarthy-Stratton, 888 F.2d 239, 242 (2d Cir.1989)* (applying New York law because parties' briefs relied on New York law and "implied consent to use a forum's law is sufficient to establish choice of law"); *City of Clinton, Ill. v. Moffit, 812 F.2d 341, 342 (7th Cir.1987)* ("Litigants can, by stipulation, formal or informal, agree on the substantive law to be applied to their case, within broad limits not exceeded here."); *Cates v. Morgan Portable Bldg. Co., 780 F.2d 683, 687 (7th Cir.1985)* (holding that parties implicitly stipulated to choice of law); *Mellon Bank v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1005 (3d Cir.1980)* (holding that party waived an objection to choice of law); *Uniroyal, Inc. v. Home Ins. Co., 707 F.Supp. 1368, 1372 (E.D.N.Y.1988)* (accepting parties' stipulation that New York law applied to their insurance contracts where there was no strong public policy against applying New York law); *National Can Co. v. Vinylex Corp., 687 F.Supp. 375, 376-77 (N.D.Ill.1988)* (deeming parties to have stipulated that Illinois law governed their dispute where both sides maintained in their briefs that Illinois law governed); *and Ackerman v. Foster, 974 P.2d 1, 9 (Col.App.1998)* (accepting parties' stipulation that California law applied to

insurance policy).

Courts in other jurisdictions have enforced choice of law stipulations on issues of tort law. *Twohy v. First Nat'l Bank of Chicago, 758 F.2d 1185, 1191 (7th Cir.1985)* (holding that parties may stipulate which state's substantive law governs their contract *and tort* claims if the chosen state "bears a reasonable relationship to the alleged transaction and injury in question" and the stipulation "does not violate public policy nor call into question the court's subject matter jurisdiction."); *Von Hundertmark v. Boston Prof'l Hockey Ass'n, 1996 WL 118538, at *4 (E.D.N.Y.1996)* ("[T]here is no express prohibition against parties stipulating as to choice of law in tort actions."); *Lloyd v. Loeffler, 694 F.2d 489, 495 (7th Cir.1982)* ("[R]easonable stipulations of choice of law are honored in contract cases, and we do not see any reason why the same principle should not apply in tort cases." (citation omitted)).

These decisions are persuasive. Allowing parties to agree to choice of law after litigation has begun, as long as the state whose law is chosen bears a reasonable relationship to the transaction and the chosen law does not affect the court's subject matter jurisdiction or violate public policy, is the logical rule for several reasons: (1) Pennsylvania allows parties to contractually agree to choice of law; (2) Pennsylvania allows parties to stipulate on matters affecting the parties' rights and obligations after litigation has begun, and (3) stipulations promote judicial economy. *See Conver v. Borough of Norristown, 58 Pa.Commw. 629, 428 A .2d 749, 751 (1981)* ("[P]arties may stipulate the law of the case and be bound by their act in all matters which affect them so long as the stipulation does not affect the jurisdiction and prerogatives of the court."); *Churchill Corp. v. Third Century, Inc., 396 Pa .Super. 314, 578 A.2d 532, 537 (1990)* (stating that a contractual choice of law is valid if the transaction bears a reasonable relation to the forum whose law is chosen). Though some federal courts have refused to enforce choice of law stipulations, these courts seemed to have accepted a minority view that is inconsistent with Pennsylvania's policy of honoring stipulations. *Consolidated Water Power & Paper Co. v. Spartan Aircraft Co.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                Page 8
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

185 F.2d 947, 949 (3d Cir.1950) ("While the stipulations of parties in the contract as to choice of law governing a contract are sometimes given effect by courts, no stipulation made after litigation has begun as to the law which is to determine it has ever been upheld so far as we know. Nor do we think it likely to be.") (apparently applying Delaware conflict of law rules), *followed in System Operations, Inc. v. Scientific Games Dev. Corp., 555 F.2d 1131, 1137 n. 4 (3d Cir.1977); Ezell v. Hayes Oilfield Const. Co., 693 F.2d 489, 492 n. 2 (5th Cir.1982)* (accord). Because Delaware has a reasonable relationship with the transactions, and because applying Delaware law will not violate a public policy of Pennsylvania or affect the court's subject matter jurisdiction, the stipulation is enforceable.

C. The Court Need Not Decide Which State's Law Applies to Avecia's Fraud Counterclaim Because The Outcome of the Plaintiffs' Motion is the Same under Both States' Laws.

The parties have not agreed which state's law governs Avecia's fraud counterclaim. Avecia argues that Delaware law applies to its fraud counterclaim. The plaintiffs argue that Pennsylvania law applies. The court need not resolve this issue because the outcome of the plaintiffs' motion is the same under both states' laws. *Ratti v. Wheeling Pittsburgh Steel Corp., 758 A.2d 695, 702 (Pa.Super.Ct.2000)* ("In Pennsylvania, choice of law analysis first entails a determination of whether the laws of the competing states actually differ. If not, no further analysis is necessary."), *quoted and followed in Keystone Aerial Surveys, Inc. v. Pennsylvania Property & Cas. Ins. Guar. Ass'n, 2001 WL 460906, at *8-9 (Pa.Super.Ct.)*.
D. Pennsylvania's Evidentiary Sufficiency Standards Apply to All Claims.

Under Pennsylvania conflict of law rules, a Pennsylvania court applies Pennsylvania's evidentiary sufficiency standard to a claim regardless of which state's substantive law applies to the claim. *Foley v. Pittsburgh-Des Moines Co., 363 Pa. 1, 68 A.2d 517, 521 (1949)* ("The law of the forum also controls all questions as to burden of proof and whether there is sufficient evidence of negligence and proximate causation to entitle the plaintiff to have the case submitted to the jury."); *Sudol v. Gorga, 346 Pa. 463, 31 A.2d 119, 120* ("The law of the forum

determines whether there is sufficient evidence on an issue of fact to warrant its submission to a jury."); *Crawford v. Manhattan Life Ins. Co. of N.Y., 208 Pa.Super. 150, 152 n. 2 (1966)* ("The questions of presumption and burden of proof in this regard are, of course, procedural and to be determined by the law of the forum."); Restatement (Second) of Conflict of Laws § 135 ("The local law of the forum determines whether a party has introduced sufficient evidence to warrant a finding in his favor on an issue of fact...."). *See also id.,* cmt. a (listing exceptions not applicable here). *Compare with In re IBP, Inc. Shareholders Litig., 2001 WL 675330, at *31 (Del.Ch.)* (deciding, under Delaware conflict of law rules, that evidentiary sufficiency was an issue of substantive law governed by the law of the state governing the underlying claim). Therefore, both sides must prove their fraud claims by clear and convincing evidence. *Kit v. Mitchell, 771 A.2d 814, 819 (Pa.Super.Ct.2001)* (stating that, in Pennsylvania, a party must prove fraud by clear and convincing evidence). *Compare with In re IBP, Inc. Shareholders Litig., 2001 WL 675330, at *31* (stating that, in Delaware, a party need only prove fraud by a preponderance of the evidence).

II. STANDARD FOR SUMMARY JUDGMENT

*8 Though Delaware substantive law governs some or all of the plaintiffs' claims, the court must apply Pennsylvania procedural rules. *Commonwealth v. Dennis, 421 Pa.Super. 600, 618 A.2d 972, 980 (1992)* ("It is a fundamental [principle] of the conflicts of laws that a court employs its own state's procedural rules."); *Drapeau v. Joy Technologies, Inc., 447 Pa.Super. 560, 670 A.2d 165, 168 (1996)* (Beck J., concurring) ("This court, as the forum court, applies its own procedural rules even when a contractual choice of law clause provides for the application of another state's substantive laws."). Therefore, the Pennsylvania standard for summary judgment applies to the motion. *Smith v. Commonwealth Nat'l Bank, 384 Pa.Super. 65, 557 A.2d 775, 771 (1989)* (applying Pennsylvania standard for summary judgment where New York substantive law governed the plaintiff's claims).

Under the Pennsylvania Rules of Civil Procedure, the court must grant summary judgment if (1) there is no genuine issue of any a material fact as to a necessary element of the cause of action or defense that could be established by additional discovery or expert report, or (2) after the completion of discovery, a party bearing the burden of proof on an issue has failed to produce evidence of facts essential

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 9
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

to the cause of action or defense such that a jury could return a verdict in his favor. Pa.R.C.P. 1035.2. The moving party has the burden to prove that there is no genuine issue of material fact. *Hagans v. Constitution State Serv. Co., 455 Pa.Super. 231, 687 A.2d 1145, 1156 (1997).* Once the moving party meets this burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* The trial court's function is to determine whether there are controverted issues of fact, not whether there is sufficient evidence to prove the particular facts. *Id.* at 1157.

III. THE COURT GRANTS IN PART AVECIA'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIMS.

A. The Court Denies Summary Judgment on the Plaintiff's Fraud Claims Arising From Kudner's Alleged Misrepresentation of the Status of the Reputex Registration (Counts I, II, VII).

The plaintiffs claim that Avecia committed fraud on or about August 20, 1997 when Kudner said that Avecia had registered Reputex in the United States for public health claims and that Avecia had registered Reputex in Mexico and Canada. The plaintiffs have produced sufficient evidence to allow fraud claims based on this statement to go to a jury, and the court denies Avecia's motion for summary judgment on these claims.

Under Delaware law, the elements of fraud are
1) a false representation, usually one of fact, made by the defendant;
2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
3) an intent to induce the plaintiff to act or to refrain from acting;
4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and
*9 5) damage to the plaintiff as a result of such reliance.

*Lord v. Souder, 748 A.2d 393, 402 (Del.2000)* (quotation omitted). [FN11]

> FN11. The standard for intentional misrepresentation under Pennsylvania law has the same elements:
> (1) A representation; (2) which is material to the transaction at hand;
> (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

(4) with the intent of misleading another into relying on it;
(5) justifiable reliance on the misrepresentation; and,
(6) the resulting injury was proximately caused by the reliance.
*Bortz v. Noon, 556 Pa. 489, 729 A.2d 555, 560 (1999)* (quotation omitted).

Krupnick and Schapiro swear in affidavits that Kudner made a representation of fact: that Avecia had these registrations. (Krupnick aff. ¶ 18; Schapiro aff. ¶ 30.) There is evidence that the representation was false: Avecia admits that Reputex has never been registered for public health claims in the United States and that Reputex has never been registered in Mexico or Canada. (Ex. P-39, Kenline dep., 7/25/00, at 443.) A jury could conclude that Kudner--the Commercial Development Manager for Reputex-- knew that Avecia did not have these registrations for Reputex or that he was recklessly indifferent to that fact. A jury could infer that Kudner made the statement with the intent to induce the plaintiffs to sign the agreements and that the plaintiffs relied on the statement: Krupnick's and Schapiro's affidavits and testimony indicate that their signing the agreement was contingent on Avecia's obtaining the registrations. (Ex. P-6, Krupnick dep., 7/14/00, at 87; Krupnick aff. ¶ ¶ 17, 18; Schapiro aff. ¶ 29, 30.) [FN12] There is evidence that the plaintiffs' reliance on Kudner's statements was justified: Kenline testified that it was Avecia's responsibility to obtain the Reputex registrations and that Avecia had more regulatory experience than the plaintiffs. (Ex. P-53, Kenline dep., 7/26/00, at 696); *Wilmington Trust Co. v. Aetna Cas. & Surety Co., 690 A.2d 914, 916-17 (Del.1996)* (holding that whether a plaintiff's reliance on defendant's misrepresentations was justified is a question of fact precluding summary judgment). [FN13] Finally, there is evidence of damages: the plaintiffs bound themselves to contracts that were arguably less valuable to them than they had bargained for. [FN14] (Ex. P-46, Expert Report on Economic Damages.)

> FN12. On the other hand, correspondence from Schapiro to Kudner indicated that Schapiro was ready to sign an agreement without Avecia's having obtained the public health claim registrations. (Ex. Db-12, Schapiro fax to Kudner, 5/5/97; Ex. Db-13, Schapiro fax to Kudner, 7/15/91.)

> FN13. In Pennsylvania, too, whether reliance is justified is generally a question of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 10
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

fact precluding summary judgment. *Silverman v. Bell Sav. & Loan Ass'n, 367 Pa.Super. 464, 533 A.2d 110, 115 (1987)*; *Rempel v. Nationwide Life Ins. Co., 323 A.2d 193, 197 (Pa.Super.Ct.1974), aff'd, 370 A.2d 366 (Pa.1977)*.

FN14. Several days after August 20, 1997, the plaintiffs learned that Avecia did not have the registrations. In spite of there having allegedly learned that Kudner lied to them, the plaintiffs continued to perform for several years. It is questionable whether any reliance on Avecia's misrepresentation after plaintiffs learned of its falsity was justifiable. See W.W. Allen, *Proceeding under executory contract after discovering fraud as waiver of right to recover damages for the fraud, 13 A.L.R.2d 807, 868 (1950) and Restatement (Second) of Torts, § 541* ("The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him), *quoted in Ward v. Hildebrand, 1996 WL 422336, at *4 (Del.Ch.) and Silverman v. Bell Sav. & L. Ass'n, 367 Pa.Super. 464, 533 A.2d 110, 115 (1987)*. The plaintiffs might argue, however, that Kudner's post-August 20 assurances that Avecia would obtain the registrations tricked them into continuing performance. See *Fox's Foods v. Kmart Corp., 870 F.Supp. 599, 609 (M.D.Pa.1994)*. Because the parties have not clearly addressed these issues, neither will the court.

Avecia argues that summary judgment is appropriate because the plaintiffs knew when they signed the agreements that they could not make public health claims for Reputex. *Restatement (Second) of Torts § 541* ("[T]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or if its falsity is obvious to him."), *quoted in Ward v. Hildebrand, 1996 WL 422336, at *4 (Del.Ch.)*, FN15] This argument must fail, because there is an issue of fact as to what plaintiffs knew when they signed the agreements. Though Schapiro seems to have known as late as July 21, 1997 that Avecia had no public health claim registration for Reputex, Krupnick and Schapiro aver in their affidavits that Avecia told them it was applying for the public health claim registration, and that, sometime on or about August 20, 1997, Avecia told them that it had obtained the registration. [FN16]

FN15. See also *Silverman v. Bell Sav. & Loan Ass'n, 367 Pa.Super. 464, 533 A.2d 110, 115 (1987), quoting Restatement (Second) of Torts § 541*.

FN16. The plaintiffs' evidence as to this point is less than compelling. The inconsistent deposition testimony of Krupnick seems to undermine their affidavits and indicate that the plaintiffs knew the true status of the Reputex registration when they signed the agreements. (Ex. Db-1, Krupnick dep., 6/5/00, at 49, 277-279). But the court cannot resolve this credibility issue on summary judgment.

Similarly, Avecia argues that summary judgment is appropriate because the plaintiffs knew before they signed the agreements that Reputex was not registered in Mexico. This argument must also fail. Though Avecia informed Schapiro on June 9, 1999 that Reputex was not registered in Mexico, Krupnick and Schapiro aver in their affidavits that Avecia told them it was applying for the Mexico registration, and that, on or about August 20, 1997, Avecia told them that it had obtained registration. [FN17]

FN17. The plaintiffs' evidence on this point is, again, not compelling. In deposition testimony that contradicts his affidavit, Krupnick clearly said that he only assumed from the language of the agreements that Avecia would register Reputex in Mexico and Canada. (Ex. Db-1, Krupnick dep, 6/5/00, at 95, 277-78).

*10 Avecia argues that the plaintiffs have produced no evidence of fraudulent intent. The court disagrees. Reputex has never been registered in the United States for public health claims and has never been registered in Mexico or Canada. There is evidence, albeit contradictory evidence, that the execution of the agreement was contingent on Avecia's obtaining these registrations. Thus a reasonable jury could infer that Avecia made the alleged misrepresentations with the intent of inducing the plaintiffs to sign the contracts. *Continental Oil Co. v. Pauley Petroleum, Inc., 251 A.2d 824, 826 (Del.1969)* ("When an ultimate fact to be determined is one of motive, intention or other subjective matter, summary judgment is ordinarily inappropriate."); *Brandywine Hills Community Ass'n v. T. Bruce Wilmoth Const. Co., 1995 WL 767336, at *8 (Del.Ch.)* ("Summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl))
Page 11

judgment is inappropriate where the inference or ultimate fact to be established concerns intent or other subjective considerations."). [FN18]

FN18. *See also Rohm and Haas Co. v. Continental Cas. Co., 732 A.2d 1236, 1253 (Pa.Super.Ct.1999)* (recognizing that a jury is permitted to infer an intent to deceive from circumstantial evidence), *appeal granted, 562 Pa. 673, 753 A.2d 820 (2000)*.

Avecia argues that the plaintiffs did not rely on Avecia's statements because they relied, instead, on attorney Wright's advice as to the scope of allowable claims under the EPA registration for Reputex. *Lord, 748 A.2d at 402* (stating that reliance is an element of fraud); *Consolidated Fisheries Co. v. Consolidated Solubles Co., 112 A.2d 30, 37 (Del.1955)* ("[E]ven though a representation made be false, that fact is immaterial if the person to whom it is made does not rely upon it but instead acts on his own knowledge."). The evidence clearly shows that Wright advised the plaintiffs about the Reputex registration *before* Kudner allegedly misrepresented that Avecia had obtained the public health claim registration for Avecia. It is not clear that the plaintiffs sought any advise from Wright *after* Kudner made the alleged misrepresentation. Wright sent a fax to Schapiro on August 20 again discussing the non-availability of health claims, (Ex. Da-16, Wright letter to Schapiro, 8/20/97), but it is not clear whether Wright knew of Kudner's alleged misrepresentations at that time.

Therefore, the court denies Avecia's motion for summary judgment on Saniclean's fraud claims and the Reputex registration aspect of Textile Biocides' fraud claims. In reaching this conclusion, the court realizes that the plaintiffs' evidence might not meet the clear and convincing evidentiary standard that the court will apply at trial. But the "quantum of evidentiary facts which must be adduced to preclude summary judgment is not the same as required ... at trial...." *McFadden v. American Oil Co., 215 Pa.Super. 44, 257 A.2d 283, 289 (1969)* (en banc ) (stating that evidence presented by non-moving party need not be clear and convincing to survive motion for summary judgment on fraud claim, although that is the standard to be applied at trial), *quoted in Elder v. Nationwide Ins. Co., 410 Pa.Super. 290, 599 A.2d 996, 1000 (1991)*. *See also Hagans v. Constitution State Serv. Co., 455 Pa.Super. 231, 687 A.2d 1145, 1157 (1997)* ("On a motion for summary judgment it is the function of the trial court to determine whether there are controverted issues of fact, not whether there is sufficient evidence to prove the particular

facts."); *Smith v. Commonwealth Nat'l Bank, 384 Pa.Super. 65, 557 A.2d 775, 771 (1989)* (applying Pennsylvania summary judgment rules where New York substantive law governed the plaintiff's claims).

*11 B. The Court Denies Avecia's Motion for Summary Judgment on the Claim of Negligent Misrepresentation (Count VIII).

Alternatively, the plaintiffs allege that Avecia committed negligent misrepresentation on or about August 20, 1997 when Kudner made his alleged statement about the Reputex registrations. There is sufficient evidence of this claim to go to a jury. Under Delaware law, the elements of negligent misrepresentation are
   (1) a pecuniary duty to provide accurate information, (2) the supplying of false information, (3) failure to exercise reasonable care in obtaining or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon false information.
*Darnell v. Myers, 1998 WL 294012, at *5 (Del.Ch.), quoted in Oliver v. Boston Univ., 2000 WL 1038197, at *11 (Del.Ch.)*. [FN19] Delaware courts have held that a pecuniary duty arises from a contract or "when the parties are in the midst of a 'business relationship' from which they expect to derive 'pecuniary' benefits." *Outdoor Techs., Inc. v. Allfirst Fin., Inc., 2001 WL 541472, at *5 (Del.Super.Ct.)*, citing *Restatement (Second) of Torts § 552(1)*; *Darnell v. Myers, 1998 WL 294012, at *5 (Del.Ch.)* (seller of house assumes pecuniary duty to provide accurate information to buyer about physical condition of house). Because Avecia and the plaintiffs were in the midst of a business relationship from which they expected to derive pecuniary benefits, Avecia had a duty to provide accurate information about the Reputex registrations. *Outdoor Technologies, 2001 WL 541472, at *5*. There is evidence that Avecia supplied false information about the Reputex registration. (Krupnick aff. ¶ 18; Schapiro aff. ¶ 30.) A jury could conclude that Avecia--the party in the best position to know the status of the registrations of its own products--failed to exercise reasonable care in obtaining information about the Reputex registration and communicating it to the plaintiffs. And a jury could conclude that the plaintiff suffered pecuniary loss by justifiably relying on Kudner's statements. (Ex. P-46, Expert Report on Economic Damages.)

FN19. Even were Pennsylvania law to apply to the plaintiffs' negligent misrepresentation claim, that claim would survive summary

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

Page 12

judgment. The elements of negligent misrepresentation under Pennsylvania law are
(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.... Moreover, like any action in negligence, there must be an existence of a duty owed by one party to another.
*Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 561 (1999)(quotation omitted). This standard is substantially the same as the Delaware standard, though it is not clear whether a plaintiff in Pennsylvania is limited to pecuniary damages. *Compare Restatement (Second) of Torts § 552* (providing that a plaintiff may recover damages for pecuniary loss on a claim for negligent misrepresentation), *cited generally in Bortz, 729 A.2d at 561, with Little v. York County Earned Income Tax Bureau, 333 Pa.Super. 8, 481 A.2d 1194, 1199-1201 (1984)* (rejecting Restatement's limitation of damages to pecuniary harm and allowing recovery of emotional damages for negligent misrepresentation).

B. The Court Grants Summary Judgment on Textile Biocides' Claim that Avecia Fraudulently Induced Textile Biocides to Enter the Sales Representative Agreement by Promising to Pay Sales Commissions under the Agreement (Counts I and VII).

The plaintiffs allege that Avecia committed fraud on August 20, 1997 by promising to pay Textile Biocides sales commissions under the agreement with the intent not to pay those commissions. Avecia argues that summary judgment is appropriate on this claim because the plaintiffs have failed to produce any evidence of damages or intent. The court agrees and grants summary judgment on this aspect of Textile Biocides' fraud claim.

A broken promise to perform a future act, alone, is not the basis for a fraud claim. *Hanna Sys., Inc. v. Capano Group, L.P., 1985 WL 21119, at *2 (Del.Ch.); Murphy v. T.B. O'Toole, Inc., 87 A.2d 637, 638 (Del.Super.Ct.1952).* [FN20] But if the promisor, at the time of making the promise, intended not to perform and made the promise only to secure the promisee's performance, the promisee may state a

claim for promissory fraud. *Hanna Sys., 1985 WL 21119, at *2; Murphy v. T.B. O'Toole, 87 A.2d at 638*; John E. Murray, Jr., *Contracts* § 85(A) n. 44 (3d ed.1990). [FN21] To succeed on this claim, a plaintiff must produce evidence that, when the defendant made the promise, the defendant intended not to perform it:

> FN20. Pennsylvania law is the same on this point. *Nissenbaum v. Farley, 380 Pa. 257, 110 A.2d 230, 233 (1955)*.

> FN21. Promissory fraud is actionable under Pennsylvania law. *Brentwater Homes, Inc. v. Weibley, 471 Pa. 17, 369 A.2d 1172, 1175 (1977)* ("A statement of present intention which is false when uttered may constitute a fraudulent misrepresentation of a fact."); *Tonkin v. Tonkin, 172 Pa.Super. 552, 94 A.2d 192, 196 (1953)*.

*12 Ordinarily, in the absence of additional circumstances, it will be found that a mere failure to perform is as consistent with an honest intent as with a dishonest one. When that is true, a prima facie case is not made out. Where the circumstances relied upon as indicating fraud are of a doubtful nature, or are susceptible of an innocent interpretation, or are calculated to raise but a bare suspicion of fraud in regard to the person charged therewith, they will not amount to sufficient evidence to establish the fact.
*Murphy v. T.B. O'Toole, 87 A.2d at 638* (footnote and quotation omitted) (granting motion of summary judgment against plaintiff on promissory fraud claim where plaintiffs had produced no evidence that, when the defendants made the promise, they intended not to perform). *See also Murphy v. Godwin, 303 A.2d 668, 672-73 (Del.Super.Ct.1973)* (same). *Compare with Hanna Sys., 1985 WL 21119, at *2* (denying defendant's motion for summary judgment on promissory fraud claim because evidence showing that defendant's conduct was "lacking in candor and fairness" raised issue that defendant intended to deceive). [FN22]

> FN22. Pennsylvania follows the same rule: An unperformed promise does not give rise to a presumption that the promisor intended not to perform when the promise was made, and a fraudulent intention will not be inferred merely from its nonperformance. The promisor may have had an honest intention to carry out his promise when he made it. He may have been prevented from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 13
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

carrying it out by unavoidable circumstances, or he may have found, after mature investigation, this his promise was unfortunate. These circumstances would not relate back to the time the promise was made and give rise to an inference of deceit at that time. *Fidurski v. Hammill,* 328 Pa. 1, 195 A. 3, 4 (1937) (citations omitted), *quoted and followed in Bash v. Bell Telephone Co.,* 411 Pa.Super. 347, 601 A.2d 825, 832 (1992).

The plaintiffs have produced no evidence that, on or before August 20, 1997, Avecia intended to deny Textile Biocides commissions on sales. The plaintiffs have attached numerous pieces of correspondence written after they signed the agreements--the earliest one dated January 28, 1998--in which Avecia personnel questioned whether Textile Biocides would be entitled to commissions on sales to certain customers. Even if this correspondence were to indicate an intent to deny commissions in 1998, it would say nothing about Avecia's intent when it signed the sales representative agreement. *K.E. Property Mgmt., Inc. v. 275 Madison Mgmt. Corp.,* 1993 WL 285900, at *7 (Del.Ch.) ("There is a rebuttable presumption that all persons act honestly, properly, in good faith and without fraud."); *Murphy v. T.B.O'Toole,* 87 A.2d at 638 (granting summary judgment on promissory fraud claim where plaintiffs had failed to produce evidence to overcome the "the legal presumption of good faith and honesty."). Because the plaintiffs have failed to produce any evidence from which a jury could conclude that Avecia intended on August 20, 1997 not to pay commissions earned under the sales representative agreement, the court grants Avecia's motion for summary judgment on this aspect of Textile Biocides' fraud claim.

D. The Court Denies Summary Judgment on the Plaintiffs' Contract Claims Based on Avecia's Failure to Obtain the Reputex Registrations. (Counts III, IV and VI).

Counts III, IV and VI are contract claims. The plaintiffs allege that Avecia breached contractual duties to obtain the Reputex registrations. The court denies Avecia's motion for summary judgment on these claims.

*1. Parol Evidence is Admissible to Show that Avecia had a duty to register Reputex in Mexico and Canada.*

The elements of breach of contract are "a contractual obligation, whether express or implied, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.,* 1995 WL 662685, at *7 (Del. Ch.). The plaintiffs argue that Avecia owed them a contractual duty to register Reputex for public health claims in the United States and to register Reputex for sale, purchase and use in Mexico and Canada for the microbial treatment of textiles.

*13 The express terms of the written agreements themselves imposed no such duty on Avecia. The plaintiffs argue, however, that the court should interpret into the agreements Avecia's alleged pre-agreement promises to obtain the registrations. (Ex. P-39, Kenline dep., 7/25/00, at 441 ("It would be my understanding and belief that as the [sales agreement] was being put together, the intention was to obtain registrations for Mexico and Canada for [Reputex].") *and* Krupnick aff. ¶¶ 17 and 18 *and* Schapiro aff. ¶¶ 25, 30 (averring that Avecia promised to register Reputex in Mexico and Canada).) Avecia argues that the parol evidence rule bars the plaintiffs from introducing evidence of these statements.

Both agreements contain integration clauses. (Ex. Da-1, Sales Representative Agreement ¶ 16; Ex. Da-2, Exclusive Supply Agreement ¶ 6.12.) Where two parties have executed a written contract which they both have agreed is the complete integration of their agreement, Delaware law generally bars the admission of evidence of prior understandings and negotiations to vary or contradict the writing. *Burgess v. Manufactured Housing Concepts, LLC,* 1997 WL 364038, at * 1 (Del.Super.Ct.). Parol evidence is admissible, however, if the writing is not integrated or is ambiguous as to a disputed term, or if the plaintiff wants to show fraud in support of a claim for reformation of the agreement. *Consolidated Fisheries Co. v. Consolidated Solubles Co.,* 112 A.2d 30, 38 (Del.1955) (stating that parol evidence is admissible where written agreement does not express the complete understanding of the parties); *James River-Pennington Inc. v. CRSS Capital, Inc.,* 1995 WL 106554, at *8 (Del.Ch.) (stating that Delaware law allows a plaintiff use parol evidence to show fraud in support of a claim for reformation of an integrated agreement).

The court will allow parol evidence of the parties' prior agreements as to the registrations. First, the plaintiffs have alleged fraud. Evidence of Kudner's alleged statements on or about August 20, 1997 about Avecia having registered Reputex for public health

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims in the United States and its having registered Reputex in Mexico and Canada is admissible to support reformation of the agreement to impose a duty on Avecia to make reasonable efforts to obtain those registrations. *James River-Pennington Inc. v. CRSS Capital, Inc.,* 1995 WL 106554, at *8 (Del.Ch.); Restatement (Second) of Contracts § 214(d) *and* (e). [FN23]

FN23. If the plaintiffs fail to prove fraud, however, this ground for considering the prior assurances will fall away.

Second, the agreements are ambiguous as to the duty to register Reputex in Mexico and Canada. In the sales representative agreement, Avecia recited that it manufactured Reputex "for use in the antimicrobial treatment of textiles" and that it "desired [Textile Biocides] to solicit orders for the purchase of [Reputex] by customers or potential customers." (Ex. Da-1, Sales Representative Agreement, Recitals.) Textile Biocides recited that it was "in contact with many customers or potential customers" of Reputex and that it was "desirous of serving [Avecia] in the capacity of sales representative for the purpose of soliciting orders for [Reputex]...." (Ex. Da-1, Sales Representative Agreement, Recitals.) Avecia appointed Textile Biocides "as its nonexclusive sales representative within the following geographic area: United States, Canada and Mexico (the "Territory")." (Ex. Da-1, Sales Representative Agreement ¶ 1.)

*14 In the supply agreement, Avecia recited that it manufactured Reputex for use in the antimicrobial treatment of textiles, and Saniclean recited that it had requirements for Reputex and wished to purchase all of its requirements from Avecia. (Ex. Da-2, Exclusive Supply Agreement.) Avecia agreed "to sell to [Saniclean] in any Contract Year ... 100% of [Saniclean's] annual requirements of [Reputex] in the United States, Mexico and Canada (collectively, the "Marketing Area")." (Ex. Da-2, Exclusive Supply Agreement ¶ 1.1 .)

Both of these agreements are capable of three meanings: (1) the parties agreed to register Reputex in Mexico and Canada, and Avecia had a duty to take reasonable steps to obtain those registrations; (2) the parties agreed to register Reputex in Mexico and Canada, and Textile Biocides and Saniclean had a duty to take reasonable action to obtain those registrations, or (3) the parties did not agree whether to register Reputex in Mexico and Canada, but if Reputex should be registered in Mexico or Canada, they agreed that Textile Biocides would have the right to sell Reputex there and Saniclean would have the right to manufacture and sell Reputex-treated products there. Parol evidence would be admissible to decide which of these meanings the parties intended. [FN24]

FN24. A fax from Avecia's employee Dr. Burt to Schapiro--in which Burt advised Schapiro that Reputex was not registered in Mexico for plaintiffs' use and that Schapiro should seek expert legal counsel on this issue--indicates that the Avecia left any responsibility for Mexican registration to the plaintiffs. (Ex. Da-12, Burt fax to Schapiro, 6/9/97.)

Third, the agreements are not integrated as to the scope of the American registrations for Reputex. The parties understandings as to the scope of the permissible advertising and labeling claims for Reputex would be set forth in the EPA registrations for Reputex. Both agreements refer to an attached EPA Registration No. 10182-128 for Reputex, which would have set forth the scope of those claims. But Krupnick and Schapiro aver in their affidavits that the registration was not attached to either agreement and that they relied on Kudner for their understanding as to the scope of the registration. *See* Restatement (Second) of Contracts § 214 ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish ... that the writing is or is not an integrated agreement."), *cited in Cochran v. Denton,* 1991 WL 203128, at *3 (Del.Ch.), *aff'd,* 612 A.2d 157 (Del.1992). The failure to attach the registration, if true, would show that the written agreements are not integrated as to the parties' agreement, if any, on the scope of the American advertising and labeling claims. Therefore, both sides may introduce parol evidence to interpret the agreement as to Avecia's obligations to obtain public health claim registrations.

Because the parol evidence relevant to the fraud claim and Avecia's duty to obtain registrations is disputed, the court cannot determine the meaning of the contract as to these issues on a motion for summary judgment.

2. *If the plaintiffs succeed in showing that Avecia was required to obtain the Reputex registrations, the implied duty of good faith and fair dealingwould have required Avecia to act reasonably to obtain those registrations.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 15
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

**\*15** The plaintiffs argue that the duty to obtain the Reputex registrations would arise independently as part of the implied contractual duty of good faith and fair dealing ("contractual good faith"). The court does not completely agree with this argument. But the plaintiffs' contract claims do implicate contractual good faith and the court must deny Avecia's motion for summary judgment on the contractual good faith claim.

Delaware law implies a covenant of good faith and fair dealing in every contract. *Continental Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1234 (Del.Ch.2000); *Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920-21 (Del.Ch.1999), *aff'd* 748 A.2d 407 (Del.2000). This covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." *Continental Ins. Co.*, 750 A.2d at 1234 (quotation omitted). Contractual good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. The parties' reasonable expectations at the time of contract formation determine the reasonableness of the challenged conduct." *Id.* (footnotes and quotation omitted). *See also Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del.1998) (In the "narrow context" of contractual good faith, "this Court has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties' reasonable expectations."). Cases invoking contractual good faith "should be rare and fact-intensive, turning on issues of compelling fairness." *Id.* A party may not invoke contractual good faith to imply duties that "contravene the parties' express agreement [or] *to forge a new agreement beyond the scope of the written contract.*" *Chamison, 735 A.2d at 920-21* (emphasis added).

The express terms of the written agreements do not impose on Avecia any duty to obtain registrations. If parol evidence does not support the plaintiffs' claim that Avecia promised to obtain the registrations, the court will not independently apply contractual good faith to impose this additional substantial obligation on Avecia. *Chamison, 735 A.2d at 920-21; Dave Greytak Enters. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del.Ch.) ("[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play."), *aff'd* 629 A.2d 668 (Del.1992). [FN25]

FN25. The plaintiffs might argue that the parties' reasonably expected that Avecia would obtain the registrations, such that Avecia had a contractual good faith duty to obtain the registrations. *See Continental Ins. Co.*, 750 A.2d at 1234. But if the plaintiffs fail to prove by parol evidence that Avecia orally promised to obtain the registrations, the plaintiffs' alleged expectations were not justified. If the plaintiffs can show by parol evidence that Avecia undertook a duty to apply for the registrations, only then will contractual good faith impose on Avecia a duty to make a reasonable effort to obtain the registrations. *See Steven J. Burton & Eric G. Andersen, Contractual Good Faith: Formation, Performance, Breach, Enforcement § 3.4.2.5, at 104-06 (1995)* (discussing view that contractual good faith does not ground an action that is independent of the parties agreement).

Should the plaintiffs prove by parol evidence, however, that Avecia promised to obtain the Reputex registrations--the implied duty of good faith and fair dealing a duty would have required Avecia to make reasonable efforts to obtain those registrations. *J.A. Jones Constr. Co. v. City of Dover*, 372 A.2d 540, 551-52 (Del.Super.Ct.1977) (stating that the terms of a contract will ordinarily be read to incorporate "the premise that each party will in good faith make reasonable effort to meet its obligations under the contract."). The typical application of contractual good faith is where the contract gives one party discretion to carry out a condition or duty within that party's control. *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del.Ch.1984) ("[I]f one party is given discretion in determining whether [a] condition in fact has occurred [,] that party must use good faith in making that determination."), *aff'd, 575 A.2d 1131 (Del.1990)*; Steven J. Burton & Eric G. Andersen, *Contractual Good Faith: Formation, Performance, Breach, Enforcement § 3.4.2.5, at 104-06 (1995).* For example, the plaintiffs could succeed in proving by parol evidence that Avecia promised to register public health claims for Reputex. The plaintiffs' right to make public health claims would then be conditioned on Avecia's obtaining EPA approval of those claims. Contractual good faith would require Avecia to make reasonable efforts to obtain the approval. *See Steven J. Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L.Rev. 369, 383 (1980) ("[A] party whose performance is conditioned on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 16
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

governmental approval of its plans ... may be required to act in good faith to secure the fulfillment of the condition." (footnotes omitted)).

*16 3. *Doubt as to whether Avecia breached these duties precludes summary judgment.*

Proof that Avecia breached any duty to take reasonable efforts to obtain the registrations must be both objective and subjective. The plaintiffs must show that Avecia failed to take reasonable steps to obtain the registrations and that its failure to do so "involved fraud, deceit, or misrepresentation." *Continental Ins. Co.,* 750 A.2d at 1234. Avecia admits that Reputex is not and never was registered in Mexico or Canada, and that it has never been registered for public health claims in the United States. (Ex. P-8, Burt dep., 6/19/00, at 199-200; Ex. P-39, Kenline dep. 7/25/00, at 443; Ex. P-49, Kenline dep., 5/17/00, at 90-91; Ex. P-52, Kenline dep. 5/18/00, at 233.) Since neither side has addressed in its papers exactly what steps Avecia should have taken and what steps Avecia actually took to obtain these registrations, Avecia's breach is a fact issue on which the court cannot grant summary judgment. [FN26] *Merriweather v. Philadelphia Newspapers, Inc.,* 453 Pa.Super. 464, 684 A.2d 137, 140 (1995) ("Summary judgment may only be granted in cases where it is clear and free from doubt that the moving party is entitled to judgment as a matter of law.").

> FN26. At his deposition, Kenline affirmed that Avecia has prepared a protocol for submission to the EPA to support an expansion of the Reputex registration to include public health claims. (Ex. P-51, Kenline dep. (8/25/00), at 870.) It is not clear when Avecia prepared the protocol.

4. *There is evidence that the alleged breach damaged the plaintiffs.*

The plaintiffs have produced evidence of damages in the form of income they would have earned had Avecia obtained the registrations. (Ex. P-46, Expert Report on Economic Damages.) This evidence creates an issue of fact precluding summary judgment. See *Liborio II, L.P. v. Artesian Water Co.,* 593 A.2d 571, 575 (Del.Super.Ct.1990) ("Where there is a need to more fully develop the facts [related to damages] and the law applicable to those facts, summary judgment is inappropriate."). [FN27]

> FN27. *Thorsen v. Iron & Glass Bank,* 328 Pa.Super. 135, 476 A.2d 928, 931 (1984)

(stating that summary judgment on the basis of absence of damages is generally improper in a contract case).

C. The Court Grants Avecia's Motion for Summary Judgment on the Plaintiffs' Implied Duty of Good Faith and Tortious Interference Claims Based on Avecia's Directly Contacting Potential Reputex Customers (Counts V and VI).

The plaintiffs allege that Avecia frequently contacted the plaintiffs' customers and potential customers after the plaintiffs had spent time and effort marketing Reputex to those customers, that Avecia encouraged these customers to deal directly with Avecia, and that Avecia attempted to deny Textile Biocides commissions on sales to the customers. Based on these allegations, the plaintiffs claim tortious interference with prospective contractual relations and breach of the implied duty of good faith and fair dealing. The court grants summary judgment against the plaintiffs on these claims.

1. *The court grants summary judgment on the tortious interference claim.*

Under Delaware law, the elements of tortious interference with prospective contractual relations are (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer (3) intentional action by the interferer, (4) that causes a breach or termination of the relationship or expectancy, and (5) resulting damages to the party whose relationship or expectancy has been disrupted. *Rypac Packaging Mach. Inc. v. Poges,* 2000 WL 567895, at *10 (Del.Ch.); *Merck & Co. v. Smithkline Beecham Pharm. Co.,* 1999 WL 669354, at *45 (Del.Ch.), aff'd, 746 A.2d 277 (Del.2000). The interference must be "improper" or unprivileged. *DeBonaventura v. Nationwide Mut. Ins. Co.,* 428 A.2d 1151, 1153-54 (Del.1981); *CPM Indus., Inc. v. ICI Americas, Inc.,* 1990 WL 28574, at *2 (Del.Super.); Restatement (Second) of Torts § 767. [FN28]

> FN28. The elements of tortious interference under Pennsylvania law are substantially the same:
>
> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
> (2) purposeful action on the part of defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.PL.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.PL))

privilege or justification on the part of the defendant; and
(4) the occasioning of actual legal damage as a result of the defendant's conduct.
*Strickland v. University of Scranton, 700 A.2d 979, 985 (Pa.Super.Ct.1997)* (citations omitted)

**\*17** The court grants Avecia's motion for summary judgment on Saniclean's tortious interference claim because Saniclean has not identified a single customer or potential customer that Avecia contacted.

There is evidence that Avecia contacted three Textile Biocides customers: Kendall, Milliken and Courtalds. (Ex. P-54, Krupnick dep., 6/5/00, at 135; Ex. P-64, Burt fax to Kenline, 5/14/98; Ex. P-68, Krupnick E-mail to Loricchio, 3/24/99; Ex. P-69, Krupnick E-mail to Loricchio, 1/13/99; Krupnick aff. ¶ ¶ 39.) That Avecia contacted them was not in itself improper, for Textile Biocides expressly agreed in the sales representative agreement that Avecia could do so. (Ex. Da-1, Sales Representative Agreement ¶ 6.) Furthermore, there is no evidence that any business relationship was disrupted or that Textile Biocides lost any commissions because Avecia contacted those customers. Therefore, the court grants Avecia's motion for summary judgment on Textile Biocides' tortious interference claim.

**2. The court grants summary judgment on the contractual good faith claim to the extent that the claim is based on Avecia's contacts with the plaintiffs' customers.**

The court grants summary judgment against Saniclean on this aspect of its contractual good faith claim because Saniclean has not identified a single customer that Avecia contacted. The court grants summary judgment against Textile Biocides because Textile Biocides expressly agreed in the sales representative agreement that Avecia could contact customers within Textile Biocides' territory. (Ex. D-1, Sales Representative Agreement ¶ 6); *Chamison v. Healthtrust, Inc., 735 A.2d 912, 921 (Del.Ch.1999)* ("The implied covenant cannot contravene the parties' express agreement....").

**IV. THE COURT GRANTS IN PART THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON AVECIA'S COUNTERCLAIMS.**

**A. The Court Grants the Plaintiffs' Motion for Summary Judgment on Avecia's Contract Counterclaims Only to the Extent that Avecia Bases**

Those Claims on the Plaintiffs' Creating Obligations on Avecia's Behalf. (Counts I and II).

Avecia alleges two types of contract breaches: (1) the plaintiffs' promotional activities violated the agreements, and (2) the plaintiffs did not use their best efforts to sell and buy Reputex. The plaintiffs argue that the court should grant summary judgment on Avecia's contract counterclaims because (1) Avecia has not produced evidence that the plaintiffs breached the agreements, (2) any breach is excusable because of Avecia's failure to obtain the public health claim registrations, and (3) Avecia has not produced evidence of damages resulting from any breach. The court denies summary judgment on the counterclaim, except for one aspect of the promotional activities claim.

**1. The court denies summary judgment on Avecia's counterclaim that Textile Biocides breached the sales representative agreement by making unapproved statements in its promotional materials.**

**\*18** Textile Biocides agreed not to use any advertising or promotional materials for Reputex except those supplied by Avecia and not to make any representations or warranties about Reputex, except those contained in Avecia's advertising promotional materials, without Avecia's written approval. (Ex. Da-1, Sales Representative Agreement ¶ 8.) There is evidence that, in violation of EPA regulations, Textile Biocides repeatedly promoted Reputex as effective against specific pathogens and as safe for food service. (Ex. Dc-24, Textile Biocides promotional materials.) There is evidence that Textile Biocides falsely told potential customers that Reputex is used in contact lens cleaning solution and that efficacy tests existed concerning the effectiveness of Reputex against specific bacteria. (Ex. Dc-24, Textile Biocides promotional materials.). There is evidence that Textile Biocides misrepresented the scope of its relationship with Avecia. (Ex. Dc-24, Textile Biocides promotional materials; Ex. P-MM, Kenline letter to Schapiro, 8/12/98.) There is no evidence that Avecia approved these promotions. Therefore, the court denies summary judgment on this aspect of the contract claim.

**2. The court grants summary judgment on Avecia's counterclaim that both plaintiffs breached their agreements by incurring unauthorized obligations on Avecia's behalf.**

Textile Biocides agreed not "to assume or create any obligation or responsibility, express or implied, on

Not Reported in A.2d                                                          Page 18
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.PL), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.PL))

behalf or in the name of Avecia or bind [Avecia] in any manner or thing whatsoever." (Ex. Da-1, Sales Representative Agreement ¶ 6.) Saniclean agreed to a similar provision. (Ex. Da-1, Exclusive Supply Agreement ¶ 6.6.) Though Avecia has produced evidence that the plaintiffs made misleading statements to potential customers about the relationship between Avecia and the plaintiffs, there is no evidence that these statements caused Avecia to be bound in any way. (Ex. P-MM, Kenline letter to Schapiro, 8/12/98.) The court grants summary judgment against Avecia on this aspect of the contract claim.

*3. The court denies summary judgment on Avecia's counterclaim that both plaintiffs breached their agreements by failing to use their best efforts to buy and sell Reputex.*

Avecia alleges that Textile Biocides breached paragraph 9 of the sales representative agreement, in which it agreed to use its best efforts to sell Reputex. *See Corwin v. DeTrey,* 1989 WL 146231, at *2 (Del.Ch.) (rejecting argument that best efforts clause was unenforceable and stating that "the failure of a party to exercise best efforts can form the basis for liability in a breach of contract action."). Though Schapiro predicted that he would sell 39,000 or even 118,000 pounds of Reputex in the first year, there is evidence that Textile Biocides merely sold about 3000 pounds in three years, that it visited only seven potential customers in those three years, that it did not maintain records of costs incurred, and that its expenses in 1998 were only $1226. (Ex. Dc-6, Schapiro letter to Kudner, 11/26/96; Ex. Dc-7, Commercial Development Visit Report, 1/15/97; Ex. Dc-21, Summary of Reputex Sales; Ex. Dc-30, Textile Biocides 1998 Federal Tax Return; Ex. Dc-5, Schapiro dep., 6/8/00, at 287, *and* 8/16/00, at 229; Ex. Dc-29, Krupnick dep., 8/18/00, at 28-29.) This evidence is sufficient for a jury to find that Textile Biocides did not use its best efforts to market Reputex. Therefore, summary judgment is not appropriate on the best efforts aspect of Avecia's contract counterclaim against Textile Biocides.

*19 Avecia alleges that Saniclean breached the exclusive supply agreement by not buying any Reputex. (Ex. Dc-3, Answer, Counterclaims ¶ 25a.) "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." 6 Del.Code § 2-306(2). [FN29] *See also Wood v. Lucy,*

*Lady Duff-Gordon,* 118 N.E. 214 (N .Y.1917) (Cardozo, J.) (holding that a contract for an exclusive agency to market a product contains an implied promise to use all reasonable efforts to market the product). This obligation protects the seller who, in an exclusive arrangement, depends solely upon the buyer to resell the goods. *See Tigg Corp. v. Dow Corning Corp.,* 962 F.2d 1119, 1125 (3d Cir.1992) (applying Michigan's version of UCC § 2-306(2) to exclusive requirements contract). Neither side has presented a standard by which this court should measure best efforts, and there appears to be no published case addressing UCC § 2-306(2) under Delaware law. *See* John E. Murray, Jr., *Contracts* § 58.1, at 221-22 (3d ed.1990) (stating that best efforts under UCC § 2-306(2) is undefined, but that it seems to require "a level of industry and even creativity" that goes beyond simple good faith). The court need not now determine a precise standard for best efforts, for Avecia has produced evidence that Saniclean made little or no effort to create a market for its Reputex-treated wipes. Even without public health claims, Reputex-treated products seem to be marketable. (Ex. Dc-5, Schapiro dep., 6/7/00, at 254.) Nonetheless, Saniclean never met its minimum purchase requirements, visited only seven customers, maintained no records of costs incurred, showed no expenses on its 1998 federal income tax form, and did not even set up a bank account. (Ex. Dc-5, Schapiro dep., 6/8/00, at 285, 287, 297- 98, *and* 8/16/00, at 229; Ex. Dc-29, Krupnick dep., 8/18/00, at 28-29; Ex. Dc-50, Saniclean 1998 Federal Income Tax Return.) This evidence is sufficient for a jury to find that Saniclean did not use its best efforts to market Reputex-treated products. Therefore, summary judgment is not appropriate on the best efforts aspect of Avecia's contract counterclaim against Saniclean.

FN29. In support of its argument that it was not required to buy any Reputex, Saniclean cites to inapposite cases involving *non-exclusive* outputs and requirements contracts. *See e.g., Dorn v. Stanhope Steel, Inc.,* 368 Pa.Super. 557, 534 A.2d 798, 805 (1987); *HML Corp. v. General Foods Corp.,* 365 F.2d 77, 81 (3d Cir.1966); *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.,* 130 F.2d 471, 473 (3d Cir.1942). *See also* 6 Del.Code § 2-306(1).

Saniclean argues that, if it did not meet the minimum purchase requirements, Avecia's sole remedy was to revoke Saniclean's exclusivity. (Ex. Da-2, Exclusive Supply Agreement ¶ 4.1.) The court disagrees. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exclusive supply agreement does not expressly limit Avecia's remedies on breach to revocation of the exclusivity. Unless parties expressly agree that a contractually provided remedy is exclusive, resort to that remedy is optional. 6 Del.Code § 2- 719(1)(b).

Both plaintiffs argue that the court must grant summary judgment on Avecia's contract counterclaims because Avecia breached the agreements first by not getting the Reputex registrations. The court disagrees. Though one party's material breach of a contract might excuse the other party's failure to perform, *Eastern Elec. & Heating, Inc. v. Pike Creek Prof'l Ctr., 1987 WL 9610, at *3 (Del.Super.),* there is a genuine issue of material fact as to whether Avecia breached the agreements. To succeed in their defense of prior material breach, the plaintiffs must show that Avecia had a duty to register public health claims. The evidence that would support the existence of that duty is the deposition testimony and testimonial affidavits of Krupnick and Schapiro. Deposition testimony and testimonial affidavits of the moving party, even if uncontradicted, are not a sufficient basis for summary judgment. *Penn Ctr. House, Inc. v. Hoffman, 520 Pa. 171, 553 A.2d 900, 903 (1989); Borough of Nanty-Glo v. American Surety Co., 309 Pa. 236, 163 A. 523, 524 (1932); Smith v. Commonwealth Nat'l Bank, 384 Pa.Super. 65, 557 A.2d 775, 771 (1989)* (applying Pennsylvania summary judgment rules where another state's substantive law governed the claims).

*20 The plaintiffs argue that the court must grant summary judgment because Avecia has offered no evidence of damages. The court disagrees. Avecia has produced evidence of damages: it spent more than $185,000 helping the plaintiffs market Reputex, while Textile Biocides sold only $30,000 worth of Reputex, and Saniclean never met its minimum purchase requirements. (Ex. Dc-5, Schapiro dep., 6/8/00, at 297-98; Ex. Dc-21, Summary of Reputex Sales; Ex. Dc-46, Scott letter to Schapiro, 8/12/99; Ex. Dc-47, Pierce E-mail to Kenline, 8/10/99.) Therefore, the court cannot grant summary judgment based on absence of damages. See *Liborio II, L.P. v. Artesian Water Co., 593 A.2d 571, 575 (Del.Super.Ct.1990)* ("Where there is a need to more fully develop the facts [related to damages], summary judgment is inappropriate.").[FN30]

FN30. *Thorsen v. Iron & Glass Bank, 328 Pa.Super. 135, 476 A.2d 928, 931 (1984)* (stating that summary judgment on the basis of absence of damages is generally improper in a contract case).

B. The Court Grants the Plaintiffs' Motion for Summary Judgment on Avecia's Fraud Counterclaim Only to the Extent that Avecia Bases that Claim on Saniclean's Statement That It Had Requirements for Reputex.

Avecia alleges fraud based on four representations by the plaintiffs. The elements of fraud are substantially the same under Pennsylvania and Delaware law: (1) a false representation, (2) which is material to the transaction at hand, (3) the defendant's knowledge of its falsity or recklessness as to whether it is true or false, (4) made with the intent of misleading another into relying on it, (5) plaintiff's action taken in justifiable reliance on the misrepresentation, and (6) damage proximately caused by the reliance. *Bortz v. Noon, 556 Pa. 489, 729 A.2d 555, 560 (1999); Lord v. Souder, 748 A.2d 393, 402 (Del.2000).* The parties disagreement over which state's law applies to Avecia's fraud counterclaim is immaterial to this motion. [FN31]

FN31. Pennsylvania and Delaware have different parol evidence rules. In Pennsylvania, the parol evidence rule bars a party from relying on prior fraudulent oral representations to prove fraudulent inducement where the representations relate to a subject that was specifically dealt with in an integrated written contract. *HCB Contractors v. Liberty Place Hotel Assocs., 539 Pa. 395, 652 A.2d 1278, 1279-80 (1995); 1726 Cherry St. Partnership v. Bell Atl. Properties, Inc., 439 Pa.Super. 141, 653 A.2d 663, 670 (1995).* In Delaware, parol evidence is admissible to prove fraudulent inducement. *Anglin v. Bergold, 1989 WL 88625, at *2 (Del.)* (unpublished); *James River-Pennington Inc. v. CRSS Capital, Inc., 1995 WL 106554, at *6 (Del.Ch.).* The plaintiffs argue that, if Pennsylvania law applies to Avecia's fraudulent inducement claim, Pennsylvania's parol evidence rule bars those claims. See *Coram Healthcare Corp. v. Aetna U.S. Healthcare Inc., 94 F.Supp.2d 589, 593 (E.D.Pa.1999)* (applying Pennsylvania parol evidence rule to bar a Pennsylvania-law fraudulent inducement claim, even though Delaware law governed the contract). The court disagrees with the plaintiffs and rejects that aspect of *Coram Healthcare.* The parol evidence rule--the purpose of which is to promote certainty in contractual relations by preserving the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

integrity of written agreements, *Kehr Packages, Inc. v. Fidelity Bank, 710 A.2d 1169, 1173 (Pa.Super.Ct.1998)*--is a rule of contract law. The parties have chosen Delaware law to govern construction and interpretation of their contracts. Therefore, Delaware's parol evidence rule applies to Avecia's fraudulent inducement claim even if Pennsylvania law governs that claim. *See Hutchison v. Luddy, 763 A.2d 826 837 n. 8 (Pa.Super.Ct.2000)* (stating that, although decisions of federal courts construing Pennsylvania law have persuasive authority, Pennsylvania state courts are not bound by those decisions); *In re Insurance Stacking Litig., 754 A.2d 702, 705 (Pa.Super.Ct.2000)* (same); *Moore v. Sims, 442 U.S. 415, 429 (1979)* ( "State courts are the principal expositors of state law.").

The first representation was Saniclean's statement in the exclusive supply agreement that it had requirements for Reputex. The plaintiffs are entitled to summary judgment on the fraud claim arising from this statement because Avecia has produced no evidence that Saniclean knew the statement to be false when made.

The second, third and fourth representations were Schapiro's statements that (1) "financing is in place as are manufacturing and contract distribution facilities in various parts of the US, Canada and Mexico" (Ex. Dc-6, Schapiro letter to Kudner, 11/26/96); (2) that his company, Daniel Schapiro & Co., had "already established our marketing operatives in [the food service and consumer] industries" (Ex. Dc-6, Schapiro letter to Kudner, 11/26/96); and (3) that his company, Global Nonwoven Technologies, had "the resources and relationships to provide master distribution of Reputex throughout the textile industry" (Ex. Dc-7, Saniclean Proposal Zeneca Biocides).

There is evidence that the plaintiffs had no financing at all: Saniclean never had a bank account, and on July 20, 1997 the plaintiffs were so strapped for cash that payment of a bill for $147 seemed to be problem. (Ex. Dc-5, Schapiro dep., 6/8/00, at 285. Ex. Dc-22, Schapiro E-mail to Krupnick, 7/20/97.)

*21 There is evidence that the plaintiffs and Schapiro's other companies had no marketing operatives and that they had few or no resources or relationships in the textile industry. Schapiro and Krupnick are the plaintiffs' only employees. (Ex. Dc-

5, Schapiro dep ., 6/8/00, at 308.) Rather than having had a marketing network in place when they signed the agreements, the plaintiffs were merely "in discussions with" marketing associates. (Ex. Dc-5, Schapiro dep., 6/8/00, at 308.) It is unclear whether Daniel Schapiro & Co. ever marketed anything in the food industry. (Ex. Dc-5, Schapiro dep ., 6/7/00, at 32.) Global Nonwoven Technologies never had any sales. (Ex. Dc-5, Schapiro dep., 6/7/00, at 30.)

From this evidence, a reasonable jury could find that these three statements were false when Schapiro made them and that Schapiro knew they were false. A reasonable jury could also conclude that Schapiro made these three statements with the intent to induce Avecia to enter into agreements with his companies and that Avecia relied on the statements: Schapiro made the statements in proposals to enter into agreements to market Reputex and Avecia entered into those agreements. Whether any reliance on these statements was justified may be questionable, [FN32] but that issue is for the jury. *Rempel v. Nationwide Life Ins. Co., 323 A.2d 193, 197 (Pa.Super.Ct.1974)* (stating that whether reliance is justified is generally an issue of fact for the jury), *aff'd, 370 A.2d 366 (Pa.1977)*; *Wilmington Trust Co. v. Aetna Cas. & Surety Co., 690 A.2d 914, 916-17 (Del.1996)* (same). Finally, there is evidence of damages: Avecia bound themselves to agreements with companies that, from the start, may have been unable to fulfill their obligations under the agreements.

FN32. In determining whether reliance is justified, the jury must consider the relationship of the parties involved, their expertise and experience and the nature of the transaction. *Rempel v. Nationwide Life Ins. Co., 323 A.2d 193, 197 (Pa.Super.Ct.1974)*. The plaintiffs may only have been puffing or expressing opinions about their financial status and marketing abilities. Moreover, the plaintiffs made the statements many months before Avecia signed the agreements. A reasonable jury might find that Avecia--a sophisticated corporation able to know whether the plaintiffs were financially capable of living up to the terms of the agreement--did not rely on these statements or that any reliance was not justified. *Rempel, 323 A.2d at 197*; Restatement (Second) of Torts § 541, cmt. a ("Although the recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity if he had shown his distrust of the

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244
(Cite as: 2001 WL 1855059 (Pa.Com.Pl.))

Page 21

maker's honesty by investigating its truth, he is nonetheless required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."), *quoted in Silverman v. Bell Sav. & Loan Ass'n, 367 Pa.Super. 464, 533 A.2d 110, 115 (1987) and cited in Ward v. Hildebrand, 1996 WL 422336, at \*4 (Del.Ch.). See also Consolidated Fisheries Co. v. Consolidated Solubles Co., 112 A.2d 30, 37 (Del.1955)* ("It is the general rule that mere expressions of opinion as to probable future events, when clearly made as such, cannot be deemed fraud. or misrepresentations.")

The court denies the plaintiffs' motion for summary judgment on the fraud counterclaim to the extent that Avecia bases the claim on the three statements about the plaintiffs' financial status and marketing abilities.

### CONCLUSION
The court will enter contemporaneous orders granting in part both sides' motions for summary judgment in accordance with this opinion.

### ORDER
AND NOW, this 26th day of July 2001, upon consideration of defendant Avecia's motion for summary judgment on the plaintiffs' claims, and the plaintiffs' response, and in accordance with the court's contemporaneously-filed opinion, IT IS HEREBY ORDERED that the motion is GRANTED IN PART as follows:

(1) Summary judgment on plaintiff Textile Biocides' fraud claims (Complaint, Counts I and VII) is DENIED to the extent that those claims are based on Avecia's alleged misrepresentation of the status of the Reputex registrations.

(2) Summary judgment on plaintiff Textile Biocides' fraud claims (Complaint, Counts I and VII) is GRANTED to the extent that those claims are based on Avecia's promise to pay commissions, and that aspect of the claim is DISMISSED.

(3) Summary judgment on plaintiff Saniclean's fraud claims (Complaint, Counts II and VII) is DENIED.

\*22 (4) Summary judgment on the plaintiffs' breach of contract claims (Complaint, Counts III and IV) is DENIED.

(5) Summary judgment on the plaintiffs' tortious interference claim (Complaint, Count V) is GRANTED, and that claim is DISMISSED.

(6) Summary judgment on the plaintiffs' contractual good faith claim (Complaint, Count VI) is DENIED to the extent that the claim is based on Avecia's failure to obtain Reputex registrations.

(7) Summary judgment on the plaintiffs' contractual good faith claim (Complaint, Count VI) is GRANTED to the extent that the claim is based on Avecia's contacting the plaintiffs' customers, and that aspect of the contractual good faith claim is DISMISSED.

(8) Summary judgment on the plaintiffs' negligent misrepresentation claim (Complaint, Count VIII) is DENIED.

Not Reported in A.2d, 2001 WL 1855059 (Pa.Com.Pl.), 52 Pa. D. & C.4th 244

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Only the Westlaw citation is currently available.PHILADELPHIA PLAZA-PHASE II, Plaintiff
v.
BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Defendant
No. 3745 APRIL TERM 2002.

June 21, 2002.

*OPINION*

HERRON, J.
**\*1** Defendant Bank of America National Trust and Savings Association ("BOA") has filed preliminary objections ("Objections") to the complaint ("Complaint") of Plaintiff Philadelphia Plaza-Phase II ("Plaza"). For the reasons set forth in this Opinion, the Court has overruled the Objections.

## BACKGROUND

Plaza owns and operates Two Commerce Square ("Property"), a 41-story commercial office building located in the Philadelphia Center City business district. In 1990, BOA extended a multimillion dollar loan to Plaza in a series of promissory notes ("Notes") to finance construction of the Property. This transaction, the terms of which were subsequently modified, is currently governed by an Amended and Restated Loan Agreement, dated March 27, 1996 ("Agreement").

Section 7.4 of the Agreement governs insurance and states, in relevant part, as follows:
*7.4 Insurance.* Borrower shall maintain the following insurance:
(a) Special form property damage insurance on the Property, with a policy limit in an amount not less than the full insurable value of the Property on a replacement cost basis, including tenant improvements, if any. The policy shall include a business interruption (or rent loss, if more appropriate) endorsement in the amount of twelve months' projected income from the Property, taxes and insurance premiums, a lender's loss payable endorsement (438 BFU, or its equivalent) in favor of Bank, and any other endorsements required by Bank.
(b) Commercial General Liability coverage with such limits as Bank may reasonably require. This policy shall name Bank as an additional insured. Coverage shall be written on an occurrence basis, not claims made.
(c) Such other insurance as Bank may require, which may include flood insurance if the Property is situated in an area designated as "flood prone," "within a flood plain" or similar designation under federal or state law.

Compl. Ex. A. § 7.4. In the event that Plaza fails to secure the insurance required by the Agreement, BOA may procure the requisite insurance, demand reimbursement and add premium charges to the amount outstanding under the Notes. *Id.*

In accordance with the Agreement's terms, Plaza has maintained an "all-risk" insurance policy ("Policy") on the Property with aggregate coverage of $650 million, of which approximately $248 million is allocable to the Property. However, the renewal of the Policy that was issued after the tragedy of September 11, 2001 excludes coverage for terrorism except for a special sub-limit that allows recovery of $100,000 per occurrence per property per year for terror-related claims. On April 10, 2002, BOA advised Plaza that the proposed renewal of the Policy was unacceptable and demanded that Plaza obtain additional terrorism insurance coverage in an amount equal to the full replacement cost of the Property of $248 million, exclusive of other properties covered by the Policy ("Terrorism Insurance"). BOA further demanded that the Terrorism Insurance be in place by April 25, 2002.

**\*2** Although it contends that the Agreement does not grant BOA the right to force the purchase of the Terrorism Insurance, Plaza nevertheless investigated the possibility of complying with BOA's demands. According to Plaza, its preliminary inquiries revealed that the Terrorism Insurance may not be available with respect to the Property alone, that premiums will be prohibitively expensive and that properties comparable to the Property are not covered by insurance similar to the Terrorism Insurance BOA demanded. When Plaza requested additional time to investigate further, BOA denied the request and threatened to secure the $248 million Terrorism Insurance itself and to demand immediate reimbursement of the premium from Plaza.

In the Complaint, Plaza asserts that BOA's actions constitute a breach of the covenant of good faith and fair dealing implied in the Agreement. On this basis,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1472337 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

it has brought a single claim for a declaratory judgment stating that its existing Policy is sufficient coverage under the Agreement. BOA has countered with the Objections, which challenge the legal sufficiency of Plaza' claim.

## DISCUSSION

Although the Objections present arguments that may be persuasive at a later point in time, the requirement that the Court treat the allegations in the Complaint as true precludes the Court from sustaining them now. Accordingly, the Objections are overruled.

### I. The Complaint Alleges a Breach of the Covenant of Good Faith and Fair Dealing Implied in the Agreement

The language of the Agreement grants BOA the option to require Plaza to purchase "other insurance." However, the implied covenant of good faith and fair dealing,[FN1] which is implied in every contract, bars BOA from exercising its discretion in an unfettered manner and limits its right to impose additional insurance mandates on Plaza. Because the Complaint alleges that BOA has acted impermissibly, Plaza has presented a viable cause of action.

FN1. It is important to distinguish among different types of good faith. Here, the Court's discussion of the covenant of good faith addresses claims that arise in contract only and does not confront insurance bad faith or the common law tort of bad faith that has emerged in other jurisdictions. *Cf. Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Trust Co.,* 385 Pa.Super. 30, 35, 560 A.2d 151, 153 (1989) ("Where a duty of good faith arises, it arises under the law of contracts, not under the law of torts."), *with D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.,* 494 Pa. 501, 431 A.2d 966 (1981) (rejecting *Gruenberg v. Aetna Insurance Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (Cal.1973), which allowed insured to bring a claim in tort against insurer for bad faith), *and* 42 Pa.C.S. § 8371 (allowing an insured to bring a statutory claim against an insurer for bad faith).

### A. The Agreement Includes an Implied Covenant of Good Faith and Fair Dealing

Pennsylvania courts have recently been plagued by a dispute as to whether the covenant of good faith is implied in all contracts or only those contracts evidencing a "special relationship" between the contracting parties. For the reasons discussed *infra,* the "special relationship" requirement is without any basis in Pennsylvania, and the Agreement includes an implied covenant of good faith and fair dealing.

The principle that a covenant of good faith is implied in every contract is a well-established axiom of Pennsylvania law. State and federal courts interpreting Pennsylvania law have stated that "[e]very contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." *Donahue v. Federal Exp. Corp.,* 753 A.2d 238, 242 (Pa.Super.Ct.2000) (citation omitted). *See also Fraser v. Nationwide Mut., Ins. Co.,* 135 F.Supp.2d 623 (E.D.Pa.2001) ("Under Pennsylvania Law, a covenant of good faith and fair dealing is implied in every contract."); *Somers v. Somers,* 418 Pa.Super. 131, 613 A.2d 1211 (1992) (holding that plaintiff could proceed on breach of the covenant of good faith implied in an employment contract); *Liazis v. Kosta, Inc.,* 421 Pa.Super. 502, 510, 618 A.2d 450, 454 (1992) ("[E]very contract imposes upon the parties a duty of good faith and fair dealing in the performance and enforcement of the contract."). A recent Pennsylvania Superior Court decision discussed the covenant of good faith as follows:

*3 Section 205 of the Restatement (Second) of Contracts, which was adopted by this Court in *Baker v. Lafayette College,* 350 Pa.Super. 68, 84, 504 A.2d 247, 255 (1986), *aff'd,* 516 Pa. 291, 532 A.2d 399 (1987), and *Creeger Brick & Building Supply, Inc. v. Mid-State Bank & Trust Company,* 385 Pa.Super. 30, 35, 560 A.2d 151, 153 (1989), provides: "Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts, § 205. A similar requirement has been imposed upon contracts within the scope of the Uniform Commercial Code (UCC) by 13 Pa.C.S.A. section 1203. *Somers v. Somers,* 418 Pa.Super. 131, 135, 613 A.2d 1211, 1213 (1992). "Good faith" has been defined as "[h]onesty in fact in the conduct or transaction concerned." 13 Pa.C.S.A. § 1201. The breach of the obligation to act in good faith cannot be precisely defined in all circumstances, however, examples of "bad faith" conduct include: "evasion of the spirit of the bargain, lack of diligence and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Somers,* 613 A.2d at 1213 (citing Restatement (Second) of Contracts, § 205(d)).

*Kaplan v. Cablevision of Pa., Inc.,* 448 Pa.Super. 306, 318, 671 A.2d 716, 721-22 (1996).[FN2]

> FN2. Other Pennsylvania decisions, including at least one decision by the Pennsylvania Supreme Court, have adopted Section 205 as well. *See, e.g., Bethlehem Steel Corp. v. Litton Indus., Inc.,* 507 Pa. 88, 125, 488 A.2d 581, 600 (1985); *Baker v. Lafayette College,* 350 Pa.Super. 68, 84, 504 A.2d 247, 255 (1986), *aff'd,* 516 Pa. 291, 532 A.2d 399 (1987).

Recently, this principle has been challenged. A number of courts interpreting Pennsylvania law have found that the covenant of good faith is not implicated in every contractual relationship:

In Pennsylvania, the courts have recognized the duty of good faith only in limited situations. *Creeger; Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685 (3rd Cir.1993). More specifically, the duty of good faith may not be implied where (1) a plaintiff has an independent cause of action to vindicate the same rights with respect to which the plaintiff invokes the duty of good faith; (2) such implied duty would result in defeating a party's express contractual rights specifically covered in the written contract by imposing obligations that the party contracted to avoid; or (3) there is no confidential or fiduciary relationship between the parties. *Department of Transportation v. E-Z Parks, Inc.,* 153 Pa.Cmwlth. 258, 620 A.2d 712 (1993), *appeal denied,* 534 Pa. 651, 627 A.2d 181 (1993); *USX Corp. v. Prime Leasing, Inc.,* 988 F.2d 433 (3rd Cir.1993); *Allstate Transportation Co. v. Southeastern Pennsylvania Transportation Authority,* 2000 WL 329015 (E.D. Pa., No. Civ.A. 97-1482, filed March 27, 2000).

*Agrecycle, Inc. v. City of Pittsburgh,* 783 A.2d 863, 867 (Pa.Commw.Ct.2001). *See also Benevento v. Life USA Holding, Inc.,* 61 F.Supp.2d 407, 424 (1999) ("[U]nder Pennsylvania law, every contract does not imply a duty of good faith. Instead, the duty of good faith and fair dealing is limited to special types of contracts, involving special relationships between the parties."). Thus, under this aberrant line of cases, only contracts that entail a "special relationship" give rise to the covenant of good faith.

*4 This Court agrees with those decisions holding that a covenant of good faith is implied in every contract. As an initial matter, the requirement that a special relationship exist between the parties before the covenant of good faith arises has unclear origins. This requirement was first imposed in *E-Z Parks, Inc.* in 1993:

Pennsylvania courts have recognized a separate duty of good faith performance of contracts only in limited circumstances. *Creeger Brick v. Mid-State Bank,* 385 Pa. Superior Ct. 30, 560 A.2d 151 (1989). This duty of good faith is limited to situations where there is some special relationship between the parties, such as a confidential or fiduciary relationship. A confidential relationship exists when "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other." *Estate of Clark,* 467 Pa. 628, 635, 359 A.2d 777, 781 (1976). (citation omitted).

153 Pa. Commw. at 268, 620 A.2d at 717. Notably, there is no citation to support the conclusion that a special relationship is necessary. Moreover, those courts outside the Commonwealth that have imposed a special relationship requirement have done so only when examining whether a plaintiff may bring a tort or tort-like claim based on a breach of the covenant of good faith. *See, e.g., Freeman & Mills v. Belcher Oil Co.,* 11 Cal.4th 85, 44 Cal.Rptr.2d 420, 900 P.2d 669, 676 (Cal.1995). *Cf. Coca-Cola Bottling Co. v. Coca-Cola Co.,* 988 F.2d 414, 430-31 (3d Cir.1993) (distinguishing between covenant of good faith and duties arising from a fiduciary or confidential relationship); Steven J. Burton & Eric G. Anderson, Contractual Good Faith: Formation, Performance, Breach, Enforcement § 9.2.3 n.28 (1995) ("To avoid misunderstanding, requirements of contractual good faith do not depend on a fiduciary relationship.").[FN3]

> FN3. The one exception to this rule is Texas. Under Texas law, good faith obligations are implied in a contract only where there is a special relationship, but a party's breach of its good faith obligations automatically give rise to a tort claim. *See Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165 (Tex.1987).

Holding that the implied covenant of good faith arises in every contractual relationship finds support from outside the jurisdiction more broadly as well.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1472337 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

As noted *supra,* Section 205 of the Restatement (Second) of Contracts states that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." This principle has been widely adopted by state and federal courts alike. *See, e.g., Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co.,* 680 F.2d 933, 941 (3d Cir.1982); *Kleiner v. First Nat'l Bank of Atlanta,* 581 F.Supp. 955, 960 n. 5 (N.D.Ga.1984); *Mitford v. de Lasala,* 666 P.2d 1000, 1006 (Alaska 1983); *Central New Haven Dev. Corp. v. La Crepe, Inc.,* 177 Conn. 212, 413 A.2d 840, 843 (Conn.1979). Moreover, the Uniform Commercial Code, as adopted in Pennsylvania and elsewhere, echoes this sentiment, states that " '[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement.' " 13 Pa.C.S. § 1203.

*5 Many courts have relied on *Creeger Brick* for their limited application of the implied covenant of good faith. These courts misunderstand and overstate *Creeger Brick's* holding. Rather, *Creeger Brick* held solely that the facts presented did not give rise to a tort claim for breach of the covenant of good faith:

It seems reasonably clear from the decided cases that a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract. Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself. As such, a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons. A lending institution also is not required to delay attempts to recover from a guarantor after the principal debtor has defaulted. Finally, if the bank in this case falsely represented appellants' financial circumstances to other creditors for the purpose of damaging appellants' ability to continue doing business, appellants may have causes of action in tort for slander, misrepresentation, or interference with existing or prospective contractual relations. There is no need in such cases to create a separate tort for breach of a duty of good faith.

385 Pa.Super. at 36-37, 560 A.2d at 154. This limited holding does not justify the conclusion that the covenant of good faith is inherent in some contracts, but absent from others.

This is not to say that the implied covenant of good faith can override the express terms of a contract. On the contrary, it is axiomatic that the covenant of good faith does nothing more than fill in those terms of a contract that have not been expressly stated. *See, e.g., Stonehedge Sq. L.P. v. Movie Merchants, Inc.,* 454 Pa.Super. 468, 480, 685 A.2d 1019, 1025 (1996), *aff'd,* 552 Pa. 412, 715 A.2d 1082 (holding that the implied covenant of good faith cannot vary the express terms of a contract). *Cf. Reading Terminal Merchants Ass'n v. Samuel Rappaport Assocs.,* 310 Pa.Super. 165, 176, 456 A.2d 552, 557 (1983) ("There can be no implied covenant as to any matter specifically covered by the written contract between the parties."); *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 198, 519 A.2d 385, 388 (1986) ("The law will not imply a contract different than that which the parties have expressly adopted."). In addition, the question of what constitutes a breach of the covenant will depend greatly upon the scenario presented and will vary from situation to situation. Nevertheless, parties owe each other a contractual obligation of good faith, even where those parties do not have a "special relationship."

*6 BOA has cited a number of cases that supposedly stand for the proposition that the covenant of good faith does not arise in a creditor-lender relationship. Each of these cases purports to rely on the Superior Court's ruling in *Creeger Brick,* and, to the extent that they advance BOA's argument, they are in error. *Creeger Brick* spoke not to whether the implied covenant of good faith was present in a creditor-lender relationship. Rather, the Superior Court held that "it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself," and that the availability of other remedies obviated the "need ... to create a separate tort for breach of a duty of good faith." 385 Pa.Super. at 37, 560 A.2d at 154. Those decisions relying on *Creeger Brick* to avoid the covenant of good faith and to narrow its application appear to confuse the *existence* of the covenant with the alleged *breach* of the covenant and to expand *Creeger Brick* into unintended areas. *Compare Fellheimer v. Maryland Nat'l Bank,* No. Civ. A. 93-2670, 1994 WL 2525, at *7 (E.D.Pa. Jan.6, 1994)* ("[A] lender does not breach an implied contractual duty of good faith by adhering to the terms of its contract with a borrower.") *with Temp-Way Corp. v. Continental Bank,* 139 B.R. 299, 319 (E.D.Pa.1992) ("While Pennsylvania recognizes an implied contractual duty of good faith in limited situations, it has refused to do so in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1472337 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

lender/borrower relationship."). Thus, *Creeger Brick* cannot be read as supporting BOA's position or validating those courts that have held that this covenant is not implied in every contract. Accordingly, the Agreement includes an implied covenant of good faith.

### B. The Complaint Alleges Facts to Support Plaza's Claim That BOA Breached the Implied Covenant of Good Faith

As noted *supra*, it is difficult to give a generalized statement that describes all breaches of the covenant of good faith, but examples of breaches include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Somers*, 613 A.2d at 1213. The covenant of good faith may also be breached when a party exercises discretion authorized in a contract in an unreasonable way. *See Burke v. Daughters of the Most Holy Redeemer, Inc.*, 344 Pa. 579, 581, 26 A.2d 460, 461 (1942) ("[T]he test of adequate performance is not whether the person for whom the service was rendered ought to be satisfied, but whether he is satisfied, there being, however, this limitation, that any dissatisfaction on his part must be genuine and not prompted by caprice or bad faith."); *Singerly v. Thayer*, 108 Pa. 291, 2 A. 230 (1885) ( "To justify a refusal to accept the [product] on the ground that it is not satisfactory, the objection should be made in good faith. It must not be merely capricious.").

\*7 The legitimacy of Plaza's claim hinges on Section 7.4(a) and (c), each of which require Plaza to maintain certain types of insurance. Under the first subsection, the question is whether the phrase "[s]pecial form property damage insurance" includes insurance against a terrorist attack. Under subsection (c), the question is whether BOA has exercised its discretion reasonably and without caprice by requiring Plaza to purchase terrorism insurance. If BOA prevails on either of these questions, Plaza's claim must be dismissed.

Based on the allegations presented in the Complaint, the Court has only moderate difficulty finding that BOA breached the covenant of good faith implied in the Agreement by deeming "other insurance" to include terrorism insurance. Plaza asserts that the Terrorism Insurance is "probably unavailable, or if available, is cost prohibitive and commercially unreasonable." Compl. ¶ 28. Because Plaza's leases

with Property tenants mandate that the cost of the Terrorism Insurance would be passed on to Property tenants, the expense would constitute "an enormous competitive disadvantage when compared to the other office buildings in Center City Philadelphia, which are not burdened with exorbitant and exclusive terrorism insurance." *Id.* ¶ 29, 2 A. 230. As an additional matter, the Terrorism Insurance BOA demands would apply solely to the Property, in contrast to previous insurance policies that insured all of Plaza's properties. *Id.* ¶ 26, 2 A. 230. By allegedly rejecting Plaza's request for an extension of time to investigate the feasibility of obtaining such insurance, BOA has exacerbated its breach. *Id.* ¶¶ 31-32, 2 A. 230. These allegations, which the Court must accept as true at this stage,[FN4] support Plaza's claim that BOA's demand's for the Terrorism Insurance as "other insurance" may be unreasonable and a breach of the implied covenant of good faith.[FN5]

FN4. For the purposes of reviewing the legal sufficiency of a complaint, a court must "treat as true all well-pleaded material, factual averments and all inferences fairly deducible therefrom." *Tucker v. Philadelphia Daily News*, 757 A.2d 938, 941-42 (Pa.Super.Ct.2000).

FN5. If, indeed, BOA's actions are as alleged in the Complaint, the general unavailability of terrorism insurance makes its conduct even more unreasonable. *See* Editorial, *Insuring Against Terrorism*, N.Y. Times, June 8, 2002, at A13 ("[S]ome insurance companies and reinsurers have stopped providing terrorism coverage altogether; many others are charging astronomical premiums for very limited coverage."); *Companies Are Increasingly Unable to Find Sufficient Terrorism Insurance*, SEC Filings Insight, Mar. 18, 2002, at 1.

Similarly, there is no indication, whether express or otherwise, that the "[s]pecial form property damage insurance" specifically includes insurance against terror attacks, whether separate or as a component. Because the scope and depth of this type of insurance are not defined and are open to more than one reasonable meaning,[FN6] the term is ambiguous and cannot be decided as a matter of law. If no ambiguities are found, the court may regard the interpretation of the contract as a question of law. *See Lapio v. Robbins*, 729 A.2d 1229, 1232

(Pa.Super.Ct.1999) ("[U]nambiguous terms of a contract are construed by a court as a matter of law."). Moreover, to the extent BOA has abused its power in defining special form property damage insurance and has attempted to foist an unreasonable definition on Plaza,[FN7] it has acted in violation of its good faith obligations.

> FN6. In general, "a clear and unambiguous contract provision must be given its plain meaning unless to do so would be contrary to a clearly expressed public policy." *Insurance Co. of Evanston v. Bowers, 758 A.2d 213, 220 (Pa.Super.Ct.2000)* (citing *Antanovich v. Allstate Ins. Co., 507 Pa. 68, 76, 488 A.2d 571, 575 (1985))*. Under Pennsylvania law, a contract is ambiguous "when a contract provision is reasonably susceptible to more than one meaning." *West Conshohocken Restaurant Assocs., Inc. v. Flanigan, 737 A.2d 1245, 1248 (Pa.Super.Ct.1999)* (citation omitted). A court must not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Constr. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 606, 735 A.2d 100, 106 (1999)* (citing *Steuart v. McChesney, 498 Pa. 45, 53, 444 A.2d 659, 663 (1982))*. *See also Tuthill v. Tuthill, 763 A.2d 417, 420 (Pa.Super.Ct.2000)* ("The fact that the parties have different interpretations of a contract does not render the contract ambiguous.").

> FN7. The conditions that render BOA's actions and proposed definition unreasonable could be similar to those that render its alleged conduct inappropriate in conjunction with subsection (c). These conditions may include the change in circumstances stemming from tragedy of September 11, 2001 and how the Parties would have addressed this change. *Cf. Laudig v. Laudig, 425 Pa.Super. 228, 233, 624 A.2d 651, 653 (1993)* (In determining the intent of the contracting parties, a court must "adopt an interpretation that is most reasonable and probable bearing in mind the objects which the parties intended to accomplish through the agreement" by examining "the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of

the subject-matter of the agreement.").

BOA contends that, in the past, the Parties have not adhered to an interpretation of this term that required Plaza to obtain discrete terrorism insurance for the Property. *Id.* ¶ 26. To the extent that insurance against incidents of terror was included in prior versions of the Policy, this allegation is not a part of the Complaint and therefore cannot be considered here. *See Caskie v. Philadelphia Rapid Transit Co., 321 Pa. 157, 160, 184 A. 17, 19 (1936)* ("A speaking demurrer is bad."); *Eckell v. Wilson, 409 Pa.Super. 132, 136 n. 1, 597 A.2d 696, 698 n. 1 (1991)* (noting that "a demurrer cannot be a 'speaking demurrer' and cannot be used to supply a fact missing in the complaint")[FN8]. Thus, the Complaint presents a complete and sustainable claim for breach of the covenant of good faith implied in the Agreement.

> FN8. The Court cautions that its decision is based on the fact that it must accept the allegations in the Complaint as true for the purposes of preliminary objections. There is a strong possibility that, at a later stage under a different procedural posture, Plaza will not prevail.

### II. The Complaint Presents a Justiciable Claim

*8 Although BOA does not challenge the justiciability of Plaza's claim,[FN9] Plaza articulates a defense as to why the Complaint presents a controversy that the Court may address. Plaza's argument has merit, and the Court may assess Plaza's request for a declaratory judgment.

> FN9. Indeed, BOA agrees with Plaza that this dispute is a justiciable dispute that the Court may address. Tr. of Oral Arg., June 3, 2002 3-4.

The purpose of Pennsylvania's Declaratory Judgment Act [FN10] "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered." *42 Pa.C.S. § 7541(a)*. However, there are limitations as to when a court may address a request for a declaratory judgment:

> FN10. *42 Pa.C.S. §§ 7531-7541*.

A declaratory judgment to decide future rights will

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not issue in a case where the alleged breach of the petitioner's rights is merely an anticipated event which may never happen and a petition for declaratory judgment is properly dismissed where the proceeding may prove to be merely academic. *McCandless Township v. Wylie,* 375 Pa. 378, 381-82, 100 A.2d 590, 592 (1953), citing *Eureka Casualty Co. v. Henderson,* 371 Pa. 587, 92 A.2d 551 (1952). While the subject matter of the dispute giving rise to a request for declaratory relief need not have erupted into a full-fledged battle, petitioner must at least allege facts demonstrating the existence of an active controversy relating to the invasion or threatened invasion of the petitioner's legal rights; there must emerge the "ripening seeds" of a controversy. *In re Cryan's Est.,* 301 Pa. 386, 152 A. 675 (1930). *Ronald C. Clark, Inc. v. Township of Hamilton,* 128 Pa. Commw. 31, 36, 562 A.2d 965, 967-68 (1989). *See also Allegheny County Constables Ass'n, Inc. v. O'Malley,* 108 Pa. Commw. 1, 5, 528 A.2d 716, 718 (1987) (reviewing requirements for declaratory judgment claim); *South Whitehall Twp. v. Commonwealth, Dept. of Transp.,* 82 Pa. Commw. 217, 222, 475 A.2d 166, 169 (1984) ("For declaratory relief to be appropriate, there must exist an actual controversy."). More specifically, a claim must be justiciable, which requires that a claimant's interest be "a direct, substantial and present interest, as contrasted with a remote or speculative interest." *Chester Upland Sch. Dist. v. Commonwealth,* 90 Pa. Commw. 464, 495 A.2d 981 (1985) (citing *Kaufmann v. Osser,* 441 Pa. 150, 155, 271 A.2d 236, 239 (1970)) (quotation marks omitted). *See also Wagner v. Apollo Gas Co.,* 399 Pa.Super. 323, 327, 582 A.2d 364, 366 (1990) ( "[A] plaintiff must demonstrate an 'actual controversy' indicating imminent and inevitable litigation, and a direct, substantial and present interest.").

When measured against these requirements, it becomes clear that the Complaint sets forth a justiciable claim. BOA has demanded that Plaza obtain terrorism insurance and has rejected Plaza's request for an extension of time to investigate the feasibility of obtaining such insurance. Compl. ¶ ¶ 26, 31-32. Moreover, BOA has threatened to purchase such insurance and to charge the premium costs to Plaza with an immediate demand for payment. *Id.* ¶ 33, 582 A.2d 364. Plaza's failure to pay such costs would allow BOA to declare that Plaza had defaulted under the Agreement. *Id.* ¶ 34, 582 A.2d 364. These allegations support finding that there is an actual controversy between the Parties and that Plaza has presented a justiciable claim.[FN11]

FN11. This conclusion is bolstered by the representations made by the Parties at oral argument before the Court. According to the Parties, since the filing of the Complaint, Plaza has secured a terrorism insurance policy with $100 million in coverage. In addition, BOA has obtained $91 million in terrorism insurance for the Property at a cost of $445,000. BOA has demanded immediate payment for this sum as it claims the terms of the Agreement authorize it to do. Tr. of Oral Arg., June 3, 2002 3-4.

CONCLUSION

*9 The Court has significant reservations about whether Plaza will be able to sustain its claim at a later stage in this litigation. However, for the purposes of the Objections, its request for a declaratory judgment based on BOA's alleged breach of the covenant of good faith and fair dealing implied in the Agreement is legally sufficient.

AND NOW, this 21st day of June, 2002, upon consideration of the Preliminary Objections of Defendant Bank of America National Trust and Savings Association to the Complaint of Plaintiff Philadelphia Plaza-Phase II and the Plaintiff's response thereto and oral argument held thereon, and in accordance with the reasons set forth in the contemporaneously issued Opinion, it is hereby ORDERED that the Objections are OVERRULED. The Defendant is directed to file an answer to the Complaint within 20 days of the date of entry of this Order.

Pa.Com.Pl.,2002.
Philadelphia Plaza-Phase II v. Bank of America Nat. Trust and Sav. Ass'n
Not Reported in A.2d, 2002 WL 1472337 (Pa.Com.Pl.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | **Chapter 11** |
| ARMSTRONG WORLD INDUSTRIES, | ) | |
| INC. et al., | ) | |
| | ) | **Case No. 00-04471 (JKF)** |
| Debtors. | ) | |
| | ) | **Jointly Administered** |
| | ) | |
| | ) | Hearing Date: October 23, 2006 at 9:45 a.m. |
| | ) | Re: Docket Nos. 9830 and 9914 |

**MOTION FOR AN ORDER AUTHORIZING SEA-PAC SALES COMPANY TO
FILE A REPLY TO OBJECTION OF ARMSTRONG WORLD INDUSTRIES,
INC. TO SEA-PAC SALES COMPANY'S MOTION (I) TO STAY OBJECTION
BY ARMSTRONG WORLD INDUSTRIES, INC. TO SEA-PAC'S PROOF OF
CLAIM NO. 4854 PENDING ARBITRATION, AND (II) FOR RELIEF
FROM THE AUTOMATIC STAY OR, IN THE ALTERNATIVE,
FOR RELIEF FROM THE DISCHARGE INJUNCTION**

Sea-Pac Sales Company ("Sea-Pac"), by and through its undersigned

counsel, hereby moves this Court (the "Motion") for entry of an order pursuant to Rule

9006-1(d) of the Local Rules of Bankruptcy Practice and Procedure for the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing Sea-Pac

to file a reply (the "Reply"), a copy of which is attached hereto as Exhibit A, to the

Objection Of Armstrong World Industries, Inc. To Sea-Pac Sales Company's Motion (I)

To Stay Objection By Armstrong World Industries, Inc. To Sea-Pac's Proof Of Claim

No. 4854 Pending Arbitration, And (II) For Relief From The Automatic Stay Or, In The

Alternative, For Relief From The Discharge Injunction (the "Objection") (D.I. No. 9914).

In support of this Motion, Sea-Pac respectfully represents as follows:

9951
10/16/06

## Jurisdiction

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On September 15, 2006, Sea-Pac filed with this Court Sea-Pac Sales Company's Motion To Stay Objection By Armstrong World Industries, Inc. To Sea-Pac's Proof Of Claim No. 4854 Pending Arbitration, And (II) For Relief From The Automatic Stay Or, In The Alternative, For Relief From The Discharge Injunction (the "Motion") (D.I. 9830).  By the Motion, Sea-Pac requested the entry of an order staying the Claims Objection pending arbitration.[1]  In addition, Sea-Pac requested that the Court enter an order granting relief from the automatic stay, or, in the alternative, relief from the discharge injunction, so as to permit Sea-Pac to proceed with arbitration of its claims.

3.      The Debtors filed the Objection on October 6, 2006.  A hearing to consider the Motion and the Objection is scheduled for October 23, 2006 at 9:45 a.m.

## Relief Requested

4.      By this Motion, Sea-Pac seeks authority, pursuant to Local Rule 9006-1(d), to file the Reply in order to address the issues raised in the Objection.  The Reply that Sea-Pac seeks authority to file is attached hereto as Exhibit A.

## Basis for Relief

5.      Pursuant to Local Rule 9006-1(d), Sea-Pac may file the Reply upon an order of this Court authorizing such filing.

---

[1]      Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

2

6.    Sea-Pac submits that the Reply is necessary to fully inform the Court of the issues presented in the Objection and provide further guidance to the Court in ruling on the Motion. Additionally, Sea-Pac believes that the Court's consideration of the Reply will help streamline oral argument on this matter.

WHEREFORE, Sea-Pac respectfully requests that the Court enter an Order, substantially in the form attached hereto as <u>Exhibit B</u>, authorizing Sea-Pac to file the Reply.

Dated: October 16, 2006

ECKERT SEAMANS CHERIN & MELLOTT, LLC

Karen Lee Turner (Bar No. 4332)
Michael G. Busenkell (Bar No. 3933)
300 Delaware Avenue, Suite 1360
Wilmington, Delaware 19801
(302) 425-0430

Michael M. Feinberg
Diana K. Carey
KARR TUTTLE CAMPBELL
1201 Third Avenue, Suite 2900
Seattle, Washington 98102
(206) 223-1313

Al Van Kampen
ROHDE & VAN KAMPEN, PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
(206) 386-7353

*U0003593*

3

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| ARMSTRONG WORLD INDUSTRIES, | ) |
| INC. et al., | ) |
| | ) Case No. 00-04471 (JKF) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) Hearing Date: October 23, 2006 at 9:45 a.m. |

**REPLY OF SEA-PAC SALES COMPANY TO DEBTORS' OBJECTION TO SEA-PAC SALES COMPANY'S MOTION (I) TO STAY OBJECTION BY ARMSTRONG WORLD INDUSTRIES, INC. TO SEA-PAC'S PROOF OF CLAIM NO. 4854 PENDING ARBITRATION, AND (II) FOR RELIEF FROM THE AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE DISCHARGE INJUNCTION [Re: D.I. 9914]**

Sea-Pac Sales Company ("Sea-Pac") hereby replies to the Objection Of Armstrong World Industries, Inc. ("AWI") To Sea-Pac Sales Company's Motion (I) To Stay Objection By AWI To Sea-Pac's Proof Of Claim No. 4854 Pending Arbitration, And (II) For Relief From The Automatic Stay Or, In The Alternative, For Relief From The Discharge Injunction (the "Objection") (D.I. 9914), and in support thereof respectfully states as follows:

I.    **Sea-Pac Has An Enforceable Right To Arbitration Under The Agreements.**

    i.   **The Arbitrators Should Decide Whether Sea-Pac has Waived Arbitration.**

1.    As a preliminary matter, the question of whether Sea-Pac has waived arbitration is a question to be determined by the arbitrators. The Supreme Court has held that whether conditions precedent to an obligation to arbitrate have been met, specifically including the timing of arbitration requests, are for the arbitrators to decide rather than the court. See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002); Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). Accordingly, the arbitrators, not the Court, should decide whether Sea-Pac has waived arbitration as the Debtors contend.

    ii.  **Sea-Pac Timely Initiated Arbitration.**

2.    Even were this Court, rather than the arbitrators, entertain the Debtors' argument that arbitration has been waived or is somehow untimely, the Debtors' position is unfounded and should be rejected. Sea-Pac's request for arbitration is timely under the

Agreements. Pursuant to the Agreements, Sea-Pac was required to negotiate the dispute or request mediation within 40 days of the dispute arising. See Commercial Agreement ¶ 24; Residential Agreement ¶ 29. Once negotiation was unsuccessful and in the absence of a request for mediation, Sea-Pac then had an additional 30 days to initiate arbitration before either of the parties were entitled to litigate the dispute. See Commercial Agreement ¶ 25, Residential Agreement ¶ 30. Thus, Sea-Pac had a total of 70 days from the time the dispute arose to seek arbitration of its claims.[1]

3.     The dispute regarding Sea-Pac's claim first arose on July 23, 2006 – the date Sea-Pac received AWI's Claims Objection. Prior to July 23, 2006, Sea-Pac's claim was deemed allowed under section 502(a) of the Bankruptcy Code ("A claim . . . , proof of which is filed under section 502 of this title, is deemed allowed, unless a party in interest . . . objects."). See In re Oakwood Homes Corp., 449 F.3d 588, 603-04 (3d Cir. 2006). Accordingly, until the Debtors filed the Claims Objection on July 20, 2006, Sea-Pac had an allowed claim and no dispute existed regarding Sea-Pac's claim.

4.     Once the Claims Objection was received on July 23, 2006, Sea-Pac had 70 days to seek arbitration. Sea-Pac filed its motion seeking arbitration on September 30, 2006 – within the 70-day time period. Under the Debtors' analysis, Sea-Pac would have been required to move for relief from stay to request arbitration before it even knew there was a dispute. Accordingly, Sea-Pac's request for arbitration was timely under the Agreements and the Court should compel arbitration of Sea-Pac's claims if it does not refer this issue first to arbitration.

### iii. The Failure to Initiate Arbitration within the Time Set Forth in the Agreements does not Amount to a Waiver of Arbitration Rights.

5.     Even assuming arguendo that Sea-Pac failed to timely demand arbitration, such failure does not amount to waiver of arbitration rights.

6.     It is well-established that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

---

[1] Preliminarily, Sea-Pac submits that the time for Sea-Pac to initiate arbitration was tolled pursuant to Section 108(c) of the Bankruptcy Code.

<u>Moses H. Cone Memorial Hosp.</u>, 460 U.S. at 24-25.  Moreover, "there is a strong presumption in favor of arbitration and a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity."  <u>Carter v. Countrywide Credit Industries, Inc.</u>, 362 F.3d 294, 297 (5th Cir. 2004) (citing <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20, 26 (1991).  The Debtors have failed to meet their burden.

       7.    The Debtors' argument that Sea-Pac has waived arbitration by not timely requesting arbitration is unsupported by the language of the Agreements.  Relying on paragraphs 25 and 30 of the Commercial Agreement and Residential Agreement, respectively, the Debtors contend that Sea-Pac has waived its arbitration rights because it did not initiate arbitration within 30 days of arbitration becoming an option. See Objection ¶ 15.2

       8.    The Debtors misinterpret the arbitrations provisions of the Agreements. The provisions of the Agreements relied upon by the Debtors do not state that arbitration is no longer available after expiration of the 30-day period.  Rather, paragraphs 25 and 30 of the Commercial Agreement and Residential Agreement, respectively, indicate that either party may pursue litigation rather than arbitration once the 30 day period expires.[3]  They do not, as suggested by the Debtors, mean that the parties are precluded from ever seeking arbitration once the 30 day time period expires or, as mistakenly characterized by the Debtors, that such provisions "provide a deadline by which a party must elect arbitration."  Objection ¶ 15. Notably, the provisions relied upon by the Debtors do not state that the parties' right to arbitration is waived or forfeited if not asserted within the 30 days.  Accordingly, assuming Sea-Pac's time to initiate arbitration under the Agreements was not tolled, Sea-Pac still has the right to seek arbitration under the Agreements.

---

[2]  The Debtors argue that the parties could "submit disputes to arbitration **if and only if** arbitration was sought within the appropriate time frame, after which either party had the express right to initiate litigation."  The Debtors argument is patently misleading.  Nowhere in the Agreements does the Debtors' suggested limitation on seeking arbitration appear.  Indeed, the Debtors cite to no provisions in the Agreements expressly providing that the right to arbitration is waived if not asserted within the 30 days.

[3]  Paragraphs 25 and 30 of the Commercial Agreement and Residential Agreement, respectively, both provide in pertinent part that: "If arbitration is not initiated within 30 days of its becoming an option, as provided above, either party <u>may</u> resort to litigation . . ." (emphasis added).

9.    Moreover, Courts have held that a waiver of arbitration rights is not to be lightly inferred absent a showing of prejudice. Shubert v. Wellspring Media, Inc. (In re Winstar Communications, Inc.), 335 B.R. 556, 565 (Bankr. D. Del. 2005). Winstar, like the present case, involved a contractual limitation specifying the time in which arbitration had to be invoked. Id. When the defendants invoked an arbitration agreement in response to the Trustee's adversary proceeding, the Trustee argued that the demand was untimely. Id. at 561. Nonetheless, the Court in Winstar granted the motion to stay the adversary pending arbitration. Id. at 568-69. The Court noted that:

> [T]he Trustee also implies that, since Wellspring did not seek arbitration until after the Trustee commenced this adversary proceeding, Wellspring, in essence, waived the option to have the Matter determined at arbitration. "The Third Circuit has established that prejudice is the touchstone for determining whether the right to arbitrate has been waived. The parties trying to avoid arbitration has the burden of establishing prejudice." .

Winstar, 335 B.R. at 567 (quoting In re Fleming Co., Inc., 325 B.R. 687, 691 (Bankr. D. Del. 2005) (quoting Hexworth v. Binder, Robinson and Co., 980 F.2d 912, 925 (3rd Cir. 1992)). The Winstar court went on to note "[A] party cannot avoid arbitration because of the other party's failure to comply with the negotiation steps of a grievance procedure as long as that other party acted in good faith to preserve its right to arbitration." Winstar, 335 B.R. at 568 (quoting Welborn Clinic v. Med Quist, Inc., 301 F.3d 634, 638 (7th Cir. 2002)). Sea-Pac has acted in good faith to preserve its right to arbitrate. Consequently, this Court should not infer waiver of Sea-Pac's right to arbitrate without a demonstration of prejudice – which the Debtors have not shown. See Winstar, 335 B.R. at 568.

## II.    Arbitration Is Appropriate For Sea-Pac's Claims.

10.    Although the Court may decline to enforce arbitration provisions in a core matter, it may only do so if it finds that enforcement of the arbitration provisions would either conflict with policies of the Bankruptcy Code or where the dispute underlying the arbitration is based on rights created by the Bankruptcy Code. See Winstar, 335 B.R. at 565. Neither is present here.

4

11.    Arbitration of the Debtors' liability under the Agreements involves neither bankruptcy issues nor statutorily created rights under the Bankruptcy Code. Rather, Sea-Pac's claims are purely state law breach of contract claims. Moreover, arbitration of the Debtors' liability under the Agreements does not offend any objectives of the Bankruptcy Code. Indeed, the Debtors fail to identify a single objective of the Bankruptcy Code that is undermined by arbitration of the Debtors' liability under the Agreements.

12.    Contrary to Debtors' assertion, Sea-Pac does not seek arbitration of the following issues, which Sea-Pac acknowledges are within the Court's jurisdiction: (i) the priority of Sea-Pac's claims, (ii) the timeliness of Sea-Pac's claims and (iii) Sea-Pac's right to recover attorneys' fees from the Debtors' estates after such fees have been awarded in arbitration.

13.    Similarly, there are no purely bankruptcy issues that require centralized resolution, Sea-Pac's underlying claims cannot be more expeditiously resolved by the Court than by arbitration, no special bankruptcy expertise is required to resolve Sea-Pac's underlying contract claims, arbitration will not adversely impact other creditors, and arbitration does not threaten the assets of the estate. See, e.g., In re Slipped Disc, 245 B.R. 342, 345 (Bankr. N.D. Iowa 2000); In re Dunes Hotel Associates, 194 B.R. 967, 993 (Bankr. D.S.C. 1995).

14.    Enforcement of the arbitration agreements is especially appropriate where, as here, the arbitration agreement is the product of bargained-for negotiations between sophisticated parties. As noted by the Winstar court, "[a]bsent evidence that arbitration would jeopardize the objectives of the Bankruptcy Code, the Court gives deference to the procedures agreed upon by the parties for resolving this dispute." Winstar, 335 B.R. at 567 citing Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., n. 23 (3d Cir. 1989).

## CONCLUSION

Sea-Pac respectfully requests that the Court (a) enter an order staying the Claims Objection pending arbitration; (b) grant relief from the automatic stay, or, in the alternative, grant relief from the discharge injunction, to permit Sea-Pac to pursue its claims in arbitration; and (c) grant such other relief as is just and proper.

Dated: October 16, 2006

ECKERT SEAMANS CHERIN & MELLOTT,
LLC

Karen Lee Turner (Bar No. 4332)
Michael G. Busenkell (Bar No. 3933)
300 Delaware Avenue, Suite 1360
Wilmington, Delaware 19801
(302) 425-0430

Michael M. Feinberg
Diana K. Carey
**KARR TUTTLE CAMPBELL**
1201 Third Avenue, Suite 2900
Seattle, Washington 98102
(206) 223-1313

Al Van Kampen
**ROHDE & VAN KAMPEN PLLC**
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
(206) 386-7353

6

**EXHIBIT B**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| ARMSTRONG WORLD INDUSTRIES, | ) |
| INC. et al., | ) |
| | ) Case No. 00-04471 (JKF) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

**ORDER APPROVING MOTION FOR AN ORDER AUTHORIZING SEA-PAC
SALES COMPANY TO FILE A REPLY TO OBJECTION OF ARMSTRONG
WORLD INDUSTRIES, INC. TO SEA-PAC SALES COMPANY'S MOTION
(I) TO STAY OBJECTION BY ARMSTRONG WORLD INDUSTRIES, INC. TO SEA-
PAC'S PROOF OF CLAIM NO. 4854 PENDING ARBITRATION, AND
(II) FOR RELIEF FROM THE AUTOMATIC STAY OR, IN THE ALTERNATIVE,
FOR RELIEF FROM THE DISCHARGE INJUNCTION**

Upon consideration of the Motion For An Order Authorizing Sea-Pac Sales

Company To File A Reply To Objection Of Armstrong World Industries, Inc. To Sea-Pac Sales

Company's Motion (I) To Stay Objection By Armstrong World Industries, Inc. To Sea-Pac's

Proof Of Claim No. 4854 Pending Arbitration, And (II) For Relief From The Automatic Stay Or,

In The Alternative, For Relief From The Discharge Injunction (the "Motion"); and the Court

having determined that good cause exists for the relief requested in the Motion; and after due

deliberation and sufficient cause appearing therefore; it is hereby

ORDERED that the relief requested in the Motion is granted; and it is further

ORDERED that Sea-Pac Sales Company is hereby permitted to file the Reply.

Dated: October __, 2006

_____

The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

*U0003599*

## CERTIFICATE OF SERVICE

I, Michael G. Busenkell, certify that on October 16, 2006 I caused copies of the foregoing Motion For An Order Authorizing Sea-Pac Sales Company To File A Reply To Objection Of Armstrong World Industries, Inc. To Sea-Pac Sales Company's Motion (I) To Stay Objection By Armstrong World Industries, Inc. To Sea-Pac's Proof Of Claim No. 4854 Pending Arbitration, And (II) For Relief From The Automatic Stay Or, In The Alternative, For Relief From The Discharge Injunction [Re: D.I. 9914) to be served in the manner indicated on the parties on the attached service list.

Michael G. Busenkell (No. 3933)

*U0003203*

*In re: Armstrong World Industries, Inc., et al.*

*Local Via Hand Delivery  -  Non-Local Via First Class Mail*

*Representing Debtors' Counsel*
Mark D. Collins
Rebecca L. Booth
Richards, Layton & Finger
P.O. Box 551
One Rodney Square
Wilmington, DE 19899

*Representing Counsel for Chase Manhattan Bank as agent for Post-Petition Lenders*
Terri Currier
Eric L. Schnabel
Klett Rooney Lieber & Schorling, PC
P.O. Box 1397
The Brandywine Building, 1000 West Street
Suite 1410
Wilmington, DE 19899-1397

*Representing Counsel for Unsecured Creditors Committee*
Mark E. Felger
David W. Carickhoff, Jr.
Cozen & O'Conner, PC
Chase Mahattan Centre, 1201 North Market
Street Suite 1400
Wilmington, DE 19801

*Representing Counsel for the Chase Manhattan Bank as Agent to the Pre-Petition Lenders*
Michael R. Lastowski
Duane, Morris & Heckscher LLP
1100 North Market Street Suite 1200
Wilmington, DE 19801-0124

*Representing Asbestos Claimants Committee*
Aileen Maguire
Marla R. Eskin
Campbell & Levine
800 King Street Suite 300
Wilmington, DE 19801

*Representing Counsel for Dean M. Trafelet*
James L. Patton, Jr.
Edwin J. Harron
Young, Conway, Stargatt & Taylor, LLP
The Brandywine Building, 1000 West Street
17th Floor
Wilmington, DE 19801

*Representing United States Trustee*
Frank J. Perch III
Office of the United States Trustee
844 King Street, Room 2313 Lockbox 35
Wilmington, DE 19801

*Representing Counsel for Dean M. Trafelet*
Nicholas Cremona
Andrew A. Kress
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

*Representing Debtor*
Debra Dandeneau
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153

*Representing Debtor*
Walter T. Gangl
Kenneth Jacobs
Mary Huwalt
Armstrong World Industries, Inc.
2500 Columbia Avenue Building 701
Lancaster, PA 17603

*Representing Counsel for Asbestos Claimants Committee*
Elihu Inselbuch
Rita C. Tobin
Caplin & Drysdale, Chartered
399 Park Avenue, 27th Floor
New York, NY 10022-4614

*Representing Debtor*
Stephen Karotkin
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153

*Representing Counsel for the Chase*
*Manhattan Bank as Agent to the Pre-*
*Petition Lenders*
William S. Katchen
Duane, Morris & Heckscher LLP
1 Riverfront Plaza 2nd Floor
Newark, NJ 07102

*Representing Counsel for Asbestos*
*Claimants Committee*
Peter Van N. Lockwood
Caplin & Drysdale, Chartered
One Thomas Circle Suite 1100
Washington, DC 20005

*Representing Counsel for Unsecured*
*Creditors Committee*
Andrew N. Rosenberg
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064

*Representing Counsel for Chase Manhattan*
*Bank as agent for Post-Petition Lenders*
Robert Scheibe
Richard Toder
Scott Talmadge
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060

*Representing Legal Representative for*
*Future Claimants*
Dean M. Trafelet
P.O. Box 518
9130 Wild Lane
Baileys Harbor, WI 54202

*Representing Prepetition Lenders*
Denise Wildes
Lewis Kruger
Stroock, Stroock & Lavin LLP
180 Maiden Lane
New York, NY 10038-4982

**8**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| ARMSTRONG WORLD INDUSTRIES, | ) |
| INC., et al., | ) |
| | ) Case No. 00-04471 (JKF) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |
| | ) Re: D.I. 9830 |

**ORDER DENYING SEA-PAC SALES COMPANY'S MOTION (I) TO STAY
OBJECTION BY ARMSTRONG WORLD INDUSTRIES, INC. TO SEA-PAC'S
PROOF OF CLAIM NO. 4854 PENDING ARBITRATION, AND (II) FOR
RELIEF FROM THE AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR
RELIEF FROM THE DISCHARGE INJUNCTION**

UPON CONSIDERATION of the motion of Sea-Pac Sales Company (i)
to stay objection by Armstrong World Industries, Inc. to Sea-Pac's proof of claim no.
4854 pending arbitration, and (ii) for relief from the automatic stay or, in the alternative,
for relief from the discharge injunction (the "Motion") (D.I. 9830), the objection thereto,
the arguments of counsel at a hearing held on October 23, 2006 (the "Hearing"), and the
entire record herein, and the Court having subject matter jurisdiction to consider the
Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334, it
is hereby ORDERED that the Motion is DENIED for the reasons stated on the record at
the Hearing.

Dated: Wilmington, Delaware

Nov. 20            , 2006

*Judith K. Fitzgerald*

JUDITH K. FITZGERALD
United States Bankruptcy Judge

**9**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) **Chapter 11** |
| **ARMSTRONG WORLD INDUSTRIES,** | ) |
| **INC.** *et al.,* | ) |
| | ) **Case No. 00-04471 (JKF)** |
| Debtors. | ) |
| | ) **Jointly Administered** |
| | ) |
| | ) |

### NOTICE OF APPEAL OF SEA-PAC SALES COMPANY

Pursuant to 28 U.S.C. 158(a) and 9 U.S.C. 16(a) Sea-Pac Sales Company appeals the

Order Denying Sea-Pac Sales Company's Motion (I) to Stay Objection by Armstrong World

Industries, Inc. to Sea-Pac's Proof of Claim No. 4854 Pending Arbitration, and (II) For Relief

from the Automatic Stay or, in the Alternative, For Relief from the Discharge Injunction, dated

November 20, 2006 and entered on the docket on November 20, 2006 (Docket No. 10117) by the

United States Bankruptcy Court for the District of Delaware, Judge Judith K. Fitzgerald, a copy

of which is attached as Exhibit A.

The names of all parties to the judgment, order or decree appealed from and the names,

addresses and telephone numbers of their respective attorneys are as follows:

10134
11/30/06

| PARTY | ATTORNEYS |
|---|---|
| Counsel for Sea-Pac Sales Company | Karen Lee Turner (Bar No. 4332)<br>Michael G. Busenkell (Bar No. 3933)<br>Eckert, Seamans Cherin & Mellott, LLC<br>300 Delaware Avenue, Suite 1210<br>Wilmington, Delaware 19801<br>Telephone: (302) 425-0430<br>Facsimile: (302) 425-0432<br><br>-and-<br><br>Michael M. Feinberg<br>Karr Tuttle Campbell<br>1201 Third Ave, Suite 2900<br>Seattle, Washington 98101<br>Phone: (206) 223-1313<br>Facsimile: (206) 682-7100<br><br>-and-<br><br>Al Van Kampen<br>Rohde & Van Kampen PLLC<br>1001 Fourth Avenue, Suite 4050<br>Seattle, Washington 98154<br>Telephone: (206) 386-7353<br>Facsimile (206) 405-2825 |
| Counsel for Armstrong World Industries | Mark D. Collins (No. 2981)<br>Jason M. Madron<br>Richards, Layton & Finger, P.A.<br>One Rodney Square, P.O. Box 551<br>Wilmington, Delaware 19899<br>Telephone: (302) 651-7700<br><br>-and-<br><br>Stephen Karotkin<br>Debra A. Dandeneau<br>Weil Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000 |

Dated: November 30, 2006

Respectfully submitted,

Karen Lee Turner (Bar No. 4332)
Michael G. Busenkell (Bar No. 3933)
Eckert, Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1210
Wilmington, Delaware  19801
Telephone:  (302) 425-0430
Facsimile:  (302) 425-0432

and

Michael M. Feinberg
Karr Tuttle Campbell
1201 Third Ave, Suite 2900
Seattle, WA 98101
Telephone:  (206) 223-1313
Facsimile:  (206) 682-7100

and

Al  Van Kampen
Rohde & Van Kampen PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington  98154
Telephone: (206) 386-7353
Facsimile (206) 405-2825

Counsel for Sea-Pac Sales Company

*U0004170*

3

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| ARMSTRONG WORLD INDUSTRIES, | ) |
| INC., et al., | ) |
| | ) Case No. 00-04471 (JKF) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |
| | ) Re: D.I. 9830 |

ORDER DENYING SEA-PAC SALES COMPANY'S MOTION (I) TO STAY
OBJECTION BY ARMSTRONG WORLD INDUSTRIES, INC. TO SEA-PAC'S
PROOF OF CLAIM NO. 4854 PENDING ARBITRATION, AND (II) FOR
RELIEF FROM THE AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR
RELIEF FROM THE DISCHARGE INJUNCTION

UPON CONSIDERATION of the motion of Sea-Pac Sales Company (i)
to stay objection by Armstrong World Industries, Inc. to Sea-Pac's proof of claim no.
4854 pending arbitration, and (ii) for relief from the automatic stay or, in the alternative,
for relief from the discharge injunction (the "Motion") (D.I. 9830), the objection thereto,
the arguments of counsel at a hearing held on October 23, 2006 (the "Hearing"), and the
entire record herein, and the Court having subject matter jurisdiction to consider the
Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334, it
is hereby ORDERED that the Motion is DENIED for the reasons stated on the record at
the Hearing.

Dated: Wilmington, Delaware

Nov. 20                    , 2006

Judith K. Fitzgerald

_____
JUDITH K. FITZGERALD
United States Bankruptcy Judge

## CERTIFICATE OF SERVICE

I, Michael G. Busenkell, certify that on November 30, 2006 I caused copies of the foregoing Notice Of Appeal to be served in the manner indicated on the parties on the attached service list.

Michael G. Busenkell (No. 3933)

*U0003266*

## SERVICE LIST

**Representing Debtors**
Mark D. Collins, Esquire
Rebecca L. Booth, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19899
*By Hand*

Office of the United States Trustee
844 King Street, Room 2313
Lockbox 35
Wilmington, DE 19801
*By Hand*

**Representing Counsel for Asbestos**
**Claimants Committee**
Elihu Inselbuch, Esquire
Rita C. Tobin, Esquire
Caplin & Drysdale, Chartered
399 park Avenue, 27th Floor
New York, NY 10022-4614
*By First Class Mail*

**Representing Counsel for Unsecured**
**Creditors Committee**
Andrew N. Rosenberg, Esquire
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
new York, NY 10019-6064
*By First Class Mail*

**Representing Debtors**
Debra Dandeneau, Esquire
Stephen Karatkin, Esquire
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153
*By First Class Mail*

**Representing Counsel for Asbestos**
**Claimants Committee**
Peter Van N. Lockwood
Caplin & Drysdale, Chartered
One Thomas Circle, Suite 1100
Washington, DC 20005
*By First Class Mail*

**Representing Counsel for Unsecured**
**Creditor Committee**
Mark E. Felger, Esquire
Cozen & O'Conner, PC
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
*By Hand*

**Representing Asbestos Claimants**
**Committee**
Aileen Maguire, Esquire
Marla R. Eskin, Esquire
Campbell & Levine
800 King Street, Suite 300
Wilmington, DE 19801
*By First Class Mail*

**10**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                .    Chapter 11
                                      .
ARMSTRONG WORLD INDUSTRIES,           .    Case No. 00-04471(JKF)
INC., *et al.*,                       .    (Jointly Administered)
                                      .
          Debtors.                    .    Oct. 23, 2006 (9:42 a.m.)
                                      .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: This is the matter of Armstrong World

2     Industries, 00-4471.  The appearances I have by telephone are

3     Marti Murray, Sara Gooch, Jeffrey Nickel, Al Van Kampen, Mark

4     Poovey, Mary Lyman, Michael Feinberg, Nicole Greenblatt,

5     Debra Dandeneau, and Kenneth Jacobs.  Yes, is Ms. Lyman on

6     for Navigant?

7          MS. LYMAN (TELEPHONIC): Yes, I am.

8          THE COURT: All right, thank you.  I just wanted to

9     make sure we weren't starting without you.  Good morning.

10         MR. MADRUN: Good morning, Your Honor.  For the

11    record, Jason Madrun of Richards, Layton & Finger on behalf

12    of Armstrong World Industries and its affiliated reorganized

13    Chapter 11 debtors.  Your Honor, we appear before the Court

14    today for the October omnibus hearing date in these confirmed

15    Chapter 11 cases.  With permission of the Court, we would

16    like to proceed directly off of the amended final agenda

17    filed with the Court on October 17.  I trust that a copy made

18    its way to Your Honor.

19         THE COURT: Probably has, but I'm not sure - Let's

20    see.  Yes.  Docket No. 99102, I have that, thank you.

21         MR. MADRUN: Thank you, Your Honor.  Your Honor, as

22    set forth on the amended agenda, items numbers 1 through 3

23    are continued to dates to be determined.  That quickly brings

24    us then to item numbers 4 and 5, which are related items.

25    Item 4 is the motion filed by Sea-Pac to stay Armstrong's

1    claim objection pending arbitration and to lift stay or

2    modify the discharge injunction.  Item 5 is the related

3    objection to claims filed by Armstrong.  I would then, Your

4    Honor, turn the proceeding over to counsel for Sea-Pac, who I

5    understand to be here in the courtroom today, as well as to

6    Debra Dandeneau who is my co-counsel from Weil, Gotshal to

7    address these two items.

8              THE COURT: All right, thank you.

9              MR. MADRUN: Thank you, Your Honor.

10             THE COURT: Good morning.

11             MS. TURNER: Good morning, Your Honor.  My name is

12   Karen Lee Turner, I'm appearing today with my colleague, Mike

13   Kundosalkow (phonetical) on behalf of Sea-Pac.  If I may

14   proceed.  Your Honor, the motion which is pending before you

15   is a motion for relief from the stay or alternatively the

16   discharge injunction because the plan has now gone effective

17   so as to permit Sea-Pac to proceed with arbitration.  There

18   were two contracts in existence between the parties that are

19   referred to colloquially as the residential agreement and the

20   commercial agreement.  The residential agreement covers

21   residential flooring products.  The commercial agreement

22   covers commercial flooring products.  Both of these

23   provisions contain arbitration clauses.  Your Honor, we filed

24   with our papers a memorandum of law that sets forth all of

25   the relative points and procedures governing the inter-

1    relationship between arbitration and the Bankruptcy Code.

2    That is Docket No. 9833.  Generally speaking, Your Honor,

3    there is a strong policy adopted by all of the federal courts

4    in favor of arbitration and in matters where an arbitration

5    clause is potentially relevant, the Court should defer to the

6    arbitration to permit that proceeding to go forward.  There

7    have been a number of arguments made by Armstrong in

8    opposition to arbitration.  Those are contained in their

9    objection which is Docket No. 9914.  Since we've set forth

10   affirmatively our position in our memorandum, they have

11   responded in their objection and Your Honor may be aware that

12   we have also filed a motion for an order authorizing us to

13   file a reply to their objection.

14        THE COURT: Yes, I instructed staff but I don't

15   think the order's been entered yet.  I just asked this

16   morning that that order be entered.  So you can proceed on

17   your reply, which I've also read.

18        MS. TURNER: Okay.  I think, Your Honor, the reply

19   is really the key, docket item 9951 has the reply attached to

20   it as an exhibit.  Generally speaking, we go through each of

21   the arguments that Armstrong has raised in their objection,

22   and we've replied to each of those, and I think that pretty

23   much summarizes our position before this Court.  To the

24   extent that there is any issue about whether there has been a

25   waiver of arbitration or the scope of arbitration or whether

5

1    arbitration applies to dispute, those issues should, in the

2    absence of compelling circumstances to the contrary, be

3    decided in the first instance by the arbitrator, and we would

4    request that this Court, in the absence of these compelling

5    circumstances, permit that arbitration to go forward.  Given

6    that this is a post-effective debtor, a reorganized debtor,

7    there are no allegations that arbitration will in any way

8    interfere with or disrupt the bankruptcy process.  Rather,

9    the parties should go to arbitration, the arbitrator should

10   determine - arbitrators, it's a three-panel - whether or not

11   arbitration is timely.  The arbitrators should determine what

12   is in fact the respective rights of the parties under the

13   various agreements, and what claims one might have against

14   the other.  At such time as the arbitration is concluded,

15   then that award would come back to this - if there's an award

16   in Sea-Pac's favor, it would come back to this Court, and

17   this Court would determine how that award will be prioritized

18   for bankruptcy purposes and where it fits into the

19   appropriate scheme of the bankruptcy proceeding, and we

20   believe that that is the appropriate way for this Court to

21   proceed with the arbitration.

22         THE COURT: All right, thank you.  Ms. Dandeneau?

23         MS. DANDENEAU (TELEPHONIC): Your Honor, thank you

24   and thank you for permitting me to appear by telephone.  If

25   this were a case in which Sea-Pac had simply filed a pre-

6

1    petition breach of contract claim and had timely invoked the

2    right to arbitration - and that's an issue, by the way, that

3    Armstrong disputes and to which I will turn later - then

4    other than the issue of the effect of the withdrawal with

5    prejudice of Sea-Pac's original proof of claim, we would

6    absolutely completely agree with Sea-Pac that enforcing the

7    arbitration provisions of the distributor agreement does not

8    conflict with the Bankruptcy Code.    In fact, I think it's

9    safe to say that throughout Armstrong's Chapter 11 case,

10   whenever we did have a dispute involving a pre-petition

11   claim, Armstrong clearly recognized the strong federal policy

12   in favor of arbitration, and Armstrong has not sought to keep

13   resolution in pre-petition claims for the Bankruptcy Court.

14   Instead, throughout its Chapter 11 case, Armstrong routinely

15   agreed to send claims to arbitration.    This case, however, is

16   different, and the law in the Third Circuit and elsewhere

17   recognizes that a case such as this belongs before the

18   Bankruptcy Court and should not be decided by arbitrators.

19   There's not a single case involving rights created by the

20   Bankruptcy Code or the interpretation of a Bankruptcy Court's

21   own order where the Court has required the Bankruptcy Court

22   to send the case to arbitration.    But this is exactly what

23   Sea-Pac is asking this Court to do.    Sea-Pac has asserted its

24   claims as administrative expenses, and we can all argue about

25   the merits of that assertion, but all parties certainly would

1   agree that the category of administrative expense is a narrow

2   priority created for a favored class of unsecured creditors

3   that entitles them to receive payment in full, ahead of other

4   creditors.  Now, the analysis of what constitutes an

5   administrative expense claim becomes even more complicated

6   when the Court is dealing with an alleged breach of a pre-

7   petition contract and that alleged breach occurred post-

8   petition, and this is not a post-petition tort.  So the Court

9   in this case must address the test under <u>Mandis Mart</u>

10  <u>(phonetical)</u> and waive such issues as, for example, what is

11  the effect of Sea-Pac never having moved to compel Armstrong

12  to assume or reject the distributor agreements even though

13  Sea-Pac claims it knew for years that Armstrong was in

14  breach.  What is the effect on this alleged administrative

15  expense claim that Sea-Pac was induced to perform,

16  supposedly, a requirement for asserting an administrative

17  expense claim?  What is the effect of the fact that Sea-Pac

18  now claims that it knew for years that Armstrong breached the

19  agreement but nevertheless continued to perform?  What is the

20  effect of Sea-Pac not having filed a claim by the

21  administrative expense bar date assuming that Sea-Pac even

22  has a valid administrative expense claim, and what is the

23  effect of Sea-Pac's withdrawal of its original proof of claim

24  with prejudice after Sea-Pac knew of the facts giving rise to

25  the alleged breaches of the distributor agreement?  All of

1    those issues are bankruptcy issues, and those are issues of

2    interpretation of a Bankruptcy Court order and interpretation

3    and application of the Bankruptcy law.  They involve

4    interpretation of rights created by the Bankruptcy Code and

5    it's that context the Third Circuit has recognized the Court

6    has discretion to determine whether that issue would conflict

7    potentially with sending it to arbitration.  Moreover, I

8    would just note that even if the Court were to find that Sea-

9    Pac is entitled to an administrative expense, the Court would

10   then have to determine what the appropriate amount of such

11   claim is because the standard for determining the amount of

12   an administrative expense claim is not simply a calculation

13   of damages under the contract.  Instead, again, we have

14   particular bankruptcy case law that has developed the

15   standard that measures the benefits of the debtor's estate

16   from the debtor's post-petition actions and not deny debtor's

17   parties' damages.  These standards conflict with the typical

18   standards that an arbitrator would apply to a breach of

19   contract claim, and as a result, these standards create

20   inherent conflict between the Bankruptcy Code and the

21   application of the Federal Arbitration Act.  Now, it's

22   interesting because, as you've heard Ms. Turner say, Sea-Pac

23   recognizes this, and it's what Sea-Pac's suggests that we do

24   is we let two tribunals decide the issues.  We send the

25   breach of contract to the arbitrators and we let this Court

1    decide the bankruptcy issues, but it's not that simple.  Just

2    from the summary of the issues, it's clear that the issues of

3    damages and liabilities are inextricably intertwined with the

4    bankruptcy issues, and if this Court has to decide the

5    bankruptcy issues then it will also need to the review many

6    of the facts that would have been presented to the

7    arbitrators.  So, this is not a situation where it would be

8    Solomonic to divide up the issues and let the arbitrators

9    hear half and the Bankruptcy Court hear the other half.

10   Instead, it really would simply be a waste of time and

11   resources.  Indeed, if the Court does not preside over the

12   issues, we actually may be talking about three tribunals

13   dealing with the Sea-Pac claims.  One thing Ms. Turner did

14   not mention is that Sea-Pac has threatened to assert

15   additional claims against Armstrong arising out of actions

16   that occurred or allegedly occurred prior to the effective

17   date of Armstrong's plan.  Those claims would constitute

18   potential additional administrative expenses.  Now Armstrong

19   has advised Sea-Pac that we are willing not to assert

20   discharge because Sea-Pac has filed an administrative expense

21   claim, and we're willing to have Sea-Pac amend its original

22   administrative expense claim to assert such additional

23   administrative expenses, and, in fact, we filed a

24   supplemental objection that kind of anticipator-ally

25   addresses that potential claim.  But for today's purpose

1    what's important is that such additional potential

2    administrative expense claim does not have any right to

3    arbitration attached to it.  So, if this Court does not

4    preside over the merits of the dispute, we potentially would

5    have three tribunals hearing the merits: the arbitration

6    panel, this Court, and another court, and this Court is the

7    only forum in which all those issues may be resolved.  Now,

8    of course, all of this assumes that Sea-Pac has a right to

9    arbitration.  In this case, though the distributorship

10   agreements specifically give the parties a very short window

11   after a dispute arises to invoke arbitration, and I do want

12   to note, Ms. Turner suggested that what we should do is have

13   the arbitrators decide whether the right to arbitration still

14   exists, and I'll note that the Supreme Court in <u>Greentree</u>

15   <u>Financial Corp. v. Basil</u>, which is 539 U.S. 444 in 2003

16   acknowledged that certain gateway matters such as whether

17   there is a binding arbitration clause and whether that

18   applied to a particular dispute are within the province of

19   the Court.  Moreover, Judge Shawl in <u>Glen Eagle Square</u>, in an

20   unreported decision which is at 1991 WestLaw 71782,

21   Bankruptcy Eastern District of Pennsylvania, basically noted

22   that there was a significant question in his case whether the

23   other party had waived its right to invoke arbitration and

24   stated it seems foolish to defer to an alternative forum

25   which may decide that its invocation has been waived and

1   would be obliged to return the matter to us in any event.  I

2   just note that, but going back to the contract, if

3   arbitration is not invoked, these contracts expressly permit

4   the parties to litigate the dispute.  So, it's not really an

5   issue of waiver of right to arbitration, but it's got a

6   specific contract provision that also grants parties the

7   right to litigate.  Now, Sea-Pac's own affidavit states that

8   Sea-Pac advised Armstrong in 2003 that the appointment of a

9   second distributor constituted a breach of the commercial

10  distribution agreement.  As Sea-Pac's affidavit asserts –

11  also, Sea-Pac constantly complained to Armstrong that the RVC

12  payments under the residential distribution agreement were

13  insufficient and in fact Sea-Pac then used the appointment of

14  the second distributor as part its argument during the

15  Chapter 11 case for why Armstrong should make higher RVC

16  payments.  Moreover, why is Armstrong filing the objection

17  that's before the Court today?  Armstrong and Sea-Pac have

18  been engaged for months in ongoing negotiations to resolve

19  the parties' disputes over the distributorship issues.  Now,

20  at no time during this several-year period did Sea-Pac ever

21  invoke its right to arbitration.  The distributor agreement

22  clearly states that a party may seek arbitration within, if

23  you do the math, mediation for 30 days and then if you do

24  mediation it's another 10 days so it's essentially 40 days

25  after the dispute arises, and if no party does so, then the

1    agreements state that either party may litigate the issue.

2    Sea-Pac did not invoke arbitration after it learned of the

3    appointment of the second distributor in 2003.  It did not

4    invoke arbitration when it filed its claim in 2005, and it

5    did not invoke arbitration during its negotiations with

6    Armstrong.  Now, Sea-Pac suggests that the commencement of

7    litigation is when a dispute arises.  In other words, after

8    Sea-Pac filed the claim which asserted that Armstrong

9    breached the agreement, Sea-Pac still did not know a dispute

10   existed and so Armstrong actually filed a formal objection as

11   if somehow Armstrong was going to concede that it had

12   breached the agreement.  Now that suggestion is somewhat

13   ludicrous and frankly gives far too much weight to the notion

14   of what constitutes a dispute and really what it says is that

15   you have to invoke litigation in order for there to be a

16   dispute.  Armstrong recognizes, Your Honor, that it is now

17   out of bankruptcy, and I just want to make clear, this is not

18   a situation in which a debtor wishes to cling to Bankruptcy

19   Court jurisdiction longer than it should.  Armstrong has not

20   run to court every time it's had a dispute with parties

21   throughout its case, but instead Armstrong has attempted at

22   every step of the way to resolve its disputes with parties

23   and to minimize the costs to Armstrong's estate, the costs of

24   litigation.  Armstrong also recognizes that litigation is a

25   last resort, but also that sometimes it's necessary.  This is

1    one of those times.  The Sea-Pac claim is one of the few

2    remaining disputed claims in the case, and it's one of the

3    last issues we really need to address in this Chapter 11

4    case.  Your Honor, we would, therefore, respectfully request

5    that the Court find first that Sea-Pac has not remaining

6    right to arbitrate, or if it does have a right that the Court

7    exercises the discretion it clearly has to preside over and

8    resolve the Sea-Pac disputes.

9              THE COURT: All right, thank you.

10             MS. TURNER: Thank you, Your Honor.  To respond to a

11   couple of these points, in sort of reverse order.  Until the

12   time that Armstrong decides to object to the proof of claim,

13   the claim is deemed allowed, and it's not unheard of,

14   frankly, for a debtor to decide that breach and payment of

15   damages is, in fact, a performance alternative.  I understand

16   that they may perceive that as being somewhat unusual, but a

17   debtor could in fact analyze its contracts, determine that it

18   wishes to continue to have the benefit of a contract, but

19   that it intends to breach same and is willing to pay damages.

20   Why we would institute arbitration at any time before they

21   say, Yes, we are going to object and we are going to go

22   forward with this, is somewhat of a mystery.  Second of all,

23   with regard to the citation to the Greentree Financial Basil

24   and Lackey decision.  That was a 4-1-4 decision from the

25   United States Supreme Court.  I don't think that anybody

1    could perceive that decision as definitively stating that the

2    Court should determine gatekeeper issues.  In fact, you could

3    perceive that decision to actually say something quite to the

4    contrary.  The overwhelming weight of authority says that the

5    issue of what is subject to arbitration, whether arbitration

6    has been waived, whether arbitration should go forward,

7    should in the first instance be determined by the arbitrator.

8    If, and if you look back on this argument that we've had

9    here, we're constantly hearing Armstrong going to the merits.

10   What happened in 2003?  What does the contract say?  Is there

11   a right of exclusivity?  These are all issues going to the

12   merits of the contract, the contract which contains an

13   arbitration clause.

14          THE COURT: Well, I think what it's going to is

15   whether or not the timing issue is properly invoked by Sea-

16   Pac and if in fact the timing has not been properly invoked

17   then there is no right to arbitration.  And I'm not sure that

18   the arbitrator should be making that determination in the

19   first instance because in the bankruptcy context there's a

20   bar date.  If you file your claim by a bar date then, you

21   know, certain things happen.  If you don't, other

22   consequences follow.  If your proof of claim actually depends

23   upon some right to invoke arbitration, shouldn't that be

24   stated in the proof of claim?

25          MS. TURNER: Your Honor, let me draw a narrow

1    distinction here.  There are two timeliness issues in this

2    case.  One issue is, have we timely invoked arbitration under

3    the contractual provisions?  It is our view that that issue

4    goes to the arbitrator.  There is another issue presented in

5    this case, Your Honor, and that is, was our claim, whatever

6    it may be, subject to this Court's administrative bar date

7    order?  We could understand where you might perceive - the

8    Court could rule that that issue is not subject to

9    arbitration but the issue of whether we've timely invoked

10    arbitration within the meaning of the contract, in our view,

11    does go to arbitration.

12            THE COURT: But isn't it a flip side of the same

13    coin?

14            MS. TURNER: They're two different issues.  A

15    contract has separate timing provisions.  Within 30 days of a

16    dispute arising, making a request for mediation, following

17    the conclusion of mediation, then it goes to various

18    different proceedings.

19            THE COURT: Yes, I understand that, but your claim,

20    as I understand it is that all of the breaches occurred post-

21    petition.  So you're not making a claim for a pre-petition

22    breach at all.

23            MS. TURNER: Technically there's 500,000 that's pre-

24    petition.

25            THE COURT: Okay, then apparently I've

1    misunderstood.  I thought that the entire request was for a

2    determination that in fact the breach occurred post-petition,

3    and that that was the basis on which you're asserting

4    administrative damages.  To the extent that you're asserting

5    administrative damages, then you have to comply with the

6    Court's bar date with respect to administrative claims, and

7    if you don't do that, then you don't have a right to

8    arbitration because you don't have a proof of claim that can

9    be sustained at all.  So, I'm not sure how - In some

10   instances, the egg's already scrambled and it seems to me

11   that this is a situation in which the egg is scrambled, and

12   I'm not sure how at this point I can send some issues to

13   arbitration and not others because even Sea-Pac, I think,

14   recognizes that if the arbitrators decide in your favor with

15   respect to whether there is a claim at all, then it still has

16   to come back here for determination as to the priority of

17   that claim.

18         MS. TURNER: But on the flip side, Your Honor, if

19   the arbitrators determine that we do not have a claim, then

20   we will not be back here, and I do want to also point out one

21   other comment that was made by counsel because I don't want

22   this to go unanswered.  They've asserted that Sea-Pac has

23   threatened to assert additional claims for other events which

24   occurred prior to the effective date, and I do want the

25   record to reflect that Sea-Pac is considering whether it has

1    other claims, but those claims may not have arisen prior to

2    the effective date.  They may actually be post-effective date

3    claims and maybe outside the jurisdiction of this Court or an

4    arbitration tribunal.  That's not necessarily the result that

5    we wanted to see occur, but we are preserving our rights to

6    argue that if we do assert those claims that they are post-

7    effective date claims and not within the Bankruptcy Court's

8    jurisdiction.

9              THE COURT: Well, I mean, if that's the case then

10   the debtor's correct that you're going to be litigating in at

11   least two places, arbitration and here, and then, if you win

12   in arbitration, you'd be back here anyway.  So, the debtor's

13   correct.  You'd be going to three different places.  Now, if

14   your as yet un-asserted claim, is in fact a post-effective

15   date claim, then you're going to be in a whole separate

16   jurisdiction but not arbitration with respect to that anyway.

17             MS. TURNER: Presumably not.  I just wanted to put

18   it on the record to make sure that, you know, we're not

19   misleading anybody that those claims, in our view, may be

20   post-effective date claims.

21             THE COURT: Okay, well, I appreciate that, but right

22   now they're not before me anyway, so if you determine that

23   they're not post-effective date, the debtor has already

24   agreed that you can amend the existing proof of claim to

25   include them so that they can get determined at the same time

1    which would probably save everybody expense if in fact you

2    can make that determination.    If you can't then, you know,

3    you'll just have to litigate wherever you have to litigate

4    that's all.

5           MS. TURNER: But I think the key issue, Your Honor,

6    frankly is that the parties in their contracts made

7    determinations about where they were going to litigation, and

8    the determination that the parties made was that these

9    disputes, for the most part, are going to be subject to

10   arbitration.

11          THE COURT: But only if the arbitration is invoked

12   within certain time frames, and that's really the key issue.

13   In many contracts there is simply a statement that disputes

14   will go to arbitration and there is no statute of limitations

15   built in for that invocation.    These contracts are different,

16   and the problem, I think, is correctly identified as when did

17   the dispute arise that sets off that 40-day time frame, and I

18   understand it's keyed to mediation and so forth, but let's

19   just use it as a 40-day time frame for purposes of this

20   discussion.    It seems to me that the dispute arises as soon

21   as Sea-Pac decides that it has a claim that it thinks that

22   Armstrong is in breach.    You know, whether there's been a

23   proof of claim bar date or not at that point in time is a

24   bankruptcy issue, but your dispute because you think that

25   Armstrong has breached the contract because its appointed a

1    second distributor is the date by which that 40-day period

2    begins.  Now, you may be able to extend that period by filing

3    an appropriate motion with the Bankruptcy Court because you

4    can't invoke that cause if the stay's in place, but your

5    remedy then is to get relief from stay, state that you want

6    to invoke the cause, and you've protected your time frame.

7    Sea-Pac didn't do that.  I really don't think Sea-Pac has

8    preserved the right to arbitrate.  I think you had one at the

9    outset.  I mean, the contract clearly provides the parties

10   with that 40-day window, but I don't think it was timely

11   invoked in this instance.

12        MS. TURNER: But, Your Honor, let me point out a few

13   things.  First of all, at the time that they appointed a

14   second distributor, the time period for the debtor to assume

15   or reject this contract had not yet run.  The debtor could

16   have filed a motion to assume the contract and could have

17   cured that default.

18        THE COURT: Yes, and Sea-Pac could have filed a

19   motion to shorten the time by which the debtor could do that

20   so that you could invoke -

21        MS. TURNER: But we're not required to.

22        THE COURT: But the only thing you are required to

23   do is invoke the right to arbitration within 40 days after

24   the dispute arises.  The dispute clearly in Sea-Pac's view

25   has nothing to do with the bar date or the debtors' agreement

1   to extend the contract or to assume the contract. It has to

2   do with the fact that under Sea-Pac's construction of the

3   contract, the debtor couldn't appoint a second distributor

4   and under the debtor's construction of the contract, the

5   debtor could.  That's the dispute.  When it arose, I think

6   Sea-Pack had 40 days from that date to make a determination

7   to invoke arbitration, and whatever bells and whistles you

8   had to get through in order to make that invocation are

9   procedural hurdles but they were not hurdles that could not

10  have been accomplished in the context of the bankruptcy case.

11       MS. TURNER: But, Your Honor, if Armstrong is

12  willing to pay damages for the privilege of appointing a

13  second distributor and we filed a proof of claim, which they

14  could have not objected to, what is there to arbitrate?

15       MS. DANDENEAU (TELEPHONIC): Well, Your Honor, if I

16  may just interject at this point.  This is a little silly.  I

17  mean what Sea-Pac's affidavit says is that in 2003 Sea-Pac

18  advised Armstrong that it was in breach of the contract.  Now

19  assuming that that is correct, Armstrong continued to have a

20  second distributor.  Armstrong did nothing to suggest that

21  Armstrong was going to acknowledge that that breach occurred

22  and didn't regard that as a disputed issue as - I can't

23  imagine that anybody would seriously believe that.

24       THE COURT: Well, regardless of whether anybody

25  would seriously believe it or not, there is a difference

1    between the debtor's ability to assume a contract, which it

2    could have done had Sea-Pac invoked the right to arbitration.

3    The debtor's defense could be we're going to assume the

4    contract and that probably would have ended the matter.  I

5    don't think the fact that the debtor had yet a period of time

6    within which to assume a contract stops the 40-day

7    arbitration statute of limitations that the parties agreed to

8    because all of those pieces could have fallen into place at

9    any point in that time line had Sea-Pac invoked arbitration

10   and the debtor wanted to assume the contract, the debtor

11   would have been in negotiations with Sea-Pac saying, Look,

12   we're going to assume this contract and as a result the

13   arbitration's not necessary.  He would have documented

14   something to that effect, and that would have ended the

15   matter.  So the fact that Sea-Pac didn't invoke the

16   arbitration simply let the dispute abide but it let it abide

17   in litigation mode as opposed to arbitration mode.  I think

18   Sea-Pac has not properly invoked the right to arbitration

19   under the contract.  I should say, has untimely invoked the

20   right to arbitration under the contract, and as a result, I

21   don't think that there is any longer a viable arbitrable

22   issue.  So I don't need to get into where the initial dispute

23   should be heard in the first instance because I think the

24   untimeliness of the invocation of the right means you're

25   here.  So, I am going to deny the request for relief from

1    stay or from the discharge injunction to let Sea-Pac

2    arbitrate, because I think that the invocation has been

3    untimely.  With respect to the debtor's objection to claim,

4    it seems to me that we should discuss whether you need some

5    discovery.  It appears, perhaps, that that's not something

6    that I can decide by argument of counsel.  So -

7            MS. DANDENEAU (TELEPHONIC): Yes, Your Honor, we had

8    actually discussed that in advance and we what we had decided

9    that it probably makes sense to do is for the parties, once

10   you ruled on the motion, we will convene and maybe we can set

11   the first status conference for the next omnibus hearing and

12   then we can come back to you with, hopefully, a consensual

13   timetable for dealing with these issues.

14           THE COURT: All right.  I'm not sure - Mr. Madrun,

15   will you be preparing the order that will deny the motion at

16   item 4 after consultation with counsel and submit it on a

17   certification of counsel?

18           MR. MADRUN: Yes, Your Honor, I'll work with counsel

19   later today and we'll get a form of order over under

20   certification.

21           THE COURT: All right.

22           MS. TURNER: Your Honor, we have one housekeeping

23   matter.

24           THE COURT: All right.

25           MS. TURNER: The debtors filed a - I'm not sure

1  exactly how - They filed a supplemental objection and

2  counterclaim which has been given an adversary proceeding

3  number; all right?  And we're not exactly sure when the

4  response to this will be due because even though it was given

5  an adversary proceeding number, no writ of summons has issued

6  and no summons has been served.

7          THE COURT: Oh.

8          MS. TURNER: So we are completely in the dark about

9  how we respond to this, when we respond to this, and we're

10  now in this unusual position where there's not an adversary

11  number.

12          THE COURT: Because it's now converted into an

13  adversary, I guess the question is, are you willing to accept

14  service.  If you can, we can bypass the summons issue, and we

15  can simply work out a scheduling order now.  Otherwise, if

16  you're not willing to accept service then they're going to

17  have to issue a summons since it's converted to an adversary

18  at this point.

19          MS. TURNER: Your Honor, I'm going to have to

20  ascertain that.  I was out of the country until very late

21  Friday and just returned, so I'm somewhat out of the loop on

22  some of these things.

23          THE COURT: Okay, well, I think that's something you

24  can work out with debtor's counsel.  If you need a summons

25  issued, then the debtor is going to have to issue the summons

```
 1    even though it's a counterclaim because it started not as an
 2    adversary proceeding, and I think in this instance we need to
 3    make sure that in fact the party invoking the adversary
 4    process issues the summons and serves it.  If you'll accept
 5    service though I think that will bypass a lot of issues, and
 6    then the question is, how much time do you need to answer, so
 7    - It might make more sense, Ms. Dandeneau to put this on to
 8    the December conference so that you can work out this issue
 9    about the summons and an answer date.  I don't think that
10    will cause any prejudice to any parties, and -
11            MS. DANDENEAU (TELEPHONIC): Yes, Your Honor, we're
12    happy to do that.  We're happy, obviously, to work with Sea-
13    Pac's counsel to come up with a reasonable schedule for them
14    responding.
15            THE COURT: Okay.  Why don't you do a discovery
16    schedule in that order as well.  I think you folks are better
17    able to determine how much time you're going to need, and
18    that may also let Sea-Pac decide whether it's going to amend
19    the existing administrative claim or whether you have some
20    additional claim that you want to pursue that would not be
21    litigated here too, and perhaps all of those things can come
22    together so you can get one overall discovery order that may
23    make sense for all of you.
24            MS. TURNER: Right.  Thank you, Your Honor.
25            THE COURT: Okay.  So I'll just expect to get
```

1    something from you by the December date, and I'm happy to

2    hold a status conference if you want to in December or at any

3    point in this process before the end or right at the end of

4    discovery before any further proceedings come up so that I

5    can find out whether you're settling and so forth.

6         MS. DANDENEAU (TELEPHONIC): All right, thank you,

7    Your Honor.

8         THE COURT: Okay, thank you.

9         MR. MADRUN: Thank you, Your Honor.  That then

10   brings us to the final matter on today's agenda which is item

11   6.  This is a carryover from the last omnibus, an interim fee

12   application hearing.  It's the interim fee application of

13   Navigant Consulting for the 15th interim period.  At the last

14   hearing I believe some issues had arose with the fee

15   auditor's final report that Navigant wanted some additional

16   time to consider the fee auditor's report and consider the

17   matter internally.  I do believe that a representative for

18   Navigant is on the telephone to discuss this matter with the

19   Court further.

20        THE COURT: Okay, yes, I'm not sure, is the fee

21   auditor on as well?  I don't recall having the fee auditor

22   on.  Is he aware of this hearing.

23        MR. MADRUN: Your Honor, the fee auditor was served

24   with the notice of agenda and amended agenda which would have

25   listed this item.  I am not aware if the fee auditor is

1    actually on the telephone today.

2         THE COURT: That's very unusual.  He was just on the

3    prior proceeding.

4         UNIDENTIFIED SPEAKER: (Microphone not recording.)

5         THE COURT: Yeah, the amended agenda was filed on

6    the 17th, and I'm not sure that he got it, so I'm happy - I

7    mean, I've read Navigant's pleadings and I've read Mr.

8    Smith's as well, but I'm not sure that I can proceed with his

9    objection without him.  Somebody want to go call him and see

10   if he can join this call, perhaps?  Do you have a phone

11   number?

12        MR. MADRUN: I do not, Your Honor, but I would be

13   glad to - It might require a brief recess for me to do so.

14        THE COURT: Oh, Ms. Zig (phonetical) has it?  Okay.

15   Well, let me ask Navigant's counsel.  I assume that you have

16   not worked out some resolution with Mr. Smith; is that

17   correct?

18        MS. LYMAN (TELEPHONIC): That is correct, Your

19   Honor.

20        THE COURT: Okay, then we'll just have to wait one

21   minute to see if we can get him on.  I'm just not sure that

22   he got this amended agenda.  I just got it myself this

23   morning.

24        MR. MADRUN: I apologize, Your Honor.  I'm looking

25   at the certification of service.  I don't readily see Mr.

1    Smith on here.  If for any reason he was not served with it,

2    I certainly do apologize for that.  That certainly was our

3    intention to insure that he would receive it when any fee

4    matters are going forward.

5         THE COURT: My clerk just left the courtroom and

6    we'll see whether or not we can contact Mr. Smith.  While

7    we're waiting, I am trying to do the schedule for next year,

8    Mr. Madrun.  It appears that this case is probably not going

9    to need very much time going forward so my tentative - and I

10   say tentative because I still have staff looking at this to

11   make sure I haven't done something that's going to impact

12   cases - I'm trying to double schedule some cases because in

13   most instances the hearings come off at least one if not

14   both, so I'm considering putting Armstrong on Mondays, my

15   Monday list at one o'clock.

16        MR. MADRUN: That is acceptable to the reorganized

17   debtors, I mean, subject unless Ms. Dandeneau -

18        MS. DANDENEAU (TELEPHONIC): Oh, yes, Your Honor,

19   that's perfectly fine.  We really don't expect, I mean, other

20   than this, we would hope that there should really be no other

21   contested matters.

22        THE COURT: Okay.  So, that's my tentative plan.  I

23   will confirm that either by having somebody call you or else

24   do an order once I get the entire schedule done, hopefully by

25   the end of the week, but that's tentatively what I'm

1    considering for Armstrong.

2              MR. MADRUN: That would be fine, Your Honor, thank

3    you.

4              THE COURT: All right.

5              UNIDENTIFIED SPEAKER: (Microphone not recording.)

6              THE COURT: Is the operator for Court Call on,

7    please?

8              TELEPHONE OPERATOR: Yes, I am.

9              THE COURT: I've been trying to get Warren Smith,

10   the fee auditor in this case, to join.  He said that he would

11   call in.  Would you please add him to this call on Armstrong

12   for me.

13             TELEPHONE OPERATOR: Absolutely.  When he dials in,

14   I'll make sure he's in there.

15             THE COURT: And would you announce it for me so I

16   know we can continue, please?

17             TELEPHONE OPERATOR: Yes, I will, Your Honor.

18             THE COURT: Thank you.

19             TELEPHONE OPERATOR: You're welcome.

20             UNIDENTIFIED SPEAKER: (Microphone not recording.)

21             MR. MADRUN: My apologies, Your Honor, we'll make

22   sure it doesn't happen again.

23             THE COURT: All right, thank you.  Mr. Madrun, I've

24   got other hearings.  I'm not going to be able to wait all day

25   for this.

1          MR. MADRUN: Your Honor, I full appreciate that, and

2     I again apologize for any complications here.  What I might

3     propose then, and we appreciate the Court's indulgence in

4     waiting for the amount of time that it already has.  What we

5     might propose would be to - and Navigant is obviously on the

6     phone, to adjourn this to the next omnibus hearing, obviously

7     to insure that Mr. Smith is served and available to appear.

8          THE COURT: Well, why don't I adjourn it until after

9     Owens and see if you can't get Mr. Smith back on the line so

10    that we can rule on Navigant.  I'm sure they'd like to get

11    paid their fees too.  Everybody else in this application is

12    up to speed but Navigant, so, I think it would be better just

13    to do it.  It's just, I don't know whether Mr. Smith is

14    having trouble connecting or what.  Perhaps you can go try to

15    call him as well.  Ms. Lyman, is it agreeable to you if I

16    take the Owens matters and then I'll just get back to

17    Armstrong and do your request for fees too so that I can get

18    Mr. Smith on the phone hopefully?

19         MS. LYMAN (TELEPHONIC): Yes, that's fine, and I

20    assume I should just stay on this line?

21         THE COURT: Yes, if you can, please, that would be

22    helpful and as soon as Owens is finished, we'll see whether

23    Mr. Smith's been able to join us by then.

24         MS. LYMAN (TELEPHONIC): Okay, that's fine, we'll do

25    that.

1          MS. DANDENEAU (TELEPHONIC): Your Honor, this is

2    Debra Dandeneau.  May I be excused from the continuation of

3    the hearing?

4          THE COURT: You're not arguing with -

5          MS. DANDENEAU (TELEPHONIC): I'm not arguing with

6    respect to Navigant, Your Honor.

7          THE COURT: Yes, anybody on Armstrong who has no

8    interest in hearing what the outcome is with respect to

9    Navigant or taking a position on that matter, is excused, but

10   I do need Ms. Lyman, I do need somebody for the debtor,

11   either in court or on the phone.

12         MS. DANDENEAU (TELEPHONIC): Yes, Mr. Madrun will be

13   there.

14         THE COURT: All right, then, and perhaps, Mr. Madrun

15   if you can try to get through to Mr. Smith and explain to him

16   that I do need him on but he has a little time to get on.

17         MR. MADRUN: Certainly, Your Honor, I shall do so.

18   Is there a particular time that I should relay to Mr. Smith?

19         THE COURT: As soon as Owens is done, so soon,

20   rather - sooner rather than later.

21         TELEPHONE OPERATOR: Your Honor, this is the

22   operator, and I do have Mr. Smith on the line, and his line

23   is live right now.

24         THE COURT: Oh, all right, if that's the case then

25   we'll proceed.

1          MR. MADRUN: Thank you again, Your Honor.

2          THE COURT: Okay.  Mr. Smith, I'm sorry.  You

3    apparently didn't get notice that this proceeding with

4    respect to Navigant had been re-calendared for today.  This

5    is agenda item number 6 on Armstrong's amended agenda, and it

6    basically is Navigant's request for the fees because you and

7    Navigant were not able to resolve the issue that I continued

8    from September.  Are you prepared, Mr. Smith, to go forward

9    to address this issue today?

10          MR. SMITH (TELEPHONIC): Yes, Your Honor.  This

11   issue has to do with their fees for fee application

12   preparation exceeding the cap.

13          THE COURT: That's correct.  Go ahead.

14          MR. SMITH (TELEPHONIC): Okay.  Well, Your Honor, I

15   guess I don't know is Navigant there in the courtroom?

16          THE COURT: Not -

17          MS. LYMAN (TELEPHONIC): Your Honor, I - excuse me.

18          THE COURT: Go ahead, Ms. Lyman.

19          MS. LYMAN (TELEPHONIC): Oh, it's just I'm here by

20   telephone.

21          MR. SMITH (TELEPHONIC): Okay.  Well, again, with

22   Navigant, we were not able to reach an agreement because

23   Navigant's fees were over the cap by $25,000 and Your Honor,

24   I guess, if Navigant has a response, I guess it might be

25   useful to hear that response.

1         THE COURT: Okay, Ms. Lyman, go ahead.

2         MS. LYMAN (TELEPHONIC): Thank you, Your Honor.

3    This was an extraordinary circumstance for various reasons,

4    including personnel changes and the ability of the former

5    person who it had been assigned to keep up.  We had gotten

6    seriously behind in filing our fee applications.  The person

7    to whom it is assigned now had to spend the time to bring the

8    file five outstanding interim fee applications.  In the

9    course of putting together the material to file those

10   applications, he found some mathematical errors in the prior

11   fee applications, and he also had to spend the time to

12   reconcile those.  So it took quite a bit of time, and that

13   was time that would, if things had been done at the proper

14   time, have been spread over several months.  Instead it was

15   all compressed into one month, and as it happened that was a

16   month where there was not very much - or a time period when

17   there was not very much activity going on in the substantive

18   matter, and so, it ended up being a very large portion of the

19   fees that had for that time been generated.  Subsequent to

20   that, the case became very active and we incurred a large

21   amount of fees and if you look at the cumulative fees up to

22   now and compare that to the fee application fees we actually

23   are quite a bit under the cap.  So given those circumstances,

24   we would ask that the fees be allowed.

25         THE COURT: Okay, Mr. Smith.

```
 1              MR. SMITH (TELEPHONIC): I'm sorry, Your Honor?

 2              THE COURT: Yes, go ahead.

 3              MR. SMITH (TELEPHONIC): Yes, and I do appreciate

 4    the circumstances surrounding the position that Navigant

 5    found itself.  However, I guess our disagreement is who

 6    should bear the cost and Navigant acknowledges that it fell

 7    behind in its fee application preparations, that the prior

 8    personnel had made some errors, that there were personnel

 9    changes at Navigant, and that those personnel changes

10    required someone else to come up to speed.  I guess the

11    issue, Your Honor, is who should bear the cost of the errors

12    that had been generated by Navigant and who should bear the

13    cost of bringing a new professional up to speed.  It seems to

14    me that Navigant should bear that cost, and I think

15    Navigant's position is the estate should bear that cost.  I

16    would note that Navigant is not - if Navigant is utilizing a

17    professional that bills at $165 a hour, which Navigant claims

18    is the lowest billing professional that it has, that may or

19    may not - and I'm granting them that fact, Your Honor, but

20    other professionals are able to utilize - other fee

21    applicants are able to utilize professionals billing at a

22    lower hourly rate.  If Navigant is unable to do so, again, I

23    think Navigant should bear that cost.

24              THE COURT: Well, that does seem like an awfully

25    high amount to prepare fee applications, Ms. Lyman.  I do
```

1    have some concern about that, and I also agree with Mr. Smith
2    that to the extent that there were errors in the prior fee
3    apps who already paid once to prepare the fee applications
4    appropriately, an error correction after the fact should not
5    be the cost of the estate.  That should be the cost of
6    Navigant.    With respect to personnel changes and someone
7    leaving the firm, I understand that there is a learning
8    curve, and there is a learning curve for any case, and it
9    seems to me in that case that although the estate is not
10   responsible for Navigant's losing personnel, nonetheless, the
11   personnel who are looking at the fee apps still do need to
12   become familiar with what's going on in a case in order to
13   have the fee application process make sense, and that's true
14   whether it's a higher or a lower rate.  I'm willing to assume
15   for purposes of this discussion that someone billing at the
16   lower rate may need as much time as this took.  I can't see
17   how someone billing at this $165 an hour rate should need
18   that time.  I think an appropriate compromise, and I put it
19   in terms of compromise because I am not at this point making
20   a line by line assessment, is to simply split this fee in
21   half and award Navigant half of that amount and not the other
22   half, but that's assuming that Navigant is willing to go
23   along with that.  If you're not, then I'll go through it on a
24   line by line analysis, which I have not done to date.
25            MS. LYMAN (TELEPHONIC): Your Honor, this would be

```
 1   to what the amount that he proposes to exclude in half?

 2              THE COURT: That's right, the 25,000-some odd

 3   dollars.  I would propose that you just split that in half.

 4              MS. LYMAN (TELEPHONIC): We would accept that, Your

 5   Honor.

 6              THE COURT: Okay, Mr. Smith, then that will be my

 7   ruling.  Just take off half of that amount and that way

 8   Navigant can get paid its fees.  I think that's a reasonable

 9   compromise for everyone under the circumstances.  Does the

10   debtor have any objection to that?

11              MR. MADRUN: Your Honor, the debtor has no position

12   with respect to the request.

13              THE COURT: All right, okay.  Who's preparing the

14   order then on this instance?  Mr. Madrun, are you?

15              MR. MADRUN: Your Honor, we'll work with Navigant's

16   counsel too insure that an appropriate form of order is

17   submitted.

18              THE COURT: All right, and Mr. Smith.

19              MR. MADRUN: Yes, we'll make sure that he sees it as

20   well.

21              THE COURT: All right, that's fine.  I'll sign your

22   fee order as soon as I get is submitted on a certification of

23   counsel then, Ms. Lyman.

24              MR. SMITH (TELEPHONIC): Thank you very much, Your

25   Honor.  May I be excused?
```

```
 1            THE COURT: Yes, sir, thank you.

 2            MR. SMITH (TELEPHONIC): Thank you.

 3            MS. LYMAN (TELEPHONIC): Thank you very much, Your

 4    Honor.

 5            THE COURT: Okay, thanks.  I believe that's

 6    everything in Armstrong.

 7            MR. MADRUN: Yes, Your Honor.  We again thank you

 8    for your indulgence with time this morning.  That is all the

 9    matters that AWI has.

10            THE COURT: All right, thank you.

11            MR. MADRUN: Thank you, Your Honor.

12            THE COURT: AWI is terminated and we will start with

13    Owens.

14            (Whereupon at 10:37 a.m., the hearing in this

15    matter was concluded for this date.)

16

17

18            I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of proceedings

21    in the above-entitled matter.

22

23    /s/ Elaine M. Ryan                    November 6, 2006
      Elaine M.  Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221
```

<u>CERTIFICATE OF SERVICE</u>

      I, Michael G. Busenkell, certify that on February 5, 2007 I caused a copy

of the foregoing Appellant's Appendix To Opening Brief to be served as indicated on:

Mark D. Collins, Esquire
Jason M. Madron, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
*By Hand*

Stephen Karatkin, Esquire
Debra A. Dandeneau, Esquire
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY  10153
*By First Class Mail*

Louis J. Rouleau, Esquire
Womble Carlyle Sandridge & Rice, PLLC
1401 Eye Street NW
Seventh Floor
Washington, DC  20005
*By First Class Mail*

Michael G. Busenkell (No. 3933)

*U0004984*