## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

*In re* ARMSTRONG WORLD INDUSTRIES, INC., *et al.*

-------------------------------------------------------------x

| | | |
|---|---|---|
| SEA-PAC SALES COMPANY, | : | |
| | : | Civil Action No. 07-4 |
| Appellant, | : | |
| | : | |
| v. | : | |
| | : | |
| ARMSTRONG WORLD INDUSTRIES, INC., | : | Bankr. Case No. 00-04471 |
| | : | Appeal No. 06-77 |
| Appellee. | : | |
| | : | |

-------------------------------------------------------------x

### <u>APPELLEE'S APPENDIX TO ANSWERING BRIEF</u>

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Stephen Karotkin
Debra A. Dandeneau
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

ATTORNEYS FOR APPELLEE
ARMSTRONG WORLD INDUSTRIES,
INC.

Dated: February 26, 2007
      Wilmington, Delaware

<u>Index</u>

Motion for Order Pursuant to Section 503(a) of the Bankruptcy Code and
Bankruptcy Rule 3003(c)(3) Fixing a Final Date for Filing Requests
for Payment of Certain Administrative Expenses in AWI's Chapter
11 Case, Approving Proposed Claim Form, and Establishing Notice
Procedures [D.I. 3986].................................................................................................1

Withdrawal of Proof of Claim No. 3528 [D.I. 4841]........................................................2

Declaration of Jared Williams in Support of Sea-Pac's Answer
to Armstrong World Industries, Inc.'s Objection [D.I. 9834] ............................................3

Supplemental Objection and Counterclaims of Armstrong World
Industries, Inc. with Respect to Proof of Claim of Sea-Pac Sales
Company (Claim No. 4854) [D.I. 9913] ...........................................................................4

Unpublished Opinions cited in Appellee's Answering Brief ............................................5

- *Cirillo v. Tice Entertainment Inc.*, No. 89-3422XX, 1989 WL 144938, (D.N.J. Nov. 20, 1989)
- *In re Barclay Bros., Inc.*, No. 82-03920G, 1986 Bankr. LEXIS 6995, (Bankr. E.D. Pa. Feb. 6, 1986)
- *In re Oakwood Homes Corp.*, No. 02-13396PJW, 2005 WL 670310, (Bankr. D. Del. Mar. 18, 2005)

**TAB 1**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARMSTRONG WORLD INDUSTRIES, | ) | Case No. 00-04471 (RJN) |
| INC., et al., | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Objection Deadline: 2/14/03 at 4:00 p.m. |
| | ) | Hearing Date: 2/28/03 at 9:30 a.m. |
| | ) | MC No. RLF-62 |

<u>NOTICE OF MOTION AND HEARING</u>

To:     Parties required to receive notice pursuant to Local Bankruptcy Rule 2002-1(b),
as modified by the Court's Order Establishing Case Management Procedures and Hearing
Schedule, dated February 11, 2002

PLEASE TAKE NOTICE that the above-captioned debtors and debtors in possession

(the "Debtors") have today filed the attached **Motion for Order Pursuant to Section 503(a) of the**

**Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Fixing Final Date for Filing Requests for**

**Payment of Certain Administrative Expenses in AWI'S Chapter 11 Case, Approving Proposed**

**Claim Form, and Establishing Notice Procedures** (the "Motion") with the United States

Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Wilmington, Delaware

19801 (the "Court").

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion

must be in writing, filed with the Clerk of the Bankruptcy Court, 824 Market Street, 5th Floor,

Wilmington, Delaware 19801, and served upon and received by the undersigned counsel on or before

**4:00 p.m. (EDT) on February 14, 2003.**

RLF1-2562531-1

A HEARING ON THE MOTION WILL BE HELD ON FEBRUARY 28, 2003 AT 9:30 A.M. AT THE J. CALEB BOGGS FEDERAL BUILDING, 844 KING STREET, COURTROOM 2B, WILMINGTON, DELAWARE 19801.

IF NO OBJECTIONS TO THE MOTION ARE TIMELY FILED, SERVED, AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: February 4, 2003
      Wilmington, Delaware

*Rebecca L. Booth*
Mark D. Collins (No. 2981)
Rebecca L. Booth (No. 4031)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
(302) 651-7701

- and -

Stephen Karotkin
Debra A. Dandeneau
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

RLF1-2562531-1                                   -2-

B-2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------ x
In re                                            :    Chapter 11
                                                 :
ARMSTRONG WORLD INDUSTRIES,                      :    Case No. 00-4471 (RJN)
INC., et al.,                                    :    (Jointly Administered)
                                                 :
                  Debtors                        :    Objection Deadline: February 14, 2003 at 4:00 p.m.
                                                 :    Hearing Date: February 28, 2003 at 9:30a.m
                                                 :    MC No. RLF-62
                                                 :
------------------------------------------------ x
```

**MOTION FOR ORDER PURSUANT TO SECTION 503(a) OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3003(c)(3)
FIXING FINAL DATE FOR FILING REQUESTS FOR PAYMENT OF CERTAIN
ADMINISTRATIVE EXPENSES IN AWI'S CHAPTER 11 CASE, APPROVING
PROPOSED CLAIM FORM, AND ESTABLISHING NOTICE PROCEDURES**

TO THE HONORABLE RANDALL J. NEWSOME,
UNITED STATES BANKRUPTCY COURT JUDGE:

Armstrong World Industries, Inc. ("AWI") hereby files its motion for an order,

pursuant to section 503(a) of title 11 of the United States Code (the "Bankruptcy Code") and

Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

(i) fixing a final date for claimants to file requests for payment of certain administrative expenses

in AWI's chapter 11 case, (ii) approving a proposed claim form, and (iii) establishing notice

procedures in connection therewith (hereinafter, the "Motion").[1]  In support of the Motion, AWI

respectfully represents as follows:

---

[1]    Capitalized terms not otherwise defined in the Motion shall have the meanings ascribed
to such terms in AWI's Plan of Reorganization dated November 4, 2002.

## I. JURISDICTION

1.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C.

§§ 157 and 1334. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C.

§ 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

A.      General

2.      On December 6, 2000 (the "Commencement Date"), AWI and two of its

affiliates (collectively, the "Debtors") each commenced a case under chapter 11 of title 11 of the

Bankruptcy Code. By previous order of this Court, the Debtors' chapter 11 cases are being

jointly administered pursuant to Bankruptcy Rule 1015. Since the Commencement Date, the

Debtors have continued to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No trustee or examiner has been appointed in the Debtors' chapter 11

cases. On or about December 15, 2000, the United States Trustee for the District of Delaware

(the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Unsecured

Creditors' Committee") and the Official Committee of Asbestos Claimants (the "Asbestos

Personal Injury Claimants' Committee") in AWI's chapter 11 case. On or about July 19, 2001,

the U.S. Trustee appointed the Official Committee of Asbestos Property Damage Claimants (the

"Asbestos Property Damage Claimants' Committee") in AWI's chapter 11 case. On or about

March 1, 2002, the Court entered an order approving the appointment of Dean M. Trafelet as the

legal representative for AWI's future asbestos personal injury claimants (the "Future Claimants'

Representative," and together with the Unsecured Creditors' Committee, the Asbestos Personal

B-4

Injury Claimants' Committee, and the Asbestos Property Damage Claimants' Committee, the "Committees").

      4.     Through AWI's divisions and subsidiaries (collectively, the "Company"), the Company is a leader in the design, manufacture, and sale of interior finishings, most notably floor coverings and ceiling systems. It ranks among the five hundred (500) largest publicly-held companies in the United States and owns and operates fifty (50) manufacturing plants in fifteen (15) countries.

      5.     The Company's current operations are divided into three principal segments: (i) floor products, (ii) building products, and (iii) cabinets. The Company's products are sold worldwide through building products distributors, who re-sell the Company's products to retailers, builders, contractors, installers, and others. In addition, the Company sells a significant portion of its products to home center chains and industry buying groups. The Company currently employs approximately 16,700 people throughout the world.

      6.     As of December 31, 2001, the Company held assets totaling approximately $4 billion. In 2001, the Company had net sales of approximately $3.1 billion and operating profits (before interest and taxes) of $140 million. As of December 31, 2001, the Company had, on a consolidated basis, approximately $1.6 billion in long and short-term debt, substantially all of which is unsecured.

      7.     On November 4, 2002, AWI filed with this Court its Plan of Reorganization pursuant to chapter 11 of the Bankruptcy Code (as such plan may be amended from time to time, the "Plan"). On December 20, 2002, AWI filed its Disclosure Statement with respect to the Plan (as such disclosure statement may be amended from time to time, the "Disclosure Statement") A hearing to consider the Disclosure Statement currently is scheduled

3

to be held on February 28, 2003. Upon approval of the Disclosure Statement by this Court, AWI

will begin the process of solicitation and balloting of creditors in connection with obtaining the

acceptances required for confirmation of the Plan. As discussed in detail below, AWI intends to

distribute, as part of its solicitation package with respect to the Plan, the notice provided for by

this Motion and the proposed order thereon.[2]

**B.    The Prior Bar Date Order**

8.    On January 30, 2001, AWI filed with the Court its schedules of assets and

liabilities, except for Schedule F (Creditors Holding Unsecured Claims Against the Estate),

which was filed on March 21, 2001, pursuant to an order of this Court extending AWI's time to

file such schedule (together, the "Schedules").

9.    By order dated April 18, 2001 (the "Bar Date Order"), the Court set

August 31, 2001 (the "Bar Date") as the deadline for filing certain proofs of prepetition claims

against the Debtors in the chapter 11 cases. Pursuant to the Bar Date Order, each creditor

holding a prepetition claim against one or more of the Debtors was required to file a proof of

claim on or before the Bar Date, subject to certain limited exceptions set forth below.

10.    As provided in the notice of the Bar Date, the following types of creditors

were *not* required to file proofs of claim on or before the Bar Date: (i) creditors holding claims

that already had been properly filed with the clerk of the Bankruptcy Court using a claim form

that substantially conforms to Official Form No. 10; (ii) creditors holding claims that (a) are

---

[2]    By order of this Court, Trumbull Services, LLC ("Trumbull") was appointed and has
acted as the official claims agent in AWI's chapter 11 case pursuant to 28 U.S.C. § 156(c). If the
Motion is granted, Trumbull will assist AWI in mailing, as part of AWI's solicitation packages
to creditors seeking acceptance of the Plan, a notice informing creditors and entities with which
AWI conducted business after the Commencement Date of the final date for filing requests for
payment of certain administrative expenses in AWI's chapter 11 case.

listed on the Schedules, (b) are not described in the Schedules as "disputed," "contingent," or "unliquidated," and (c) are in the same amount and of the same nature as set forth in the Schedules; (iii) creditors asserting an administrative expense claim against AWI's chapter 11 estate under section 503(b) or 507(a) of the Bankruptcy Code; (iv) creditors holding claims of AWI or a subsidiary of AWI against another debtor or another subsidiary of a debtor; (v) creditors holding claims that had been allowed by an order of the Bankruptcy Court entered on or before the Bar Date; (vi) creditors holding asbestos-related personal injury claims (other than a claim for contribution, indemnity, reimbursement, or subrogation); (vii) claims of current employees of AWI for prepetition benefits or deferred compensation; or (viii) creditors holding claims that had been paid in full by AWI prior to the Bar Date.[3]

11.    As noted above, the Bar Date Order provided that certain claimants whose claims against one or more of the Debtors arose prior to the Commencement Date were required to file written proofs of their claims on or before the Bar Date. As stated, the Bar Date Order specifically excepted from its scope administrative expense claims and did not require proofs of administrative expenses to be filed by holders of administrative expenses arising under section 503(b) or 507(a) of the Bankruptcy Code.

### III. RELIEF REQUESTED

12.    By this Motion, AWI seeks entry of an order (the "Proposed Order," a form of which is annexed hereto as Exhibit "A"), pursuant to section 503(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), fixing a final date (the "Administrative Expense Bar Date") by which certain claimants must file requests for payment of certain administrative

---

[3]    The Bankruptcy Court subsequently extended the Bar Date for Asbestos Property Damage Claims to March 20, 2002.

expenses that are entitled to priority under sections 503(b) and 507(a)(1) of the Bankruptcy Code

in AWI's chapter 11 case and that are described more fully in paragraph 17 hereof (such claims,

hereinafter, the "Specified Administrative Expense Claims"). AWI respectfully requests that the

Court (i) order that the Administrative Expense Bar Date will be 5:00 p.m. (Eastern Time) on the

date that is five (5) business days after the date scheduled for the commencement of the hearing

on confirmation of the Plan; (ii) approve the proposed proof of administrative expense form for

filing Specified Administrative Expense Claims annexed hereto as Exhibit "B"; and

(iii) establish the notice procedures in connection therewith as described below. *As more fully*

*discussed below, the proposed Administrative Expense Bar Date only covers a specific list of*

*administrative expenses arising in AWI's chapter 11 case; it does not seek to require the filing*

*of administrative expense claims by creditors with administrative expenses arising out of*

*AWI's day-to-day payment and benefit obligations to employees and to providers of goods and*

*services or parties to contracts unless AWI's postpetition payment obligations to such parties*

*are more than sixty (60) days past due.*

### A.    Fixing the Administrative Expense Bar Date at this Time Is Justified

13.    Section 503(a) of the Bankruptcy Code provides that "[a]n entity may

*timely* file a request for payment of an administrative expense, or may tardily file such request if

permitted by the court for cause." *See* 11 U.S.C. § 503(a) (emphasis added). An inference can be

drawn from section 503(a) that a deadline may be established for filing administrative expense

claims to enable a debtor and its creditors to know what entities are asserting such claims and in

what amounts. Importantly, the Bankruptcy Code requires payment of allowed administrative

expense claims in full, in cash, on the effective date of a plan of reorganization unless the holder

of such claim agrees to a different treatment. *See* 11 U.S.C § 1129(a)(9)(A). Furthermore,

6

Bankruptcy Rule 3003(c) authorizes the bankruptcy court to fix a time within which proofs of claim (including requests for payment of administrative expenses) must be filed against the debtor in its chapter 11 case

      14.    The method by which an Administrative Expense becomes Allowed under the Plan differs depending upon the type of Administrative Expense that is being asserted. Pursuant to section 1.8(c)(i) of the Plan, each Administrative Expense that represents an actual or necessary cost or expense of preserving AWI's estate or operating the business of AWI for payment of goods, services, wages, or benefits or for credit extended to AWI, as debtor in possession, will be Allowed to the extent that such postpetition liability is reflected on AWI's books and records as of the Effective Date.[4] Any other Administrative Expense that is timely asserted against AWI but disputed by AWI (whether because AWI disputes that it has liability or because AWI disputes that such Administrative Expense is entitled to administrative expense priority under sections 503(b) and 507(a)(i) of the Bankruptcy Code) will only become Allowed when a court of competent jurisdiction enters an order allowing such Administrative Expense and such order becomes a Final Order. Moreover, if AWI disputes that such Administrative Expense is entitled to Administrative Expense priority, then such Administrative Expense will only become an Allowed Administrative Expense if and to the extent the Bankruptcy Court determines, by a Final Order, that it is entitled to administrative expense priority. The Allowed Amount of any such Administrative Expense will be paid in full, in cash, as soon as practicable after such Administrative Expense becomes Allowed.

---

[4]    Pursuant to section 2.1 of the Plan, these Administrative Expenses (which are intended to represent the day-to-day obligations of AWI to its vendors, employees, and parties to contracts) will be assumed and paid by Reorganized AWI in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.

7

15     Pursuant to the Plan, AWI may reserve from Available Cash a reasonable estimate of Administrative Expenses that may become Allowed as of the last day of the month immediately preceding the Effective Date, other than Administrative Expenses of the type specified in section 1.8(c)(i) of the Plan. Accordingly, to properly estimate the amount of such reserve, it is important for AWI to understand what Administrative Expenses, other than those of a type reflected in AWI's normal payables records, exist.

16     The circumstances of AWI's chapter 11 case justify the setting of the Administrative Expense Bar Date at this time. As previously noted, AWI's Plan has been filed and, upon the Court's approval of AWI's Disclosure Statement, AWI will commence the process of soliciting votes on the Plan. Because the amount of Specified Administrative Expense Claims asserted against AWI must be factored in to the calculation of Available Cash under the Plan and because the Plan seeks to discharge *all* claims against AWI arising prior to the Effective Date (other than Administrative Expenses of the type specified in section 1.8(c)(i) of the Plan), it is essential that AWI be able to ascertain the amount of Administrative Expenses prior to consummation of the Plan.

B.     **Proposed Procedures for Filing Specified Administrative Expense Claims**

17.     Under the Proposed Order, not all holders of Administrative Expenses are required to file a proof of such claim. Specifically, the Proposed Order provides that *only* those persons or entities asserting any of the following types of Administrative Expenses must file proof of such Administrative Expense by the Administrative Expense Bar Date:

8

(a)    Any Administrative Expense representing personal injury, property damage, or other tort claims against AWI, *excluding* Asbestos Personal Injury Claims;[5]

(b)    Any Administrative Expense for breach of an obligation – contractual, statutory or otherwise – by AWI, including any environmental liability (but other than any environmental liability with respect to property that is currently owned or operated by AWI);

(c)    Any Administrative Expense for amounts incurred by AWI after the Commencement Date in the ordinary course of AWI's business if payment of such amounts is alleged to be overdue by at least sixty (60) days as of the Confirmation Date;

(d)    Any Administrative Expense incurred by AWI outside the ordinary course of its business or on other than ordinary business terms, except to the extent the incurrence of such Administrative Expense Claim was approved by the Bankruptcy Court (*e.g.*, the DIP Credit Facility Claim, the postpetition COLI loans incurred by AWI, or any claims under any hedging agreement entered into after the Commencement Date)[6] or represents fees and expenses of professionals arising under sections 330, 331, or 503(b)(2) - (5) of the Bankruptcy Code;

(e)    Any Administrative Expense that would not ordinarily be reflected as a payable on AWI's books and records or as a liability on AWI's financial statements; and

(f)    Any Administrative Expense representing an employee claim against AWI, *other than* (i) a claim for wages, benefits, pension or retirement benefits or expense reimbursement by an employee who is employed by

---

[5]    Asbestos Personal Injury Claims, other than Asbestos PI Contribution Claims, have not been subject to any bar date in AWI's chapter 11 case. Such claims will be addressed by the Asbestos PI Trust that will be established pursuant to the Plan.

[6]    AWI believes that any obligation arising under a contract entered into by AWI after the Commencement Date or any obligation to pay for goods or services received after the Commencement Date is an obligation arising in the ordinary course of business and pursuant to ordinary business terms, and the holder of any such administrative expense does not need to file a proof of Administrative Expense *unless* such administrative expense is alleged to be overdue by at least sixty (60) days as of the Confirmation Date or is an obligation under a contract other than to pay the specified amounts stated therein. For example, a party to a postpetition contract with AWI *would* be required to file a proof of Administrative Expense if such party was asserting an indemnification obligation thereunder or asserting that AWI in some way committed a breach of such contract.

9

> AWI as of the Administrative Expense Bar Date or (ii) a grievance claim
> under any collective bargaining agreement to which AWI is a party.

Only the holders of the foregoing Administrative Expenses ("Specified Administrative

Expenses") are required to file a proof of administrative expense. Moreover, if a claim is of the

type specified in sub-paragraphs (a) – (f) above *and* the holder of such claim has asserted the

claim in an action commenced against and served on AWI on or before entry of the Proposed

Order (and in which such holder alleges that AWI's liability is predicated upon the operation of

AWI's business after the Commencement Date or otherwise alleges that such liability should be

accorded administrative expense status), then the holder of such alleged Administrative Expense

is *not* required to file a proof of Administrative Expense.

      18. Typically, an administrative expense bar date will require *all* holders of

administrative expense claims, with certain enumerated exceptions, to file proof of such

administrative expenses. The exceptions, however, usually are fairly broad and often ill-defined.

By only requiring certain types of Administrative Expenses to be asserted by the Administrative

Expense Bar Date, AWI simply is trying to "flush out" potential Administrative Expenses of

which AWI may be unaware – and provide parties that might assert such "extraordinary"

Administrative Expenses the opportunity to assert such claims and avoid having them discharged

as a result of the operation of section 1141(d)(1)(A) of the Bankruptcy Code.

      19. The Proposed Order requires persons or entities asserting Specified

Administrative Expenses against AWI to file an original written proof of administrative expense

so as to be received on or before the Administrative Expense Bar Date. All proofs of

Administrative Expenses must be mailed, hand delivered, or delivered by courier service to

**Trumbull Services LLC,** *Attn: Armstrong World Industries, Inc.,* **(by mail: P.O. Box 1117,**

**Windsor, Connecticut 06095; by hand delivery or overnight courier: 4 Griffin Road North,**

RLF1-2562369-1

Windsor, Connecticut 06095) so that they are *actually received* by 5:00 p.m., New York City time, on the date that is five (5) business days after the date scheduled for the commencement of the hearing on confirmation of the Plan. Trumbull *will not* accept proofs of Administrative Expenses by facsimile or any electronic means.

20.    The Proposed Order further provides that the form of any Specified Administrative Expense Claim must conform substantially to the claim form annexed hereto as Exhibit "B." Such form will be posted on the website established by AWI in connection with the Plan, www.armstrongplan.com, or may be obtained by contacting Trumbull Services LLC at 860-687-3806.

### C.    Consequences of Failure to File an Administrative Expense Claim

21.    The Proposed Order provides that *if a holder of a Specified Administrative Expense Claim is required to file a proof of Administrative Expense and fails to do so such that it is ACTUALLY RECEIVED by Trumbull at the address specified above prior to the Administrative Expense Bar Date, then such Administrative Expense will be barred and discharged, and the holder of such Administrative Expense will have no right to assert such Administrative Expense against AWI, AWI's estate, Reorganized AWI, or any of the AWI Progeny.*

### D.    Notice of the Administrative Expense Bar Date

22.    Pursuant to the Proposed Order and Bankruptcy Rules 2002(a)(7), and in the manner provided for by Bankruptcy Rule 3017(d), AWI (with the assistance of Trumbull) will mail, as part of the solicitation packages to be sent to creditors and parties in interest by AWI upon the Court's approval of the Disclosure Statement and related materials, a notice of entry of the Proposed Order (the "Notice") in the form annexed hereto as Exhibit "C." The

11

Notice will be sent by United States Postal Service, first-class mail, in the manner provided for by Bankruptcy Rule 3017(d), to creditors and parties in interest at their addresses last known to AWI, including: (a) all entities that supplied goods or rendered services to AWI after the Commencement Date (other than professionals retained by AWI or any of the Committees during AWI's chapter 11 case); (b) all direct customers of AWI from and after the Commencement Date; (c) all parties to contracts with AWI that either (i) were listed on Schedule G or (ii) were entered into by AWI after the Commencement Date; (d) the U.S. Trustee; (e) the members of the Committees and their attorneys; (f) the DIP Lenders and their attorneys; (g) all parties who have filed notices of appearance in AWI's chapter 11 case; and (h) all parties to actions commenced against AWI after the Commencement Date. If an entity required to receive such Notice also will be receiving a solicitation package with respect to the Plan, the Notice will be included as a separate document as part of the solicitation package. Otherwise, AWI will mail the Notice separately to such entity.

23.    In addition to sending the Notice by mail as described above, AWI will also cause to have the Notice published in the national edition of *The New York Times*, *The Wall Street Journal*, and *The USA Today* one day per week for a period of two consecutive weeks, commencing no later than ten (10) business days after entry by the Court of an order fixing the date for commencement of the hearing to consider confirmation of the Plan, as well as once in each of the trade publications and regional newspapers listed in Exhibit "D" annexed hereto, in accordance with the limitations set forth on the list of trade publications, at least thirty (30) days prior to the scheduled confirmation hearing

RLF1-2562369-1

E.    The Proposed Notice Is Reasonable and Adequate

24.    As noted above, AWI proposes that Notice pertaining to the Administrative Expense Bar Date be included in the solicitation packages to be mailed to creditors and parties in interest by AWI after the Court has approved the Disclosure Statement with respect to the Plan. By establishment of the Administrative Expense Bar Date as the fifth business day after the date scheduled by the Court for the commencement of the hearing on confirmation of the Plan, all potential claimants will have as much or more notice of the opportunity to file Specified Administrative Expense Claims as eligible creditors will have for submitting their votes accepting or rejecting the Plan, or that parties in interest will have of the hearing on confirmation of the Plan. Such period provides ample notice of the time within which to file a Specified Administrative Expense Claim, as Bankruptcy Rule 2002(a)(7) requires only twenty (20) days' notice of a bar date.

25.    Moreover, AWI submits that the proposed form of Notice is clear, concise, and provides sufficient information to the holders of Specified Administrative Expense Claims informing them of the (i) Administrative Expense Bar Date, (ii) instructions for the filing of proofs of Administrative Expenses, and (iii) consequences of failing to file a proof of Administrative Expense Claim by the Administrative Expense Bar Date.

26.    Based upon the foregoing, AWI respectfully submits that entry of the Proposed Order facilitates the administration of AWI's chapter 11 case and is in the best interests of AWI, its estate, and creditors.

27.    Notice of the Motion has been provided to the U S Trustee, the agent for AWI's prepetition bank lenders, the agent for the Debtors' postpetition bank lenders, the attorneys for the Committees, and all parties on the Debtors' Core Group Service List and All

13

Notices List in these cases pursuant to the Court's Order Establishing Case Management Procedures and Hearing Schedule, dated February 11, 2002. AWI submits that no other or further notice need be provided of this Motion.

      28.    No previous application for the relief requested herein has been made to this or any other court.

      WHEREFORE AWI requests that the Court enter the Proposed Order in the form annexed as Exhibit "A" hereto and grant such other and further relief as the Court deems appropriate.

Dated: February 4, 2003
      Wilmington, Delaware

            *Rebecca L. Booth*

            Mark D. Collins (No. 2981)
            Rebecca L. Booth (No. 4031)
            RICHARDS, LAYTON & FINGER, P.A.
            One Rodney Square
            P.O. Box 551
            Wilmington, Delaware 19899
            (302) 651-7700

                -and-

            Stephen Karotkin
            Debra A. Dandeneau
            WEIL, GOTSHAL & MANGES LLP
            767 Fifth Avenue
             New York, New York 10153
            (212) 310-8000

            ATTORNEYS FOR THE DEBTORS AND
            DEBTORS IN POSSESSION

14

# *EXHIBIT A*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------x
*In re*                           :    Chapter 11
                                  :
ARMSTRONG WORLD INDUSTRIES,       :    Case No. 00-4471 (RJN)
INC., *et al.*,                   :    (Jointly Administered)
                                  :
                      Debtors.    :    Re: Docket No. _____
                                  :    MC No. RLF-62
------------------------------------------------x

ORDER PURSUANT TO SECTION 503(a) OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULE 3003(c)
FIXING A FINAL DATE FOR FILING REQUESTS FOR
PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSES IN
AWI'S CHAPTER 11 CASE, APPROVING PROPOSED CLAIM
FORM, AND ESTABLISHING NOTICE PROCEDURES

Upon the motion dated February 4, 2003 (the "Motion") of Armstrong World

Industries, Inc., as debtor and debtor in possession ("AWI"), for an order pursuant to

section 503(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule

3003(c)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) fixing the

final date for filing requests for payment of certain administrative expenses in AWI's chapter 11

case, (ii) approving a proposed proof of claim form, and (iii) establishing notice procedures in

connection therewith, all as set forth more fully in the Motion; and the Court having jurisdiction

to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334; and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and it appearing that (a) fixing a final date for filing Specified

Administrative Expenses[1] is necessary for the efficient administration of AWI's chapter 11 case

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such
terms in the Motion.

RLF1-2562371-1

B-18

and to protect the interests of AWI, its creditors, and other parties in interest, (b) notification of

the relief granted by this Order in the manner proposed by AWI in the Motion is fair and

reasonable and will provide good, timely, and sufficient notice to the holders of Specified

Administrative Expenses of their rights and obligations in connection with their claims against

AWI and its estate, and (c) due and sufficient notice of the Motion having been given to the U.S.

Trustee, the agent for AWI's prepetition bank lenders, the agent for the Debtors' postpetition

bank lenders, the attorneys for the Committees, and all parties on the Debtors' Core Group

Service List and All Notices List in these cases pursuant to the Court's Order Establishing Case

Management Procedures and Hearing Schedule, dated February 11, 2002, and it appearing that

no other or further notice need be given; and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted in all respects; and it is further

ORDERED that, pursuant to section 503(a) of the Bankruptcy Code and

Bankruptcy Rule 3003(c)(3), each person or entity, including, without limitation, each

individual, partnership, joint venture, corporation, estate, trust and governmental unit, that asserts

a Specified Administrative Expense against AWI shall file a proof of such Specified

Administrative Expense that substantially conforms to the form annexed as Exhibit "B" to the

Motion[2] so as to be actually received not later than 5:00 p.m. (New York City time) on the date

that is five (5) business days after the date scheduled for the commencement of the hearing on

confirmation of the Plan (the "Administrative Expense Bar Date"), by mailing, hand delivering,

or delivering by courier service the original request to Trumbull Services LLC, Attn: Armstrong

---

[2]     Such form will be posted on the website established by AWI in connection with the
Plan, www.armstrongplan.com, or may be obtained by contacting Trumbull Services LLC
at 860-687-3806.

World Industries, Inc. (by mail: P.O. Box 1117, Windsor, Connecticut 06095; by hand delivery

or overnight courier: 4 Griffin Road North, Windsor, Connecticut 06095); and such request will

be deemed timely filed only if it is actually received by Trumbull at the above-referenced

address on or before the Administrative Expense Bar Date; and it is further

ORDERED that requests for payment of Specified Administrative Expenses will

*not* be deemed properly and timely filed if sent by facsimile or telecopy; and it is further

ORDERED that only the following constitute Specified Administrative Expenses

for which a proof of Administrative Expense must be filed on or before the Administrative

Expense Bar Date:

1. Any Administrative Expense representing personal injury, property damage, or other tort claims against AWI, *excluding* Asbestos Personal Injury Claims;

2. Any Administrative Expense for breach of an obligation (contractual, statutory or otherwise) by AWI, including any environmental liability, but other than any environmental liability with respect to property that is currently owned or operated by AWI;

3. Any Administrative Expense for amounts incurred by AWI after the Commencement Date in the ordinary course of AWI's business if payment of such amounts is alleged to be overdue by at least sixty (60) days as of the Confirmation Date;

4. Any Administrative Expense incurred by AWI outside the ordinary course of its business or on other than ordinary business terms, except to the extent the incurrence of such Administrative Expense Claim was approved by the Bankruptcy Court (*e.g.*, the DIP Credit Facility Claim, the postpetition COLI loans incurred by AWI, or any claims under any hedging agreement entered into after the Commencement Date) or represents fees and expenses of professionals arising under sections 330, 331, or 503(b)(2) - (5) of the Bankruptcy Code;

5. Any Administrative Expense that would not ordinarily be reflected as a payable on AWI's books and records or as a liability on AWI's financial statements; and

3

6. Any Administrative Expense representing an employee claim against AWI, *other than* (i) a claim for wages, benefits, pension or retirement benefits or expense reimbursement by an employee who is employed by AWI as of the Administrative Expense Bar Date or (ii) a grievance claim under any collective bargaining agreement to which AWI is a party;

*provided, however,* if a claim is of a type specified in sub-paragraphs (1) – (6) above *and* the

holder of such claim has asserted the claim in an action commenced against and served on AWI

on or before the date of entry of this Order (and in which such holder alleges that AWI's liability

is predicated upon the operation of AWI's business after the Commencement Date, or otherwise

alleges that such liability should be accorded administrative expense status), then the holder of

such alleged claim is not required to file a proof of Administrative Expense; and it is further

ORDERED that, to be properly filed pursuant to this Order, each Administrative

Expense shall (i) be written in the English language, (ii) be denominated in lawful currency of

the United States, and (iii) conform substantially to the form annexed as Exhibit "B" to the

Motion (which form may be obtained on the website established by AWI in connection with the

Plan, www.armstrongplan.com, or by contacting Trumbull Services LLC at 860-687-3806); and

it is further

ORDERED that, pursuant to Bankruptcy Rule 3003(c), if any person or entity that

is required by this Order to file proof of a Specified Administrative Expense fails to do so such

that it is *actually received* by Trumbull at the address specified above prior to the Administrative

Expense Bar Date, then such Specified Administrative Expense will be barred and discharged,

and the holder of such Specified Administrative Expense will have no right to assert such

Administrative Expense Claim against AWI, AWI's estate, or Reorganized AWI; and it is further

ORDERED that notice of entry of this Order and of the Administrative Expense

Bar Date substantially in the form annexed to the Motion as Exhibit "C" (the "Notice"), which

Notice is hereby approved, shall be deemed good, adequate, and sufficient notice, if such Notice

is served by United States Postal Service, first-class mail, in the manner provided for by

Bankruptcy Rule 3017(d), to creditors and parties in interest at their addresses last known to

AWI, including: (a) all entities that supplied goods or rendered services to AWI after the

Commencement Date (other than professionals retained by AWI or any of the Committees

during AWI's chapter 11 case); (b) all direct customers of AWI from and after the

Commencement Date; (c) all parties to contracts with AWI that either (i) were listed on

Schedule G or (ii) were entered into by AWI after the Commencement Date; (d) the U.S.

Trustee; (e) the members of the Committees and their attorneys; (f) the DIP Lenders and their

attorneys; (g) all parties who have filed notices of appearance in AWI's chapter 11 case; and

(h) all parties to actions commenced against AWI after the Commencement Date. If an entity

required to receive such Notice also will be receiving a solicitation package with respect to the

Plan, the Notice may be included as a separate document as part of the solicitation package.

Otherwise, AWI shall mail the Notice separately to such entity; and it is further

ORDERED that AWI will also cause to have the Notice published in the national

edition of *The New York Times*, *The Wall Street Journal*, and *The USA Today* one day per week

for a period of two consecutive weeks, commencing no later than ten (10) business days after

entry by the Court of an order fixing the date for commencement of the hearing to consider

confirmation of the Plan and in those trade publications and newspapers listed in Exhibit "D"

annexed to the Motion, in accordance with the limitations set forth on the list of trade

5

publications, once at least thirty (30) days prior to the commencement of the hearing to consider

confirmation of the Plan, which publication is hereby approved in all respects and which shall be

deemed good, adequate and sufficient notice of publication; and it is further

ORDERED that AWI be, and hereby is, authorized and empowered to take such

steps and to perform such acts as may be necessary to implement and effectuate the terms of this

Order.

Dated:    February _____, 2003
          Wilmington, Delaware

_____
THE HONORABLE RANDALL J. NEWSOME
UNITED STATES BANKRUPTCY JUDGE

*EXHIBIT B*

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | PROOF OF ADMINISTRATIVE EXPENSE |
|---|---|

*In re*

**ARMSTRONG WORLD INDUSTRIES, INC. (Case No. 00-4471) (RJN)**

This form should only be used to make a claim for an administrative expense arising under 11 U.S.C. § 503(b)(1) after December 6, 2000, the commencement of the chapter 11 case of Armstrong World Industries, Inc. ("AWI")

Name of Creditor
*(The person or other entity to whom AWI owes money or property)*

Name and Address Where Notices Should be Sent

Telephone No

**ORIGINAL**

THIS SPACE IS FOR COURT USE ONLY

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:

Check here ☐ replaces
if this claim ☐ amends   a previously filed administrative expense, dated _____

| 1 | BASIS FOR ADMINISTRATIVE EXPENSE: | |
|---|---|---|

☐ Personal Injury (other than asbestos personal injury)
☐ Property Damage
☐ Other tort claim
☐ Breach of contract
☐ Environmental liability (other than any liability for property currently owned by AWI)
☐ Statutory violation
☐ Other breach of obligation

☐ Postpetition account payable more than 60 days past due
☐ Employee claim (other than claim for wages, benefits, pension or retirement benefits or expense reimbursement) by current employee of AWI or a grievance claim under any AWI collective bargaining agreement)
☐ Taxes
☐ Other (please specify): _____

| 2 | DATE DEBT WAS INCURRED: | 3 | IF COURT JUDGMENT, DATE OBTAINED: |
|---|---|---|---|

| 4 | TOTAL AMOUNT OF ADMINISTRATIVE EXPENSE: |
|---|---|

| 5 | SECURED ADMINISTRATIVE EXPENSE |
|---|---|

☐   Check this box if your administrative expense is secured by collateral (including a right of setoff)

Brief Description of Collateral:

☐ Real Estate  ☐ Motor Vehicle  ☐ Other

Value of Collateral: $_____

6   CREDITS: The amount of all payments on this administrative expense has been credited and deducted for the purpose of making this proof of administrative expense

7   SUPPORTING DOCUMENTS: *Attach copies of supporting documents*  If the documents are not available, explain  If the documents are voluminous, attach a summary.

8   DATE-STAMPED COPY: To receive an acknowledgment of the filing of your administrative expense, enclose a stamped, self-addressed envelope and copy of this proof of administrative expense

THIS SPACE IS FOR COURT USE ONLY

| Date: | Sign and print the name and title, if any, of the creditor or other person authorized to file this administrative expense (attach copy of power of attorney, if any) |
|---|---|

*Penalty for presenting fraudulent claim:  Fine of up to $500,000.00 or imprisonment for up to 5 years, or both  18 U.S.C. §§ 152 & 3571*

## INSTRUCTIONS FOR PROOF OF ADMINISTRATIVE EXPENSE

### — WHO MUST FILE AN ADMINISTRATIVE EXPENSE —

Pursuant to an order of the Bankruptcy Court, only holders of the following types of administrative expenses are required to file a proof of administrative expense:

7     Any administrative expense representing personal injury, property damage, or other tort claims against Armstrong World Industries, Inc ("AWI"), *excluding* Asbestos Personal Injury Claims

8     Any administrative expense for breach of an obligation – contractual, statutory or otherwise – by AWI, including any environmental liability (but other than any environmental liability with respect to property that is currently owned or operated by AWI)

9     Any administrative expense for amounts incurred by AWI after December 6, 2000 in the ordinary course of AWI's business if payment of such amounts is alleged to be overdue by at least sixty (60) days

10     Any administrative expense incurred by AWI outside the ordinary course of its business or on other than ordinary business terms, except to the extent the incurrence of such Administrative Expense Claim was approved by the Bankruptcy Court (*e.g.*, the DIP Credit Facility Claim, the postpetition COLI loans incurred by AWI, or any claims under any hedging agreement entered into after December 6, 2000) or represents fees and expenses of professionals arising under sections 330, 331, or 503(b)(2)-(5) of the Bankruptcy Code

11     Any administrative expense that would not ordinarily be reflected as a payable on AWI's books and records or as a liability on AWI's financial statements

12     Any administrative expense representing an employee claim against AWI, *other than* (i) a claim for wages, benefits, pension or retirement benefits or expense reimbursement by an employee who is employed by AWI as of [INSERT DATE] or (ii) a grievance claim under any collective bargaining agreement to which AWI is a party

Administrative expenses required to be filed must also fall under one of the following definitions to constitute a valid administrative expense, pursuant to section 503(b)(1) of the Bankruptcy Code:

- an actual, necessary cost and expense of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case

- any tax incurred by the estate, except a tax of the kind specified in section 507(a)(8) of the Bankruptcy Code

- any tax attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to which such adjustment relates ended before or after the commencement of the case; or

- any fine, penalty or reduction in credit relating to a tax of a kind specified above.

Only administrative expenses arising under section 503(b)(1) are subject to the requirement to file a proof of administrative expense.

### ITEMS TO BE COMPLETED IN PROOF OF CLAIM FORM

**Information about Creditor:** Complete the section giving the name, address and telephone number of the creditor to whom AWI owes money or property, and AWI's account number, if any

**1. Basis for Claim:** Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt

**2. Date Debt Incurred:** Fill in the date when the debt first was owed by AWI

**3. Court Judgment:** If you have a court judgment for this debt, state the date the court entered the judgment

**4. Total Amount of Administrative Expense:** Fill in the amount of the entire administrative expense

**5. Secured Administrative Expense:** Check the appropriate place if the claim is a secured administrative expense. You must state the type and value of property that is collateral for the administrative expense, and attach copies of the documentation of your lien.

**6. Credits:** By signing this proof of administrative expense, you are stating under oath that in calculating the amount of your administrative expense you have given AWI credit for all payments received from AWI

**7. Supporting Documents:** You must attach to this proof of administrative expense form copies of documents that show AWI owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available

**8. Returning Proof of Administrative Expense:** All proofs of administrative expense must be mailed, hand delivered, or delivered by courier service to Trumbull Services LLC, *Attn: Armstrong World Industries, Inc.*, (by mail: P.O. Box 1117, Windsor, Connecticut 06095; by hand delivery or overnight courier: 4 Griffin Road North, Windsor, Connecticut 06095) so that they are *actually received by* 5:00 p m , New York City time, on [INSERT DATE]

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
--------------------------------------------------  x
In re                                               :    Chapter 11 Case No.
                                                    :
ARMSTRONG WORLD INDUSTRIES,                          :    00-4471 (RJN)
INC., et al.,                                        :
                                                    :    (Jointly Administered)
                     Debtors                         :
                                                    :
                                                    :
--------------------------------------------------  x
```

NOTICE OF DEADLINE TO FILE CERTAIN
REQUESTS FOR PAYMENT OF ADMINISTRATIVE EXPENSES

PLEASE TAKE NOTICE THAT the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has entered an order, dated [ _date_ ], requiring all persons and entities that assert certain types of administrative expense arising under section 503(b)(1) of the Bankruptcy Code ("Administrative Expense") against Armstrong World Industries, Inc. ("AWI") to file a proof of Administrative Expense by 5:00 p.m. (New York City time) on [insert date] (the "Administrative Expense Bar Date").

### 1.    WHO MUST FILE AN ADMINISTRATIVE EXPENSE CLAIM

Only certain holders of Administrative Expenses must file a proof of Administrative Expense. If you believe you have a claim against AWI that (i) arose after December 6, 2000, (ii) qualifies as an administrative expense under section 503(b)(1) of the Bankruptcy Code, *and* (iii) falls within any of the six categories described below, no matter how remote or contingent, you must file a request for payment on account of such Administrative Expense on or before the Administrative Expense Bar Date:

- Any Administrative Expense representing personal injury, property damage, or other tort claims against AWI, *excluding* Asbestos Personal Injury Claims;

- Any Administrative Expense for breach of an obligation – contractual, statutory or otherwise – by AWI, including any environmental liability (but other than any environmental liability with respect to property that is currently owned or operated by AWI);

- Any Administrative Expense for amounts incurred by AWI after December 6, 2000 in the ordinary course of AWI's business if payment of such amounts is alleged to be overdue by at least sixty (60) days;

- Any Administrative Expense incurred by AWI outside the ordinary course of its business or on other than ordinary business terms, except to the extent the incurrence of such Administrative Expense Claim was approved by the Bankruptcy Court (*e.g.*, the DIP Credit Facility Claim, the postpetition COLI loans incurred by AWI, or any claims under any hedging agreement entered into after the Commencement Date) or represents fees and expenses of professionals arising under sections 330, 331, or 503(b)(2)-(5) of the Bankruptcy Code;

- Any Administrative Expense that would not ordinarily be reflected as a payable on AWI's books and records or as a liability on AWI's financial statements; or

- Any Administrative Expense representing an employee claim against AWI, *other than* (i) a claim for wages, benefits, pension or retirement benefits or expense reimbursement by an employee who is employed by AWI as of the Administrative Expense Bar Date or (ii) a grievance claim under any collective bargaining agreement to which AWI is a party.

If a claim is of the type specified in (A) – (F) above *and* the holder of such claim has asserted the claim in an action commenced against and served on AWI on or before [date of entry of the Proposed Order] (and in which such holder alleges that AWI's liability is predicated upon the operation of AWI's business after December 6, 2000, or otherwise alleges that such liability should be accorded administrative expense status), then the holder of such alleged Administrative Expense Claim is *not* required to file a proof of Administrative Expense Claim.

## 2.   WHEN AND WHERE TO FILE

All Administrative Expense Claims must be filed so as to be received no later than 5:00 P.M. (New York City time), on or before the Administrative Expense Bar Date at the following address:

| By Hand Delivery: | By Mail: |
|---|---|
| Trumbull Services, LLC | Trumbull Services, LLC |
| 4 Griffin Road North | P.O. Box 1117 |
| Windsor, CT 06095 | Windsor, CT 06095 |
| (Attn: Armstrong World Industries, Inc.) | (Attn: Armstrong World Industries, Inc.) |

Trumbull will *not* accept proofs of Administrative Expense Claims by facsimile or any electronic means.

## 3.   WHAT TO FILE

Each Administrative Expense Claim must conform substantially to the claim form that has been approved by the Bankruptcy Court. Such claim form may be obtained on the website established by AWI in connection with the Plan, www.armstrongplan.com, or by contacting Trumbull Services LLC at 860-687-3806. Such claim must be written in English, and any amounts claimed therein must be converted to United States dollars.

Any creditor who is required, but fails, to file a request for payment of an Administrative Expense Claim by 5:00 p.m. (New York City time) on or before the Administrative Expense Bar Date will be forever barred, estopped, and enjoined from asserting such Administrative Expense against AWI and its property, and AWI will be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense.

Dated:   Wilmington, Delaware
February ___, 2003

RICHARDS, LAYTON & FINGER, P.A.          WEIL, GOTSHAL & MANGES LLP
One Rodney Square                         767 Fifth Avenue
P.O. Box 551                              New York, New York  10153
Wilmington, Delaware  19899
                 ATTORNEYS FOR THE DEBTOR AND DEBTOR IN POSSESSION

2

RLF1-2562371-1

B-29

# EXHIBIT D

Trade Publications

| Media Name | Next Available Issue Date* | Mail Date | Space Close | Materials Close |
|---|---|---|---|---|
| A H A News | March 24, 2003 | March 24, 2003 | March 10, 2003 | March 10, 2003 |
| BOMA | April | April 4, 2003 | February 17, 2003 | March 14, 2003 |
| Building Operating Management | April | April 21, 2003 | March 3, 2003 | March 3, 2003 |
| Buildings | April | April 1, 2003 | March 1, 2003 | March 1, 2003 |
| Business Officer | April | April 3, 2003 | March 12, 2003 | March 12, 2003 |
| Chronicle of Higher Education | April 4, 2003 | April 4, 2003 | March 24, 2003 | March 24, 2003 |
| College Planning & Management | April | April 21, 2003 | April 4, 2003 | April 11, 2003 |
| Commercial Property News | April 16, 2003 | April 16, 2003 | March 13, 2003 | March 20, 2003 |
| Facilities Manager | May/June | May 19, 2003 | March 21, 2003 | March 28, 2003 |
| Facility Management Journal | May/June | May 1, 2003 | April 1, 2003 | April 10, 2003 |
| Facility Manager | May/June | May 1, 2003 | March 14, 2003 | April 4, 2003 |
| FacilityCare | May/June | May 1, 2003 | April 22, 2003 | April 29, 2003 |
| Governing | April | April 1, 2003 | February 21, 2003 | February 28, 2003 |
| Government Executive | April | April 1, 2003 | March 3, 2003 | March 10, 2003 |
| Health Facilities Management | April | April 7, 2003 | March 3, 2003 | March 7, 2003 |
| Journal of Property Management | May/June | May 8, 2003 | April 1, 2003 | April 8, 2003 |
| National Real Estate Investor | April | April 1, 2003 | March 7, 2003 | March 14, 2003 |
| Nation's Cities Weekly | April 7, 2003 | April 7, 2003 | March 17, 2003 | March 24, 2003 |
| School Administrator | April | April 1, 2003 | February 28, 2003 | March 4, 2003 |
| State Government News | April | March 27, 2003 | February 14, 2003 | February 15, 2003 |
| University Business | May | April 27, 2003 | April 1, 2003 | April 8, 2003 |

* Based upon entry of order approving disclosure statement on February 28, 2003

** Many of the publications listed above publish infrequently and have early deadlines for the submission of advertising. Therefore, the availability of the publications will be dependent upon the actual date on which the order approving the disclosure statement is entered and whether an issue of such publication will be printed and mailed prior to the expiration of the Administrative Expense Bar Date. AWI

statement if such publication is expected to be mailed prior to the Administrative Expense Bar Date.

REGIONAL NEWSPAPERS

| |
|---|
| Mobile Register |
| Daily News |
| LA Times |
| Pensacola News Journal |
| Macon Telegraph |
| Kankakee Daily Journal |
| Baltimore Sun |
| Jackson Clarion Ledger |
| Columbus Dispatch |
| Stillwater Newspress |
| Portland Oregonian |
| Beaver County Times |
| Lancaster Intelligencer |
| Williamsport Sun-Gazette |

## CERTIFICATE OF SERVICE

I, Rebecca L. Booth, hereby certify that on the 4th day of February, 2003, I caused

copies of the foregoing **Motion for Order Pursuant to Section 503(a) of the Bankruptcy Code**

**and Bankruptcy Rule 3003(c)(3) Fixing Final Date for Filing Requests for Payment of Certain**

**Administrative Expenses in AWI'S Chapter 11 Case, Approving Proposed Claim Form, and**

**Establishing Notice Procedures** to be served upon the Core Group (local) via hand delivery, Core

Group (non-local) via first class mail, All Notices List (local) via hand delivery, and All Notices List

(non-local) via first class mail.

_Rebecca L. Booth_
Rebecca L. Booth (No. 4031)

RLF1-2562541-1

B-33

**TAB 2**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------x
*In re*                      :      **Chapter 11 Case No.**

ARMSTRONG WORLD INDUSTRIES,    :     **00-4471 (RJN)**
INC., *et al.*,                      :

                                   :     **(Jointly Administered)**
                 Debtors.      :
------------------------------------------------x

### WITHDRAWAL OF PROOF OF CLAIM

Pursuant to Rule 3006 of the Federal Rules of Bankruptcy Procedure, Sea Pac

Sales ("SPS"), a creditor in the above-captioned chapter 11 cases, hereby withdraws with

prejudice its proof of claim filed against Armstrong World Industries, Inc. on August 30,

2001, numbered 3528, in the liquidated, noncontingent amount of $11,448.00 and the

precautionary unliquidated, contingent amount of $7,000,000 (the "Proof of Claim").

Withdrawal of this Proof of Claim is without prejudice to SPS to seek payment for any

unpaid postpetition expenses, in accordance with the provisions of Bankruptcy Code and

any applicable orders of the Court and SPS expressly reserves its rights under any

agreement made by the Debtor postpetition, including, but not limited to any rights SPS

has under that certain Inventory Purchase Agreement with Armstrong World Industries,

dated April 1, 2003. A copy of the Proof of Claim is attached hereto as Exhibit "A."

Dated: May 28 , 2003     Sea Pac Sale By: _Jared Williams_, President

                                 Name: _Jared Williams_

                                 Title: _President_

MI1st13573S1U3JU3X5V031 DOC\17168.0020

EXHIBIT "A"

DO NOT USE THIS FORM IF YOU HAVE AN ASBESTOS PERSONAL INJURY CLAIM

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

Name of Debtor: check one  (See Reverse Side for Complete List of Debtors and Case Nos.)
☐  Armstrong World Industries, Inc. (Case No. 00-4471)
☐  Nitram Liquidators, Inc. (Case No  00-4469)
☐  Desseaux Corporation of North America  (Case No.  00-4470)

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br><br>Name and Address where notices should be sent:<br>Sea Pac Sales<br>Dale Griffiths, Pres<br>6307 South 228th Street<br>Kent, WA 98032<br>Telephone # 253-796-3500 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. |

| | |
|---|---|
| Account or other number by which creditor identifies debtor: | Check here if   ☐ replaces<br>this claim      ☐ amends     a previously filed claim, dated _____ |

This Space is for Court Use Only

**1. Basis for Claim**
☐ Acquisitions/Divestitures    ☐ Freight    ☐ Non-Asbestos Property Damage    ☐ Taxes
☐ Asbestos Property Damage    ☒ Goods Sold    ☐ Officer Indemnity    ☐ Tooling
☐ Bank Service Charges    ☐ Industrial Revenue Bonds    ☐ Other _____    ☐ Trade Payables
☐ Contribution, Indemnity or    ☐ Letters of Credit or Surety    ☐ Other Financing    ☐ Unknown
Guaranty    Bonds    ☐ Pension Insurance    ☐ Wages, Salaries and
☐ Customer Deposits    ☐ Litigation    ☐ Professional Fees    Compensation (fill out below)
☐ Environmental    ☐ Long Term Disability    ☐ Property Leases    Your SS #:_____
☐ Equipment Financing    ☐ Mechanic's Lien    ☐ Reclamation Notices    Unpaid compensation for services
☐ ESOP Repurchase    ☐ Money Loaned    ☐ Retiree Benefits as defined in    performed from _____
Obligation    ☐ Mortgages    11 U.S.C §1114(a)    (date)
☐ Executory Contracts    ☐ Non-Asbestos    ☐ Senior Debt    to _____
☐ Expenses    Personal Injury    ☐ Subordinated Debt    (date)
☐ Workers' Compensation

**2. Date debt was incurred:**    **3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:**    $ See Attached
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim  Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff)
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle
☐ Other _____
Value of Collateral:  $_____
Amount of arrearage and other charges at time case filed
included in secured claim, if any: $_____

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,300), earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C  §507(a)(4)
☐ Up to $ 1,950 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8)
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**7. Credits:**  The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
**8. Supporting Documents:**  Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien  DO NOT SEND ORIGINAL DOCUMENTS.  If the documents are not available, explain.  If the documents are voluminous, attach a summary
**9. Date-Stamped Copy:**  To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

This Space is for Court Use Only

RECEIVED
TRUMBULL SERVICES
COMPANY

2001 AUG 30  PH 2: 16

BANKRUPTCY

| | |
|---|---|
| Date<br>8/29/01 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br>_Dale Griffiths_, DALE GRIFFITHS, President<br>Sea Pac Sales |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Prepared by Trumbull Services on Time: 12:15 pm Date: 6-September-01

B-36

Exhibit A

## PROOF OF CLAIM
(Sea Pac Sales Company)

Sea Pac Sales Company ("SPSC") is an Armstrong distributor under a series of Sales Service Agreements ("Contracts") with Armstrong World Industries, Inc

SPSC has a liquidated, noncontingent claim for $11,448 for STPA and SCPR for sales of products pursuant to the Contracts made prior to December 6, 2000.

SPSC additionally asserts an unliquidated, contingent, unmatured claim for STPA and SCPR based on materials shipped prior to December 6, 2000, in the amount of $100,000  This amount is estimated and subject to amendment, revision or supplementation   SPSC contends that its right to these payments are post-petition contractual obligations of the debtor entitled to administrative priority  SPSC files this claim on a precautionary basis to the extent this claim is determined to be a prepetition claim

SPSC is also a third party beneficiary of that certain Inventory Purchase Agreement dated April 23, 2001, between Armstrong World Industries, Inc , and U S. Bank  SPSC as third party beneficiary asserts an unliquidated, contingent, unmatured claim in the amount of $7,000,000.  This amount is estimated and subject to amendment, revision or supplementation.  SPSC contends that its right to these payments are post-petition contractual obligations of the debtor entitled to administrative priority.  It files this claim on a precautionary basis to the extent this claim is determined to be a prepetition claim.

SPSC has not received any notice from the court and any notice of the bar date other than that contained in the letter dated August 24, 2001, from Stephen E. Stockwell, Senior V P. Strategic Relations   SPSC expressly reserves the right to amend and supplement this proof of claim for any other damages arising out of its pre-petition contractual relationships with Armstrong World Industries, Inc , including, but not limited to, any damages or breaches the untimely notice of the bar date precluded Sea Pac from discovering and for any claims which may arise form the subsequent rejection of the Contracts

Proof of Claim - Exhibit A
Sea Pac sale Company, page 1 of 1

**TAB 3**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| ARMSTRONG WORLD INDUSTRIES, ) | |
| INC. *et al.*, ) | Case No. 00-04471 (JKF) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | Objection Deadline: September 15, 2006 (rev.) |
| ) | Hearing Date: October 23, 2006 9:45 a.m. |
| ) | Re: DI 9683 |

### DECLARATION OF JARED WILLIAMS IN SUPPORT OF
### SEA-PAC'S ANSWER TO ARMSTRONG'S OBJECTION

To:    Parties required to receive notice pursuant to Local Bankruptcy Rule 2002-1(b), as modified by the Court's Second Revised Order Establishing Case Management Procedures and Hearing Schedule, dated March 15, 2005.

Jared R. Williams states as follows:

1.    I am the President of Sea-Pac Sales Company ("Sea-Pac"). The following is based upon personal knowledge and I am competent to testify.

2.    In 1999, Sea-Pac executed new distribution agreements with Armstrong World Industries, Inc. ("AWI") covering residential flooring products and commercial flooring products. The main body of these agreements are included Exhibit A to AWI's Objection.

3.    Both the residential and commercial floor product agreements provided that they expired on February 15, 2004. By letter agreement entered into between the parties, the agreements were extended until March 31, 2004, *see* **Exhibit 1** hereto, and then December 31, 2004, *see* Exhibit A to AWI's Objection.

B-38

4.     The 1999 Residential Agreement included a provision under which Sea-Pac was required to be a Regional Distribution Center ("RDC") to warehouse, merchandise, service and ship to AWI's corporate retail accounts to which AWI sold directly, including The Home Depot and Lowe's. Because AWI was selling directly to these customers, it was required to reimburse Sea-Pac for its RDC services. Residential Agreement at ¶ 12.g., attached as Exhibit A to AWI's Objection. These reimbursements were based on a fee schedule that Armstrong was required to review and revise annually. *Id.* The understanding was that AWI would reimburse Sea-Pac so that our company received a "fair return on investment" for the services provided to AWI's RDC customers. This understanding was reflected in the many statements by AWI representatives and in AWI documents, including AWI's RDC business plans, dated February 5, 2002, and June 2002, excerpts of which are attached hereto as **Exhibits 2 and 3.** *See* Exhibit 2 at 2, 5; Exhibit 3 at 2, 3.

5.     As part of AWI's obligation to review and revise the RDC fee schedules to ensure that it reimbursed Sea-Pac for these services, Sea-Pac was required to "[s]ubmit financial performance of RDC activity as part of annual Operation Study" as provided in Attachment E to the Residential Agreement, which is attached hereto as **Exhibit 4.**

6.     Armstrong annual operation studies of the RDC activity demonstrated that AWI was not reimbursing Sea-Pac for its RDC services. For example, the 2002 study shows that Sea-Pac was losing $260,577 because AWI was under-reimbursing it for

2

RDC activities. This was more than one-half of Sea-Pac's total profit on its entire operations and had a major financial impact on Sea-Pac. Likewise, in 2003, AWI's Operating Studies show that Sea-Pac lost $509,794 on RDC activities, which was almost 2/3 of Sea-Pac's profits from its overall operations and a major financial impact. The relevant portions of these studies are attached hereto as **Exhibit 5** (*see* column E).

7.      Soon after the RDC system was implemented, Sea-Pac began to realize that AWI was not reimbursing it in full for RDC activities and complained to AWI about this. The RDC under-reimbursement was due in part to the failure of AWI to adjust RDC compensation in an expedited manner. Many times, AWI promised RDC adjustments but then delayed them, which exacerbated the RDC under-reimbursement to Sea-Pac. For example, attached hereto as **Exhibit 6** is a copy of an email I received from AWI's Robert H. Miller discussing the additional under-reimbursement to Sea-Pac due to AWI's delay in utilizing new RDC compensation schedules.

8.      AWI's RDC reimbursement simply did not reflect the practical reality faced by Sea-Pac in distributing product to AWI's direct customers in our sales territory, which has large, sparsely populated rural areas. Although AWI's RDC reimbursement may be equitable for distributors with more densely urbanized sales territories, AWI representatives have acknowledged many times that Sea-Pac's sales territory, which includes northern Wyoming, Montana, Alaska, Idaho, Washington and Oregon, has much higher shipping and distribution expenses. Sea-Pac's complaints about the RDC reimbursement levels were made on numerous occasions, and

3

acknowledged by Armstrong on numerous occasions. Documentary examples of this are attached as **Exhibit 7** hereto.

9.    AWI finally began to recognize the significant under-reimbursement in its RDC fee schedule in July 2004. Since that time, Sea-Pac has charged AWI an additional monthly fee, over and above the RDC fee schedule, for RDC services. These additional RDC charges allow Sea-Pac to come close to recovering its expenses in providing the RDC services to AWI's direct customers. Attached as **Exhibit 8** is a summary of the RDC chargebacks by Sea-Pac from July 2004 through June 2006, which total $1,448,818.

10.    The Commercial Agreement between AWI and Sea-Pac required that "annual mill shipment requirements" be determined by the parties after discussions of the reasonable achievable market penetration. *See* AWI Objection Exhibit A. For the first few years after the contract was executed, AWI dictated the "annual mill shipment requirements," but never did so based on its discussions with Sea-Pac. The annual mill shipment requirements dictated by Armstrong also were never a reasonable calculation of the achievable sales in the Sea-Pac sales territory. Indeed, distributors nationwide have stated that AWI's mill shipment requirements were generally unrealistic assumptions, unilaterally set by AWI.

11.    According to the Commercial Agreement, the mill shipment requirements were supposed to be provided to Sea-Pac by December 15 of the prior year. Sea-Pac never received any mill shipment requirements from AWI by December 15, 2001, or at

4

any time thereafter, for the 2002 calendar year. In fact, for 2002, AWI measured

performance by its distributors, including Sea-Pac, based on Sea-Pac's sales to its

customers, which it termed "Wholesale To Retail (WTR) Net Bill Sales." For example,

attached hereto as **Exhibit 9** is the 2002 performance report from AWI to Sea-Pac,

which uses the wholesale-to-retail measurements and does not utilize mill shipments as

the performance metric.

     12.   Sea-Pac has been an AWI distributor for 50 years. However, by 2002,

many of AWI's products had become unprofitable, which required Sea-Pac to add

additional product lines. One of these new product lines was a wood laminate floor

covering called Quick-Step, which was manufactured by Unilin. This product

competed with AWI's wood laminate product, which was inferior in many ways. AWI

representatives were very angry when Sea-Pac began selling the Quick-Step line,

threatening Sea-Pac if it continued to sell Quick-Step flooring. AWI representatives

made clear that they were going to punish Sea-Pac for selling the Quick-Step line, and

then admitted that the "punishment" was AWI's appointment of a second distributor for

commercial product in Sea-Pac's exclusive territory.

     13.   I pointed out to AWI representatives on many occasions that the

appointment of the second distributor was not only a poor business decision, but also a

breach of AWI's contract with Sea-Pac. Indeed, I recall specifically stating this to Rik

Born, AWI's vice-president in March 2003. During these discussions with AWI

representatives, they had never claimed that the appointment of a second distributor in

5

Sea-Pac's exclusive territory was a result of deficiencies in Sea-Pac's sales. To the contrary, they had many times advised me that AWI made that decision because Sea-Pac was selling the Quick-Step line. For example, on March 22, 2004, Frank Ready, the current president and CEO for AWI North America Floor Products, admitted this to me in a telephone conference. AWI's current position, in the matter before the Court, that this decision was made because of Sea-Pac's failure to meet mill shipment requirements is a pretext to cover the real reason a second distributor was appointed.

14.    Our records indicate that Sea-Pac never received a copy of the order setting the administrative expense bar date that is relied upon by AWI in its Objection.

15.    All the documents attached to this declaration are true and correct copies of the originals.

16.    I declare under penalty of perjury that the foregoing is true and correct.

Executed at Bellevue, Idaho this 14th day of September, 2006.

Jared R. Williams

6

B-43



Your ideas become reality.

RICHARD K. BORN, VICE PRESIDENT
RESIDENTIAL SALES – NORTH
Tel: (717) 396-2259  —  Fax: (717) 396-6334
rkborn@armstrong.com

January 29, 2004

Jared Williams, Owner/President
Sea-Pac Sales Company
P.O. Box 3846
Seattle, WA  98124-3846

Dear Jared:

As you know, our Residential Flooring Products Distributorship and Sales/Service Center
Agreement dated February 15, 1999 (the "Agreement") is due to expire February 15, 2004. To
allow us appropriate time to discuss with you and put into place our new agreements, we propose
to extend the Agreement to the earlier of: (i) March 31, 2004; or (ii) the Effective Date of our
Plan of Reorganization. If this is acceptable, please acknowledge your agreement by signing
both copies of this letter, returning one to our office and keeping the other for your files

We appreciate your cooperation in this matter

Sincerely,

Richard K. Born

Agreed and accepted:

**SEA-PAC SALES COMPANY**

By: _____

Title: _____

Date: _____

# EXHIBIT 1



RANDALL L. GABLEHOUSE, GENERAL MANAGER
COMMERCIAL SALES
Tel: (717) 396-2681 — Fax: (717) 396-6334
rlgablehouse@armstrong.com

February 9, 2004

Jared Williams, Owner/President
Sea-Pac Sales Company
P.O. Box 3846
Seattle, WA 98124-3846

Dear Jared:

Last week, Rik Born sent to you the extension letter for the residential business. This is a similar letter for the commercial business. If you have any questions, please do not hesitate to call.

As you know, our Commercial Flooring Products Distributorship Agreement dated February 15, 1999,(the "Agreement") is due to expire February 15, 2004. To allow us appropriate time to discuss with you and put into place our new agreements, we propose to extend the Agreement to the earlier of: (i) March 31, 2004; or (ii) the Effective Date of our Plan of Reorganization. If this is acceptable, please acknowledge your agreement by signing a copy of this letter, returning it to our office and keeping a copy for your files.

We appreciate your cooperation in this matter.

Sincerely,

Randall L. Gablehouse

Agreed and accepted:

**SEA-PAC SALES COMPANY**

By: _____

Title: _Pres._ _____

Date: _4/17/04_ _____

B-45



**Floor Products**

EXHIBIT 2

# RDC Business Plan
# 2/5/2002

**Confidential Privileged Information**

## RDC Business Plan                Situation/Business Assessment

### ...ove toward a Regional Third Party Logistics (3PL) structure...

### Objectives
- **Optimize network of RDC locations**
- **Fees paid for service provided as opposed to margin on product sales**
- **Sharing of business risk and opportunity**
- **Simplified, activity-based fee structure**
  - Unbundled fees
  - Fixed and variable components
  - Non-technology based distribution standards and benchmark data used to structure fee calculations
  - Local market cost factors
- **Formalized annual review process at the beginning of each year**

> **The structure must provide a competitive advantage in ASA distribution for Armstrong and <u>a fair return on investment for distribution partners</u>**

✳



**CONFIDENTIAL**                    2

RDC Business Plan                    Situation/Business Assessment

# The ASA distribution process is over 5 years old and does not reflect the "actual economics" of the service provided...

| Situation | Implication |
|---|---|

**ASA Customers**
- The existing RDC structure meets current service requirements for ASA customers  → • Changes to RDC structure must not impact service levels
- Service requirements are dynamic for ASA customers  → • New service requirements must be incorporated into business plan
  - Night Deliveries
  - "Transit centers"
  - Laminate through RDC's
  - Store count growth

**RDC Partners**
- All 13 US distribution partners provide RDC service  → • Changes to RDC's can impact traditional channel business
- ✳ <u>Most believe they lose money on the RDC component of their business</u>  → • We must provide a structure that enables distributors to understand and fairly measure the RDC component of their business
- Some distributors have requested to get out of the RDC business  → • If a new structure is not developed, we will need to find alternative RDC distribution
- RDC distribution territories mirror traditional channel territories  → • Higher transportation costs result from stores not being serviced through the closest distribution point
- Distributors own ASA segmented inventory  → • Distributors expect to earn a return on their investment

**Armstrong**
- ASA customers are Armstrong's largest customers  → • Effective distribution service is critical for business success
- Floor products believes distributors are not investing in traditional channel business because they are subsidizing ASA business  → • Slower business growth with traditional channel customers
- The RDC distribution model can translate into stronger logistics capability in servicing traditional customers, both aligned (CCA, Sherwin Williams, Stamet, etc.) and unaligned  → • Opportunity to lower system cost for service while providing a platform for business growth
- Distribution costs have not been considered in product packaging specifications  → • By optimizing total delivered cost when designing product packaging, overall profitability can be improved

---

## A change must be made or ASA business will be at risk

---

**Armstrong**

**CONFIDENTIAL**                    3

# RDC Business Plan

# Recommended Actions

## The network should be reconfigured and the compensation system redesigned to align with services performed...

| Topic | From | | To | | Rationale |
|-------|------|---|-----|---|-----------|
| Network Rationalization | Traditional channel flooring distributors | → | Continue to utilize current distribution partners | → | Capitalize on business synergy (cost/complexity) Minimize business disruption |
| Network Optimization | ASA territories mirror traditional channel territories | → | Align THD stores with closest RDC location | | Improve service Reduce transportation cost by reduction of miles |
| Compensation Structure | 5 year old compensation structure | → | Externally competitive compensation system | → | Fair return on investment for distribution partners |
| | Pounds-based system | → | Activity-based structure | → | Fee alignment with activities performed |
| | No documented information on rate development | → | Utilize non-technology-based industry standards | → | Raise distributor performance levels by establishing and measuring based on standards |
| | RDC's bear business risk if volume drops below break-even | → | Share risk/opportunities | | Protect distribution partners from volume declines/share gains |
| | Revenue neutral | → | Structure for a fair business return of 8% PBT | → | Transition from "margin business" to third-party logistics business mindset Appropriately align distribution partner investment between ASA and traditional businesses |
| | System reviews based on squeaky wheel | → | Establish annual (system) and periodic (fuel, etc.) review process | → | Ensure alignment with changing business conditions and technology advancements |
| Investment Evaluation | Difficult to determine return on RDC investments | → | Fact-based process derived from change in activities, resource requirements, etc. | | Framework for decision making |

**The new network will maintain service performance while the new compensation system provides a fair business return, is simpler, and aligns costs with associated services provided**

Armstrong

**CONFIDENTIAL**

5

B-49



# Armstrong
## Floor Products

# RDC Business Plan
# Sea Pac - June 2002

**Confidential·Privileged Information**

EXHIBIT 3

B-50

# RDC Business Plan                                    Objectives

**Move toward a Regional Third Party Logistics (3PL) structure...**

### Objectives
- **Optimize network of RDC locations**
- **Fees paid for service provided as opposed to margin on product sales**
- **Sharing of business risk and opportunity**
- **Simplified, activity-based fee structure**
  - Unbundled fees
  - Fixed and variable components
  - Non-technology based distribution standards and benchmark data used to structure fee calculations
  - Local market cost factors
- **Formalized annual review process at the beginning of each year**

> **The structure must provide a competitive advantage in ASA distribution for Armstrong and <u>a fair return on investment for distribution partners</u>**



**CONFIDENTIAL**

# RDC Business Plan                    Recommended Actions

**The network should be reconfigured and the compensation system redesigned to align with services performed...**

| Topic | From | To | Rationale |
|---|---|---|---|
| Network Rationalization | Traditional channel flooring distributors | → Continue to utilize current distribution partners | → Capitalize on business synergy (cost/complexity) Minimize business disruption |
| Network Optimization | ASA territories mirror traditional channel territories | → Align THD stores with closest RDC location | → Improve service Reduce transportation cost by reduction of miles |
| Compensation Structure | 5 year old compensation structure ✳ | → Externally competitive compensation system | ↪ Fair return on investment for distribution partners ✳ |
| | Pounds-based system | → Activity-based structure | → Fee alignment with activities performed |
| | No documented information on rate development | → Utilize non-technology-based industry standards | → Raise distributor performance levels by establishing and measuring based on standards |
| | RDC's bear business risk if volume drops below break-even | → Share risk/opportunities | → Protect distribution partners from volume declines/share gains |
| | Revenue neutral | → Structure for a fair business return of 8% PBT ✳ | → Transition from "margin business" to third-party logistics business mindset Appropriately align distribution partner investment between ASA and traditional businesses |
| | System reviews based on squeaky wheel | → Establish annual (system) and periodic (fuel, etc.) review process | → Ensure alignment with changing business conditions and technology advancements |
| Investment Evaluation | Difficult to determine return on RDC investments | → Fact-based process derived from change in activities, resource requirements, etc. | → Framework for decision making |

> **The new network will maintain service performance while the new compensation system provides a fair business return, is simpler, and aligns costs with associated services provided**

(Armstrong)

CONFIDENTIAL

# RDC Business Plan                    **Performance Measures**

**Distribution performance should be measured based on industry standard performance metrics...**

**Warehouse Activity Metrics:**

- Receiving (Units/Hour)
- Put Away (Units/Hour)
- Picking (Units/Hour)
- Special handling (Units/Hour)
- Load/Ship (Units/Hour)

**Warehouse Inventory Metrics:**

- Turn Rate (Times/Year)
- Obsolescence (Days-on-Hand)
- Shrink (%)
- Fill Rate (%)

**Warehouse G & A Metrics:**

- Fixed / Variable Costs (%)
- Overtime (%)
- Direct / Indirect Labor Hours (%)
- Efficiency (Costs/Fees %)

**Warehouse Space Metrics:**

- Cube Utilization (%)
- Damages (%)
- Inventory Dollars / Cubic Foot
- Travel Time Per Activity



**Armstrong will regularly review performance measures with RDC partners**

Source:  Standards & benchmark metrics:  JMBI LLC, CLM & George Gross & Assoc.

**CONFIDENTIAL**            Armstrong

Attachment E

## SSC'S DUTIES AS RDC

1.  Purchase CRA Products from Armstrong at the terms in effect at the time of purchase.

2.  Warehouse and manage sufficient inventory of CRA Products to support Armstrong's CRA sales efforts and to achieve the operational performance measures and goals described in paragraph 13 below.

3.  Upon receipt of delivery instructions from Armstrong, sell CRA Products to Armstrong at the terms in effect at the time of shipment from RDC to CRA Customer. Title to and risk of loss or damage to CRA Products will transfer to Armstrong upon SSC's sale of CRA Products to Armstrong. All shipments from SSC's RDC to CRA Customers are FOB Destination, unless otherwise indicated by Armstrong.

4.  Deliver CRA Products to CRA Customers as directed by Armstrong.

5.  Purchase, operate and maintain the most current approved release of Dancik-on-Disk ("DOD") Floor Vision software and operate the software as required by Armstrong.

6.  Install new releases of the DOD Floor Vision software in accordance with Armstrong's requirements.

7.  Purchase, operate and maintain as required by Armstrong the hardware and communications capability to support the DOD system and to electronically interface with Armstrong systems real time.

8.  Purchase and maintain disaster recovery services for SSC's business, which includes, but is not limited to, all software, hardware and communications elements. All disaster recovery plans must be approved in advance by Armstrong.

9.  As part of a comprehensive operational business resumption plan, the SSC's will contract with the Dancik-On-Disk company to provide nightly batch support. Any exceptions to this requirement must be approved in writing by Armstrong.

10. Provide Armstrong access to the Armstrong business related data such as, but not limited to, inventory, sales shipments and marketing data.

11. Purchase, operate and maintain as required by Armstrong the hardware and communications capability to support the DOD system and to electronically interface with Armstrong systems real time.

12. Support the order management process by allowing Armstrong to real time hard allocate CRA Products and to automate the replenishment of selected CRA Products at the RDC.

13. As needed, provide warehouse value-added services including, but not limited to, slip sheets, mixed pallets/mixed products and special handling (products/administrative).

14. Fill and ship orders from Armstrong for its CRA Customers providing one shipment per order, bundling multiple CRA Products on one truck and providing Armstrong with one transaction per truck and order

15. Annually submit to Armstrong a written business plan that addresses delivery, logistics, warehousing facilities, information systems development and personnel/succession plans for remainder of the Agreement.

16. Submit financial performance of RDC activity as part of annual Operation Study. ✳

W#786034 v4 - ARMSTRONG/SALES/SER AGR

 EXHIBIT 4

B-54

17.  Use best efforts to achieve the following operational performance measures and goals:

   a.  total order quantity fill rate at a minimum of 97%, and order line fill rate at a minimum of 97%;

   b.  on time delivery at the predetermined day and time;

   c.  shipping accuracy at a minimum of 99%;

   d.  inventory accuracy at a minimum of 99%;

   e.  year on year operating efficiency improvements - minimum of 3%, and

   f.  system availability during working hours of 98%.

18.  Develop a written plan, approved by Armstrong, to meet the operational performance measures and goals set forth in paragraph 17 above, if the goals are not met during any time periods specified by Armstrong.

Armstrong Operating Statement Study
2002 Calendar Year
Sea Pac Sales



EXHIBIT 5

Armstrong Operating Statement Study
2003 Calendar Year
Sea Pac Sales

| Review Complete | Armstrong Core Business | | | | Armstrong Wood | | | Non-Armstrong | | | A + B + C + D Total Non-Arm | | | Total Non-SOC | | | Total Company | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dollars | % | FTE | | Dollars | % | FTE | Dollars | % | FTE | Dollars | % | FTE | Dollars | % | FTE | Dollars | % | FTE |
| 1 GROSS SALES - TOTAL | 25,477,107 | 102.34 | | | | | | 9,375,256 | 100.12 | | 34,852,373 | 101.13 | | 34,452,346 | 100.00 | | 34,452,346 | 100.00 | |
| 2 Less: Sell of House Gross Sales | 25,477,107 | | | | | | | 9,375,256 | | | 34,852,373 | 100.00 | | 18,452,345 | 100.00 | | 18,452,345 | 100.00 | |
| 10a Direct Shipment Gross Sales | | | | | | | | | | | | | | | 0.03 | | | | |
| 3 Less: Cash Discount Allowed | 581,848 | 2.34 | | | | | | 11,472 | 0.12 | | 593,421 | 1.73 | | | | | 593,421 | 1.13 | |
| 4 Less: Returns & Allowances | | | | | | | | | | | | | | | | | | | |
| 5 NET SALES | 24,895,259 | 100.00 | | | | | | 9,363,783 | 100.00 | | 34,259,352 | 100.00 | | 18,452,295 | 100.00 | | 33,711,947 | 100.00 | |
| 6 Inventory Drop off Host Discount | | | | | | | | | | | | | | | | | | | |
| 7 Cost of goods purchased | 20,643,628 | 82.92 | | | | | | 7,104,451 | 75.87 | | 27,747,440 | 80.96 | | 16,735,447 | 90.83 | | 44,507,127 | 84.43 | |
| 8 Fuel Freight In | | | | | | | | | | | | | | | | | | | |
| 9 Less: cash (disc earned) | 757,710 | 3.20 | | | | | | 124,457 | 1.33 | | 822,167 | 2.58 | | 522,187 | 90.83 | | 522,187 | 1.75 | |
| 10 Plus: cost freight (In + Out of WH) | | | | | | | | | | | | | | | | | | | |
| 11 COST of WORK INVENTORY - Out of WH | 19,845,310 | 79.711 | | | | | | 6,979,994 | 74.54 | | 26,825,313 | 78.50 | | 18,736,047 | 90.83 | | 43,894,960 | 82.53 | |
| 12 COST OF GOODS SOLD - Direct Ship | | | | | | | | | | | | | | | | | | | |
| 13 COST OF GOODS SOLD - TOTAL | 19,845,310 | 79.71 | | | | | | 6,979,994 | 74.54 | | 26,825,313 | 78.50 | | 18,736,047 | 90.83 | | 43,894,960 | 82.53 | |
| 14 GROSS PROFIT ON SALES | 5,051,219 | 20.29 | | | | | | 2,383,789 | 25.46 | | 7,434,318 | 21.70 | | 7,462,748 | 9.17 | | 9,138,647 | 17.21 | |
| 15 Plus Return fee Income | 36,582 | | | | | | | 19,253 | | | 6,404,213 | 21.50 | | 6,435,717 | | | 49,874 | | |
| 16 | | | | | | | | | | | | | | | | | | | |
| 17 ROC ONLY: | | | | | | | | | | | | | | | | | | | |
| 18 Total Fees | | | | | | | | | | | | | | | | | | | |
| 19 Inventory Fees | | | | | | | | | | | | | | | | | | | |
| 20 Warehouse Space | | | | | | | | | | | | | | | | | | | |
| 21 Warehouse Act Fees | | | | | | | | | | | | | | | | | | | |
| 22 Outbound Transportation Fees | | | | | | | | | | | | | | | | | | | |
| 23 GROSS PROFIT ON TOTAL OPNS | 7,366,024 | | | | | | | 7,366,024 | 21.41 | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | | | | | |
| 25 SELLING EXPENSE | | | | | | | | | | | | | | | | | | | |
| 26 Compensation-Sales Managers | 105,852 | 0.43 | | | | | | 105,852 | 1.13 | | 545,333 | 1.74 | | 245,720 | 1.30 | | 751,755 | 1.61 | 25.0 |
| 27 Compensation-Sales Act | 726,200 | 2.92 | 1.0 | | | | | 663,557 | 7.07 | 9.0 | 1,191,944 | 3.48 | 3.0 | 282,010 | 1.60 | 7.0 | 731,752 | 1.43 | 18.0 |
| 28 Compensation-Detail | 24,607 | 0.10 | 0.5 | | | | | 94,425 | 1.55 | 6.0 | 120,075 | 0.51 | 16.0 | 131,406 | 0.84 | | 331,174 | 0.63 | |
| 29 Travel & Entertainment expense | 299,552 | 1.17 | 7.0 | | | | | 84,503 | 0.96 | 3.0 | 378,055 | 1.11 | 9.0 | 93,855 | 0.51 | | 257,258 | 0.49 | |
| 30 Sample Expense | 23,450 | 0.09 | | | | | | 83,477 | 0.51 | | 133,537 | 0.32 | | 473,137 | 3.53 | 7.0 | 2,101,252 | 4.15 | 25.0 |
| 31 Promo, Advtg, MrktData, ID&IAC | 240,230 | 0.97 | | | | | | 31,483 | 0.52 | | 271,363 | 0.83 | | | | | | | |
| 32 TOTAL SELLING EXPENSE | 133,530 | 0.54 | | | | | | 73,764 | 0.62 | | 215,112 | 0.63 | | | | | | | |
| 33 Warehouse wages | 1,548,090 | 6.21 | 18.5 | | | | | 655,845 | 18.53 | | 2,301,193 | 7.53 | 32.0 | 2,920,005 | 10.83 | 49.0 | 2,501,195 | 4.75 | 50.0 |
| 34 Warehouse act | | | | | | | | | | | 585,202 | 1.74 | | 851,642 | 1.61 | | 751,742 | 1.43 | |
| 35 Warehouse management exp | | | | | | | | | | | 54,437 | 1.60 | | 245,976 | 1.31 | | 331,174 | 0.63 | |
| 36 Warehouse supplies | | | | | | | | | | | 206,572 | 0.51 | | 93,855 | 0.51 | | 257,258 | 0.49 | |
| 37 TOTAL WAREHOUSE EXPENSE | | | | | | | | | | | 133,835 | 4.53 | 18.0 | 473,137 | 3.53 | 7.0 | 2,101,252 | 4.15 | 25.0 |
| 38 DELIVERY EXPENSE | | | | | | | | | | | 1,374,726 | 3.43 | | 834,048 | 4.54 | | 2,086,772 | 3.65 | |
| 39 Truck expense | | | | | | | | | | | | | | | | | | | |
| 40 Driver wages | | | | | | | | | | | 345,236 | 3.63 | | 834,048 | 4.54 | | 2,086,772 | 3.65 | |
| 41 TOTAL DELIVERY EXPENSE | | | | | | | | | | | 645,901 | 1.63 | | 819,045 | 4.54 | | 503,443 | 1.05 | |
| 42 GENERAL & ADMIN EXP | | | | | | | | | | | 639,260 | 2.90 | | | | | 1,527,226 | 2.90 | |
| 43 Executive salaries | | | | | | | | | | | 125,193 | 0.53 | 1.0 | 77,916 | 0.42 | 4.0 | 260,100 | 0.49 | 1.0 |
| 44 Office wages | | | | | | | | | | | 605,001 | 1.21 | 10.0 | 243,976 | 1.31 | | 526,976 | 1.79 | 14.0 |
| 45 Telephone expense | | | | | | | | | | | 61,000 | 0.51 | | 74,136 | 0.23 | | 187,130 | 0.22 | |
| 46 Warehouse expense | | | | | | | | | | | | | | | | | | | |
| 47 Data processing | | | | | | | | | | | 67,019 | 0.20 | | 34,551 | 0.21 | | 105,570 | 0.20 | |
| 48 Office postage & bank charges | | | | | | | | | | | 216,844 | 0.63 | | 133,247 | 0.72 | | 350,091 | 0.66 | |
| 49 Office rent | | | | | | | | | | | 120,130 | 0.22 | | 61,243 | 0.33 | | 170,343 | 0.33 | |
| 50 Insurance | | | | | | | | | | | | | | | | | | | |
| 51 TOTAL GENERAL & ADMIN EXP | | | | | | | | | | | 140,150 | 0.41 | | 47,720 | 0.25 | 4.0 | 187,845 | 0.34 | 16.0 |
| 52 TOTAL OPERATING EXPENSE | | | | | | | | | | | 1,319,751 | 4.11 | | 774,116 | 3.48 | | 2,151,140 | 0.42 | |
| 53 Net Pre-Mtkt Pymt Pretax | 214,150 | 0.43 | | | | | | 214,150 | 18.63 | 5.0 | 214,150 | 0.63 | | 215,742 | 1.43 | | 214,150 | 0.43 | 7.0 |
| 54 NET OPERATING PROFIT | 6,402,709 | | | | | | | 6,402,709 | 18.88 | | 6,402,709 | 8.88 | 53.0 | 2,149,060 | 11.53 | 11.0 | 8,552,096 | 16.22 | 70.0 |
| 55 Interest (on inventory & vendor) | | | | | | | | | | | 1,062,451 | 3.19 | 63.0 | | | 17.0 | 624,922 | 1.18 | 70.0 |
| 56 Interest Income and line Charges | | | | | | | | | | | 147,310 | 0.72 | | 34,551 | -2.45 | | 236,755 | 0.57 | |
| 57 Other | | | | | | | | | | | 70,300 | 0.21 | | 61,855 | 0.28 | | 70,900 | 0.13 | |
| 58 PROFIT /(LOSS) BEF. INC. TAX | | | | | | | | | | | 252,151 | -0.50 | | | | | (52,151) | -0.10 | |
| 59 | | | | | | | | | | | 9,302,110 | 7.44 | 63.0 | 1,550,354 | 22.73 | 11.0 | 329,776 | 0.62 | 70.0 |

**Jared Williams**

| | |
|---|---|
| **From:** | Robert H Miller [Robert_H_Miller@armstrong.com] |
| **Sent:** | Monday, August 19, 2002 1:32 PM |
| **To:** | jwilliams@seapacsales.com |
| **Cc:** | Richard K Born |
| **Subject:** | Sea-Pac RDC |

Jared, in early July, we had a conversation about your May '02 YTD RDC
expenses and the impact that the delay in the new RDC compensation was
having on Sea-Pac. At that time, I agreed to have a monthly discussion
with you and Pat over Sea-Pac's RDC expenses vs compensation from June
forward, but not retroactive. In closing, you and Pat agreed to forward
the June information as it became available and also agreed to research the
increase in warehouse rent from '00 to '02. Because your facility is
leased from a related party and the rent appears to be growing
significantly in a tight market, I asked that this expense be validated.

After not receiving the June information, we (I had Sandy Wenger, Janice
Stetter - both from CFS) followed up several times for the June
information. I then followed up with Pat last wk and learned that the
information was sent once but we never received. In any event, Pat resent
the information last wk and we are now in receipt.

As stated in my voicemail to you early last wk, I am available to discuss
at your convenience. I also stated to Pat last week that we can discuss
June and July if July information is now available.

Jared, I am available to discuss this matter as promised during our initial
call. I await to hear from you regarding available times.

Robert H. Miller
GM, Global Customer Financial Services
Phone: 717-396-5724
Fax:      717-396-6389
E-Mail:  robert_h_miller@armstrong.com



EXHIBIT 6

**Compaq**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Rick Bom | **From:** | Jared Williams |
| **Fax:** | (717) 396-8334 | **Date:** | May 15, 2002 |
| **Phone:** | | **Pages:** | 5 |
| **Re:** | RDC Service fees | **CC:** | Frank Ready and Keith Ziegler |

☐ **Urgent**   x **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

•**Comments:**

# EXHIBIT 7

# Sea-Pac Sales

Hi Frank and Rick,

Once again I want to thank you for taking the time to come out and visit during your last trip. I appreciated the candor of our dialogue. I have restated below the current trends at Sea Pac that we discussed in general terms during your visit and other related conversations. I have also added the first quarter numbers to illustrate. The numbers are now based more on direct costing of activities than general allocations.

When I became totally involved in Sea Pac a few years ago I focused on trying to adapt the business model to the margin opportunities we were provided and I believe we have reorganized Sea Pac to about as lien a model as its going to be. There are still a few remaining opportunities that I am working on – inventory turns, etc. However, I believe we have achieved the majority of our possibilities, and our present reality is as follows:

- Since inception of the RDC concept we have had to accept that it is a subsidized model from the traditional business. I know that was not and is not your objective, but it continues to be the reality. RDC services are expanding and the proportion of business activity going through that channel for us has been rising significantly – 25% of our business activity in January of 2000; 42.35% in March of 2002. With this increasing business volume and expanding service requirements (more cuts, etc ) and with the degree of cannibalization that goes with it (whatever it is) the current fee structure has the real possibility of putting us out of business if costs and related service are not adjusted and/or a more equitable fee structure is not implemented immediately.  

- As you are aware the margin dollars available to continue to subsidize RDC and to realistically invest in the traditional business have been dropping for both of us and further service/cost reductions in this segment and the related drop in customer service that would result would not be a desirable approach.

- We anticipated a 7% decline in business in 2002 from our internal economic assessment and we are tracking at just about that level. I am aware that Armstrong discounts this impact, but it is a reality and it is adding to the issues I have mentioned above. It is a sensitivity to the banking community as well, not just for us, but for northwest companies in general – they are very concerned about the impacts on their customers and are much more vigilant than is typical. We are fortunate that we have other leverage with our bank. (I have enclosed for you a typical daily news publication from this morning).

We would be fine as a company, just hunkering down to work through a recession as a normal business reality, if RDC was not creating this condition and when the recession is over we would be in a position to better service our traditional customer. The added product lines essentially "saved our bacon" for 2001. but they are also experiencing the economic effects, and will not carry the weight of these costs.

I asked Keith Ziegler to propose to you that at least the preliminary negotiated fee changes we were working with Bruce on for the RDC services be implemented retro active to January 1 immediately and then a retroactive adjustment made for any further adjustments determined in September when your analysis is complete. I am formally requesting that by this letter and hope you understand the gravity of the impacts RDC is having on Sea Pac and the difficulty I am and will have selling this as my bank lines are currently up for review It is pretty obvious, I will have to show them a reasonable number of compensating cost reductions or revenue enhancements to adjust the model to reality.

Thanks,

Jared

Enclosures as stated
cc: Keith Ziegler

6307 South 228th Street, Kent, WA 98032 • Phone (253) 796-3500 • Fax (253) 796-3507

Sea-Pac ladies

March 30, 2004

Mr. Frank Ready, President
Senior Vice-President of Sales & Marketing
Armstrong World Industries
Bldg. #701
P.O. Box 3001
Lancaster, PA 17604

Dear Frank:                          (Original mailed)

Thank you for the time you have invested in recent discussions re: how to put some profit
back into the Armstrong business at Sea Pac given the adverse effects of dual
distribution. This is obviously essential to give us the resources to continue to invest in
our Armstrong support, including other lines you would like us to distribute.

As I have articulated on many occasions, historically the reimbursement for RDC
services has been well below Sea Pac's cost in spite of our best efforts to consolidate and
integrate costs, in most cases to the detriment of our service profile for traditional
residential and commercial business. Your own studies confirmed this when you made
the most recent fee evaluation. The most recent study and fee adjustment helped to
narrow this issue, but reimbursement remains below our cost and has virtually no
provision for a fair profit for the services. Given dual distribution of commercial, it
compounds the problem because there are even less Armstrong units shipped to help
spread the fixed and semi variable costs of distribution, and of course the margins on
Armstrong commercial are now substantially impaired.

We have explored with you alternatives to alleviate this problem and I sincerely
appreciate your willingness to talk through these. However, as I understand the closure
of our discussions, you do not want to change the current model.

Given this reality, we have studied the market value of logistic services in the area, which
we also did with the Henry Company when we assumed a direct relationship with them
and they were separated out of your RDC package. The market value of these services
are much higher than the current reimbursement rate and we believe the minimum
increase in fees to Armstrong to begin to compensate (even given a substantial discount
from market) is a six (6) point increase in overall effective margin on these services.
Accordingly, effective April 1, 2004 this increase will apply. Please have your
reimbursement schedule adjusted accordingly, effective that date.

We realize you will want to do your own evaluation and perhaps consider alternatives
and we will be proactive in helping you do so. We just feel this is the best we can do in
the circumstances and we will continue to evaluate to see how it works from our end as
well. We certainly want to continue our relationship with Armstrong in a constructive

6307 South 228th Street, Kent, WA 98032 • Phone (253) 796-3500 • Fax (253) 796-3507

Mr. Frank Ready, President
Senior Vice-President of Sales & Marketing
March 30, 2004
Page 2

and proactive manner. However, we must do it in the context of profitability for Sea Pac
or obviously we will just work our way out of business. Given this adjustment we could
continue to evaluate the Hartco and Robbins lines to determine a go to market strategy.
The separate division strategy I suggested before would have to be modified and the
focus narrowed for the first year or two, but given time and growth of these products
along with ceramic we could evolve a broader specialized approach to continue to expand
these lines.

Thanks again for your help

Best Regards,

Jared R. Williams, President
SeaPac Sales Company

# Sea-PacSales

May 4, 2004

Mr. Frank Ready, Senior Vice President
Sales and Marketing
Armstrong Floor Products
Building #701
P.O. Box 3001
Lancaster, PA 17604

Dear Frank:

Hearing the news about the Formosa plant along with all of the other issues from
bankruptcy on down, I am sure you have more things on your plate than one person
should be expected to bear. I am sorry I am adding to that load.

We have completed our review of the RDC reimbursement model using the realities of
actual costs and circumstances vs. the hypothetical model from your end of the world. I
assure you if one spends a little time understanding the breadth of our area, the small
population and the associated costs per dollar of sales, agreement on RDC matters would
be a whole lot easier. 

We have tried to take the high road on finding a fair reimbursement for RDC services that
is still favorable to Armstrong. The essence of the RDC fee adjustment I mentioned in
my letter of March 30, 2004 is as follows:

1. Your freight reimbursement assumes a national common carrier discount that is not
available to us, it further assumes load factors which are not practically achievable in the
reality of our market place, and it does not contemplate the large open distances between
remote locations and absence of backhaul possibilities. We have used your model and
substituted the actual common carrier rates available to us to derive the actual equivalent
cost of this portion of the RDC fee adjustment 

2. Your administrative RDC reimbursement assumes that RDC is a minor add on to an
existing relatively fixed pool of administrative costs. RDC is a major part of our business
and along with commercial, which is now yielding a margin close to RDC; they are over
forty percent of our business and almost sixty percent of the overall Armstrong business.
These must be considered primary (not incidental) parts of the Sea Pac business and
accordingly administrative costs (less any costs clearly having no pertinence to RDC)
have been allocated to RDC pro rata

3. We have applied Armstrong's RDC markup to the actual costs (adjusted as explained
above) vs the hypothetical costs which aggregates an adjustment for April of $43,248.
Per the March 30 letter, we have charged Armstrong starting in April since we

6307 South 228th Street, Kent, WA 98032 • Phone (253) 796-3500 • Fax (253) 796-3507

B-63

Mr. Frank Ready
May 4, 2004
Page 2

have to start changing the financial trends of our Armstrong business immediately. Due to the need for the lag time required to finalize numbers each month end, certain costs have to be estimated and we will adjust any variances from actual on a one-month trailing basis. We will keep detailed working papers of all calculations and adjustments for review by your representative at your convenience.

I would suggest that we share the cost of your consultant (I believe that is Joe Bongiovanni) to come and work with me in Seattle. I believe it would be beneficial to all if we could jointly diagnose the costs of all of the distribution points in our area and start with a clean sheet of paper to see what new approaches we can jointly come up with that gives us a better mutual competitive edge, leaving a profit opportunity for Sea Pac. He could also review the cost and fee adjustments we have mentioned above.

Some of our distant locations may lend themselves to a different approach and a restructuring of our branch lay out could yield some positive opportunities if we could resolve the cost of RDC. Given a more equitable approach to the RDC service it may be very possible to define that channel more broadly to include some major customers in more distant locations. Freight has become one of the most competitive variables (even over price) in this market area and Armstrong with the RDC structure may have some untapped opportunities for both of us.

I hope this is received in the constructive intent it is sent. We want to change the discussion and our relationship with Armstrong to one of partnering and using our collective energy against the competition and we want to be able to go forward confidently in the other areas important to Armstrong.

Best Personal Regards,

Jared R. Williams

cc: Keith Ziegler

**Sea-Pac Sales**

6307 South 228th Street, Kent, WA 98032 • Phone (253) 796-3500 • Fax (253) 796-3507

June 18, 2004

Mr. Thomas R. Lewis
Manager Customer Fulfillment & Channel Logistics
Armstrong World Industries, Inc.
PO Box 3001
Lancaster, PA  17604

Re:  Seattle Distributor Operations and Transportation Audit (PRP-24128-01)

Dear Tom:

Thank you for this opportunity to be of continued service.  We hope you find this proposal acceptable and feel we can make a superior contribution.

<u>Premise:</u>

Armstrong World Industries utilizes 13 distributors nationally to support direct store delivery to The Home Depot and Lowe's accounts.  Armstrong provides inventory and orders to these distribution centers in a timely manner thus allowing for minimal space requirements while providing adequate planning and processing time for order fulfillment and transportation.  Armstrong negotiates service contracts and fees typically on an annual basis with these distributors for this specific service.

This process has generally worked quite well to date for all parties.  Over the years, however, the Armstrong Seattle distributor has complained of inadequate compensation which not only disallows a profit but results in net additional cost to his distributorship.  To date, Armstrong has not been able to rationalize this position.  In an effort to be fair and a good business partner, Armstrong has decided to utilize an external logistics consulting company to conduct an operations and transportation audit of the Seattle distributor to either define cost reduction opportunities or to defend the current practices and costs. 

As a leading logistics consulting company who has experience with Armstrong, St. Onge Company has been requested to prepare this proposal.  We thank Armstrong again for this opportunity to be of service.

<u>Scope:</u>

St. Onge Company will conduct an audit of the Seattle distribution center operation as well as outbound transportation.  The distribution center audit will include a review of:

- Layout and Flow
- Storage Aids and Handling Devices
- Supportive Facility Areas (Docks, Staging, Yards, Amenities, etc.)
- Current Practices Including Work Shifts
- Supportive Computer Systems (Planning, WMS, TMS)
- Space Utilization

*Creative Manufacturing, Distribution, Logistics Engineering*

1400 Williams Road
York, PA  17402

Phone 717-840-8181
Fax 717-840-8182

- Direct Operator Productivity
- Indirect Labor Utilization
- Operational Records
- Historical Throughput
- Operation Costing
- Management Perspective

Based upon these field observations, counts, measurements, document review and management interviews, St. Onge Company will identify current demand and capacity as well as space utilization, flow and productivity. St. Onge Company will then identify areas of improvement for space efficiency, process improvement, dock utilization, shift coverage, temporary help, work balancing, shift utilization, pick line or process layout enhancement, zoning strategies, etc. These recommendations will be reviewed with the distributor and Armstrong prior to finalization, documentation and presentation.

The Transportation Audit will include:

- Review of Contracts and Representative Costs
- Comparative review of LTL and full load standard costing (Czarlite/TL)
- As possible a comparative review of significant lanes to other carriers
- As possible a comparative review to other similar regions
- Review of mode selection
- Review (higher level) of route structure and planning
- Consideration of local/regional distribution centers or cross docks
- Consideration of the distribution traditional wholesale business as well as Home Depot/Lowe's service.

These reviews will incorporate the use of document reviews and management interviews in order to establish metrics and transportation costs. Based upon these reviews St. Onge Company will attempt to identify areas for improvement in planning, execution or other specific areas of cost reduction. As indicated, route planning, trailer utilization, timing, mode selection, rates and charges and contract conditions will service as areas of potential improvement. Where possible, comparisons to other carrier costing in and out of area as well as average costing will also be made. All findings and recommendations will be reviewed with the Seattle distributor and Armstrong prior to final documentation and presentation.

A final review of the Seattle Distributor/Armstrong Distribution agreement will also be conducted and compared in general with at least one other distributor (Baltimore/Kansas City) in terms of compliance and successful practices. Further interface definition will be reviewed relative to communication, reporting, change order, timing, service, agreement compliance, inventory plan, forecast, order drop, and specific Home Depot/Lowe's implications.

All findings will be documented and presented to the Seattle Distributor and Armstrong. It is important to note that much of the success in findings, timing and effort will rest on timely and accurate data collection and that St. Onge Company is heavily depending upon Armstrong to provide a high level of participation in this area.

**Approach:**

St. Onge Company will initiate the effort with a conference call among all parties to identify project approach, timing, team and data requirements. This will be immediately followed up with an e-mail of the project agenda and a data requirements definition. It is expected that this data will be made available upon first visit to Seattle. The initial project trip will be scheduled to the Baltimore distributor in order to establish a comparative benchmark as possible. The escorted St. Onge team will make an operational tour conducting management interviews and review operational and planning practices and costs in distribution center operations and transportation. Additionally, the Distribution Agreement with Armstrong will be reviewed in detail.

After this tour a visit to Seattle by team members will be made with approximately one week on – site planned. The next two weeks will be spent clarifying information, researching opportunities, identifying recommendations and preparing documentation. Constant communication by e-mail and telephone is expected during this 2-week period. At the end of this period, a final video conference will be conducted among all parties to review findings and identify next steps. Any final changes will be documented and final reports published.

**Project Team:**

The project team will consist of Ernie Romeo who is already known to Armstrong. Ernie's primary focus will be on distribution center operations. Ernie will be supported by Bryan Jensen, a St. Onge Company principal. While adding value to Ernie's work, Bryan's focus will be on transportation including mode utilization, routing and comparative analysis. Bryan was chosen for this role based upon previous experience and knowledge. Another St. Onge contributor will be Matthew Smoker, a logistics analyst who will contribute in data reduction and analysis as well as comparative transportation rate review. Finally we intend to have Chris Graham, an independent transportation specialist review carrier contract(s) and broad comparative analysis.

**Time:**

St. Onge Company expects the total project duration to require 3 weeks.

**Price:**

St. Onge Company has established the following fee estimate:

| Contributor | Hourly Rate | Estimated | |
| --- | --- | --- | --- |
| | | **Hours** | **Fee** |
| Ernie Romeo | $187.50 | 48 | $9,000 |
| Bryan Jensen[1] | $250.00 | 88 | $22,000 |
| Matthew Smoker | $150.00 | 16 | $2,400 |
| Chris Graham | $200.00 | 24 | $4,800 |
| TOTAL | | 176 | $38,200 |

[1] It is noted that 40 additional hours have been added to provide a contingency in the event more time is required to review the complete distribution ship-to-market and local/regional distribution within markets.

Based upon a car trip to the Baltimore distributor with 2 men and a couple of car trips to Lancaster for Armstrong reviews as well as 2 trips via air travel to Seattle and miscellaneous cost, we expect total project expenses to remain under $5,000. It is noted that expenses are passed through at cost.

St. Onge Company proposes that Armstrong World Industries establish a project budget of forty three thousand dollars ($43,000) for fee and expense. St. Onge Company will only bill for actual hours worked and actual expenses experienced not-to-exceed forty three thousand dollars ($43,000).

**Conclusion:**

We feel most comfortable with this assignment and look forward to strengthening our relationship with Armstrong. We ask that you contact us relative to clarification or direction to proceed.

Regards,

ST. ONGE COMPANY


James B. Armstrong
Vice President

Page 4

# Sea-Pac Sales Company
## *RDC Chargeback Summary*
July 2004 - June 2006

| Month | Year | Amount |
|-------|------|--------|
| July | 2004 | $ 46,266.18 |
| August | 2004 | $ 52,542.43 |
| September | 2004 | $ 51,027.90 |
| October | 2004 | $ 55,085.59 |
| November | 2004 | $ 96,977.77 |
| December | 2004 | $ 60,900.75 |
| January | 2005 | $ 50,381.36 |
| February | 2005 | $ 44,646.93 |
| March | 2005 | $ 47,439.73 |
| April | 2005 | $ 67,347.11 |
| May | 2005 | $ 72,451.31 |
| June | 2005 | $ 57,950.73 |
| July | 2005 | $ 60,502.42 |
| August | 2005 | $ 65,937.75 |
| September | 2005 | $ 69,863.35 |
| October | 2005 | $ 62,198.08 |
| November | 2005 | $ 61,143.01 |
| December | 2005 | $ 59,669.50 |
| January | 2006 | $ 30,669.34 |
| February | 2006 | $ 51,637.55 |
| March | 2006 | $ 47,737.76 |
| April | 2006 | $ 74,468.51 |
| May | 2006 | $ 91,220.22 |
| June | 2006 | $ 70,753.17 |

*Total RDC Chargeback July 2004 - June 2006*     $ 1,448,818.48

EXHIBIT 8

January 21, 2003

TO ALL DISTRIBUTORS OF THE
ARMSTRONG FLOOR PRODUCTS LINE

Subject: 2002 Performance

 Happy New Year! Enclosed is your <u>final scorecard for 2002</u>. As we close the year, let me  provide some comments regarding our total business performance.

On a wholesale-to-retail basis, we finished 2002 with total flooring -3% of plan and +2% versus the prior year. In the individual segments, residential was -6% versus our plan and +2% versus prior year. We saw a softening in our residential sheet business during the last half of 2002. Our residential tile business was up 2% over prior year, and our laminate, while it was off a very aggressive plan, finished up 39% versus prior year.

Our total commercial business finished 1% ahead of our plan and prior year. This performance was made up by our commercial sheet business being up 7% versus prior year, a 25% increase in our linoleum, and declines in our commercial tile and wall base product categories. Overall, with the challenges we faced, it was a solid year.

Another major initiative was the win-back target, and this goes to show that with clear focus and execution, we deliver truly outstanding results. We had a target to achieve 1,000 win-back retailers in North America. We finished with 2,109, which are projecting wholesale-to-retail sales of $15,536,000. This is a key initiative that we'll continue to focus on in 2003 and expand it against specific customer groups like commercial contractors, builders, builder contractors, and key retailers

2002 could be characterized as a year where we made significant investments in our product lines, implemented new programs and merchandising concepts, and added coverage at the manufacturer and distributor levels. In 2003 we need to focus on getting a return on these investments. The feedback from the 2003 kickoff meetings is that everyone is excited about the new products, programs and merchandising for 2003. The focus of 2003 is on improving our market position, improving our mix, and executing all products and programs flawlessly.

Good luck in 2003!

Sincerely,

R. K. Born
Vice President, Distributor Sales
Floor Products – Americas

CMA

Enclosure

**EXHIBIT 9**

B-70

Armstrong World Industries
Wholesale To Retailer Monthly Performance Vs Budget Report
SEA-PAC SALES COMPANY
Actual 2002 Wholesale To Retail (WTR) Net BU Sales $ vs Wholesale Budget and Prior Year - Close Date

*

| Y-T-D through December | JAN Actual | FEB Actual | MAR Actual | Q-1 TO DATE | APR Actual | MAY Actual | JUN Actual | Q-2 TO DATE | JUL Actual | AUG Actual | SEP Actual | Q-3 Actual | OCT | NOV | DEC | Q-4 | YEAR TO DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*(table data illegible due to image resolution)*

Armstrong World Industries Confidential

1/10/2003

**TAB 4**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------- x

In re          :    Chapter 11

           :

ARMSTRONG WORLD INDUSTRIES,  :    Case No 00-4471 (JKF)
INC., *et al*,         :

           :    (Jointly Administered)

     Debtors      :

           :

           :

----------------------------------------- x

In re          :

           :

ARMSTRONG WORLD INDUSTRIES,  :
INC., *et al*,         :    Adversary Proceeding No.

           :

Plaintiff,         :    _____

           :

*v*            :

           :

SEA-PAC SALES COMPANY,    :

           :

Defendant.        :

----------------------------------------- x

## SUPPLEMENTAL OBJECTION AND COUNTERCLAIMS OF ARMSTRONG WORLD INDUSTRIES, INC. WITH RESPECT TO PROOF OF CLAIM OF SEA-PAC SALES COMPANY (CLAIM NO. 4854)

TO THE HONORABLE JUDITH K. FITZGERALD,
UNITED STATES BANKRUPTCY COURT JUDGE:

    Armstrong World Industries, Inc. ("*AWI*"), as reorganized debtor, hereby

supplements its objection (the "*Supplemental Objection*"), dated July 20, 2006 [Docket No.

9683] (the "*Claim Objection*"), with respect to claims filed against AWI by Sea-Pac Sales

Company ("*Sea-Pac*") on or about November 8, 2005, as reflected in proof of claim

number 4854 (the "*Sea-Pac Claim*"), and asserts counterclaims (the "*Counterclaims*") against

Sea-Pac. In support of the Supplemental Objection and Counterclaims, AWI respectfully

represents as follows:

RLF1-3066064-1

## I.   OVERVIEW

1.     Since filing the Claim Objection, AWI has become aware of additional information relating to the Sea-Pac Claim, which requires AWI to amend the Claim Objection in order to (i) assert additional defenses to the Sea-Pac Claim, and (ii) raise additional objections to the Sea-Pac Claim to the extent it is amended or deemed amended by Sea-Pac to include additional administrative expenses with respect to actions occurring prior to the Effective Date and as to which Sea-Pac has threatened to bring suit against AWI. Moreover, AWI has become aware of claims it has against Sea-Pac, which have arisen during the pendency of AWI's chapter 11 case and are appropriately included as Counterclaims against Sea-Pac [1]

## II.   JURISDICTION

2.     On December 6, 2000 (the "*Commencement Date*"), AWI and two of its affiliated debtors each commenced a case under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). On October 2, 2006, the "Effective Date" under AWI's Fourth Amended Plan of Reorganization, As Modified, dated February 21, 2006 (the "*Plan*"), occurred, and AWI emerged from chapter 11 protection.

3.     As a result of the Counterclaims asserted herein, this is an adversary proceeding initiated by AWI pursuant to sections 502, 503 and 553 of the Bankruptcy Code and Bankruptcy Rules 7001 and 7003

4.     This Court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U S C. §§ 157 and 1334 because the issues involved arise in

---

[1]   AWI has also filed a complaint commencing suit against Sea-Pac in the United States District Court for the Eastern District of Pennsylvania, Case No  2:06-CV-4435 (the "*Pennsylvania Action*"), asserting many of the claims included herein as Counterclaims  AWI intends to stay the Pennsylvania Action pending resolution of these matters by the Court

RLF1-3068064-1

or are related to the voluntary petition for relief filed under chapter 11 of the Bankruptcy Code by AWI. Jurisdiction is also proper before this Court pursuant to section 9.3 and 9.4 of the Plan.

5.    This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157 and, accordingly, this Court has the power to enter final findings of fact and conclusions of law, subject to review under 28 U.S.C. § 158.

6.    Venue in this district is proper pursuant to 28 U.S.C. § 1409(a) because this is the district where AWI's chapter 11 case is pending.

### III.    COUNTERCLAIMS

7.    AWI has claims against Sea-Pac, which have arisen during the pendency of AWI's chapter 11 case, as follows:[2]

8.    For many years Sea-Pac has been a wholesale distributor for AWI's commercial and residential floor covering products in the Pacific Northwest. Pursuant to this arrangement, Sea-Pac agreed to warehouse, sell and distribute AWI's products to AWI's retailers and other customers in the Pacific Northwest.

9.    In the summer of 2006, AWI and Sea-Pac were involved in discussions concerning the future of the distribution relationship between the parties. On July 19, 2006, Frank Ready, President and CEO of the North American Floor Products division of AWI, sent a letter to Mr. Jared Williams, President of Sea-Pac (July 19, 2006 Letter, attached hereto as Exhibit "A"). In the letter, AWI stated that it would continue the distribution relationship with Sea-Pac until July 31, 2007. The letter further stated that: "If you [Sea-Pac] would like to exit any of those businesses [i.e. vinyl, wood, laminate, installation and all related products] as an

---

[2] AWI incorporates by reference the background information included in the Claim Objection as if fully set forth herein. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Claim Objection.

3

[AWI] distributor at any time before that date, we would be happy to discuss with you an earlier transition."

10. By letter dated September 15, 2006 from Mr. Williams to Mr. Ready, Sea-Pac accepted AWI's offer to continue the distribution relationship through July 31, 2007 (September 15, 2006 Letter attached hereto as Exhibit "B"). This letter specifically stated: "[Sea-Pac] hereby accepts [AWI]'s offer in your letter of July 19, 2006, to continue the distribution relationship between the companies. ..."

11. The July 19, 2006 and September 15, 2006 letters constitute an agreement between AWI and Sea-Pac (hereinafter referred to collectively as the "*Letter Agreement*"). Pursuant to the Letter Agreement, Sea-Pac would continue to act as AWI's distributor and warehouse and sell AWI's products to its customers in the Pacific Northwest. Pursuant to the Letter Agreement, this distribution relationship was to continue until July 31, 2007 unless AWI and Sea-Pac agreed to an earlier transition.

12. AWI relied upon Sea-Pac's promise to act as its distributor in the Pacific Northwest until July 31, 2007 unless an earlier transition date was agreed to by the parties. Although the parties continued their discussions regarding the winding up of the distribution relationship, the parties reached no further agreement

13 It was common knowledge among the employees of Sea-Pac and AWI that Sea-Pac and AWI were negotiating a transition to a different distribution relationship for AWI in the Pacific Northwest. One or more employees of Sea-Pac contacted AWI regarding the status of Sea-Pac as an AWI distributor and inquiring as to their current and future employment situation. Certain AWI sales representatives told certain Sea-Pac sales people that, "if you lose your employment with Sea-Pac and do not have a written agreement preventing you from

4

working for us, then we would be extremely interested in speaking with you about employment possibilities with AWI."

14. On Saturday, September 30, 2006, Mr. Williams emailed Paul Murfin, Vice President of Sales for AWI Floor Products. The email accused AWI of having a program of trying to hire away Sea-Pac's sales representatives. The email concluded: "I will obviously be filing a lawsuit against you for tortuous [sic] interference with my business and intentional efforts to destroy Sea-Pac. That will sit real well with the press and the other distributors."

15 In response to this email, Mr. Paul K. Murfin, Vice President of Sales for AWI Floor Products, responded, "There has been no plan to hire your people away. What we have said is that if they lose their jobs with you that we would be interested in talking to them."

16. On October 2, 2006, Mr. Terry Goodall, Director of Sales for Sea-Pac, sent a letter to all of AWI's retailers and customers in the Pacific Northwest. (October 2, 2006 letter attached hereto as Exhibit "C") This letter notified AWI's customers that AWI and Sea-Pac have come to a "strategic impasse" and have "agreed to separate and we are anxious for this to occur." Sea-Pac stated:

> "However, we realize the importance to you of having a smooth transition so this is not also disruptive to your business and commitments you have to your customers. To this end, we have been diligently negotiating with [AWI] to develop a transition plan that works for everyone.... To our surprise, we learned over this last weekend that [AWI], using our confidential information, has been secretly soliciting several of our key personnel for future employment. Accordingly, we now have to move to protect Sea-Pac from this activity. I know that each of you, as successful entrepreneurs, understand our need to do that. Unfortunately, that brings our efforts to effect a smooth transition with [AWI] to an end."

5

17    In the October 2, 2006 letter, Sea-Pac told AWI's customers of the "diversification of our product lines" and encouraged AWI's customers to purchase competing Non-AWI flooring products from Sea-Pac

18    The October 2, 2006 letter was a unilateral repudiation and material breach of Sea-Pac's obligations under the Letter Agreement. The letter effectively, unilaterally, and immediately ended the distribution relationship between AWI and Sea-Pac without notice to AWI.

19.    On October 2, 2006, in a phone call to AWI manager Jay Fike, Mr. Williams repeated his threat to sue AWI and reiterated his decision to immediately repudiate and terminate Sea-Pac's obligations and services as a distributor of AWI's products in the Pacific Northwest

20.    Because of Sea-Pac's immediate and unilateral repudiation of its obligation, AWI has incurred and continues to incur increased expenses in finding substitute distribution services, cancelled orders, increased sales cost, lost sales, and loss of reputation and goodwill

(i)    *Count I: (Breach of Contract)*

21    AWI incorporates by reference its allegations set forth in paragraphs 8 through 20 hereof, as if fully set forth herein.

22.    The July 19, 2006 letter and September 15, 2006 letter constitute a valid and enforceable agreement ("Letter Agreement") between Sea-Pac and AWI pursuant to which Sea-Pac was required to act as AWI's distributor in the Pacific Northwest until July 31, 2007 unless an earlier transition date was agreed to by the parties

23      Sea-Pac's actions and letter of October 2, 2006 constitute a unilateral repudiation and material breach of its obligations under the Letter Agreement.

24.     Sea-Pac provided no notice of its actions and intentions to unilaterally repudiate its obligations and withdraw as AWI's distributor.

25.     Sea-Pac's breach of contract has caused and will continue to cause AWI damages in excess of $75,000 in the form of increased costs and expenses in finding substitute distribution services, cancelled orders, increased sales cost, lost sales, and loss of reputation and goodwill.

26.     AWI is entitled to damages to compensate it for all such damages caused by Sea-Pac's breach of contract.

27.     To the extent Sea-Pac is entitled to an allowed administrative expense for any portion of the Sea-Pac Claim, AWI's liability for such administrative expense should be offset by the amount of damages owed to AWI as a result of Sea-Pac's breach of the Letter Agreement.

(ii)    *Count II: Anticipatory Breach of Contract —*
        *Failure to Pay Amounts Due for Goods Supplied to Sea-Pac*

28      As of the Effective Date, AWI's records reflect that a total amount of $2,011,187.33 was owed to AWI by Sea-Pac on account of goods delivered prior to the Effective Date, which amount is subject to reduction by certain credits applied in the ordinary course of the parties' business dealings.[3]

29      Although certain invoices with respect to such goods are not yet past due, Sea-Pac's actions lead AWI to believe that Sea-Pac does not intend to pay the amounts owing to

---

[3] This amount also does not reflect other amounts payable, or that may be payable, to Sea-Pac by AWI, including reimbursement of expenses for, among other things, filebacks and certain RDC functions.

AWI for such goods by due dates approaching in the very near future. To the extent that Sea-Pac fails to pay for such goods, AWI has a counterclaim against Sea-Pac that may offset AWI's liability on account of any allowed administrative expense that Sea-Pac might have against AWI.

### IV.    SUPPLEMENTAL CLAIM OBJECTION

30.    AWI hereby supplements the Claim Objection as follows:

**(i)    *The Sea-Pac Claim is Barred to the Extent it Asserts Claims Previously Asserted and Withdrawn, With Prejudice.***

31.    On August 30, 2001, Sea-Pac filed proof of claim number 3528 against AWI, asserting liquidated claims of approximately $111,500 as well as a precautionary, contingent claim in the amount of $7,000,000, all with respect to the Sea-Pac Agreements. On May 29, 2003 — well after Sea-Pac became aware of the alleged breaches asserted in the Sea-Pac Claim — Sea-Pac withdrew with prejudice such proof of claim. *See* Withdrawal of Proof of Claim [Docket No. 4841]. Accordingly, to the extent the claims asserted in the Sea-Pac Claim have already been asserted and withdrawn with prejudice, Sea-Pac is barred from re-asserting such claims.

**(ii)    *Sea-Pac's Residential Agreement Breach Claim Must Be Disallowed Because It Is Barred By the Applicable Statute of Limitations.***

32.    AWI has an additional defense to the Residential Agreement Breach Claim asserted by Sea-Pac, which is that such claim is barred, in whole or in part, by the applicable statute of limitations.

33.    Therefore, AWI requests that the Residential Agreement Breach Claim be disallowed and expunged in its entirety.

RLF1-3068064-1

(iii)    *AWI Objects to Any Amendment of the Sea-Pac*
*Claim Asserting Additional Administrative Expenses for*
*Actions Occurring Before the Effective Date of AWI's Plan.*

34.    As set forth above, AWI has been notified that Sea-Pac is likely to amend the Sea-Pac Claim to assert additional administrative expense claims, including alleged claims against AWI for tortious interference and/or other claims for allegedly misusing Sea-Pac's confidential information and/or allegedly trying to hire Sea-Pac's sales force away from Sea-Pac.

35.    AWI denies that it attempted to hire Sea-Pac's sales force away from Sea-Pac, that it misused Sea-Pac's confidential information, or that it took any action that was a breach of any contractual duty or a violation of any state or federal law and, therefore, AWI objects to the Sea-Pac Claim to the extent it is amended to assert that AWI attempted to do any of the above

## V.    NOTICE

36.    Notice of this Supplemental Objection has been provided to the United States Trustee for the District of Delaware, Sea-Pac in accordance with the address or addresses for further notice provided on the Sea-Pac Claim, and counsel of record for Sea-Pac. AWI submits that no other or further notice need be provided of this Supplemental Objection.

RLF1-3068064-1

B-80

VI.    **PRAYER FOR RELIEF**

WHEREFORE, AWI prays for entry of judgment (i) finding that Sea-Pac

breached its agreement with AWI when it unilaterally repudiated its distribution obligations and

withdrew as AWI's distributor in the Pacific Northwest, (ii) awarding AWI damages for breach

of contract, which damages should offset AWI's liability for any allowed administrative expense

of Sea-Pac, (iii) finding Sea-Pac liable for any outstanding amounts owed to AWI, which

amounts should offset AWI's liability for any allowed administrative expense of Sea-Pac,

(iv) awarding AWI its costs in this matter, and (v) granting AWI such other and further relief as

is just and proper.

Dated:    October 6, 2006    Respectfully submitted,
          Wilmington, Delaware

          Mark D. Collins (No. 2981)
          Jason M. Madron (No. 4431)
          RICHARDS, LAYTON & FINGER, P.A.
          One Rodney Square
          P.O. Box 551
          Wilmington, Delaware  19899
          (302) 651-7700

                    -and-

          Stephen Karotkin
          Debra A. Dandeneau
          WEIL, GOTSHAL & MANGES LLP
          767 Fifth Avenue
          New York, New York 10153
          (212) 310-8000

          ATTORNEYS FOR DEBTORS AND
          DEBTORS IN POSSESSION

B-82

# EXHIBIT A



Your ideas become reality.

ARMSTRONG WORLD INDUSTRIES, INC
2500 COLUMBIA AVE  LANCASTER  PA 17603
P O BOX 3001  LANCASTER  PA 17604
717 397 0611

www armstrong com

*Via Certified U.S. Mail and Facsimile (253) 796-3507*

July 19, 2006

Mr. Jared R. Williams
President
Sea-Pac Sales Company
6307 South 228th Street
Kent, WA 98032

     Re:   Sea-Pac Sales

Dear Jared:

    Based upon our many recent discussions concerning our differing business expectations, it has become apparent that the future goals of our companies are not compatible. We believe that it is not in our respective economic best interests to continue the disruptive relationship that has caused much conflict and controversy over the past several months.

    As we have already communicated to you, your RDC monthly fee "supplement" was discontinued effective April 30. That supplement was begun merely as an accommodation to you and was never meant to become permanent. We understand that that decision has led you to begin to cease performing RDC functions on behalf of Armstrong. You have rejected replenishment orders and our fee schedule. You have stated you will ship RDC products from existing inventory. We accept that decision and will no longer expect those services from you after August 31, after which we will repurchase remaining RDC inventory. You will be paid RDC fees for those services until that date according to our standard RDC fee schedule. Also, as previously stated, you should inform your bank that we will not be renewing the inventory repurchase guarantee which expires on September 30, 2006.

    This letter is notice to you that we have determined not to renew all distribution relationships between our companies for vinyl, wood, laminate, installation and all related products effective July 31, 2007. If you would like to exit any of those businesses as an Armstrong distributor any time before that date, we would be happy to discuss with you an earlier transition. In any event, if it is your preference when those transitions occur, we will repurchase at your cost, and handle reshipping for all current cartoned Armstrong inventory, unused displays or other unused merchandising materials purchased from Armstrong.

We would like to meet with you to go over the details of these changes in our relationship and to answer any questions you may have   Further, we have enclosed our response to your Proof of Claim filed in Armstrong's bankruptcy case   As you can see, we have absolute defenses to your claims   If you would like to discuss disposition of those claims at our meeting, we would be happy to do so or we will let the Bankruptcy Court deal with them   I will give you a call to discuss a convenient time and place for us to meet and work out an amicable separation of our businesses   We wish you the best in your future endeavors

Sincerely,

Frank J Ready
President & CEO
North American Floor Products

EXHIBIT B

# Sea-Pac Sales

September 15, 2006

*Via Facsimile and Certified Mail*

Mr. Frank Ready, President & CEO
North American Floor Products
Armstrong World Industries, Inc.
2500 Columbia Avenue
Lancaster, Pennsylvania 17603

Re:    *Distribution of Armstrong and AHFC by Sea-Pac Sales Company*

Dear Frank:

Unfortunately, you were unwilling to sign the transition agreement the two companies' and their lawyers spent weeks negotiating and drafting. Sea-Pac hereby withdraws that proposal.

Instead, Sea-Pac Sales hereby accepts Armstrong's offer in your letter of July 19, 2006, to continue the distribution relationships between the companies, and for Armstrong to repurchase at Sea-Pac's cost, and pay for reshipping, all current cartoned inventory, unused displays or other unused merchandising materials purchased from Armstrong, when Sea-Pac discontinues selling Armstrong products.

Sea-Pac reserves its rights with respect to Armstrong's termination of RDC services. Armstrong's notice to Sea-Pac that it was terminating those services was not sufficiently in advance to constitute a commercially reasonable notice period.

We are notifying US Bank of your instruction that Armstrong would not renew the Inventory Purchase Agreement with the bank and of Armstrong's planned termination of Sea-Pac. You are intimately aware of the arrangement with the bank and you should expect to hear from its representatives.

Best Regards,

*Jared R. Williams* JTN

Jared R. Williams, President
Sea-Pac Sales Company

cc:    Mr. Al Van Kampen

6307 South 228th Street, Kent, WA 98032 ∘ Phone (253) 796-3500 ∘ Fax (253) 796-3507

# EXHIBIT C



October 2, 2006

To Our Valued Customers:

As many of you know from recent press reports, Armstrong and Sea-Pac have come to strategic impasse on the direction of our companies. We have agreed to separate and we are anxious for that to occur. However, we realize the importance to you of having a smooth transition so this is not also disruptive to your business and commitments you have to your customers. To this end, we have been diligently negotiating with Armstrong to develop a transition plan that works for everyone. Naturally, there are a lot of business and financial complications and entanglements involved in separating such a long-standing relationship so it has been very difficult. To our surprise, we learned over this last weekend that Armstrong, using our confidential information, has been secretly soliciting several of our key personnel for future employment. Accordingly, we now have to move to protect Sea-Pac from this activity. I know that each of you, as successful entrepreneurs, understand our need to do that. Unfortunately, that brings our efforts to effect a smooth transition with Armstrong to an end. That is very unfortunate for all concerned, but given these tactics I hope you understand we have no choice.

Sea-Pac has been pursuing diversification for several years now and we are anxious to continue on that course. The diversification of our product lines is in the best interest of Sea-Pac, and in the long run, will allow us to serve you better.

We are now able to expand our product offering into some exciting new avenues we have been exploring for some time. Here are just a few of many examples:

Laminate - we have the best laminate line in the market with Quick Step and we will be adding a second line shortly with one of the best brand names in the industry.

Vinyl Composition Tile - we will be adding a new VCT line that is very high quality in comparison to competitive products, but at similar or better pricing. We are also evaluating some new roll vinyl as well.

Vinyl planks and luxury vinyl tile - We have added a floating line of patented vinyl planks (November 06) and tile (due first quarter of 07), which are revolutionary and pre-orders, are accelerating at an unbelievable pace. This will be another revolutionary advance in the flooring business - a vinyl that can be put down anywhere - basements, bathrooms, over other flooring, etc with a minimum of installation costs and problems. This is a "hot seller" for our dealers and we encourage you to get your displays as quickly as possible

A variety of new stone and wood products are on board and are being very well received in the commercial and residential community

We have consummated a lease on a new Portland facility and it will be open no later than December 1, 2006 and we are negotiating for a facility in Boise, Idaho and will be moving to Western Canada next spring

We have inaugurated a new in house trucking system beginning in October 06.

The flooring business has become innovative and fun again, so we at Sea-Pac are excited about now being positioned to add these new opportunities as they arise!

Again we apologize in advance for any complications that may arise due to the transition away from Armstrong, but we have little control over that and we will provide all the help we can. We can acquire product, within reason, from sister distributors and we have a substantial inventory to draw from. As far as we are aware, Armstrong's commercial products will also be available at Pacific Commercial and we know Armstrong will provide access to their residential products through another venue soon, but we just don't have any information who that will be

We have been an Armstrong supplier for 50 years and we certainly part with fond memories and wish them well.

We are excited about our new strategic profile and look forward to serving you

Terry Goodall
Sea-Pac Director of Sales

## CERTIFICATE OF SERVICE

I, Jason M. Madron, hereby certify that on the 6th day of October, 2006, I caused

copies of the foregoing Supplemental Objection and Counterclaims of Armstrong World

Industries, Inc. with Respect to Proof of Claim of Sea-Pac Sales Company (Claim No. 4854)

to be served upon the parties on the attached list and in the manner indicated thereon

Jason M. Madron (No. 4431)

RLF1-3068070-1

ARMSTRONG WORLD INDUSTRIES, INC.
CASE NO. 00-4471
SERVICE LIST

**Via Hand Delivery**

*(United States Trustee)*
Richard Schepacarter
Office of the United States Trustee
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE 19801-3519

Karen Lee Turner
Michael G. Busenkell
Eckert Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1360
Wilmington, DE 19801

**Via First Class Mail**

Michael M. Feinberg
Diana K. Carey
Karr Tuttle Campbell
1201 Third Avenue, Suite 2900
Seattle, WA 98102

Al Van Kampen
Rohde & Van Kampen, PLLC
1001 Fourth Avenue, Suite 4050
Seattle, WA 98154

Sea-Pac Sales Company
6307 South 228th Street
Kent, WA 98032

2

**TAB 5**

Westlaw.

Not Reported in F.Supp.                                          Page 1
Not Reported in F.Supp., 1989 WL 144938 (D.N.J.)
(Cite as: 1989 WL 144938 (D.N.J.))

Only the Westlaw citation is currently available

United States District Court, D. New Jersey.
Frank CIRILLO, et al., Plaintiffs,
v.
TICE ENTERTAINMENT INC., Defendant.
CIV. No. 89-3422XX(CSF).

Nov. 20, 1989.

OPINION

CLARKSON S. FISHER, Senior District Judge.

**\*1** The court is called upon to exercise its appellate jurisdiction, pursuant to 28 U.S.C. § 158(a), in the review of an order of the bankruptcy court which denied the application of debtor, Frank Cirillo, for a permanent injunction restraining Tice Entertainment, Inc. ("Tice") and Mark Levine from continuing a suit against the debtor in the Superior Court of New Jersey, Chancery Division, Middlesex County. This court will apply a mixed standard of review: factual determinations of the bankruptcy court will be reviewed under a "clearly erroneous" standard, and legal questions will be examined under plenary review. See Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 84 (3d Cir.1988).

The dispute which is the basis for the superior court action arose from a contractual relationship between Cirillo and Tice. The two parties executed a contract on July 1, 1987, under which Tice became the personal manager of Cirillo, an entertainer. The terms of the contract required all of Cirillo's entertainment compensation to be paid directly to Tice, which, entertainment compensation to be paid directly to Tice, which, after deducting expenses, would pay 75% to Cirillo. The contract precluded Cirillo from performing in any way unless such performance was arranged through Tice. Tice was required to use its best efforts to promote Cirillo and also to provide Cirillo with a base salary of $26,000.00 per year. (See plaintiff-appellant's brief, Exhibit 1).

Cirillo filed a bankruptcy petition on May 4, 1988. On October 31 of that year he began performing at the SHOWBOAT Hotel, Casino and Bowling Center ("SHOWBOAT") in Atlantic City, New Jersey, with

Robert D'Andrea. The compensation for this engagement was paid directly to D'Andrea, who, in turn, paid Cirillo. No funds were paid to Tice. Tice filed suit on November 22, 1988, in the New Jersey Superior Court against Cirillo for breach of contract and against D'Andrea for tortious interference with the contractual relationship of Cirillo and Tice. The bankruptcy court temporarily enjoined Tice and Levine from proceeding with the state court action and scheduled a show cause hearing for April 24, 1989, on whether the injunction should continue. It is the bankruptcy court ruling of April 24, which discharged the injunction, from which Cirillo now appeals.

The bankruptcy court determined that prior to Cirillo's filing of his bankruptcy petition, the contractual relationship between the parties was problem free. Tr. 13. This was a factual determination by the bankruptcy court and is therefore reviewed by this court under a "clearly erroneous" standard. There is no evidence to dispute this finding. Accordingly, it will not be disturbed.

This court will now review the bankruptcy court's legal determinations, under a plenary standard. The bankruptcy court assumed, without deciding, that the contract between Cirillo and Tice is not an executory contract. Tr. 3. It determined that Tice did not have any cause of action against Cirillo until Cirillo appeared at the SHOWBOAT on October 31, 1988, and accepted compensation directly, without first channelling it through Tice, as required by the contract. Since this conduct occurred after Cirillo had filed his bankruptcy petition, the court determined that the dispute was governed by Matter of M. Frenville Co., Inc., 744 F.2d 332 (3d Cir.1984), cert. denied. 469 U.S. 1160 (1985). Frenville held that the automatic stay provision of the bankruptcy law applies only to claims which arose or proceedings which could have been commenced prior to the time when the bankruptcy petition was filed Id. at 335 (interpreting 11 U.S.C. § 362(a)(1)). The Frenville court relied in part on In re Anderson, 23 B.R. 174 (Bankr.N.D.Ill.1982), which held that the execution of a contract prior to the filing of a bankruptcy petition is an insufficient basis for a finding that the claim arose before the filing.

**\*2** This court is of the opinion that since Cirillo performed according to the terms of his contract with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp
Not Reported in F Supp , 1989 WL 144938 (D N J )
(Cite as: 1989 WL 144938 (D.N.J.))

Tice until the time of his engagement at the SHOWBOAT on October 31, 1988, Tice had no claim against him prior to his filing of the bankruptcy petition in May 1988. Therefore, if the contract was not an executory contract, or was an executory contract which has not been rejected by Cirillo, then *Frenville* is controlling, and the bankruptcy court was correct in discharging the injunction against Tice from proceeding with the New Jersey state court action against Cirillo.

Appellant bases his appeal on the contention that the contract was an executory contract which could be rejected pursuant to 11 U.S.C. § 365. As noted above, the bankruptcy court did not decide this issue. The Supreme Court has held that a bankruptcy court is required to state on the record why the rejection of a particular executory contract should be permitted. *See N.L.R.B. v. Bildisco and Bildisco, 465 U.S. 513, 527 (1984). [FN1]* The bankruptcy court must therefore make a determination of whether the agreement between Cirillo and Tice is an executory contract and, if so, whether it has been or should be rejected.

For the foregoing reasons this matter is remanded to the bankruptcy court for further proceedings not inconsistent with this opinion. An order accompanies this opinion. No costs.

This matter having come before the court on appeal by plaintiffs from an order of the bankruptcy court filed April 24, 1989; and the court having considered the written submissions and oral argument of counsel; and good cause appearing,

IT IS on this 20th day of November 1989

ORDERED that the action be and hereby is remanded to the bankruptcy court for further proceedings not inconsistent with the opinion of this court filed this date

> FN1. Although *Bildisco* involved a collective-bargaining agreement under Chapter 11, it was based on the policy determination that the purpose of the Bankruptcy Code is to provide for the successful rehabilitation of debtors. This same policy applies to the instant debtor
> In Chapter 7 bankruptcy cases, executory contracts are deemed to be rejected if they are not assumed by the trustee within 60 days 11 U.S.C. § 365(d)(1) When a contract is found to be executory, a

bankruptcy court should make that finding a part of the record and should indicate whether the contract has been rejected.

Not Reported in F Supp , 1989 WL 144938 (D N J )

END OF DOCUMENT

© 2007 Thomson/West No Claim to Orig. U.S. Govt. Works.

LEXSEE



Analysis
As of: Feb 16, 2007

### In re: BARCLAY BROTHERS, INC., Debtor

### Chapter 11, Bankruptcy No. 82-03920G

### UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1986 Bankr. LEXIS 6995*

### February 6, 1986, Decided

**DISPOSITION:** [*1] Debtor's objection to the claim DENIED and the claim of Friedlander, Dunn & Company ALLOWED IN THE AMOUNT OF $ 32,420.00 AS AN UNSECURED CLAIM.

**COUNSEL:** William T. Windsor, Esq., Phila., PA, for Debtor.

Stephen M. Cohen, Esq., Phila., PA, for Friedlander, Dunn & Company

**JUDGES:** BY: WILLIAM A. KING, JR., UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** WILLIAM A. KING, JR.

**OPINION:** BY: WILLIAM A. KING, JR., UNITED STATES BANKRUPTCY JUDGE

This matter comes before the Court on the debtor's objection to a proof of claim in the amount of $ 32,420.00 for accounting services rendered to the debtor for the period 1979 through 1982. For the reasons stated herein, we will allow the claim.

The facts are as follows: n1

n1 This Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Bankruptcy Rules.

Friedlander, Dunn & Company, ("creditor") together with its predecessor in interest, provided accounting ser-

vices to Barclay Brothers, Inc. ("debtor") for thirty-five (35) years. These services consisted [*2] of a compilation rather than a certified audit and were performed on both a monthly and year-end basis. The debtor was billed at an hourly rate. Prior to 1979, no substantial disputes arose between the parties as to billing policies.

Beginning in 1979, the health of Stanley Morris, sole owner of the debtor, began to deteriorate. Due in part to Mr. Morris' failing health and to general economic conditions, the debtor's financial affairs suffered.

Mr. Morris entered into an informal agreement with S. William Lapan, C.P.A., the partner who serviced the debtor's account, to allow the debtor additional time to pay for the creditor's services. This agreement contemplated payment of a standard amount on a monthly basis regardless of the quantity of services performed, with all charges in excess of this amount to be paid during the debtor's next fiscal year. The agreement contemplated a temporary deferral rather than a waiver of a portion of the fees.

Upon the death of Mr. Lapan, Jerome Kotzen, C.P.A. and senior partner of creditor, reviewed the billing status of the debtor and met with Mr. Morris to discuss payment. The amount due, as evidenced by the creditor's client ledger, is $ 32,420.00. [*3]

The debtor informed the creditor that its services were no longer needed in July, 1982. On August 19, 1982, the debtor filed a petition under Chapter 11 of the Bankruptcy Code.

We noted in the case of *In re Eastern Fire Protection, Inc., 44 B.R. 140 (Bankr. E.D.Pa. 1984),* that a proof of claim executed in accordance with *section 501*

~~Case 1:07-cv-00004-ER    Document 10-6    Filed 02/26/2007    Page 5 of 10~~

1986 Bankr LEXIS 6995, *

*of the Bankruptcy Code* and the Bankruptcy Rules is deemed allowed unless a party in interest objects. *11 U.S.C § 502*(a) The filing of the proof of claim constitutes *prima facie* evidence of the validity and amount of the claim. Bankruptcy Rule 3001(f).

Since the filing of a proof of claim has been said to be tantamount to the filing of a complaint in a civil action, see *Nortex Trading Corp v Newfield. 311 F 2d 163 (2d Cir 1962),* the trustee's formal objection to the claim is considered to be the answer to the claim under Bankruptcy Rule 9014 3 Collier on Bankruptcy P 502.01 p. 502-16 (15th ed. 1984).

Although the Bankruptcy Rules do not specify whether the claimant or the objecting party carries the burden of proof, Collier has observed that:

> "When      the trustee does make [*4] his objection within the procedural guidelines of Bankruptcy Rule 9014, that trustee carries the burden of going forward with the evidence on the issue concerning his view of the validity and the amount of the claim   . If the trustee succeeds in overcoming the prima facie effect given to the claim . . the burden, however, remains on the claimant to prove the validity of his claim by a preponderance of the evidence. The burden then rests on the court to determine whether or not the claimant has prevailed, with due regard to the probative value of the proof of claim, for, after all, whether or not the claim is to be allowed in the face of a contest remains a judicial determination.
>
> In short, the allegations made by the creditor in the proper and properly filed proof of claim are to be taken as true if they set forth all the necessary facts to establish the claim and they are not self-contradictory. Section 502(a) and Rule 3001(f), prima facie, establish the claim even in the presence of objections. Upon the filing of objections, the trustee is then called upon to produce evidence and show facts tending to defeat the claim Such evidence must be of a probative force equal to that [*5] of the allegations of the creditor's proof of claim While the burden of ultimate persuasion is always on the claimant, and while probative force is given to the allegations in that creditor's proof of claim, the trustee nonetheless carries the burden of going forward to meet, overcome, or at least equalize, what

operates in favor of the creditor by the force of section 502(a) and the Rule."

(footnotes omitted) 3 Collier on Bankruptcy, P 502.01, pp. 502-16 - 502-17 (15th ed 1984)

In the matter at bench, the debtor has failed to carry its burden of going forward with evidence disputing the validity and amount of the claim.

At the hearing, Mr. Morris was the principal witness for the debtor According to his testimony, the debtor's books show the amount owed as $ 500.00 However, he admitted that the actual amount owed exceeds $ 500.00. (N.T p 85). No evidence was presented by the debtor to show exactly how much is owed. Rather, the debtor contends that the amount owed is somewhere between $ 500.00 and $ 4,000.00.

On the other hand, the creditor submitted proof at the hearing that it rendered services to the debtor, valued at $ 32,420.00, for which it has not been [*6] paid The records of the creditor are the only detailed evidence of the amount of the outstanding debt

In conclusion, the burden was on the debtor to meet, overcome, or at least equalize the prima facie effect to be given to the creditor's proof of claim Since the testimony presented on behalf of the debtor was vague and lacking in detail, we find that the debtor has not succeeded in overcoming the prima facie effect to be given to the claim. Therefore, we will allow the claim in its entirety.

WILLIAM A. KING, JR.

UNITED STATES BANKRUPTCY JUDGE

3722 United States Court House

Philadelphia, PA 19106-1763

Dated at Philadelphia, PA,
this 6th day of February, 1986.

ORDER

AND NOW, this 6th day of February, 1986, after hearing held on the proof of claim filed by Friedlander, Dunn & Company and the debtor's objection thereto, and upon consideration of the memoranda of law filed by counsel, it is

ORDERED and DECREED that the debtor's objection to the claim is DENIED and the claim of Friedlander, Dunn & Company IS ALLOWED IN THE AMOUNT OF $ 32,420 00 AS AN UNSECURED CLAIM.

WILLIAM A. KING, JR.

1986 Bankr LEXIS 6995, *

UNITED STATES BANKRUPTCY JUDGE

3722 United States Court House

Philadelphia, [*7] PA 19106-1763

Westlaw.

Not Reported in B.R.                                                    Page 1
Not Reported in B.R., 2005 WL 670310 (Bkrtcy.D.Del.), 53 Collier Bankr.Cas.2d 1664, 44 Bankr.Ct.Dec. 127
(Cite as: Not Reported in B.R.)

**H**

In re Oakwood Homes Corp Bkrtcy D.Del.,2005.
United States Bankruptcy Court,D. Delaware
In re: OAKWOOD HOMES CORPORATION, et al.,
Debtors
OHC Liquidation Trust, by and through Alvarez &
Marshal, LLC, the OHC Liquidation Trustee,
Plaintiff,
v.
AMERICAN BANKERS INSURANCE CO.,
Defendant
**No. 02-13396PJW, ADV.No. 04-56928PBL.**

March 18, 2005.

Michael G. Busenkell, Wilmington, DE, for Debtor.

*MEMORANDUM OPINION*
LINDSEY, Bankruptcy J.
**\*1** Before the Court is the Motion of American
Bankers Insurance Company (hereafter referred to as
"Defendant") for Dismissal in Favor of Arbitration.
For the reasons stated herein, the Motion will be
denied.

### I. BACKGROUND

The Debtors, Oakwood Homes Corporation, and
certain of its affiliates (hereafter referred to as
"Debtors"), filed voluntary petitions for relief under
Chapter 11 of the Bankruptcy Code on November 15,
2002. Debtors' Second Amended Joint Consolidated
Plan of Reorganization was confirmed on March 31,
2004. The Plan provided for the creation of a
liquidating trust and vested the trust with the right to
pursue and prosecute any and all avoidance actions
on behalf of the beneficial interests in the trust.

The OHC Liquidation Trust (hereafter referred to as
"Plaintiff"), commenced this adversary proceeding
by filing a complaint on November 12, 2004 against
Defendant. Plaintiff seeks to avoid and recover
certain allegedly preferential transfers pursuant to §
547(b), or alternatively, to avoid and recovery any
fraudulent transfers pursuant to § 548 and 544(b);
to preserve any avoidable transfers for the benefit of
Debtors' estates pursuant to § 551; and to disallow
any claims of Defendant until the amount of the
avoidable transfers are repaid to the OHC Liquidation

Trust pursuant to § 502(d).[FN1] The complaint prayed
for recovery of an amount not less than
$9,760,004.62. Defendant responded to the complaint
with this Motion to Dismiss which was filed on
December 20, 2004. Briefing has been completed and
on February 15, 2005, Defendant appropriately filed
a Notice of Completion of Briefing. The Motion is
therefore, ripe for disposition at this time.

> FN1. Hereinafter, references to statutory
> provisions by section number only will be to
> provisions of the Bankruptcy Code unless
> the contrary is clearly stated.

### II. JURISDICTION AND VENUE

This Court has jurisdiction over this adversary
proceeding and the parties thereto, pursuant to 28
U.S.C. § § 1334 and 157(b)(1), and this is a core
proceeding pursuant to 28 U.S.C. § 157(b)(2), (A),
(B), (F), (H) and (O). Venue is proper in this
jurisdiction pursuant to 28 U.S.C. § 1409.

### III. DISCUSSION

Defendant American Bankers Insurance Company
has filed its Motion to Dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6), made applicable to
this adversary proceeding by Federal Rule of
Bankruptcy Procedure 7012(b), seeking an order
dismissing this action in favor of arbitration.
Defendant asserts that it and Oakwood Mobile
Homes, Inc., one of the debtors in this bankruptcy
case, are parties to a certain Insurance Services
Agreement (hereafter, the "Agreement") Section V
of the Agreement provides, in material part, that "[i]f
any dispute shall arise between the [Debtor] and
[Defendant] with reference to the interpretation of
this Agreement or their rights with respect to any
transaction involved, the dispute shall be settled by
arbitration in accordance with the rules of the
American Arbitration Association." (Exhibit A to
American Banker Insurance Co.'s Opening Brief in
Support of the Motion to Dismiss in Favor of
Arbitration, at 6)

**\*2** Defendant argues that all of the claims made by
Plaintiff are covered by § V of the Agreement, and
therefore, the complaint fails to state a claim upon

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                          Page 2
Not Reported in B.R., 2005 WL 670310 (Bkrtcy.D.Del.), 53 Collier Bankr. Cas. 2d 1664, 44 Bankr. Ct. Dec. 127
(Cite as: Not Reported in B.R.)

which relief can be granted "because all of the claims purportedly asserted in the Complaint are subject to mandatory arbitration and must be referred to arbitration pursuant to 9 U.S.C. § § 2 and 3." (Defendant's Brief in Support of the Motion to Dismiss, at 2)

Alternatively, Defendant asserts that it is well established in this district, that this Court is permitted to exercise its discretion to dismiss an adversary proceeding in favor of arbitration, notwithstanding the fact that this is a core proceeding.[FN2] (Id. at 5) Defendant has urged this Court therefore, to use that discretion and dismiss in favor of arbitration because it will be more cost effective, more expeditious than litigation, and the panel of arbitrators will presumably be more familiar with the insurance industry and the relationships involved in this dispute

> FN2. See, SFC New Holdings, Inc v. Earthgrains Co (In re GWI, Inc.), 269 B.R. 114, 117 (Bankr.D.Del.2001) (holding that "where a matter is a core proceeding, it is left to the bankruptcy court's discretion to decide whether to refer the matter to arbitration.")

Conversely, Plaintiff opposes the Motion to Dismiss arguing that a trustee cannot be compelled to arbitrate fraudulent conveyance claims under § § 544(b) and 548, as well as, any other type of claim that the trustee brings on behalf of the creditors of the bankruptcy estate, including preference claims. (Plaintiff's Answering Brief in Opposition to Defendant's Motion for Dismissal in Favor of Arbitration, at 2) Plaintiff asserts that a trustee, who stands in the shoes of the creditors, cannot be required to arbitrate disputes pursuant to an agreement that neither the creditors nor the trustee entered into. Plaintiff also contends that "[b]ankruptcy courts enjoy significant discretion to deny arbitration of core bankruptcy-created claims." (Id, at 4) Plaintiff then discusses certain factors that courts have typically looked to when determining whether to exercise their discretion in favor of dismissal Those factors include: the importance of a centralized resolution of purely bankruptcy issues, the degree to which specialized bankruptcy knowledge is required to resolve the dispute, the need to protect creditors from piecemeal litigation, whether the parties have commenced arbitration outside of bankruptcy, and whether arbitration would cause undue delay in the administration of the case

(Plaintiff's Answering Brief, at 4) (citations omitted)

The leading Third Circuit precedent on the issue of mandatory arbitration in the bankruptcy context is Hays and Company v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149 (3rd Cir 1989) In that case, the Chapter 11 trustee brought an action against a securities broker-dealer, asserting various claims under federal and state securities laws, as well as common law claims for breach of contract and fiduciary duties, gross negligence and conversion, claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), and equitable claims pursuant to § 544(b) of the Bankruptcy Code under the Uniform Fraudulent Conveyances Act as adopted by New York, New Jersey and Pennsylvania. The broker-dealer/defendant filed a motion to compel arbitration under its pre-petition agreement with the debtor. The District Court denied the motion, holding that it had discretion to nullify a mandatory arbitration clause, and stating that since neither the trustee nor the creditors represented by him signed the arbitration clause, they should not be bound by its terms. Hays, 885 F.2d at 1151.

*3 On appeal, the Third Circuit Court of Appeals held that the District Court was correct denying the motion with respect to the § 544(b) claims, because those claims were not derivative of the debtor and therefore not subject to arbitration Initially, Hays noted that the United States Supreme Court held that an arbitration agreement binds the parties who execute it and it is the parties' intentions that must then be carried out Id, at 1155 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)) The Hays Court therefore held that "there is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative from one who was a party to it." Id. at 1155. The Court noted that its conclusion in this regard was supported by Allegaert v. Perot, 548 F.2d 432 (2nd Cir.), cert denied, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977), where the trustee's complaint also contained several causes of action unique to the trustee under the Bankruptcy Act and not derivative of the bankrupt In its discussion of Allegaert, the Court stated:
(With respect to those of the trustee's claims, such as fraudulent and preferential transfers, that arose under the Bankruptcy Act, the court stated that "[t]hese are statutory causes of action belonging to the trustee, not to the bankrupt, and the trustee asserts them for the

© 2007 Thomson/West No Claim to Orig U.S Govt Works.

Not Reported in B.R.                                                                                                      Page 3
Not Reported in B.R., 2005 WL 670310 (Bkrtcy.D.Del.), 53 Collier Bankr.Cas.2d 1664, 44 Bankr.Ct.Dec. 127
(Cite as: Not Reported in B.R.)

benefit of the bankrupt's creditors, whose rights the trustee enforces "). It follows that the trustee cannot be required to arbitrate its <u>section 544(b)</u> claims and that the district court was not obliged to stay them pending arbitration.

<u>Hays,</u> 885 F.2d at 1155 (quoting <u>Allegaert,</u> 548 F.2d at 436).

With regard to the remaining issues, i.e., the non-core securities law, common law and RICO claims, *Hays* refers to a number of decisions in which debtors in bankruptcy had been held bound by mandatory arbitration agreements entered into by them pre-petition, and held "that the trustee is bound to arbitrate all of its claims that are derived from the rights of the debtor under section 541." *Id.,* at 1154.

*Hays* next examined the provisions of the Bankruptcy Code and determined that the Code does not conflict with the Arbitration Act or with the enforcement of a valid arbitration clause in a non-core adversary proceeding. *Id.,* at 1156. Therefore, *Hays* found that the District Court lacked discretion to deny enforcement in such a case.

While it is clear that bankruptcy courts do not possess discretion with respect to enforcement of an arbitration clause in a non-core adversary proceeding, it does appear manifest that such discretion exists with respect to core adversary proceedings. *In the Matter of National Gypsum Company,* 118 F.3d 1056 (5th Cir.1997) (core declaratory judgment action by debtor against liability insurer to collect pre-confirmation debts); *In re Mintze,* 288 B.R. 95 (Bankr.E.D.Pa.2003) (core proceeding to determine validity, priority and extent of lien); *In re APF Co.,* 264 B.R. 344 (Bankr.D.Del.2001) (core proceeding to recover capitation payments withheld by HMO); *American Freight Sys. v. Consumer Prods. Assocs. (In re American Freight Sys.),* 164 B.R. 341, 347 (D.Kan., 1994) (core proceeding to collect freight undercharges); *Sacred Heart Hosp. v. Independence Blue Cross (In re Sacred Heart Hosp.),* 181 B.R. 195, 202 (Bankr.D.Pa., 1995) (core proceeding).

*\*4 Although the issues before the *Hays* Court, except for the § 544(b) claims, were clearly non-core, and therefore arbitrable, the Court also made reference to circumstances in which discretion could be exercised on the issue of enforcement of an arbitration agreement. After discussing the Bankruptcy Reform Act of 1978, *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.W. 50, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (generally

ruling the jurisdictional provision of the 1978 Act unconstitutional), the 1984 amendments to the 1978 Act, and various Supreme Court cases interpreting the Arbitration Act, the *Hays* Court stated:
[W]e can no longer subscribe to a hierarchy of congressional concerns that places the bankruptcy law in a position of superiority over [the Arbitration] Act. The message we get from these recent cases is that we must carefully determine whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an arbitration clause and that we should enforce such a clause unless that effect would seriously jeopardize the objectives of the Code.

<u>Hays,</u> 885 F.2d at 1161.

In this adversary proceeding, Plaintiff urges this Court to hold that the § 547 and § 548 claims asserted by it in its complaint are entitled to precisely the same treatment as the § 544(b) claims, on the grounds that they are purely core statutory claims not derivative of the Debtor. Plaintiff contends that the § 547 and § 548 claims are those that belong solely to the trustee, and are asserted for the benefit of the creditors of the debtor. As a result, they are not arbitrable.

In *In re EXDS, Inc.,* 316 B.R. 817, (Bankr.D.Del.2004), Judge Peter J. Walsh of this Court held without discussion that a § 548 fraudulent conveyance claim, was created by the Bankruptcy Code, and that therefore, under *Hays,* he could not require such claims to be submitted to arbitration. Although the *Hays* Court referred to the trustee's statutory causes of action in *Allegaert,* collectively as claims "such as fraudulent and preferential transfers," Plaintiff does not cite, and this Court has not found, any decisions holding that § 547 preference actions may be equated with § 544(b) and § 548 actions for purposes of disposition under *Hays.* Nevertheless, this Court agrees with Plaintiff that such equation is entirely appropriate.

A preference action under § 547 is clearly a core proceeding under 28 U.S.C. § 157(b)(2)(F), as are fraudulent conveyance actions under § § 544(b) and 548, pursuant to 28 U.S.C. § 157(b)(2)(H). Neither of these may be brought by a debtor, and under no interpretation could any such action be described or construed as having been derived from the debtor. They are creatures of statute, available in bankruptcy solely for the benefit of creditors of the debtor, whose rights the trustee enforces. The arbitration agreement was entered into by Debtor, pre-petition, and as the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                      Page 4
Not Reported in B.R., 2005 WL 670310 (Bkrtcy D Del ), 53 Collier Bankr Cas 2d 1664, 44 Bankr Ct Dec 127
(Cite as: Not Reported in B.R.)

courts have made clear, it is the parties to such an agreement who are bound by it and whose intentions must be carried out. Thus, it is the view of this Court that, under *Hays,* as extended by *EXDS,* this Court may not require fraudulent conveyance actions, under either § § 544(b) or 548, or preference actions under § 547, to be submitted to arbitration

*5 Moreover, even if the § 547 and § 548 claims set forth in Plaintiff's complaint herein were determined to be derived from Debtor, the interests, policies and objectives of the Bankruptcy Code would be seriously jeopardized by requiring arbitration of such claims. Many, if not most substantial bankruptcy cases involve numerous preference and fraudulent conveyance claims. The law, and the lore surrounding the adjudication of such claims is extensive, and has been developed over significant periods of time The result is, that certain fact situations may be expected to bring about fairly consistent results, wherever they are tried. To subject these matters to arbitration, before individuals or tribunals with little or no experience in bankruptcy law or practice, and with little or no concern for the rights and interests of the body of creditors, of which the particular defendant is only one, would introduce variables into the equation which could potentially bring about totally inconsistent results. Such a result would be contrary to the primary policy of the Bankruptcy Code, which is that all classes of creditors of a debtor are entitled to be treated as equitably as possible, and that the remaining assets of a liquidating debtor are to be distributed on a pro rata basis to all creditors of a given class Thus, even if § § 547 and 548 were found to be claims derivative of the Debtor, this Court would exercise its discretion in favor of declining to enforce the arbitration agreement as contrary to the objectives of the Bankruptcy Code, and would therefore deny the motion to dismiss filed herein by Defendant

IV. *CONCLUSION*

For the foregoing reasons, the Motion of American Bankers Insurance Company for Dismissal in Favor of Arbitration is DENIED An appropriate order follows.

Bkrtcy D Del ,2005.
In re Oakwood Homes Corp
Not Reported in B R, 2005 WL 670310 (Bkrtcy D Del ), 53 Collier Bankr Cas 2d 1664, 44 Bankr Ct Dec 127

END OF DOCUMENT

© 2007 Thomson/West No Claim to Orig U S Govt Works

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, Jason M. Madron, hereby certify that on the 26th day of February, 2007, I electronically

filed the **Appellee's Appendix to Answering Brief** with the Clerk of the Court using CM/ECF

which will send notifications of such filing to the following :

>   Michael Busenkell
>   mbusenkell@eckertseamans.com
>
>   Mark David Collins
>   Collins@rlf.com
>
>   Karen Lee Turner
>   kturner@eckertseamans.com

I, Jason M. Madron, hereby certify that on the 26th day of February, 2007, I sent via Hand

Delivery Service (Local) or via First Class Mail (Non-Local) the **Appellee's Appendix to**

**Answering Brief** to the following participants:

>   **Via Hand Delivery**
>
>   *(United States Trustee)*
>   Richard Schepacarter
>   Office of the United States Trustee
>   844 King Street, Suite 2313
>   Lockbox 35
>   Wilmington, DE 19801-3519
>
>   **Via First Class Mail**
>
>   *(Attorneys for Sea-Pac Sales Company)*
>   Michael M. Feinberg
>   Diana K. Carey
>   Karr Tuttle Campbell
>   1201 Third Avenue, Suite 2900
>   Seattle, Washington 98102

**Via First Class Mail**

*(Attorneys for Sea-Pac Sales Company)*
Al Van Kampen
Rohde & Van Kampen PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154

Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
Madron@rlf.com